IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br><br>Plaintiff, )<br><br>v. )<br><br>DTE ENERGY COMPANY, and )<br>DETROIT EDISON COMPANY )<br><br>Defendants. ) | Civil Action No. |

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges:

### NATURE OF THE ACTION

1. This is a civil action brought against DTE Energy Co. and Detroit Edison Co. (collectively "Defendants" or "DTE") pursuant to Sections 113(b) and 167 of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. §§ 7413(b) and 7477, for injunctive relief and the assessment of civil penalties for violations of the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-7492, the nonattainment New Source Review ("Nonattainment NSR") provisions of the Act, 42 U.S.C. §§ 7501-7515, and the State Implementation Plan ("SIP") adopted by the State of Michigan and approved by EPA pursuant to Section 110 of the Act, 42 U.S.C. § 7410.

1

2. On or about March 13, 2010, Defendants modified, and thereafter operated, an electric generating unit known as Monroe Unit 2 at the Monroe Power Plant in Monroe County, Michigan without obtaining appropriate permit(s) authorizing the modification and subsequent operation of the modification at the unit, and without installing and employing the best available control technology ("BACT") or achieving the lowest achievable emissions rate ("LAER"), as required by the Act, to control emissions of sulfur dioxide ("$SO_2$") and nitrogen oxides ("$NO_x$"), as required by the Act. The modification was described in an April 22, 2010 article of the *Monroe Evening News* entitled "Extreme makeover: Power plant edition."

3. As a result of Defendant's operation of Monroe Unit 2 following the unlawful modification, large amounts of $SO_2$, $NO_x$, and related pollution are and will be released into the atmosphere. $SO_2$ and $NO_x$ can combine with other elements in the air to form particulate matter known as PM2.5. These pollutants cause harm to human health and the environment once emitted into the air, including premature death, heart attacks, and respiratory problems.

## JURISDICTION AND VENUE

4. This Court has jurisdiction of the subject matter of this action pursuant to Sections 113(b) and 167 of the Act, 42 U.S.C. §§ 7413(b) and 7477, and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

5. Venue is proper in this District pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the violations occurred and are occurring in this District, the facility at issue is operated by Defendants in this District, and Defendants reside in this District.

## NOTICES

6. EPA issued Defendant a Notice of Violation on June 4, 2010 and provided a copy of this Notice to the State of Michigan, as required by Section 113(a)(1) of the Act, 42 U.S.C. § 7413(a)(1).

7. The United States is providing actual notice of the commencement of this action to the State of Michigan as required by Section 113(b) of the Act, 42 U.S.C. § 7413(b).

8. The 30-day period established in 42 U.S.C. § 7413 between issuance of the Notice of Violation and commencement of this action has elapsed.

## AUTHORITY

9. Authority to bring this action is vested in the Attorney General of the United States by CAA Section 305, 42 U.S.C. § 7605, and pursuant to 28 U.S.C. §§ 516 and 519.

## THE DEFENDANTS

10. Defendant DTE Energy Co. is a Michigan corporation with its principal place of business at One Energy Plaza, Detroit, Michigan 48226-1279. Defendant Detroit Edison Co. is a Michigan corporation with the same place of business as DTE Energy Co. Detroit Edison Co. is a wholly-owned subsidiary of DTE Energy Co.

11. Defendant Detroit Edison Co. owns and operates the Monroe Power Plant, including Monroe Unit 2. Upon information and belief, DTE Energy Co. is an operator of the Monroe Power Plant, including Monroe Unit 2, because, among other things, DTE Energy Co. employees make decisions involving construction and environmental matters at the plant. In addition, as Detroit Edison's parent company, DTE Energy Co. must approve major capital expenditures at the Monroe Power Plant, such as the installation of pollution controls or the modification work at issue here.

12. Each Defendant is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

## STATUTORY BACKGROUND

13. The Clean Air Act is designed to protect and enhance the quality of the nation's air to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

<u>The National Ambient Air Quality Standards</u>

14. Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality standards") for those air pollutants ("criteria pollutants") for which air quality criteria have been issued pursuant to Section 108 of the Act, 42 U.S.C. § 7408. The primary NAAQS are to be adequate to protect the public health with an adequate margin of safety, and the secondary NAAQS are to be adequate to protect the public welfare from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

15. Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data. An area that meets the NAAQS for a particular pollutant is an "attainment" area. An area that does not meet the NAAQS is a "nonattainment" area. An area that cannot be classified due to insufficient data is "unclassifiable."

