# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

     Plaintiff,

     v.

DTE ENERGY COMPANY and
DETROIT EDISON COMPANY,

     Defendants.

Civil Action No.
2:10-cv-13101-BAF-RSW

Judge Bernard A. Friedman

Magistrate Judge R. Steven Whalen

## DEFENDANTS' MOTION TO STRIKE
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants DTE Energy Company and Detroit Edison Company (collectively, "Detroit Edison"), through their undersigned counsel, submit their Motion to Strike Plaintiff's (United States Environmental Protection Agency, or "EPA") Motion for Preliminary Injunction. In support of this Motion, Detroit Edison respectfully refers the Court to its Brief in Support, filed herewith.

Pursuant to E.D. Mich. LR 7.1(a), on August 17, 2010, Detroit Edison's counsel conferred with counsel for EPA to explain the nature of this Motion and its legal basis, and to request concurrence in the relief requested in this Motion; such concurrence was not forthcoming, thus necessitating the filing of this Motion.

WHEREFORE, Detroit Edison respectfully requests that this Court grant its Motion to Strike EPA's Motion for Preliminary Injunction, or grant such further relief as this Court may deem appropriate.

Respectfully submitted, this 18th day of August 2010.

<u>/s/ Matthew J. Lund</u>

Matthew J. Lund (P48632)
Pepper Hamilton LLP
100 Renaissance Center, 36th
Floor
Detroit, Michigan 48243
lundm@pepperlaw.com
(313) 393-7370

Michael J. Solo (P57092)
Office of the General Counsel
DTE Energy
One Energy Plaza
Detroit, Michigan
solom@dteenergy.com
(313) 235-9512

*Counsel for Defendants*

*applications for admission
to E.D. Mich. pending*

F. William Brownell*
brownell@hunton.com
Mark B. Bierbower*
mbierbower@hunton.com
Makram B. Jaber*
mjaber@hunton.com
James W. Rubin*
jrubin@hunton.com
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
(202) 955-1500

Brent A. Rosser*
Hunton & Williams LLP
101 South Tryon Street
Suite 3500
Charlotte, North Carolina 28211
brosser@hunton.com
(704) 378-4707

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record as follows:

> Ellen E. Christensen
> U.S. Attorney's Office
> 211 W. Fort Street
> Suite 2001
> Detroit, MI 48226
> 313-226-9100
> Email: ellen.christensen@usdoj.gov

> Thomas Benson
> U.S. Department of Justice
> Environmental and Natural Resource Div.
> Ben Franklin Station
> P.O. Box 7611
> Washington, DC 20044
> 202-514-5261
> Email: Thomas.Benson@usdoj.gov

I further certify that I have mailed by United States Postal service the paper to the following non-ECF participants:

> Ignacia S. Moreno
> Justin A. Savage
> U.S. Department of Justice
> Environmental and Natural Resource Div.
> Ben Franklin Station
> P.O. Box 7611
> Washington, DC 20044
> 202-514-5261

> Sabrina Argentieri
> Mark Palermo
> Susan Prout
> Associate Regional Counsel
> United States Environmental Protection Agency, Region 5
> 77 W. Jackson Blvd.
> Chicago, Illinois 60604

Barbara L. McQuade
United States Attorney
211 W. Fort St., Suite 2100
Detroit, Michigan  48226-3211
(313) 226-9112

Apple Chapman
Attorney Adviser
United States Environmental Protection Agency
1200 Pennsylvania Ave. NW
Washington D.C. 20460

This 18th day of August, 2010.

/s/ Matthew J. Lund

### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

DTE ENERGY COMPANY and
DETROIT EDISON COMPANY,

      Defendants.

Civil Action No.
2:10-cv-13101-BAF-RSW

Judge Bernard A. Friedman

Magistrate Judge R. Steven Whalen

### BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO
### STRIKE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## STATEMENT OF ISSUE PRESENTED

Whether this Court should strike Plaintiff's Motion for Preliminary Injunction where the Motion was submitted without proper notice or conference with Defendants, seeks permanent relief on issues that require extensive discovery and expert analysis that cannot be fully and fairly accomplished in an expedited manner, and effectively necessitates trial of this dispute in a cursory fashion that significantly prejudices Defendants.

Defendants' answer:  Yes.

## <u>CONTROLLING OR OTHER APPROPRIATE AUTHORITY</u>

*Lowrey v. Beztak Properties*, No. 06-13408, 2009 WL 309390 (E.D. Mich. Feb. 3, 2009)

*Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1 (1st Cir. 2009)

*University of Texas v. Camenisch*, 451 U.S. 390 (1981)

E.D. Mich. Local Rule 7.1(a)

## INTRODUCTION

Defendants DTE Energy Company and Detroit Edison Company (collectively, "Detroit Edison") respectfully submit the following brief in support of their motion to strike Plaintiff's (United States Environmental Protection Agency, or "EPA") motion for a preliminary injunction.

EPA filed this lawsuit on August 5, 2010.  The Complaint, which contains no allegations of imminent irreparable harm, alleges that Detroit Edison performed work on a coal-fired electric generating unit in Monroe, Michigan, without obtaining certain permits, and without installing what EPA contends to be required additional pollution controls.  The Complaint seeks permanent injunctive relief and civil penalties.  The lawsuit follows extensive requests for information by EPA, and dialogue between the parties related to the work performed by Detroit Edison on Monroe Unit 2.  Notwithstanding ongoing dialogue with Detroit Edison, on August 6, 2010, without proper notification or the pre-filing conference mandated by Local Rule 7.1, EPA filed a Motion for Preliminary Injunction, asking this Court to order Detroit Edison to expend hundreds of millions of dollars on what EPA alleges to be required additional controls on the unit at issue, as well as many millions more on controlling other units on the Detroit Edison system that have nothing to do with the alleged violation or work at Monroe Unit 2.  This request for a mandatory injunction comes at this preliminary stage, where neither Detroit Edison nor the Court has the benefit of a developed evidentiary record.

