# EXHIBIT M TO DETROIT EDISON'S BRIEF IN SUPPORT OF MOTION TO STRIKE

229.

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,              )
                                       )                    2003 AUG -4  P 3: 50
        Plaintiff,                     )
                                       )                         FILED
    and                                )                    U.S. DISTRICT COURT
                                       )                       GREENSBORO, NC
ENVIRONMENTAL DEFENSE, ET AL.,         )
                                       )
        Plaintiff-Intervenors,         )
                                       )
    v.                                 )        Civil Action No. 1:00 CV 1262
                                       )
DUKE ENERGY CORPORATION,               )
                                       )
        Defendant.                     )
_____)

**UNITED STATES' OPPOSITION TO DUKE ENERGY'S MOTION
TO DETERMINE THE SUFFICIENCY OF PLAINTIFF'S RESPONSES
TO DUKE'S FIRST REQUEST FOR ADMISSIONS**

        The United States of America ("United States") respectfully submits this memorandum in

opposition to Defendant Duke Energy Corporation's ("Duke") Motion to Determine the

Sufficiency of Plaintiff's Responses to Duke's First Request for Admissions (Docket No. 226).

**INTRODUCTION**

        Duke's motion has no merit. The United States' responses were appropriate to Duke's

Requests for Admissions ("RFAs"), which were improperly phrased so as to be unanswerable

without qualification or objection. The real purpose of Duke's motion is to deflect attention

from Duke's own refusal to comply with a prior discovery order of this Court and from Duke's

evasion of its obligations under Rule 36. This is apparent from the timing of Duke's motion.

The United States served the responses that are the subject of Duke's motion on December 10,

2002. Seven months later, Duke has filed a motion complaining about these answers. What has

happened in the interim? On January 6, 2003, the United States filed a motion to determine the

sufficiency of *Duke's* responses to hundreds of Requests for Admissions (Docket No. 110), and

on February 10, 2003, this Court issued an Order requiring Duke to provide supplemental

responses to more than 600 Requests (Docket No. 137). In disregard of the Court's order, Duke

raised new objections and served new artful, evasive responses, forcing the United States to file a

second motion regarding the same RFAs on June 3, 2003 (Docket No. 207). That motion is

currently pending before the Court.

Only now, called to task for its repeated failure to provide adequate responses to hundreds

of Requests for Admissions, does Duke determine that there are deficiencies in the government's

responses served last year that require a retaliatory motion to the Court.[1] The result is a strained

and unsupportable effort to equate the claimed shortcomings in the United States' responses to a

small number of Requests to Duke's blanket resistance to compliance with the Federal Rules.

Apparently recognizing that the Court may rule against it with respect to its own responses to the

United States' RFAs, Duke asks the Court to "deem admitted Plaintiff's responses . . . to the

same extent that it does so with respect to Plaintiff's challenge to Duke's responses," and argues

that "[i]f Plaintiff is correct that Duke has not complied with Rule 36, then neither has Plaintiff."

Duke Memorandum in Support of Motion to Determine Sufficiency ("Duke Memo"), at 2, 3

(Docket No. 227).

---

[1] Duke originally raised concerns with just four of the United States' responses, on December 31, 2002.
See Ex. B to Duke Memo. In response, the United States further explained its responses to these four
requests and offered to respond to narrowed requests. See Jan. 10, 2003 Letter from D. Beckhard to N.
Long (attached as Ex. 1). It was not until five months later, after seeing its own deficient responses serve
as the subject of two motions and one Order, that Duke suddenly decided that these and many additional
responses by the United States warranted an additional meet and confer process. See Ex. C to Duke
Memo.

-2-

The parties' respective RFA responses, however, demand a more individualized review than Duke's "split the baby" approach suggests. Although the United States agrees with Duke that the same standards under Fed. R. Civ. P. 36 apply to both Duke's and the United States' responses, a close inspection reveals that the United States' responses stand in marked contrast to the deficient responses provided by Duke. Just as Duke engaged in artful evasions in response to the United States' straightforward requests, a close review of each of Duke's requests demonstrates that Duke was not attempting to narrow the issues for trial, but rather was attempting to force the United States to adopt legal conclusions or artful statements of half-truths. Given Duke's inappropriate requests, good faith required the United States to qualify many of its responses, or explain why it was unable to admit or deny, as directed by Rule 36(a). The United States' responses are thus sufficient to meet the requirements of Fed. R. Civ. P. 36, and Duke's motion should be denied.