16. Defendants' Monroe Power Plant is located in Monroe County, Michigan. At all times relevant to this Complaint, Monroe County has been classified as in attainment or unclassifiable for $SO_2$, $NO_X$, and ozone, among other pollutants. At all times relevant to this Complaint, Monroe County has been classified as nonattainment for PM2.5.

17. Pursuant to 42 U.S.C. § 7410, each State must adopt and submit to EPA for approval a SIP that provides for the attainment, maintenance, and enforcement of the NAAQS. Under Section 110(a)(2) of the CAA, 42 U.S.C. § 7410(a)(2), each SIP must include a permit program to regulate the modification and construction of any stationary source of air pollution as necessary to assure that NAAQS are achieved.

The Prevention of Significant Deterioration Requirements

18. Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process. These provisions are referred to herein as the "PSD program."

19. Pursuant to CAA Section 110, 42 U.S.C. § 7410, each State must adopt and submit to EPA for approval a SIP that includes, among other things, regulations to prevent the significant deterioration of air quality under CAA Sections 161-165, 42 U.S.C. §§ 7471-7475.

20. Upon EPA approval, state SIP requirements are federally enforceable under CAA Section 113, 42 U.S.C. §§ 7413(a), (b); 40 C.F.R. § 52.23.

21. A state may comply with Section 161 of the Act by having its own PSD regulations approved as part of its SIP by EPA, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166.

22. If a state does not have a PSD program that has been approved by EPA and incorporated into the SIP, the federal PSD regulations set forth at 40 C.F.R. § 52.21 shall be incorporated by reference into the SIP. 40 C.F.R. § 52.21(a).

23. On September 16, 2008, EPA conditionally approved Michigan's PSD SIP provisions. 73 Fed. Reg. 53,366. This approval included approval of provisions relevant to this proceeding. On March 25, 2010, EPA fully approved Michigan's PSD SIP provisions, 75 Fed. Reg. 14,352. The Michigan PSD SIP provisions are codified at Michigan Admin. Code R. 336.2801 to 336.2830. The Michigan SIP adopts by reference several sets of EPA regulations, including 40 C.F.R. § 52.21. Mich. Admin. Code R. 336.2801a.

24. Section 165(a) of the Act, 42 U.S.C. § 7475(a), among other things, prohibits the construction and operation of a "major emitting facility" in an attainment area unless a permit has been issued that comports with the requirements of Section 165 and the facility employs the BACT for each pollutant subject to regulation under the Act that is emitted from the facility. Similarly, the Michigan SIP prohibits actual construction of a new source or modification of a major stationary source unless that source has obtained a permit and met several requirements, including the application of BACT. Mich. Admin. Code R. 336.2802(3), 336.2810(3) to 336.2818. Section 169(1) of the Act, 42 U.S.C. § 7479(1), designates fossil fuel fired steam electric plants of more than two hundred and fifty million British thermal units ("BTUs") per hour heat input and that emit or have the potential to emit one hundred tons per year or more of any regulated pollutant to be "major emitting facilities." Under the PSD program, a "major

6

stationary source" is defined to include fossil fueled steam electric generating plants of more than 250 million BTUs per hour heat input that emit, or have the potential to emit, one hundred tons per year or more of any regulated air pollutant. 40 C.F.R. § 51.166(b)(1)(i)(a); Mich. Admin. Code R. 336.2801(cc)(i)(A).

25. Section 169(2)(c) of the Act, 42 U.S.C. § 7479(2)(C), defines "construction" as including "modification" (as defined in Section 111(a) of the Act). "Modification" is defined in Section 111(a) of the Act, 42 U.S.C. § 7411(a)(4), to be "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." Under the Michigan SIP, "construction" means any physical change or change in the method of operation that would result in a change in emissions. Mich. Admin. Code R. 336.2801(m).

26. "Major modification" is defined at 40 C.F.R. § 51.166(b)(2)(i) as "any physical change in or change in method of operation of a major stationary source that would result in a significant emissions increase of a regulated NSR pollutant subject to regulation under the Act." Under the Michigan SIP, major modification is defined as any physical change or change in the method of operation that results in both a significant increase and a significant net increase of a regulated NSR pollutant from a major stationary source. Mich. Admin. Code R. 336.2801(aa)(i).