By any measure, this is a complex dispute.  Over the past decade, EPA, states and/or citizens have filed at least 30 similar cases involving over 420 utility projects throughout the United States, and EPA—indeed no party—has ever sought resolution through preliminary injunctive relief.  There is a reason why this extraordinary relief has never been sought.  A case of this nature is an enforcement action that necessitates extensive fact discovery, expert analysis

and extensive briefing before a reasoned resolution may be reached through dispositive motions or a trial on the merits. EPA itself acknowledges that this case "involves the application of a broad and intricate statutory and regulatory framework which has not been commonly litigated in the District." Doc. No. 2 at 1.[1]  As discussed below, Detroit Edison would be significantly prejudiced if this Court were to countenance what is an attempt by EPA to enforce its position by ambush. In effect, EPA's motion seeks to establish liability and a permanent remedy without discovery and without the benefit of a trial on the merits. EPA's attempt to try the merits of this case under the guise of a preliminary injunction should be rejected.

**BACKGROUND AND PROCEDURAL HISTORY**

Given the unprecedented nature of EPA's motion and the substantial relief it seeks, Detroit Edison believes a summary of the background will aid the Court in understanding the issues, the history of EPA's environmental enforcement initiative, and the events that preceded the filing of EPA's lawsuit and motion for a preliminary injunction.

**A.      Detroit Edison.**

Detroit Edison is an energy company headquartered in Detroit, and has provided electricity to Michigan residents and businesses since the early 1900s. Declaration of Skiles W. Boyd ("Boyd Decl.") (Ex. A) at ¶ 3. Detroit Edison's system of generating facilities includes nuclear, hydroelectric, natural gas-fired and coal-fired plants. *Id.* at ¶ 2. The Monroe power plant consists of four coal-fired electric generating units (Units 1-4) placed in service in the early 1970s, and each year produces approximately 35% of Detroit Edison's total electrical power and 44% of its total fossil power. *Id.* at ¶ 3. The Monroe plant is one of the largest employers and

-----

[1] Citations to "Doc. No." in this brief refer to the docket entries on the Court's PACER system.

taxpayers in Monroe County, employing approximately 400 permanent employees and 100 long-term contract employees. *Id.*

Given the current economic climate and the recent heat wave, Detroit Edison recognizes more than ever the importance of providing and maintaining a stream of safe, reliable and affordable electricity to residents and businesses in Michigan. As a regulated public utility under the jurisdiction of the Michigan Public Service Commission, Detroit Edison has a duty to maintain an adequate supply of generating capacity so that electricity is available upon demand at reasonable cost. *Id.* at ¶ 4. The safe, reliable and continued operation of Monroe Unit 2 is a critical component of meeting that demand. *Id.* Monroe Unit 2 alone supplies electricity to over 100,000 residential customers and businesses in southeast Michigan. *Id.*

Though EPA's brief attempts to create the impression that Detroit Edison has supplied this electricity to Michigan residents and businesses in an environmentally irresponsible manner, quite the opposite is true. Detroit Edison has substantially decreased its emissions, including of sulfur dioxide ($SO_2$) and nitrogen oxides ($NO_x$), over the years, and is currently decreasing them at an accelerated pace. *Id.* at ¶ 5. At the Monroe plant in particular, Detroit Edison has reduced annual $SO_2$ emissions by approximately 63% and annual $NO_x$ emissions by approximately 62% since the late 1970s. *Id.* More recently, Detroit Edison has embarked on a $2 billion program to install advanced $SO_2$ and $NO_x$ controls at Monroe. *Id.* In 2005-2006, Detroit Edison installed a second generation of low-$NO_x$ burners on Monroe Units 1-4 (the first generation Low-NOx burners were installed in the mid-1990s). *Id.* After several years of construction, Detroit Edison started operating Selective Catalytic Reduction ("SCR") systems on Monroe Units 1 and 4 in 2004, and on Unit 3 in 2007; and Flue Gas Desulfurization ("FGD") systems on Monroe Units 3

3

and 4 in 2009.[2]  *Id.*  Construction work has already started on FGDs for Monroe Units 1 and 2, with planned final connection and start-up in 2014.  *Id.*  Finally, Detroit Edison plans to start of construction on the Unit 2 SCR in 2011, with completion and start-up in 2014.  *Id.*  When Detroit Edison's $2 billion controls plan is complete, all four Monroe units will be operating with low-$NO_x$ burners, SCRs, and FGDs, creating one of the cleanest and most efficient coal-fired power plants in the country.  *Id.*

**B.    The Monroe Unit 2 Work.**

A coal-fired boiler is a complex collection of tubes and tube components (*e.g.*, economizers, reheaters and superheaters).  Boyd Decl. at ¶ 6.  Water is heated and turned to steam, which then turns a turbine to generate electricity.  *Id.*  Because Detroit Edison's facilities are subject to harsh operating conditions, Detroit Edison must frequently repair and replace deteriorating tubes and related components.  Like every other electric utility company in the country, Detroit Edison regularly performs maintenance activities to ensure its units run efficiently and safely—without interruption and without injury to its workforce.  *Id.*  Like every other utility in the country, Detroit Edison periodically removes its units from service for up to three months to perform this maintenance work.  *Id.*