## ARGUMENT

I.      The Requests For Admission Have Been Fully and Appropriately Answered.

Duke's claim that the United States' responses are "evasive" and rest on "invalid" objections is unfounded. Requests for admissions serve a valuable function in narrowing issues for trial because all matters admitted are deemed "conclusively established." Fed. R. Civ. P. 36(b). Accordingly, it is incumbent upon a party responding to requests for admissions to consider its responses very carefully, to ensure that any admissions will not later be found to be erroneous or based on a misunderstanding of the request. Although Duke would rather the United States have admitted its requests, a party need not adopt artful statements of half-truths or legal conclusions proffered in the guise of requests to admit. In fact, Rule 36 provides that

-3-

responding parties qualify their answers when necessary to avoid this very tactic. As discussed

below, Duke's requests are objectionable and unanswerable as phrased. Nevertheless, where

possible, the United States has in fact provided responses that "fairly meet the substance of the

requested admission[s]." Fed. R. Civ. P. 36(a). Duke just does not like the answers.

A.      Requests for Admission Nos. 131 to 191.

Duke is frustrated that the United States was unable to admit or deny requests that ask the

United States to admit that certain projects undertaken by Duke are "common in the electric

utility industry." Duke's frustration, however, is attributable not to the United States' responses,

but to the requests themselves. These requests have at least two fundamental problems that

prevent the United States from being able to issue an unqualified admission or denial: they seek

what Duke characterizes to be a determinative legal conclusion, and they are so vague as to be

unanswerable.

1.      Requests 131-191 seek admissions that certain repairs are "common in the
        industry," a test which Duke contends is wholly determinative of whether
        PSD applies.

First, these requests seek an answer that, to Duke, is equivalent to a legal conclusion.

Under Duke's (incorrect) legal interpretation of the routine maintenance exemption, one would

look only at whether a project is "common in the industry." Duke has repeatedly stated that this

is the test, and the only test, for whether a project is "routine maintenance, repair or replacement"

under the PSD modification rules. See, e.g., Duke Response to Interrogatory No. 74, at 29, 35,

37 (attached as Ex. 9 to U.S. Memo in Support of Motion for Partial Summary Judgment (Docket

No. 133)); see also Duke Brief in Support of Motion for Summary Judgment, at 13-15, 19-21,

35-37, 39-40 (Docket No. 129); Duke Brief in Opposition to U.S. Motion for Partial Summary

-4-

Judgment, at 15 (Docket No. 160). Thus, Duke's Requests seek admissions equivalent to a legal

conclusion that modifications of the types specified in its requests do *not* trigger the requirements

of PSD.

The United States has consistently denied that this is the proper legal test. As described

in our summary judgment briefs, the proper test for the "routine maintenance" exemption is a

multi-factor test that examines nature/extent, purpose, cost, and frequency of the repair at the

individual unit. The dispute regarding the proper legal test is squarely before the Court in

connection with the parties' motions for summary judgment.

By proffering Request Nos. 131-191, Duke sought to elicit an irrelevant fact which it

could later characterize as a legal conclusion in the hope that this Court ultimately decides to

reject EPA's authoritative interpretation and instead use Duke's. In order to avoid any possibility

of confusion on this point, the United States clearly explained in its objections that Duke's view

is not the correct interpretation of the routine maintenance test. Rather, the United States

explained that "The appropriate frame of reference for a 'routineness' determination is what is

'routine' at a unit of the same 'type,' i.e., in the particular source category (as opposed to some

other source category), and that the inquiry focuses on, among other things, whether the project is

of a sort which would frequently be performed at an *individual unit* of that type rather than across

all units within the source category."[2] Duke's decision to use a term with (under its discredited

---

[2] Duke incorrectly claims that the United States' relevance objection contradicts its arguments made
before the Court on summary judgment. The United States' position on this point is clear – what is
relevant to the routine maintenance determination is not how frequent a project may have been performed
in the industry as whole, as Duke argues, but rather how frequent a project is expected to be done at a
unit in that industry. Although a source seeking to convince EPA that it is entitled to the routine
maintenance exemption may well point to how frequently projects are done at other units in the industry,
(continued...)

-5-

version of the routine maintenance test) legal significance thus left the United States with no choice but to object as it did, so as to avoid even implying such a legal conclusion.

> 2.    Duke refused to articulate any criteria or threshold to determine whether a project is "common," and Duke's own inconsistent use of the term in this litigation demonstrates that it is vague and ambiguous.