27. "Net emissions increase" means "the amount by which the sum of the following exceeds zero: (a) [a]ny increase in actual emissions [as defined by 40 C.F.R. § 51.166(b)(21)] from a particular physical change or change in the method of operation at a stationary source; and (b) [a]ny other increases and decreases in actual emissions [as defined by 40 C.F.R. § 51.166 (b)(21)] at the source that are contemporaneous with the particular change and are otherwise

7

creditable." 40 C.F.R. § 51.166(b)(3)(i); Mich. Admin. Code R. 336.2801(ee)(i). A "significant" net emissions increase means an increase in the rate of emissions that would equal or exceed any of the following rates for the following pollutants: 40 tons per year of $SO_2$; 40 tons per year of $NO_X$; and 25 tons per year of PM. 40 C.F.R. § 51.166(b)(23)(i); Mich. Admin. Code R. 336.2801(qq). Effective July 15, 2008, $SO_2$ is regulated as a precursor to PM2.5. 73 Fed. Reg. 28321, 28327-28 (May 16, 2008).

28.  As set forth at 42 U.S.C. § 7475(a)(4) and 40 C.F.R. § 51.166(j), a source with a major modification in an attainment or unclassifiable area must install and operate BACT, as defined in 42 U.S.C. § 7479(3) and 40 C.F.R. § 51.166(b)(12), where the modification would result in a significant net emissions increase of a pollutant subject to regulation under the Act. 42 U.S.C. § 7475(a)(4); Mich. Admin. Code R. 336.2802(3), 336.2810.

29.  The relevant law defines BACT, in pertinent part, as "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility. . . ." Section 169(3) of the Act, 42 U.S.C. § 7479(3); Mich. Admin. Code Rule 336.2801(f).

30.  Though PSD is a preconstruction permitting program, the Clean Air Act, the federal implementing regulations, and the Michigan SIP establish requirements for the lawful operation of the source following a modification.

The Nonattainment New Source Review Requirements

31. Part D of Title I of the CAA, 42 U.S.C. §§ 7501-7515, sets forth provisions for New Source Review requirements for areas designated as nonattainment for purposes of meeting the NAAQS standards. These provisions are referred to herein as "Nonattainment NSR." The Nonattainment NSR program is intended to reduce emissions of air pollutants in areas that have not attained NAAQS so that the areas make progress towards meeting the NAAQS.

32. Under Section 172(c)(5) of the Nonattainment NSR provisions of the CAA, 42 U.S.C. § 7502(c)(5), a state is required to adopt Nonattainment NSR SIP rules that include provisions that require that all permits for the construction and operation of modified major stationary sources within nonattainment areas conform to the requirements of Section 173 of the CAA, 42 U.S.C. § 7503. Section 173 of the CAA, in turn, sets forth a series of requirements for the issuance of permits for major modifications to major stationary sources within nonattainment areas. 42 U.S.C. § 7503.

33. By rule, EPA regulates $SO_2$ as a precursor to PM2.5. 73 Fed. Reg. 28321 (May 16, 2008). Until EPA approves Michigan SIP provisions related to PM2.5, 40 C.F.R. § 51 Appendix S applies to areas of PM2.5 nonattainment, including Monroe, County, Michigan. 73 Fed. Reg. 28321, 28343 (May 16, 2008). Michigan has submitted for EPA's review and approval revised Nonattainment NSR provisions that include regulation of PM2.5 precursors. If those provisions are approved, they will become federally enforceable at that time. 42 U.S.C. §§ 7413(a), (b); 40 C.F.R. § 52.23.

34. Section 173 of the Act, 42 U.S.C. § 7503, 40 C.F.R. § 51 Appendix S, and Mich. Admin. Code R. 336.2908 provide that construction and operating permits for a major modification in a nonattainment area may only be issued if, *inter alia*, (a) sufficient offsetting

9

emission reductions have been obtained to reduce existing emissions to the point where reasonable further progress towards meeting the NAAQS is made; and (b) the pollution controls to be employed will reduce emissions to the lowest achievable emission rate.

35. "Major modification" is defined in 40 C.F.R. § 51 Appendix S and Mich. Admin. Code R. 336.2901(s) as any physical change or change in the method of operation that results in both a significant increase and a significant net increase of a regulated NSR pollutant from a major stationary source.