Before commencing this work, Detroit Edison submits a planned outage notification to Michigan's air permitting authority—the Michigan Department of Natural Resources and the Environment ("MDNRE").  *Id.* at ¶ 7. These notifications have been discussed with and are regularly submitted to MDNRE in accordance with the applicable regulations and Detroit Edison policy.  *Id.*  They explain in detail the scope and purpose of the project, the length of the

---

[2] SCRs and FGDs are the very types of control equipment that EPA is asking be installed at Monroe Unit 2 as a result of this lawsuit.

particular outage, whether the project will result in any significant increase of emissions from the unit, and whether or not Detroit Edison believes the project is a "major modification" that could trigger permitting obligations under the Clean Air Act ("CAA") which are contained in Michigan's State Implementation Plan ("SIP"). That SIP governs certain emission sources within the State, including Monroe Unit 2, and is administered by MDNRE. *Id.*

In general, these provisions require a utility to obtain a preconstruction permit when a new source is built or when an existing major stationary source constructs a "major modification." *See* 40 C.F.R. § 52.21(b)(2)(i). While there are differences in the details of the definition of "major modification" under the Prevention of Significant Deterioration ("PSD") and Nonattainment New Source Review ("NNSR") programs—the two New Source Review ("NSR") programs at issue here—an inherent part of both definitions is the identification of the kinds of activities that are *not* "major modifications." Projects that constitute "routine maintenance, repair or replacement" ("RMRR") are not "major modifications." *See* 40 C.F.R. § 52.21(b)(2)(iii). Nor are projects that do not result in a significant emissions increase. *See* 40 C.F.R. § 52.21(b)(2)(i).

The work at Monroe Unit 2 involved primarily economizers and reheater replacements. Boyd Decl. at ¶ 8. Detroit Edison sent an outage notification to MDNRE before this work began, explaining why the work was RMRR, and would not result in a significant emissions increase. *Id.*; Letter from Kelly L. Guertin (Detroit Edison) to William Presson (MDNRE) dated March 12, 2010 (Ex. B).[3] Detroit Edison concluded that its planned work did not trigger any

---

[3] EPA's observation that Detroit Edison's pre-project notification was sent to MDNRE one day before construction commenced requires clarification. Detroit Edison regularly communicates with MDNRE and MDNRE was informed of the Monroe Unit 2 project before the final submission. Boyd Decl. at ¶ 6. Moreover, the applicable rules explicitly provide that such
…continued

permitting obligations under the CAA and/or Michigan's SIP.  Ex. B at 3.  MDNRE did not

question Detroit Edison's determination at the time it received Detroit Edison's notification.

Boyd Decl. at ¶ 8.  Nor has MDNRE questioned it since that time.  *Id.*  The work at Monroe Unit

2 commenced on March 13, 2010, and concluded on June 20, 2010.  *Id.*

## C.     EPA's Initial Challenge to the Monroe Unit 2 Work.

Citing a local newspaper article, EPA challenged the Monroe Unit 2 work for the first

time on May 28, 2010, stating that the Monroe Unit 2 work constituted a "major modification"

under the CAA and Michigan SIP.  Letter from Phillip A. Brooks (EPA) to Michael J. Solo

(Detroit Edison) dated May 28, 2010 (Ex. C).  In that same letter, which EPA sent to Detroit

Edison on the Friday before the Memorial Day holiday weekend, EPA demanded that Detroit

Edison produce within one business day "any additional information" Detroit Edison believed

supported its "contention that the work done during this outage does *not* require a permit."  *Id.* at

2.  Despite this short period of time, Detroit Edison did its best to respond to EPA's request, and

submitted a letter to EPA on June 1 (the day after Memorial Day) explaining the bases for its

conclusions.  Letter from Michael J. Solo (Detroit Edison) to Sabrina Argentieri (EPA) dated

June 1, 2010 (Ex. D).  Unsatisfied with this response, EPA responded with a flurry of Section

114 administrative requests for additional information.[4]  *See, e.g.*, Letter from Phillip A. Brooks

(EPA) to Michael J. Solo (Detroit Edison) June 2, 2010 (Ex. E).  Detroit Edison again did its best

_____

a notification, if required, be submitted "before beginning actual construction."  Michigan Air
Rule 336.2818.  Detroit Edison complied with the applicable Michigan regulation.

[4] In general, Section 114 of the CAA authorizes EPA to request information from any
person who owns or operates any emissions source for purposes of, among other things,
"determining whether any person is in violation of any … standard or any requirement" of the
CAA.  42 U.S.C. § 7414(a).

to comply, and provided EPA with additional information, usually within one or two days of the request. *See, e.g.*, Letter from Michael J. Solo (Detroit Edison) to Mark Palermo (EPA) dated June 3, 2010 (Ex. F).

EPA issued a formal "Notice and Finding of Violation" ("NOV") to Detroit Edison on June 4, asserting that the outage work at Monroe Unit 2 constituted "major modifications under the [CAA] and the Michigan implementation regulations." EPA NOV (June 4, 2010) (Ex. G). On June 8, EPA informed Detroit Edison that it had "inadvertently left off [its NOV] notice of opportunity to [Detroit Edison] to have a Section 113 conference," and asked Detroit Edison to let EPA know by June 11 if it "is interested having such a conference." Email from Mark Palermo (EPA) to Michael J. Solo (Detroit Edison) dated June 8, 2010 (Ex. H).[5]  In response to Detroit Edison's request for a conference, EPA scheduled a conference call for the afternoon of June 16.  During a short telephone call, EPA told Detroit Edison that it was not interested in discussing the legal basis for the June 4 NOV or EPA's position regarding the adequacy of the notification that Detroit Edison had provided to MDNRE before the project.  Rather, EPA presented Detroit Edison with its demand for substantial emission reductions, both at Monroe Unit 2 and elsewhere, and told the company that it had one week to accept that demand.