Second, and more to the point, the vague and ambiguous nature of the term "common" as used by Duke renders the requests improper. In its ordinary usage, the term "common" requires a subjective comparison and the application of some threshold test that distinguishes between projects that are "common" from those that are "uncommon" or "rare." Duke's Requests provided no definition or other assistance to determine the applicable criteria or thresholds for distinguishing between "common" and "uncommon." It was the absence of this definition that made it impossible for the United States to admit or deny these requests.

The problem is compounded by Duke's studied refusal, throughout this litigation, to articulate any coherent criteria for the "common in the industry" test that Duke contends is wholly determinative of whether a project is "routine maintenance." For example, Duke's expert witness initially testified that he might consider a project to be "common in the industry" if it had occurred at 3% to 5% of all of the similar units in the industry, but backed away and stated that it was a "starting point" of an analysis that lacks either coherent criteria or a basis in applicable

---

(...continued)

this "incidence in the industry" information would be relevant only to the extent it shows how frequently projects are done in the lifetime of individual units in that industry. For instance, just because a project has never before been done at a particular unit does not necessarily mean that it is non-routine, if it is the type of project that is frequently done during the life of units in that source category. However, the simple fact that a project has been performed at other sources in the industry as a whole is not the relevant measure of routineness for purposes of EPA's exemption. This point was explained in the United States' summary judgment briefing, and is completely consistent with the United States' relevance objection to Duke's RFA Nos. 131-191.

-6-

precedent. See William Tuppeny Tr., at 167-173 (attached as Ex. 117 to Duke Brief in Support

of Motion for Summary Judgment (Docket No. 129)). This testimony did not provide useful

criteria for the United States to apply in responding to these Requests.

The testimony of Duke's Rule 30(b)(6) witness regarding Duke's interpretation of the

"common in the industry" tests is similarly confusing and unhelpful. When asked whether Duke

considered replacement of all the waterwalls in a boiler to be "common in the industry," Duke's

30(b)(6) witness stated that such a project "is certainly conceivable from a hypothetical

standpoint. So it would not be frequent in its recurrence at a particular location but across the

industry would be conceivable. . . . Replacement of entire waterwalls, as you have theorized,

would be *less common* but across the industry could happen in various cases, various situations."

Buddy Davis Tr., at 330-332 (emphasis added) (attached as Ex. 71 to U.S. Memo in Support of

Motion for Partial Summary Judgment (Docket No. 133)). Duke contends that the replacement

of entire waterwalls (which is one type of project that is at issue in this case) is "routine

maintenance."[3] In other words, it appears that Duke also contends that a project that is

"conceivable from a hypothetical standpoint" is "common in the industry" – a strange (and

objectively unmeasurable) criterion indeed.

Duke's summary judgment briefs, which were filed subsequent to the United States'

responses, also reveal no criteria for what is "common," although they do suggest that Duke

considers the threshold to be incredibly low. Duke claims that *any* replacement involving

---

[3] Duke replaced all of the waterwall tubes at Buck Unit 4, for example. See U.S. Memo in Support of
Motion for Partial Summary Judgment, at 8 (Docket No. 133). Duke's 30(b)(6) witness contends Duke
has never performed work that is not "routine maintenance." Buddy Davis Tr., at 384 (attached as Ex. 71
to U.S. Memo in Support of Motion for Partial Summary Judgment (Docket No. 133)).

-7-

equipment of a type that "has been repaired or replaced by sources within the relevant industrial category," (i.e. coal-fired electric steam generating units) is "routine," and therefore "common in the industry." Duke Brief in Support of Motion for Summary Judgment, at 36-37. (Docket No. 129). Duke claims that the exemption applies to *any* "maintenence, repair and replacement projects that are undertaken by sources 'within' the electric utility industry source 'category.'" Id. at 8. Elsewhere, Duke suggests that a project must be "unprecedented" to be something other than "routine maintenance." See Duke Brief in Opposition to U.S. Motion for Partial Summary Judgment, at 17 (Docket No. 160). Thus, it appears from Duke's subsequent summary judgment arguments that its "common in the industry" test is really a "precedented in the industry" test.