36. "Net emissions increase" means the amount by which the sum of the following exceeds zero: (a) any increase in actual emissions from a particular physical change or change in the method of operation at a stationary source; and (b) any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable as calculated under the applicable rules. 40 C.F.R. § 51 Appendix S; Mich. Admin. Code R. 336.2901(v). A "significant" net emissions increase means an increase in the rate of emissions that would equal or exceed any of the following rates for the following pollutants: 40 tons per year of $SO_2$; 40 tons per year of $NO_X$; and 25 tons per year of PM. 40 C.F.R. § 51 Appendix S; Mich. Admin. Code R. 336.2901(gg).

37. The relevant law defines LAER, in pertinent part, as "the most stringent emissions limitation which is contained in [any SIP] for such class or category of sources, unless . . . the proposed source demonstrates that such limitations are not achievable, or . . . which is achieved in practice by such class or category of source, whichever is more stringent." 42 U.S.C. § 7501(3); Mich. Admin. Code Rule 336.2901(r).

38. Though Nonattainment NSR is a preconstruction permitting program, the Clean Air Act, the implementing regulations, and the Michigan Nonattainment NSR rules establish requirements for the lawful operation of the source following a modification.

New Source Review Reporting Requirements

39. The relevant federal regulations and Michigan SIP require sources to maintain and report certain information where there is a "reasonable possibility" that a project may qualify as a major modification. Under the rules, a reasonable possibility exists where the projected emissions increase is at least 50% of the significance level. 40 C.F.R. § 51.166(r)(6)(vi); Mich. Admin. Code R. 336.2818(3) (f)(ii). For an electric utility, where there is a reasonable possibility that the project will trigger NSR, the source is required to maintain information related to its analysis that the project is not a major modification under the law, including the basis for any emissions excluded from the calculated emissions increase. 40 C.F.R. §§ 51.165(a)(6), 51.166(r)(6)(i); Mich. Admin. Code R. 336.2818(3)(a), 336.2902(6)(a).

## ENFORCEMENT PROVISIONS

40. Sections 113(a)(1) and (3) of the Act, 42 U.S.C. § 7413(a)(1) and (3), provide that the Administrator may bring a civil action in accordance with Section 113(b) of the Act whenever, on the basis of any information available, the Administrator finds that any person has violated or is in violation of any other requirement or prohibition of, *inter alia*, the PSD or Nonattainment NSR requirements of the Act or the Michigan SIP.

41. Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes EPA to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $37,500 per day for each such violation after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C.

§ 3701, against any person whenever such person has violated, or is in violation of, *inter alia,* the requirements or prohibitions described in the preceding paragraph.

42. Section 167 of the Act, 42 U.S.C. § 7477, authorizes EPA to initiate an action for injunctive relief as necessary to prevent the construction, modification, or operation of a major emitting facility which does not conform to the PSD requirements in Part C of Title I of the Act.

## MONROE UNIT 2

43. Monroe Unit 2 is an 823 megawatt ("MW") coal-fired electrical generating unit that began operation in 1973. It is located in Monroe, Michigan, on the western shore of Lake Erie and approximately 40 miles southwest of Detroit.

44. Monroe Unit 2 emitted 27,230 tons of $SO_2$ and 8,205 tons of $NO_X$ in 2009. The Unit was the largest individual source of $SO_2$ and $NO_X$ in the state of Michigan in 2009. DTE has predicted that by 2013, Monroe Unit 2 will emit 33,816 tons of $SO_2$ and 14,494 tons of $NO_X$.

45. Monroe Unit 2 is an electric steam generating unit as that term is used in the Act and the Michigan SIP.

## GENERAL ALLEGATIONS

46. On or about March 13, 2010, DTE began a major overhaul project at Monroe Unit 2. This overhaul project included the complete replacement of two major boiler components: the high temperature reheater and the economizer, at a cost of approximately $30 million. The project as a whole cost approximately $65 million and was unprecedented in the 40-year history of the Monroe Power Plant.

47. DTE mailed a notification letter to the state of Michigan the day before starting the project.

48.     At all times pertinent to this civil action, the Monroe Power Plant as a whole and Monroe Unit 2 individually were each a "major emitting facility" and a "major stationary source," within the meaning of the Act and the Michigan SIP for $NO_X$, $SO_2$, and PM.

**FIRST CLAIM FOR RELIEF**
(PSD Violations at Monroe Unit 2)

49.     Paragraphs 1 through 48 are realleged and incorporated herein by reference.

50.     On or about March 13, 2010, Defendants commenced construction of a major modification, as defined by the Act and the Michigan SIP, that included the overhaul work described above. This major modification included one or more physical changes or changes in the method of operation at Monroe Unit 2. This major modification resulted in significant net emissions increases, as defined by the relevant PSD regulations, of one or more of the following pollutants: $NO_X$ and $SO_2$.