**D.     EPA's Complaint.**

EPA filed its Complaint on August 5.  Doc. No. 1.  EPA did so despite Detroit Edison's indication that, in light of the parties' ongoing dispute, it was managing the operation of Monroe Unit 2 to ensure there would be no increase in annual emissions from the unit for any reason, *i.e.*,

---

[5] Pursuant to Section 113 of the CAA, any NOV issued by EPA must provide the recipient with an opportunity to conference and present evidence bearing on the finding of violation, on the nature of the violation, and any efforts it may have taken or proposes to take to achieve alleged compliance. 42 U.S.C. § 7413.

even for reasons completely unrelated to the project.  Boyd Decl. at ¶ 9.  The Complaint asserts

that Detroit Edison violated the CAA when it performed the Monroe Unit 2 work without

obtaining NSR permits, and seeks injunctive relief and civil penalties.  Doc. No. 1 at 2, 15-16.

**E.      EPA's Enforcement Initiative.**

EPA's Complaint is similar to complaints it has been filing against utilities since the

waning days of the Clinton Administration, in late 1999, when EPA commenced its "utility

enforcement initiative."  At that time, EPA filed seven lawsuits against Midwestern and Southern

coal-fired utilities and an administrative action against the Tennessee Valley Authority ("TVA"),

the federal government's own utility.  These actions—which alleged widespread non-compliance

with NSR dating back to the 1970s—were based not upon any longstanding interpretation and

application of the NSR rules, but upon a new interpretation of the NSR program developed by

EPA in the late 1990s.  Before EPA launched this initiative, every utility in the country

undertook replacement projects similar to the Monroe Unit 2 work to maintain the reliability,

efficiency and safety of their generating plants.  While these projects were undertaken in full

view of EPA, the agency never claimed these projects triggered permitting requirements under

the CAA.  Before 1999, EPA determined that only *one* project at a utility triggered NSR—a

"massive" and "unprecedented" life extension at a Wisconsin Electric Power Company

("WEPCo") plant that was the subject of the decision in *WEPCo v. Reilly*, 893 F.2d 901, 911

(7th Cir. 1990).

Because EPA's positions on the meaning and application of the PSD regulations have

been inconsistent, utilities and several states have challenged EPA's enforcement initiative as an

unlawful effort to revise the NSR program to create universal liability.  In an *amicus* brief filed

with the Supreme Court, ten states—Alabama, Alaska, Colorado, Indiana, Kansas, Nebraska,

South Carolina, South Dakota, Virginia and Wyoming—debunked EPA's apparent "elaborate conspiracy theory" that "state environmental agencies" and "every major utility-industry player (and, more particularly, every major player's lawyers) either fundamentally misunderstood or blatantly ignored EPA guidance on the meaning" of the NSR regulations for over twenty years. *Compare* Brief of State of Alabama et al. as *Amici Curiae* at 14, *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (U.S. 2007) (No. 05-848) (excerpts attached as Ex. I) *with* Testimony of Bruce Buckheit before the Senate Democratic Policy Comm. (Feb. 6, 2004) (*available at* http://dpc.senate.gov/hearings/hearing11/buckheit.pdf) (stating that power companies have demonstrated a "cavalier disregard for the law over the past twenty years"). Rather, the states offered the most obvious explanation: "EPA's current litigating position just wasn't the prevailing understanding of NSR/PSD applicability during the two decades that preceded the current enforcement initiative's launch in 1999." Ex. I at 14.

Citing the states' *amicus* brief, the Supreme Court raised but did not decide the question whether EPA's interpretations could be enforced in light of "charges that the agency has taken inconsistent positions" on the meaning of the NSR regulations. *Envtl. Def.*, 549 U.S. at 581-82. At least one district court has said no, and many others have rejected EPA's interpretations under the new NSR program. *See, e.g., United States v. Duke Energy Corp.*, No. 00-cv-1262, 2010 WL 3023517, at *7 (M.D.N.C. July 28, 2010) ("The EPA is bound by its own interpretation of the PSD regulations, which have consistently referenced industry standards" for RMRR); *United States v. E. Ky. Power Coop., Inc.*, 498 F. Supp. 2d 976, 993 (E.D. Ky. 2007) (holding EPA's narrow interpretation deserves no deference where it "takes an inconsistent view of the regulations, makes inconsistent statements with respect to the regulation, and also enforces the regulation with no discernable consistency").

According to one court, EPA's "zigs and zags represented by its contradictory …
statements and rules" and its failure to speak "with one voice, or a consistent voice, or even a
clear voice, on this issue" fatally undermines EPA's claim for deference.  *United States v. Ala.
Power Co.*, 372 F. Supp. 2d 1283 (N.D. Ala. 2005).  That same court characterized EPA's
enforcement initiative as a "sport, which is not exactly what one would expect to find in a
national regulatory enforcement program."  *Id.* at n.44; *see also Duke Energy, supra*, Order
Denying Pl.'s Mot. Reconsideration (Feb. 23, 2004) at 3 (noting EPA's propensity to "sp[eak]
out of both sides of its mouth" on the issue of NSR applicability) (Ex. J).