Thus, Duke has never offered any useful or coherent criteria or threshold for applying its "common in the industry" test. Nevertheless, in an effort to resolve part of this dispute by utilizing what appears, from Duke's subsequently-filed summary judgment briefs, to be one of Duke's interpretations of the word "common," i.e, "not unprecedented," the United States proposed to amend most or all of its responses by adding the following admission:

> The United States admits that [category of project] has occurred at some number of coal-fired utility units in the electric utility industry in addition to any such replacements performed by Duke. The United States has made reasonable inquiry and the information known or readily available to the United States at this time is insufficient to enable it to determine the precise number of incidences in which this has occurred.[4]

See Aug. 1, 2003, E-mail from D. Beckhard to N. Long (attached as Ex. 6 hereto). Duke has not yet responded to this proposed resolution (though it may still do so if it chooses), and at no time has offered any additional insight into what criteria or threshold the United States should apply in

---

[4] As stated in the correspondence making this offer, there is a possibility that a few of Duke's requests still could not be admitted even using a "not unprecedented" interpretation of "common."

-8-

determining whether a project was "common in the industry." As a result, the United States is

simply unable to admit or deny these responses or otherwise supplement them. See Booth Oil

Site Admin. Group v. Safety-Kleen Corp., 194 F.R.D. 76, 79 (W.D.N.Y. 2000) ("Ambiguous and

vague requests which cannot be fairly answered will not be enforced."); Fulhorst v. United Tech.

Auto., Inc., 1997 WL 873548, *1 (D. Del. 1997) (finding that request need not be responded to

due to ambiguity of term "associated") (attached as Ex. 2) ; Dubin v. E.F. Hutton Group, Inc.,

125 F.R.D. 372, 376 (S.D.N.Y. 1989) (denying motion to compel, as objections to the requests as

"vague, ambiguous, overbroad and burdensome" were "well-founded"). Requests for admission

should be phrased so that they can be admitted or denied with an absolute minimum of

explanation. See United Coal Cos. v. Powell Constr. Co., 839 F.2d 958, 967-968 (3d Cir. 1988).

As Duke itself has argued, "[a]ny ambiguity in a request to admit is construed against the

drafter." Ortho Diagnostic Sys. Inc. v. Miles Inc., 865 F. Supp. 1073, 1079 (S.D.N.Y. 1994)

(citing Talley v. United States, 990 F.2d 695, 699 (1st Cir. 1993). Given the legally

determinative impact that Duke ascribes to the term "common in the industry," coupled with its

complete lack of guidance on what this term means for purposes of its requests, the United

States' responses to these requests more than met the requirements of Fed R. Civ. P. 36.

      3.    The United States has not refused to provide Duke with information about
            projects at other utilities.

     At page 9 of its Memo, Duke incorrectly accuses the United States of "simply refus[ing]

to provide Duke with information it has gathered regarding the frequency of component

replacements across the industry." As a result of CAA "Section 114" information requests sent

out as part of the enforcement initiative of which this case is a part, the United States has

obtained information from a number of utilities regarding replacement projects performed at a

number of coal-fired utility units in the United States. Additional information of this nature has

been obtained during discovery in this case and in other CAA enforcement cases involving

electric utilities. As the United States explained in a 30(b)(6) deposition taken by Duke on this

very topic, because "common in the industry" is not the relevant inquiry, EPA did not perform

any analysis of whether certain projects it became aware of as part of this enforcement initiative

are common in the industry as a whole.[5]  The burden of reviewing and tabulating this voluminous

information for the purpose of responding to this Request would be extraordinary but would still

not enable the United States to admit or deny this Request, because Duke has still not provided

any criteria for distinguishing between "common" and "uncommon" projects, and because the

United States is not reasonably able to assess and attest to the accuracy of the information

contained in each and every Section 114 response, or to make admissions based on such

information provided by other parties.

Because of claims of business confidentiality asserted by the respondents, the United

States is prohibited from providing this information directly to Duke. The United States offered

to allow Duke to arrange for a third party to examine and tabulate the information contained

therein, subject to an appropriate protective order that would protect the respondents' claims of

business confidentiality. See Oct. 3, 2002 E-mail from R. Kaplan to T. Cottingham (attached as

Ex. 4). Duke did not accept this offer, and instead was apparently satisfied with simply obtaining

---

[5] See Richard Killian Depo Tr., at 21-22, 28-29, 39-41 (attached as Ex. 3). Duke apparently would
require the United States to undertake a comprehensive and irrelevant statistical analysis of the so-called
"114 responses" received as part of the enforcement initiative to determine whether certain projects are
"common in the industry" to attempt to answer this request. But given the inherent ambiguity in Duke's
requests, only Duke can really know what it means by "common in the industry."