51.     Defendants did not comply with the PSD requirements in the Act and Michigan SIP with respect to the major modification at Monroe Unit 2. Among other things, Defendants failed to take the following actions required by the Act and the Michigan SIP with respect to the major modification at Monroe Unit 2: (i) obtain a PSD permit for the construction and operation of the major modification; (ii) undergo a BACT determination in connection with this major modification; (iii) install and operate the best available control technology for control of $NO_X$ and $SO_2$, pursuant to such BACT determination.

52.     Defendants have violated and continue to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the PSD provisions of the Michigan SIP at Monroe Unit 2. Unless restrained by an order of this Court, these and similar violations of the Act will continue.

53.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $37,500 per day for

each such violation occurring on or after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

## SECOND CLAIM FOR RELIEF

(Nonattainment NSR Violations at Monroe Unit 2)

54. Paragraphs 1 through 53 are realleged and incorporated herein by reference.

55. On or about March 13, 2010, Defendants commenced construction of a major modification, as defined by the Act and the implementing regulations, that included the overhaul work described above. This major modification included one or more physical changes or changes in the method of operation at Monroe Unit 2. This major modification resulted in a significant net emissions increase, as defined by the relevant NNSR regulations, of the pollutant $SO_2$. Under the applicable NNSR rules, Defendants are required to comply with NNSR for $SO_2$ because it is a precursor to PM2.5, and Monroe County is in nonattainment for PM2.5.

56. Defendant did not comply with the applicable Nonattainment NSR requirements under the Act and the implementing regulations with respect to the major modification at Monroe Unit 2. Among other things, Defendants failed to take the following actions required by the Act and the implementing regulations with respect to the major modification at Monroe Unit 2: (i) obtain a Nonattainment NSR permit for the construction and operation of the major modification; (ii) undergo a LAER determination in connection with this major modification; (iii) install and operate the pollution controls required by such LAER determination. In addition, Defendants have not complied with other Nonattainment NSR requirements, including the requirement to obtain and operate with federally enforceable emission offsets at least as great as the modified source's emissions.

57. Defendants have violated and continue to violate the Nonattainment NSR provisions of Part D of Title I of the Act, 42 U.S.C. §§ 7501-7515, and the implementing regulations. Unless restrained by an order of this Court, these and similar violations of the Act will continue.

58. As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $37,500, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701.

**PRAYER FOR RELIEF**

WHEREFORE, based upon all the allegations set forth above, the United States requests that this Court:

1. Permanently enjoin Defendants from operating Monroe Unit 2, including the construction of future modifications, except in accordance with the Clean Air Act and any applicable regulatory requirements;

2. Order Defendants to apply for New Source Review permit(s) under Parts C and/or D of Title I of the Clean Air Act, as appropriate, that conform with the permitting requirements in effect at the time of the permitting action, for each pollutant in violation of the New Source Review requirements of the Clean Air Act;

3. Order Defendants to remedy their past violations by, among other things, requiring Defendants to install and operate the best available control technology or lowest achievable emission rate, as appropriate, at Monroe Unit 2, for each pollutant in violation of the New Source Review requirements of the Clean Air Act;

4. Order Defendants to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act alleged above;

5. Assess a civil penalty against Defendants of up to $37,500 per day per violation;

6. Award Plaintiff its costs of this action; and,

7. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

Dated: July 27, 2010

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

JUSTIN A. SAVAGE
Senior Counsel
THOMAS A. BENSON
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20530
(202) 514-5261
thomas.benson@usdoj.gov

                    BARBARA L. McQUADE
                    United States Attorney


                    <u>s/with consent of Ellen Christensen</u>
                    Assistant U.S. Attorney
                    211 W. Fort St., Suite 2001
                    Detroit, Michigan 48226-3211
                    (313) 226-9112
                    ellen.christensen@usdoj.gov
                    P29574

OF COUNSEL:
SABRINA ARGENTIERI
MARK PALERMO
SUSAN PROUT
Associate Regional Counsel
United States Environmental
  Protection Agency, Region 5
77 W. Jackson Blvd.
Chicago, IL  60604

APPLE CHAPMAN
Attorney Adviser
United States Environmental
  Protection Agency
1200 Pennsylvania Ave. NW
Washington D.C. 20460