Even after EPA changed course in 1999, however, it still did not have its story straight
about how it was supposed to apply the NSR program to utilities.  Just six months after EPA
commenced its enforcement initiative, EPA's enforcement chief conceded that "when you get
into [the] question of what's routine, you can find a substantial gray area."  Transcript:
American Bar Association Update re Clean Air Act, Part 2 (May 23, 2000), 40:4-5, 50:9-11
(emphasis added) (excerpts attached as Ex. K).  Not surprisingly, he described EPA's utility
enforcement initiative as "[p]erhaps … *reinvented enforcement*."  *Id.* at 40:4-5 (emphasis added).
Indeed, when EPA in 1999 attempted to apply its new NSR positions to TVA in an
administrative proceeding, the Eleventh Circuit rejected EPA's effort as a "patent violation of the
Due Process Clause" which "lacked the virtues of most agency adjudications."  *TVA v. Whitman*,
336 F.3d 1236, 1245-46, 1258-59 (11th Cir. 2003); *see id.* at 1261 (Barkett, J., specially
concurring) ("[C]onstitutional due process cannot be provided on an ad hoc basis under the
direction and control of the entity whose decision is being challenged.").  The court declared
EPA's order "legally inconsequential," and directed that "TVA is free to ignore [it]."  *Id.* at
1239-40.

Worse, EPA's NSR interpretations continued to fluctuate even as its enforcement initiative progressed. EPA asserted in 2002 that "[w]hether a replacement is 'common in the industry' is *irrelevant* to whether a replacement is routine," *Duke Energy, supra*, EPA's Resp. to Duke's First Req. for Admissions (Dec. 12, 2002) (emphasis added) (Ex. L), despite the fact that EPA explained in the *Federal Register* ten years earlier that the RMRR case-by-case inquiry "*must* be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant *industrial category*." 57 Fed. Reg. 32,314, 32,326 (July 21, 1992) (emphasis added). And despite its clear *Federal Register* guidance *requiring* use of an "industrial category" test, EPA stated that it did not "perform *any analysis* of whether certain projects it became aware of as part of *this enforcement initiative* [were] common in the industry as a whole." *Duke Energy, supra*, EPA's Opp'n to Duke's Mot. to Determine Sufficiency of Pl.'s Resp. to Duke's First Req. for Admissions (Aug. 4, 2003) at 10 (emphasis added) (Ex. M).

A year later, EPA stated quite differently that EPA "has *long considered* industry practice … under the interpretation of its routine maintenance exclusion that the United States relies on in this litigation." *United States v. Ala. Power*, No. 01-cv-152-VEH (N.D. Ala.), United States' Reply Regarding the Correct Legal Tests (Oct. 28, 2004) at 55 (emphasis added) (excerpts attached as Ex. N). Then, in 2007, EPA reversed course again, asserting that "EPA *did not* analyze whether similar projects were common in the industry as a whole" in connection with the enforcement litigation. *Duke Energy, supra*, EPA Mem. In. Supp. of Mot. to Vacate (Oct. 4, 2007) at 12 (emphasis added) (excerpts attached as Ex. O). At one point, EPA also stated the CAA "itself *does not* mandate the *narrow* construction" of routine, *United States v. Illinois Power Co.*, No. 99-833 (S.D. Ill.), Plaintiff's Reply to Defendants' Findings of Fact and Conclusions of Law (Sept. 5, 2003) at 3-4 (emphasis added) (excerpts attached as Ex. P), but

later took the opposite view that routine "*must be interpreted narrowly*," *Duke Energy*, *supra*,

EPA Mem. in Supp. of Mot. to Vacate (Oct. 4, 2007) at 25 (emphasis added) (Ex. O).  To say the

least, tracing the history of EPA's statements on PSD is a dizzying exercise.  Perhaps this

explains why EPA admitted in 2005 that "it can be difficult ... to know with reasonable certainty

whether a particular activity would trigger major NSR."  70 Fed. Reg. 61,081, 61,093 (Oct. 20,

2005).

In the enforcement cases that have proceeded to a final judgment after years of discovery,

EPA's theories have achieved but limited success.  For example, after several years of discovery

and two separate liability trials spanning eight days, EPA proved liability on just *six* of 129 NSR

violations initially alleged in its and the intervenors' various amended complaints in *United*

*States v. Cinergy Corp.*, No. 1:99-cv-1693-LJM-VSS (S.D. Ind.).  Similarly, a district court in

this Circuit recently held that projects similar the Monroe Unit 2 work were RMRR.  *See Nat'l*

*Parks Conservation Ass'n et al. v. Tenn. Valley Auth.*, No. 3:01-CV-71, 2010 WL 1291335, at

*26 (E.D. Tenn. Mar. 31, 2010) ("The Court finds economizer replacements to be common in the

industry."), *29 ("The Court finds superheater replacements to be common in the industry.").  In

fact, the court found all four "*WEPCo* factors"—nature and extent, purpose, frequency, and

cost—favored a finding that these projects were RMRR.  *Id.* at *24-31.

**F.     EPA's Motion for Preliminary Injunction.**

Nevertheless, EPA continues to insist that projects like the Monroe Unit 2 work trigger

permitting requirements under the CAA.  In this case, however, EPA has adopted a new strategy.