-10-

30(b)(6) testimony confirming that the United States only analyzed the individual 114 responses
to determine if projects were routine for a unit – the relevant inquiry under EPA's interpretation.[6]

Request for Admissions Nos. 131-191 did not seek "information [the United States has
gathered regarding the frequency of component replacements across the industry." They sought
admissions that certain projects were "common in the industry," a test that Duke contends is
wholly determinative of whether the projects are "routine maintenance" and that Duke apparently
contends has no relationship to *frequency* (which connotes repetition) at all. Duke's accusation
regarding the United State's willingness to provide discovery is false and irrelevant.

> 4. The United States' position regarding Duke's requests is not inconsistent
> with its position regarding its own requests.

Duke claims the United States' objection to the amorphous term "common" is simply
"the pot calling the kettle black" given the phrasing of the United States' own requests. A review
of the parties' respective requests and responses thereto reveals that this is not true. As explained
in the United States' briefs in support of its motion to determine the sufficiency of Duke's
amended RFA responses (Docket No. 207), Duke manufactured confusion about the meaning of
otherwise unambiguous terms to avoid answering the United States' requests. With respect to
Duke's requests, on the other hand, there is simply no comparison between an inherently vague,
ambiguous, and subjective term like "common" and the patently objective terms that were used

---

[6] Duke's accusation that the United States did not undertake a reasonable inquiry is ironic given its own
approach to responding to the United States' requests. For instance, Duke takes the United States to task
for not having undertaken a completely irrelevant analysis of the frequency of certain projects in the
industry as a whole, yet itself claims to be unable to admit or deny basic facts about *its own projects*.
See, e.g., Duke Responses to RFAs 310, 319, 320, 321 (claiming to be unable to admit or deny requests
that sought specific comparisons of cost and extent of Duke projects at issue in this case with previous
Duke projects) (attached as Ex. 1 to U.S. Memo in Support of Motion to Determine Sufficiency of
Duke's Amended RFA Responses (Docket No. 208)).

-11-

in the United States' requests ("reduction," "actual work," and "redesigned"). As shown above, Duke contends that whether a project is "common in the industry" is wholly determinative of whether a legal exemption from PSD applies; the term contains no intrinsic criteria for distinguishing common from uncommon, and Duke provides none. Neither of these circumstances is present with respect to the terms in the United States' Requests to which Duke objected. There is nothing inherently subjective about a term like "reduction"; one need only admit or deny the objective fact of whether an event will occur *less*. Nor is there any ambiguity in a term like "actual work" when the context of the request makes clear that the "work" referred to is the work at issue in the case (about which the parties have engaged in almost two years of discovery). Nor, in the context of the few requests by the United States which used the term, was there any ambiguity in the word "redesign" given the ordinary meaning of the term, Duke's contemporaneous use of the term, and the massive nature of the design upgrades undertaken by Duke. Whereas Duke artfully misconstrued otherwise clear terms in its responses, the United States simply explained why Duke's requests were improper and thus unanswerable as phrased. This Court should therefore reject Duke's retaliatory attempt to equate its own artful evasions with the United States' good faith objections and responses.

B.    Request for Admission No. 23.

This request asks the United States to admit that the "two year period when a unit last produced power before going into ECS is more *representative of normal source operations* for that unit than the years in ECS when the unit did not produce power." Duke Request No. 23 (emphasis added). Not coincidentally, the language of this request identically tracks legal language in EPA's PSD regulations governing calculation of so-called "baseline" emissions

-12-

(against which projected future emissions are compared). These regulations state that baseline emissions generally equal emissions "during a two-year period which precedes the particular date and which is *representative of normal source operation*." 40 C.F.R. § 51.166(b)(21)(ii) (emphasis added). Duke is thus seeking an admission concerning a legal conclusion that goes to the very heart of the dispute between the parties in this case – whether, as a legal matter, the last two years of operation of Duke's PMP units should be used to calculate the baseline period. EPA interprets its regulations as requiring that, for long-shutdown units that undergo a physical change, the baseline period will generally precede the date of each proposed physical change (i.e., a boiler rehabilitation project), not the date the unit last produced power. Thus, the United States has moved for summary judgment that the baseline emissions for Duke's Buck 4 PMP project were zero *as a matter of law* because the Buck 4 unit was taken out of service for almost a decade prior to the PMP project. See U.S. Memo in Support of Motion for Partial Summary Judgment, at 36 (Docket No. 133); U.S. Reply in Support of Motion for Partial Summary Judgment, at 8-10 (Docket No. 189). Duke, however, contends that as a legal matter the last two years of *operation* of Buck 4 rather than a two year period immediately *preceding* the change should be used for the baseline. See Duke Opp. to U.S. Summary Judgment Motion, at 38-39 (Docket No. 158).