Rather than allowing Detroit Edison an opportunity for discovery, EPA filed a motion for

preliminary injunction that would, among other things, order Detroit Edison to immediately

begin the process of obtaining NSR permits for the Monroe Unit 2 work, "offset" emissions from

12

Monroe Unit 2 through reductions of emissions at Detroit Edison's other coal-fired units, submit within 30 days to the Court and to EPA its plan for achieving the annual air pollution reductions required by the order, and install pollution control equipment.  EPA Proposed Order at ¶¶ 3-7. As part of this new strategy, EPA pre-packaged its entire case on the merits—both on liability and remedy—and served its motion and brief (without attachments) on Detroit Edison on Friday afternoon, August 6, knowing that Detroit Edison would have just 24 days to respond.  E.D. Mich. L.R. 7.1(e)(1)(A) and (B); Fed. R. Civ. P. 6(d) (providing three additional days for mailing).  Since 1999, EPA, states and citizen groups have filed at least 30 NSR actions involving over 160 units and 420 projects, and have never sought preliminary injunctive relief for any project alleged to violate NSR.  The courts have invariably bifurcated liability and remedy, and they have established schedules spanning years for discovery on liability alone.

This case is more complicated than EPA's brief leads the Court to believe.  The issues raised by EPA are not subject to resolution without a developed record, expert testimony, ample opportunity for discovery, and extensive briefing.  For example, in another NSR case involving one plant, the parties did not conclude liability discovery until approximately *31 months* after EPA filed its complaint.  *United States v. Ohio Edison Co.*, No. 99-1181 (S.D. Ohio) (complaint filed 11/3/1999; close of liability discovery 6/1/2002).  Similarly, in an NSR case involving two projects, EPA proposed a discovery period on liability and remedy of over *16 months*.  Joint Status Report, *United States v. Louisiana Generating, LLC*, No. 09-100, at 7, 12 (M.D. La) (Ex. Q) (filed June 8, 2009).  In an NSR case involving *one* project—as is the case here—EPA agreed to a discovery period on *liability only* of over *14 months*.  Joint Status Report and Discovery Plan, *United States v. Ky. Utils. Co.*, No. 07-cv-75, at 2 (E.D. Ky.) (Ex. R) (filed July 31, 2007). Given the time period normally allowed for liability discovery in NSR actions appears to be at

least 14 months, EPA cannot contend that counsel for Detroit Edison should be expected to consult with their client, retain several third-party consultants, and review, prepare and file a meaningful opposition to EPA's motion on liability *and* remedy in *less than one month*. This is especially true during the month of August, when many Detroit Edison employees, the company's lawyers, and potential experts are or will be on pre-planned vacations and geographically dispersed. Moreover, EPA enjoyed unilateral discovery and an advance review of Detroit Edison documents related to the activity now alleged in the Complaint (produced in response to Section 114 information requests, starting months ago).

EPA's motion includes a 36-page brief for which it had sought and obtained an *ex parte* order for additional pages, 22 attachments spanning 494 pages, and a compact disc containing 365 pages and a computer-generated animation. Eight of the 22 attachments consist of lengthy declarations from third-party consultants hired by EPA to support its request for a preliminary injunction, including Lyle Chinkin, Ranajit Sahu, Robert Koppe, Alan Hekking, Bruce Biewald, Myron Adams, Matthew I. Kahal and Joel Schwartz. The declarations amount to full-fledged expert reports on contentious and complex technical issues, and have in every NSR case to this date taken years to develop.

EPA filed and served these extensive materials without even attempting to comply with Local Rule 7.1(a), which requires a moving party to state that "there was a conference between attorneys …in which the movant explained the nature of the motion and its legal basis and requested but did not obtain concurrence in the relief sought." E.D. Mich. L.R. 7.1(a); *see also* Practice Guidelines for Judge Bernard A. Friedman ("The Court requires strict compliance with

E.D Mich. L.R. 7.1(a) which refers to seeking concurrence of opposing counsel.").  The Court

should reject EPA's attempt to convert this proceeding into a trial by ambush.[6]

## ARGUMENT

**I.    UNDER THIS COURT'S PRECEDENT, EPA'S MOTION SHOULD BE STRICKEN AS PREMATURE AND PROCEDURALLY IMPROPER.**

Though styled as a motion for a preliminary injunction, EPA's motion invites the Court

to resolve the issues of liability and remedy at the preliminary injunction stage in the face of

sharply contested facts and without the benefit of any discovery.  In particular, much of the *final*

relief EPA requests in its Complaint is not materially different than the *preliminary* relief EPA

seeks in its motion.  In its Complaint, EPA requests that this Court:

> Order Defendants to apply for New Source Review permit(s) under Parts
> C and/or D of Title I of the Clean Air Act, as appropriate, that conform
> with the permitting requirements in effect at the time of the permitting
> action, for each pollutant in violation of the New Source Review
> requirements of the Clean Air Act.

Doc. No. 1 at 15.  In connection with its motion for preliminary injunction, EPA requests that

this Court:

> [Order] Defendants [to] apply for NSR permits under the Prevention of
> Significant Deterioration ("PSD") and nonattainment NSR ("NNSR")
> program for the project performed at Monroe Unit 2 from March to June
> 2010 … for the air pollutants for which the project was a major
> modification under applicable law ….  Defendants must obtain the
> necessary permit applications within 45 days of this Order and diligently
> pursue obtaining final permits as quickly as possible.