Duke thus knows that calculation of the baseline period for its PMP units is a central legal dispute in this case. Because Duke sought an admission of a legal conclusion at the very heart of the dispute in this case, its request was objectionable on that basis alone. United Coal Cos. v. Powell Constr. Co., 839 F.2d at 967 (where "issues in dispute are requested to be admitted, a denial is a perfectly reasonable response"); Kasar v. Miller Printing Machinery Co.,

-13-

36 F.R.D. 200, 203 (W.D. Pa. 1964). The United States clearly and appropriately denied this request. And to avoid any confusion on the matter, the United States made clear that the parties remain at odds over the interpretation of EPA's PSD regulations.[7]

Duke also again tries to distract the Court with retaliatory comparisons of the United States' responses with Duke's own deficient responses. For instance, Duke claims that "[t]his response represents precisely the type of denial on the basis of legal argument of which Plaintiff complains in its motion to determine the sufficiency of Duke's responses." Duke Memo, at 10. Nothing could be further from the truth. In the present dispute, Duke inappropriately and unambiguously sought an admission of a legal conclusion at the very heart of this case – that the two year period prior to ECS was "representative of normal source operations" (a loaded legal term drawn straight from EPA's regulations) – which the United States properly denied. In contrast, the United States' requests to which Duke refers sought simple factual admissions that state environmental regulators never told Duke that its projects did not require permits. See, e.g., Duke Responses to RFA 375 (attached as Ex. 1 to U.S. Memo in Support of Motion to Determine Sufficiency of Duke's Amended RFA Responses (Docket No. 208)). Duke completely evaded this factual issue and instead responded with improper legal arguments concerning its interpretation of the PSD regulations. See U.S. Memo in Support of Motion to Determine Sufficiency of Duke's Amended RFA Responses, at 10 (Docket No. 208). By

---

[7] That the United States denied this request should really come as no shock to Duke. During the multi-year shutdowns of Duke's ECS units, and prior to undertaking the boiler rehabilitation at issue in this case, Duke retained an operating staff at the units and operated equipment at the units such as dehumidified air blowers. See Martin Beam Tr., at 25-26 (attached as Ex. 5). To put it bluntly, the normal operating status of Duke's ECS units *was* to produce no power.

-14-

including terms of legal significance that go to the very heart of issues in dispute in this case, Duke drafted a request to which the United States could not respond without qualification.

    C.    <u>Request For Admission Nos. 26 to 29.</u>

These requests seek admissions that EPA has "no evidence" that the States of North Carolina and South Carolina have "failed to administer or implement" or "incorrectly administered or implemented" the PSD program. In responding, the United States explained that it was unable to admit or deny the requests as written because of its limited oversight role with states like North and South Carolina, which operate under federally-approved State Implementation Plans ("SIPs"). In a follow-up letter to Duke concerning these requests, the United States further explained that it had made reasonable inquiry of EPA employees and reiterated that, in part because EPA does not have oversight authority regarding actions of federally approved SIP states like North and South Carolina, it was unable to admit or deny Duke's requests. <u>See</u> January 10, 2003 Letter from Dan Beckhard to Nash Long (attached as Ex. 1). The United States also explained that the requests are overly burdensome and irrelevant, and effectively ask the United States to prove a negative – to determine the non-existence of evidence that the state had incorrectly applied, or incorrectly failed to apply, the PSD program. <u>See id.</u> at 1-2. Although the United States explained that it could not admit or deny Duke's request as phrased, the United States did offer to respond to rephrased requests concerning any particular state actions about which Duke may have been concerned. <u>See id.</u> at 2. Duke, however, did not take the United States up on this offer, implying that it was less interested in obtaining admissions about particular facts than in obtaining unqualified admissions of generalized half-truths.