EPA Proposed Order at ¶ 3.  In its Complaint, EPA requests that this Court:

---

[6] Detroit Edison moves to strike EPA's motion pursuant to the inherent authority of the
Court.  *See, e.g., Farid v. Bouey*, 554 F. Supp. 2d 301, 313 (N.D.N.Y. 2008) (considering motion
to strike defendant's motion to dismiss because "request[ed] relief . . . squarely lies within the
inherent authority of the court").

> Order Defendants to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act alleged above.

Doc. No. 1 at 16.  In its motion for preliminary injunction, EPA requests that this Court:

> [Order] Defendants [to] reduce annual air pollution from the Monroe Power Plant or other coal-fired generating units in their fleet by an amount equal to the unpermitted excess emissions from Monroe Unit 2.  The annual obligation to reduce this amount of air pollution shall begin sixty days from entry of this Order … and continue until Monroe Unit 2 installs pollution controls that meet emissions limits set by NSR permits.

EPA Proposed Order at ¶ 4.

In *Lowrey v. Beztak Properties*, No. 06-13408, 2009 WL 309390 (E.D. Mich. Feb. 3, 2009), this Court adopted Magistrate Judge Morgan's recommendation to deny a similar motion for preliminary junction in part on procedural grounds. *Id.* at *4.  There, plaintiffs sued Canton Township for alleged violations of the Americans with Disabilities Act ("ADA").  *Id.* at *5.  Plaintiffs alleged that Township facilities violated the ADA because they exceeded slope levels permitted under the Act.  *Id.*  Plaintiffs requested a preliminary injunction requiring the Township to "[b]ring into compliance with ADA[] … sidewalks, curb ramps, parking and any other facilities," to construct "ADA[]-compliant parking spaces" in certain areas, and to cease and desist booking new events in these areas until compliance was achieved.  *Id.* at *6.  In recommending denial of plaintiffs' motion, Magistrate Judge Morgan held the motion was "premature" on "a procedural basis" because "[m]inimal discovery ha[d] been conducted and *no determination by a court* ha[d] been made regarding defendant's liability [under the ADA or plaintiffs' entitlement to relief." *Id.* (emphasis added).  Under these circumstances, the court refused to impose "mandatory duties on a governmental entity including construction of facilities, cancellation of community events, and approval of defendants' future actions contingent on [plaintiffs'] determination." *Id.*

There is no material distinction between the *Beztak Properties* plaintiffs' attempt to bring the Township into compliance with the ADA and EPA's claimed efforts to bring Detroit Edison into alleged compliance with the CAA.  Like plaintiffs in *Beztak Properties*, EPA seeks to impose "mandatory duties ... including the construction of facilities" without discovery and without a "determination by [this] Court ... regarding [Detroit Edison's] liability [under the CAA] or *[EPA's] entitlement to relief."  Id.* (emphasis added).  As noted, EPA's motion seeks an order requiring Detroit Edison to engage in several alleged compliance activities, including applying for and obtaining NSR permits and the installation of costly pollution control equipment even beyond the plant at which the violation allegedly occurred.  EPA Proposed Order at ¶¶ 3-4; *see also* Doc. No. 1 at 1 (seeking order requiring Detroit Edison "to take steps to offset the *illegal* pollution from Monroe Unit 2") (emphasis added).  Requesting such relief at the preliminary injunction stage is premature.

Detroit Edison does not dispute the Court's authority under Sixth Circuit law to alter the *status quo* when considering a motion for a preliminary injunction.  *See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998).  But altering the *status quo* does not extend to awarding *permanent* relief that would only be available upon a final determination of liability, especially when *no* discovery has been conducted and the facts are contested.  *See, e.g.*, *Beztak Properties*, 2009 WL 309390, *6; *Brown v. Voorhies*, No. 07-cv-463, 2009 U.S. Dist. LEXIS 110961, *3 (S.D. Ohio Sept. 10, 2009) ("The remedy Plaintiff presently seeks is more than an injunction maintaining the *status quo*; he seeks an Order from this Court *requiring* Defendants to affirmatively correct constitutional deficiencies *yet to be proven*.  Such affirmative relief is generally beyond the scope and purpose of preliminary injunctive relief.") (emphases added); *see also Sanchez v. Esso*

*Standard Oil Co.*, 572 F.3d 1, 20 (1st Cir. 2009) ("Because the court's ultimate findings of liability were made before [defendant] had the benefit of the [discovery] process which it was due, the [preliminary] injunction, as issued, cannot stand."); *cf. Helena Chem. Co. v. Huggins*, No. 4:06-cv-2583-RBH, 2007 WL 1725242, at *12 (D.S.C. June 8, 2007) ("In light of the fact this case is in its early stages and discovery has yet to be exchanged between the parties, the court is not in the position to determine the likelihood of success on the merits of either party's case. … To issue a preliminary injunction under these circumstances would be premature and inappropriate.").[7]

This is particularly true in the NSR context, where the contested issues of fact are rarely resolved on dispositive motions even after *years* of discovery.  In *United States v. Duke Energy Corp.,* 278 F. Supp. 2d 619, 622, 638 (M.D.N.C. 2003), *aff'd on other grounds*, 411 F.3d 439 (4th Cir. 2005), *vacated in Envtl. Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007), for example, the court refused to grant EPA summary judgment after two years of liability discovery, "which produced 4.6 million pages of documents, extensive discovery disputes, and numerous pretrial motions," because there was a "genuine issue of material fact as to whether the project … was non-RMRR."  The court held that EPA had not yet provided sufficient "evidence regarding whether the project undertaken …, given the specific nature and extent, purpose, frequency, and cost of the work, is routine in the electrical industry."  *Id.* at 638.  Likewise, after approximately 31 months of liability discovery in *United States v. Ohio Edison*, No. 99-CV-1181, 2003 U.S. Dist. LEXIS 25464, at *46 (S.D. Ohio Jan. 22, 2003), the court determined that

---

[7] Indeed, in an exhibit to its motion, one of EPA's hired consultants implicitly acknowledges that EPA's motion is premature, and the need for factual development and discovery, stating that his "conclusions are still being developed, and could be affected by information or analysis that has yet to be produced."  *See* Declaration of Lyle Chinkin at ¶ 4.