-15-

The half-truth Duke was hoping to elicit in proffering these requests was presumably this: If EPA has not determined that the states have incorrectly implemented the PSD program, and the states are primarily responsible for implementing the program, then Duke's modifications must be consistent with the program. However, requests that are "phrased so as to infer unfairly a particular or varied conclusion from the fact admitted are objectionable, as are requests which are half-truths, if such half-truths would imply a conclusion different from the whole truth." Kasar, 36 F.R.D. at 203 (quoting Johnstone v. Cronlund, 25 F.R.D. 42, 44 (E.D. Pa. 1960).

Significantly, although the United States could not admit or deny the requests as written, it nevertheless attempted to respond to the "essential truth" underlying the requests by stating that it is aware that the States of North and South Carolina did not apply their PSD programs to Duke's modifications. This is presumably the essential truth at which Duke is aiming – did the states correctly apply the PSD program with respect to Duke's modifications. The answer, as made clear by the United States' responses, is that the states did not apply the PSD program to Duke's modifications *at all*. This is not surprising, because Duke did not seek an applicability determination from the states about its boiler rehabilitation projects, or otherwise inform the states of the nature, extent, purpose, frequency, and cost of the projects. See, e.g., Duke Response to U.S. Request for Admission No. 374 (attached as Ex. 1 to U.S. Memo in Support of Motion to Determine Sufficiency of Duke's Amended RFA Responses (Docket No. 208).[8]

---

[8] Duke did tell the states in 1983 about its plans to *shut down* the units as part of its Extended Cold Shutdown" program, and sought assurances that the simple *restart* of the units, with "minimal expenditures," would not trigger PSD and NSPS. See, e.g., Ex. 70 to U.S. Memo in Support of Motion for Partial Summary Judgment (Docket No. 133). These letters undisputably do not describe *any* of the boiler work that was actually done, which ultimately cost hundreds of millions of dollars. In fact, the letters only mentioned running dehumidified air in the boilers, which, as Duke's 30(6)(6) witness
(continued...)

-16-

D.    Request for Admission Nos. 207 to 216.

These requests seek admissions that certain projects undertaken *by Duke* that were not

included in the Complaint are "comparable" to other projects undertaken *by Duke* that were

included in the Complaint. Duke thus curiously seeks a subjective comparison from the United

States about Duke's own projects, about which Duke of course has complete information to

make any comparison it may desire. Cf. Feb 10 Order, at 1 n.1 (noting that certain of the United

States' requests concerned "matters within Plaintiff's knowledge") (Docket No. 137).

Even putting aside the subject of Duke's unusual requests, the United States appropriately

objected to these requests because the inherently vague and ambiguous nature of the term

"comparable" renders them unanswerable. See Booth Oil, 194 F.R.D. at 79; Fulhorst, 1997 WL

873548, *1; Dubin, 125 F.R.D. at 376. As with Duke's use of the term "common" in Request

Nos. 131 to 191, the term "comparable" as used by Duke necessarily connotes some sort of

subjective and individualized determination of whether the projects are above or below some

undefined level of sameness. Again, in Duke's mind, at what point does a project start or stop

being sufficiently comparable to another project for purposes of its requests? Duke offers no

---

(...continued)

admitted, does not indicate that major boiler work is being done. See Ex. 155 to U.S. Memo in
Opposition to Duke Motion for Summary Judgment, at 410-11 (Docket No. 152). When Duke later
decided to perform major boiler rehabilitation work on its units, Duke changed the name of the Extended
Cold Shutdown program to the "Plant Modernization Program" to better reflect the change in focus from
preservation (ECS) to rehabilitation (PMP). *See* U.S. Memo in Support of Motion for Partial Summary
Judgment, at 5 (Docket No. 133). However, Duke never told the state environmental regulators or EPA
about this change in focus or about the change in the name of the program. See id., at 12; see also Ex. 11
to U.S. Memo in Support of Motion for Partial Summary Judgment, at 112-114 (Docket No. 133); Ex. 71
to U.S. Memo in Support of Motion for Partial Summary Judgment, at 249-253, 491 (Docket No. 133).
Although Duke claims that the states inspected Duke's plants for compliance with PSD and concluded
PSD was not applicable, in reality the inspections in question were not meant to detect the types of PSD
violations at existing units that are at issue in this case. See U.S. Response to Duke Motion for Summary
Judgment, at 19-20 (Docket No. 152).