"unresolved questions of fact as to the scope and extent of the projects, the treatment of allegedly similar projects undertaken at other plants, and the effect of the projects on the environment render summary judgment *particularly* inappropriate." (emphasis added). And in *Nat'l Parks Conservation Ass'n v. TVA,* 618 F. Supp. 2d 815, 827 (E.D. Tenn. 2010), the court denied the parties' motions for summary judgment because "neither side ha[d] established as a matter of law the applicability or non-applicability of the RMRR exclusion to the specific facts of th[e] case."

Contrary to EPA's motion, the Court cannot impose costly compliance obligations until a *final* judgment of *noncompliance* is entered and EPA demonstrates that it is entitled to the relief it seeks. *Beztak Properties,* 2009 WL 309390, at *6. That has not occurred here, nor could it at this preliminary stage in the case. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."). For these reasons, EPA's motion is procedurally improper and should be stricken.

## II.   UNDER THIS COURT'S PRECEDENT, EPA'S MOTION SHOULD BE STRICKEN FOR FAILURE TO COMPLY WITH LOCAL RULE 7.1.

EPA's motion should also be stricken because it fails to comply with Local Rule 7.1(a). Under that rule, EPA was required to seek concurrence from counsel for Detroit Edison prior to filing its motion, explain the legal basis for it, and include a statement that such concurrence was sought and denied. *See* E.D. Mich. L.R. 7.1(a); *see also* Practice Guidelines for Judge Bernard A. Friedman ("The Court requires strict compliance with E.D. Mich. LR 7.1(a) which refers to seeking concurrence of opposing counsel."). EPA failed to comply with any of these requirements. As such, the Court should strike EPA's motion for this reason as well. This Court has recently denied motions under Local Rule 7.1(a) for less egregious conduct than EPA's.

19

*Innovation Ventures, LLC v. N.V.E.*, No., 08-11867, 2010 WL 1923790, at *5 (E.D. Mich. May 12, 2010) (denying motion for summary judgment in part because defendant's counsel sought concurrence but "refused to provide further detail or allow counsel for Plaintiff to review the motion"); *see also Brown v. VSI Meter Servs.*, No. 09-11449, 2010 U.S. Dist. LEXIS 38605, *3 (E.D. Mich. Apr. 20, 2010) (Whalen, J.) (denying motion to compel for failure to comply with Local Rule 7.1(a)).

## CONCLUSION

EPA should not be permitted to wage a campaign that is nothing more than an effort to convert a hearing on preliminary relief into a final trial on the merits.  Because EPA's motion is premature and procedurally improper and was filed in violation of Local Rule 7.1(a), the Court should strike it.

Respectfully submitted, this 18th day of August 2010.

/s/ Matthew J. Lund

Matthew J. Lund (P48632)
Pepper Hamilton LLP
100 Renaissance Center, 36th Floor
Detroit, Michigan 48243
lundm@pepperlaw.com
(313) 393-7370

Michael J. Solo (P57092)
Office of the General Counsel
DTE Energy
One Energy Plaza
Detroit, Michigan
solom@dteenergy.com
(313) 235-9512

*Counsel for Defendants*

*applications for admission to E.D. Mich. pending*

F. William Brownell*
brownell@hunton.com
Mark B. Bierbower*
mbierbower@hunton.com
Makram B. Jaber*
mjaber@hunton.com
James W. Rubin*
jrubin@hunton.com
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
(202) 955-1500

Brent A. Rosser*
Hunton & Williams LLP
101 South Tryon Street
Suite 3500
Charlotte, North Carolina 28211
brosser@hunton.com
(704) 378-4707

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record as follows:

> Ellen E. Christensen
> U.S. Attorney's Office
> 211 W. Fort Street
> Suite 2001
> Detroit, MI 48226
> 313-226-9100
> Email: ellen.christensen@usdoj.gov
>
> Thomas Benson
> U.S. Department of Justice
> Environmental and Natural Resource Div.
> Ben Franklin Station
> P.O. Box 7611
> Washington, DC 20044
> 202-514-5261
> Email: Thomas.Benson@usdoj.gov

I further certify that I have mailed by United States Postal service the paper to the following non-ECF participants:

> Ignacia S. Moreno
> Justin A. Savage
> U.S. Department of Justice
> Environmental and Natural Resource Div.
> Ben Franklin Station
> P.O. Box 7611
> Washington, DC 20044
> 202-514-5261
>
> Sabrina Argentieri
> Mark Palermo
> Susan Prout
> Associate Regional Counsel
> United States Environmental Protection Agency, Region 5
> 77 W. Jackson Blvd.
> Chicago, Illinois 60604

Barbara L. McQuade
United States Attorney
211 W. Fort St., Suite 2100
Detroit, Michigan  48226-3211
(313) 226-9112

Apple Chapman
Attorney Adviser
United States Environmental Protection Agency
1200 Pennsylvania Ave. NW
Washington D.C. 20460

This 18th day of August, 2010.


/s/ Matthew J. Lund