-17-

criteria for making such a determination, and the United States is unable to divine from Duke's request where it might draw this line. This is unsurprising, since Duke itself is in the best position to draw comparisons about its own projects.[9]

Although it is not the United States' role to suggest to Duke how to craft its own requests, it seems that if Duke were truly interested in specific comparisons of certain Duke projects to other Duke projects, it should have provided guidance or discrete metrics against which it sought such comparisons. Indeed, this is the approach the United States itself took when it sought admissions from Duke comparing certain Duke projects in the Complaint with historic Duke projects undertaken by Duke. For instance, the United States sought admissions concerning specific criteria, such as whether certain projects *cost more* than other projects, required *more labor* than other projects, involved replacement of *more tubes* than other projects, and involved replacement of *greater percentages of tubes* than other projects.[10] Duke, by contrast, chose not to ask for comparisons of any objectively measurable criteria, such as whether certain projects cost *more or less* than others. Instead, Duke failed to define the scope of its requests and subjectively

---

[9] Duke also criticizes the United States for stating that it is unable to admit or deny these requests despite the fact that *Duke* provided information about the projects in the "114 responses." Duke misconstrues the United States' response. The United States is unable to admit or deny these requests because Duke has provided no guidance on what it means by the inherently vague and ambiguous term "comparable." However, the fact that Duke claims that the information needed to respond to these requests is contained in *Duke's* 114 responses (presumably using whatever definition of "comparable" that Duke has in mind), simply highlights the fact that Duke is inappropriately seeking admissions concerning "matters within [Duke's] knowledge." Feb. 10, 2003 Order at 1 n.1 (Docket No. 137).

[10] See, e.g., U.S. Request for Admission Nos. 310, 319, 320, 321 (attached as Ex. 1 to U.S. Memo in Support of Motion to Determine Sufficiency of Duke's Amended RFA Responses (Docket No. 208). Duke, however, refused to admit or deny these requests, claiming that they were "vague and ambiguous" even though the United States provided the specific comparison criteria. Duke's current motion is thus particularly ironic given Duke's refusal to respond to the United States' requests, which are immeasurably more specific and concrete than Duke's requests.

-18-

and amorphously asked the United States to admit that certain projects were simply

"comparable" in nature, purpose, frequency, or cost, to those in the Complaint.  As discussed

above, requests that contain such vague and ambiguous phrasing are improper.

**CONCLUSION**

The purpose of requests to admit is to eliminate disputes, not to bind an opponent to

incorrect legal conclusions or artful statements of half-truths.  The United States responded in

good faith to Duke's requests, and in compliance with the requirements of Fed. R. Civ. P. 36.

Duke's Motion should be denied.

Dated: August 4, 2003

                                      Respectfully submitted,

                                      THOMAS L. SANSONETTI
                                      Assistant Attorney General
                                      Environment and Natural Resources Division
                                      United States Department of Justice

                                      *for* _Jim P. Buchy_  AUSA, NCSB 13175

                                      Daniel C. Beckhard
                                      Jason A. Dunn
                                      Deborah Behles
                                      Katherine E. Konschnik
                                      Environmental Enforcement Section
                                      U.S. Department of Justice
                                      P.O. Box 7611
                                      Washington, D.C. 20044

OF COUNSEL
ALAN DION
Assistant Regional Counsel
U.S. Environmental Protection Agency
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, GA 30303

-19-

CERTIFICATE OF SERVICE

I certify that on this the 4th day of August, 2003, I caused a true and correct copy of the foregoing UNITED STATES' OPPOSITION TO DUKE ENERGY'S MOTION TO DETERMINE THE SUFFICIENCY OF PLAINTIFF'S RESPONSES TO DUKE'S FIRST REQUEST FOR ADMISSIONS to be served upon the following counsel of record in this matter via electronic mail and U.S. First Class Mail.

T. Thomas Cottingham, III- Trial Attorney
Nash E. Long, III
Hunton & Williams
101 South Tryon Street, Ste. 3500
Charlotte, NC 28280

Mark B. Bierbower
Hunton & Williams
1900 K Street, N.W.
Washington, D.C. 20006-1109

Peter Pappas
Adams Keemeier Hagan Hannah & Fouts PLLC
701 Green Valley Road, Ste. 100
Greensboro, NC 27408

Garry S. Rice
Associate General Counsel
Duke Energy Corporation
422 South Church Street, PBO5#
Charlotte, NC 28242

J. Blanding Holman
Southern Environmental Law Center
200 W. Franklin Street, Suite 300
Chapel Hill, NC 27516-2520

Jeffrey M. Gleason
Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA 22902


For _Jim P. Beck, AUSA_
        Jason Dunn