IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:10-cv-13101-BAF-RSW |
| | ) | |
| v. | ) | Judge Bernard A. Friedman |
| | ) | |
| DTE ENERGY COMPANY, and DETROIT EDISON COMPANY | ) | Magistrate Judge R. Steven Whalen |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF UNITED STATES' REPLY MEMORANDUM
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     The United States Is Likely To Succeed On The Merits . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.     The Unprecedented, $65 Million Overhaul Cannot Be Considered Routine . . . . 2

        B.     DTE's Selected Analysis Confirms a Triggering Emissions Increase . . . . . . . . . 5

II.    The Irreparable Harm To Public Health Compels Redress . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.     DTE Cannot Obscure the Harm Resulting From Its Violation . . . . . . . . . . . . . . 8

        B.     The Balance of the Harms and Public Interest Favor Injunctive Relief . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## TABLE OF AUTHORITIES

**Federal Cases**

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

*Anglers of the AU Sable v. U.S. Forest Service*, 402 F. Supp. 2d 826 (E.D. Mich. 2005) . . . . . 14

*Crutchfield v. U.S. Army Corps of Engineers*, 192 F. Supp. 2d 444 (E.D. Va. 2001) . . . . . . 13-14

*Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Hawaiian Elec. Co., Inc. v. U.S. EPA*, 723 F.2d 1440 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . 9

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, No. 3:01-CV-71,
    2010 WL 1291335 (E.D. Tenn. Mar. 31, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

*New York v. EPA*, 443 F.3d 880 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Pennsylvania v. Allegheny Energy, Inc.*, No. 02:05cv885, 2008 WL 4960090
    (W.D. Pa. Nov. 18, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Sierra Club v. Morgan*, No. 07-C-251-S, 2007 WL 3287850 (W.D. Wis. Nov. 7, 2007) . . . . 4-5

*South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882 (D.C. Cir. 2006) . . . . . . . . . . . . . . . 9

*Stenberg v. Cheker Oil Co.*, 573 F.2d 921 (6th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010 (N.D. Cal. 2002) . . . . . . . . . . . . . . . 9

*United States v. Cinergy Corp.*, 495 F. Supp. 2d 909 (S.D. Ind. 2007) . . . . . . . . . . . . . . . . . . . . 4

*United States v. Cinergy Corp.*, No. 1:99-cv-01693-LJM-JMS, 2008 WL 7679914
    (S.D. Ind. Dec. 18, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Cinergy Corp.*, - - F.3d - -, 2010 WL 4009180 (7th Cir. Oct. 12, 2010) . . . . . . . 6

*United States v. Duke Energy Corp.*, No. 1:00cv1262, 2010 WL 3023517
    (M.D.N.C. July 28, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3

*United States v. Mass. Water Res. Auth.*, 256 F. 3d 36 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . 10

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) . . . . . . . . . . . . . . . . . 4

*United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/F, 2002 WL 1629817
(S.D. Ind. July 18, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10-11

*United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994 (S.D. Ind. 2003) . . . . . . . . . . . . . 4

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Federal Regulations**

70 Fed. Reg. 39,413 (July 8, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

70 Fed. Reg. 61,081 (Oct. 20, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Other Materials**

Brief for Respondent EPA, *New York v. EPA*, No. 02-1387 (D.C. Cir. Oct. 26, 2004) . . . . . . . . 9

*Sierra Club v. Army Corps of Engineers*, No. 4:10-cv-4017, slip op. (Dkt. 143)
(W.D. Ark. Oct. 27, 2010) (filed as Appendix B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

If DTE can be believed, compliance with New Source Review ("NSR") will come in 2014 for the unit at issue in this case. Since this action was filed in August, DTE has committed to address two of the three things the United States sought in its complaint:

- After telling EPA in June that it had no plans to install the required selective catalytic reduction technology ("SCR") at Monroe Unit 2, Defendants told this Court soon after the United States filed the complaint that it would install SCR by 2014. Ex. 2,[1] Declaration of Ethan Chatfield ¶17; Doc. # 15 at 4.
- After arguing in its brief opposing the preliminary injunction ("Def. Br.") that obtaining an NSR permit for Unit 2 would be burdensome and "pointless," at 34-35, it turns out that DTE *has already applied* for precisely that permit. Ex. 13-A, September 2010 DTE Permit Application ("Permit App.").

The landscape of this case has changed dramatically. The only problem is that DTE's compliance will come four years too late – four years after the company triggered NSR permitting and emissions control requirements by undertaking a $65 million overhaul at Monroe Unit 2. After holding DTE to its promises, the primary question remaining for this Court is how to redress the irreparable harm to human health that the people downwind of the Monroe plant will suffer for those four years. Ordering DTE to reduce emissions from its fleet will prevent that harm and fulfill the court's mandate to use its injunctive authority to prevent injury. *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

## ARGUMENT

While DTE launches a variety of attacks, there are two critical areas of difference between the Parties: (1) whether the United States is likely to succeed on the merits; and (2) what remedy is supported by the harm from DTE's violation of law.

---

[1] Exhibits 1-12 were submitted with the United States' memorandum in support of the preliminary injunction motion. Exhibits filed with this brief start at Ex. 13.

1

I.      The United States Is Likely To Succeed On The Merits

The Parties agree that the likelihood prong boils down to whether the overhaul was routine maintenance and whether there is an emissions increase related to the project. Despite DTE's vigorous opposition, there can be little doubt on either score.[2] The company spent $65 million on an unprecedented project, and it expected that project to improve plant reliability and result in greater generation.

A.      The Unprecedented, $65 Million Overhaul Cannot Be Considered Routine

No common sense understanding of the word routine can include the $65 million extreme makeover DTE performed at Monroe Unit 2.

DTE's argument to the contrary focuses on the legal standard for the frequency prong of the analysis. While often litigated, this dispute is not dispositive, and several courts have determined that the difference between the opposing standards is minimal. *See, e.g.*, *United States v. Duke Energy Corp.*, No. 1:00CV1262, 2010 WL 3023517, at *7 (M.D.N.C. July 28, 2010) (citing *Pennsylvania v. Allegheny Energy, Inc.*, No. 02:05CV885, 2008 WL 4960090, at *8 (W.D. Pa. Nov. 18, 2008)). In any event, the Michigan Department of Natural Resources & the Environment ("MDNRE") – the permitting authority that would have addressed the issue had

---

[2] While DTE suggests a preliminary injunction is inappropriate because of the results in "thirty or so" other cases against electric utilities, Def. Br. at 1, relief turns on the facts in this case, not other litigation. DTE also cherry picks the results in other cases. For example, the *Cinergy* jury verdict touted in DTE's brief was partially vacated due to the defendant's misconduct at trial, and the claims that the United States prevailed upon in the retrial were favorably settled, not appealed. *Compare* DTE Br. at 1 n.3 and Ex. 12, *with United States v. Cinergy Corp.*, No. 1:99-cv-01693-LJM-JMS, 2008 WL 7679914 (S.D. Ind. Dec. 18, 2008). Additional victories in the Supreme Court and lower courts have contributed to twenty consent decrees across the industry, resulting in the removal of *millions of tons* of air pollutants *every year*. *See, e.g.*, *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) (rejecting utility industry's "hourly rate" test for emissions increases); EPA, Coal-Fired Power Plant Enforcement Initiative (listing prior settlements), *available at* http://www.epa.gov/compliance/resources/cases/civil/caa/coal/index.html.

2

DTE sought an applicability determination – has made clear that its analysis focuses on the unit itself.  MDNRE explained that its "overall emphasis is on the history of the specific unit(s), information regarding the history of other similar units at the same facility and the history of similar units at other facilities within the same industry may sometimes be taken into consideration."  Ex. 13-B, Michigan New Source Review Program Review at 26; *see also Duke*, 2010 WL 3023517, at *7 (overemphasis on frequency in the industry would "allow the industry to render [NSR] a nullity by making its own practice the sole standard.").

Michigan also makes clear that the Detroit Edison Applicability Determination (Ex. 4) that DTE attempts to brush off is a prime source of guidance for determining NSR applicability.  Ex. 13-B.  The Applicability Determination announces that the routine maintenance exemption must have a "narrowly limited scope."  Ex. 4 at 15.  In the Applicability Determination, EPA found that a $6 million replacement that had not been previously performed at the unit was not routine.  Ex. 4 at 3-4.  This finding is an apt analogy for either the economizer or pendant reheater upgrades alone – both of which had never been done before at Monroe 2 and cost approximately $15 million each, Doc. # 8 ("U.S. Br.") at 20 – to say nothing of the entire $65 million overhaul.

DTE ignores the case law requiring a limited scope for the exemption, and instead relies on a report from the utility TVA and the anomalous decision of a single trial court.[3]  The TVA report was published in 2000, while TVA was defending against an administrative NSR enforcement action brought by EPA, and must be treated with care as a self-serving litigation position.  The *NPCA* decision DTE relies on turns the routine maintenance exemption

---

[3] Despite its emphasis on the routine in the industry test, DTE presents no evidence that projects similar to the $65 million overhaul have in fact been done at other units.  Indeed, DTE does not even set forth how often other units have made complete replacements of economizers or pendant reheaters, to say nothing of replacing both in full as part of a larger overhaul.  Def. Br. Ex. 9 at 61, 66.

3

completely on its head.  The court stated that, "Replacing an economizer . . . is not a small task, but it is also not an extraordinary task."  *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth. ("NPCA")*, No. 3:01-CV-71, 2010 WL 1291335, at *25 (E.D. Tenn. Mar. 31, 2010).  If a job must simply not be "extraordinary" to qualify as routine maintenance, the exclusion "has swallow[ed] both the rule and specific provisions of the Clean Air Act."  *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 855 (S.D. Ohio 2003).  As the D.C. Circuit, the court charged with reviewing EPA regulations, has made clear, the statute applies to "*any* physical change" that increases emissions, so only *de minimis* changes can be excluded under exemptions like that for routine maintenance.  *New York v. EPA*, 443 F.3d 880, 890 (D.C. Cir. 2006).  The *NPCA* case is an outlier, while the other courts to consider the issue have concluded that the exemption must be narrowly construed.  *See Sierra Club v. Morgan*, No. 07-C-251-S, 2007 WL 3287850, at *11 (W.D. Wis. Nov. 7, 2007) (exemption limited to "*de minimis* changes") (citing *New York v. EPA*, 443 F.3d at 880); *United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994, 1009 (S.D. Ind. 2003) ("Giving the routine maintenance exemption a broad reading . . . would flout the Congressional intent evidenced by its broad definition of modification.").

Looking at *NPCA* in context demonstrates how out of step it is with the weight of authority.  The United States and other parties have litigated 33 claims to final judgment on routine maintenance rendered by a judge or jury.  *Ohio Edison*, 276 F. Supp. 2d at 861; *United States v. Cinergy Corp.,* 495 F. Supp. 2d 909, 933-948 (S.D. Ind. 2007); *Morgan*, 2007 WL 3287850, at *11-17; Ex. 14, Cinergy 2008 Jury Trial Special Verdict Form; *NPCA*, 2010 WL 1291335, at *24-31.  Only three of those 33 projects were found to be routine.  *NPCA,* 2010 WL 1291335, at *24-31 (two projects routine based on test that looks to whether project is "not extraordinary"); *Morgan,* 2007 WL 3287850, at *12-17 (finding $97,000 project routine, while

4

finding four other projects costing between $77,000 and $1.7 million not routine). The instant project, unprecedented in the four-decade history of the Monroe plant, does not fit within any reasonable understanding of the routine maintenance exemption.

### B.     DTE's Selected Analysis Confirms a Triggering Emissions Increase

The question for the Court is whether, when DTE spent $65 million to improve performance of Monroe Unit 2, the company actually expected to increase generation. Common sense and DTE's own pre-project documents confirm that the answer must be yes.

DTE relies on a legal standard for emissions increase that the company simply invents.[4] Without citation, DTE states that "EPA must demonstrate that it would be unreasonable for the utility to conclude that any post-project increase would be caused by factors other than the project."[5] Def. Br. at 19. This reverses the clear standard set forth in EPA and Michigan regulations and by the D.C. Circuit. U.S. Br. at 7-8; 22. To exclude any portion of the emissions increase, DTE must demonstrate *both* that the emissions could have been accommodated before the project and that they are unrelated to the project. No matter what the standard, there is a significant emissions increase.

First, Monroe 2 was simply *not* capable of accommodating the emissions increase in the baseline period it selected for $NO_X$. As Mr. Koppe explained in his original declaration (without being rebutted): the availability of the unit in the baseline period is *less* than the projected operation of the unit in the future. Ex. 15, Reply Declaration of Robert Koppe ("Koppe Reply Dec.") ¶¶102-110. For the unit to operate as much as the company expected, it would be

---

[4] DTE also creates a straw man in positing that "EPA claims [that an increase in generation and utilization] is *ipso facto* due to the project." Def. Br. at 17, *see also id*. at 19. As described in the text, this is simply not true; there is ample evidence that DTE itself projected emissions increases *resulting from* the project. *See also* U.S. Br. at 23-24.

[5] DTE also states, without citation, that the United States must prove that the project is the "*predominant* cause" of the emissions increase. Def. Br. at 19 (emphasis added). This claim has no basis in the law.

5

necessary to improve the availability.  Under either Party's test, this is sufficient to show an emissions increase that triggers NSR.

Second, there can be little doubt that a significant projected emissions increase is caused by the project.  Because the unit generates a ton (or more) of $SO_2$ and $NO_X$ each hour it runs at full power, the unit only needs to run an additional 40 hours a year due to the project to trigger NSR.  Ex. 3, Declaration of Ron Sahu ("Sahu Dec.") ¶13.  The facts here show that DTE expected to get far more than 40 hours of additional generation out of its $65 million investment.  As Mr. Koppe testified, again without rebuttal, Monroe Unit 2 operated *every hour* it was available in the five years before the project.  Ex. 5, Declaration of Robert Koppe ("Koppe Dec.") ¶34.  So if the extreme makeover *allowed* the unit to run more, it *will* run more.  Replacing the economizer alone would be expected to eliminate hundreds of outage hours each year.  Ex. 5, Koppe Dec. ¶92 and Table 2.  DTE's documents demonstrate that it expects the unit will run in those recovered hours, just as it had run in every available hour before the project.  Ex. 16, Reply Declaration of Bruce Biewald ("Biewald Reply Dec.") ¶8.  As the Seventh Circuit recently opined, there is a presumption that baseload plants will run more if availability increases.  *United States v. Cinergy Corp.*, --- F.3d ----, 2010 WL 4009180, at *5 (7th Cir. Oct. 12, 2010).  DTE considers Monroe 2 a baseload unit, meaning it generally operates if available.  Ex. 15, Koppe Reply Dec.  ¶¶62-63; Ex. 2-H, Direct Testimony of Paul Fessler at PF-12.

DTE's own documents confirm Mr. Koppe's analysis.  For example, DTE stated that the purpose of the economizer upgrade was to eliminate forced outages caused by the economizer.  Ex. 2-F, Excerpts of DTE Documents.  Eliminating those forced outages – and thus providing additional generation – provides the lion's share of the economic benefit from the project.  Ex. 17, Reply Declaration of Myron Adams ("Adams Reply Dec.") ¶¶12-17; Ex. 18, Reply

6

Declaration of Matthew Kahal ("Kahal Reply Dec.") ¶8; Ex. 13-E, Monroe Unit 2 Economizer Replacement Presentation (SEALED). That economic benefit is realized through increased generation that would not be possible without replacing the economizer. Ex. 15, Koppe Reply Dec. ¶¶20-49. This is exactly what the PROMOD run that DTE actually relied upon in submitting its Notice Letter to the state demonstrates. *Id.* Moreover, as retired utility system planner Myron Adams explains, DTE calculated the economic benefit for the project the same way Koppe and Sahu calculated the emissions increase. Ex. 17, Adams Reply Dec. ¶¶3, 18-24.

DTE does not challenge the United States' interpretation of its documents or the 2010 PSCR PROMOD run that DTE presented to Michigan. Nor does the company rely on any contrary pre-project analysis as required under the regulations. *See* U.S. Br. at 22-23. Instead, the company relies on two other PROMOD runs, both performed *after* the project was complete and the preliminary injunction motion filed,[6] to argue that any emissions increase was unrelated to the project. Such post-hoc analyses ignore that the critical question for NSR is whether a source should expect emissions to increase before starting the project. *See, e.g.*, *United States v. S. Ind. Gas & Elec. Co. ("SIGECO"),* No. IP99-1692-C-M/F, 2002 WL 1629817, at *3 (S.D. Ind. July 18, 2002). In any event, the PROMOD meta-analysis that DTE presents via expert witness Michael King fails to answer the question under the law. Mr. King does not testify that the emissions increases are unrelated to the project, a necessary prong to excluding emissions increases. *See* Def. Br. Ex. 10 at ¶101(1); U.S. Br. at 22. Indeed, Mr. King testifies that it is the interaction of many variables – all based on "system or market assumptions *made by the company*" – that explains the differences between the three PROMOD runs he reviewed. *Id.* at ¶¶ 6, 103 (emphasis added). This post-hoc PROMOD analysis ignores the fact that the 2010

---

[6] Mr. King relied on a re-run of the 2009 run performed at his request rather than the original. Def. Br. Ex. 10 at ¶79 n.19.

PSCR run, which represented DTE's best projection at the time of the project and which the company *chose* to rely on in determining the emissions increase to present to the state permitting office, is entirely consistent with the Koppe-Sahu analysis. It also ignores the internal DTE documents that the company relied on in deciding to replace the economizer. Notably, DTE does *not* rerun the 2010 PSCR PROMOD run with a different availability input, which would be the best way to identify the influence availability had on generation in the relevant projection. Ex. 16, Biewald Reply Dec. ¶11-13, 16.

The United States' proof via Koppe and Sahu and DTE's own documents demonstrate an emissions increase caused by the project, while DTE cannot meet its burden to exclude any emissions increase.

## II.     The Irreparable Harm To Public Health Compels Redress

There is grave human health harm from DTE's illegal emissions. This Court can serve the public interest by preventing that harm. These circumstances compel injunctive relief. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

### A.     DTE Cannot Obscure the Harm Resulting From Its Violation

DTE does not dispute that PM2.5 causes premature mortality and a host of other health effects. Nor does DTE dispute that had it obtained an NSR permit, its emissions would be dramatically less, resulting in less PM2.5 and improved health. Instead, DTE seeks refuge in a series of fictions, arguing, for example, that because NSR is triggered by an emissions increase that "it follows inexorably that it is the *increase* in emissions that provides the measure of harm,

8

if any." Def. Br. at 26. Unfortunately, reality does not track DTE's logic. Harm is caused by the pollution emitted above what is allowed by law, creating an irreparable injury that this Court has a duty to address. *See United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010, 1027 (N.D. Cal. 2002) ("[T]he Court has the responsibility in this case of crafting a remedy that is protective of public health, *and this responsibility necessarily takes preeminence over all other considerations*.") (emphasis added). DTE's efforts to excuse the harm from its emissions are unpersuasive.

*First*, DTE attempts to rely on a handful of EPA statements, Def. Br. at 2, 26,[7] to argue that NSR is meant only to manage growth. It cannot be disputed that when an existing source, such as Monroe Unit 2, is modified, the state-of-the-art pollution control technology required by its NSR permit will reduce emissions. The same EPA brief DTE cites clarifies that "the purpose of New Source Review is to require that facilities making changes that increase their emissions meet emission limits that reflect state-of-the-art control technology, analyze the increased emissions from their facilities to ensure that they will not adversely affect air quality, and, in nonattainment areas, offset their emission with emission reduction credits." *New York v. EPA*, No. 02-1387 (D.C. Cir. Oct. 26, 2004) Respondent EPA Brief at 74 (cited in Def. Br. at 2); *see also Hawaiian Elec. Co., Inc. v. U.S. EPA*, 723 F.2d 1440, 1447 (9th Cir. 1984) ("Congress found that it was important to *reduce pollution levels* below those mandated by the standards and that the best means of doing so was to require the installation of BACT on all sources which would otherwise increase pollution.") (emphasis added); *see also* U.S. Br. at 1-5. In this case, there is no question that NSR will indeed result in huge emissions reductions. When *applying*

---

[7] DTE cites EPA preamble language for two rules. One of those rules was vacated, *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 891 n.2, 900-02, 905 (D.C. Cir. 2006), while the other was never finalized, 70 Fed. Reg. 39,413, 39,418 (July 8, 2005), and 70 Fed. Reg. 61,081, 61,088 (Oct. 20, 2005).

9

for NSR permits, DTE trumpets the emissions reduction compelled by BACT by highlighting that the permit limits at Monroe "will result in **substantial reductions** to actual and potential emissions" of $SO_2$, $NO_X$, and several other pollutants. Ex. 13-A, Permit App. at 16 (emphases in the original). There can be no dispute that NSR requires installation of BACT, and that, in this case, BACT means a sharp reduction in pollution.

*Second*, DTE argues that the Court need not require BACT. Def. Br. at 27-29. However, the Court is charged to order the "relief it considers necessary to *secure prompt compliance* with the Act." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) (emphasis added). The very case DTE cites extensively for its proposition makes clear that a "violating party [is] not permitted to evade the substantive requirements of the statute." *United States v. Mass. Water Res. Auth.*, 256 F.3d 36, 55 and n.21 (1st Cir. 2001) ("*MWRA*") (citing Supreme Court cases). The First Circuit affirmed after finding that the trial court "*did* require compliance" with the statute. *Id* at 53 n.19.[8] As *Romero-Barcelo* and *MWRA* make clear, this Court's flexibility to determine *how* DTE meets its NSR obligations does not extent into license to allow DTE to evade the obligations.

DTE attempts to argue that various methods it theoretically could have pursued *before* starting the Monroe Unit 2 overhaul counsel in favor of not requiring emissions reductions now. As an initial matter, the fact that DTE could have avoided breaking the law does not mean it should get to turn back the clock. Such a ruling would simply encourage utilities to flout the law and hope to avoid detection, knowing that if they were caught, they would be no worse off than had they simply complied from the outset. *See SIGECO*, 2002 WL 1629817, at *3 (S.D. Ind.

---

[8] Importantly, the First Circuit also noted that the United States had not alleged imminent harm in the appeal, which is a sharp point of departure with the instant case. *Id*. at 38. Additionally, the First Circuit concluded by saying that "it should be a rare case in which a violation of [Safe Drinking Water Act] regulatory standards does not lead to an injunction if the responsible enforcement agency requests one." *Id*. at 58.

10

July 18, 2002) (allowing sources to construct and then determine if they violated would "turn the . . . program on its head . . . and eviscerate the *preconstruction* dimension of the program.") (internal citations omitted). Moreover, DTE fails to grapple with the reality of its proposed measures to avoid NSR. Each of the methods DTE raises to avoid NSR, Def. Br. at 30 n.32, are precluded here based on requirements that the company doesn't even acknowledge, let alone satisfy, in its brief and supporting materials. Ex. 19, Reply Declaration of Ranajit Sahu ¶¶11-16. Finally, DTE's own actions belie its claims to the Court. While DTE writes in its brief that "no rational company" would go through permitting for the Monroe Unit 2 project, DTE is doing just that for the Monroe fuel optimization project. Def. Br. at 30; Ex. 13-A, Permit App. In that instance, the company did not try to take emissions limits or otherwise avoid NSR. In fact, DTE stated in its permit application that installing BACT-level pollution controls would result in "cost effective" generation from the Monroe unit. Ex. 13-A, Permit App. at 17.

*Third*, DTE attempts to argue that it has already offset excess emissions through other emissions reductions at Monroe. Once again, DTE attempts to parlay compliance with one rule into a free pass from the consequences of its NSR violation. The controls at Monroe are necessary to comply with the NSR permits for units 3 and 4 that DTE recently obtained and will be necessary to comply with the NSR permits for units 1 and 2 that the company is now seeking. *See, e.g.*, Ex. 13-A, Permit App.; Ex. 13-C, Permit to Install for Monroe 3-4. The compliance with the law on those units cannot excuse unit 2's violation.

*Fourth*, DTE attempts to minimize the harm caused by its violation. While DTE decries as "alarmist" the science linking PM2.5 to premature mortality, that is the scientific consensus. The reasonable estimate of 90 premature mortalities resulting from DTE's violations is based on a peer-reviewed paper written by Dr. Joel Schwartz, the world's most cited authority on air

pollution. Ex. 20, Declaration of Joel Schwartz ¶¶4, 67-71. The contrary opinions from Dr. Suresh Moolgavkar were rejected by the mainstream scientific community long ago. *Id.* ¶¶3, 6-66. The Court can decide for itself whether it believes the conclusions of the American Medical Association and similar organizations or a witness who has testified 25 times in the last two years and who relies on discredited tobacco industry data. *Id.* Neither the company's technical critique of the United States' air pollution modeling[9] nor an appeal to the NAAQS can obscure the scientific consensus that emissions from Monroe cause harm to human health downwind.

### B.     The Balance of the Harms and Public Interest Favor Injunctive Relief

The only harm DTE has alleged is financial, and it pales in comparison to the human health impact from the company's illegal emissions. "When balancing monetary costs against loss to the environment . . . courts have often held that environmental harm outweighs monetary harm." *Sierra Club v. Army Corps of Engineers*, 4:10-cv-4017, slip op. (Dkt. 143) at 14 (W.D. Ark. Oct. 27, 2010) (Appendix B); *see also Village of Gambell*, 480 U.S. at 545.

DTE argues that the cost of controlling emissions at other units would be far greater than estimated by the United States' expert. However, the United States never sought to dictate how DTE reduces emissions, but merely presented potential measures to make up for four years of illegal, excess emissions resulting from the violation. Presumably DTE would be able to develop a less expensive method to reduce emissions based on the company's superior knowledge of its generating fleet. Indeed, company witness William Rogers is in charge of doing precisely that with respect to other $SO_2$ and $NO_X$ reduction programs. *See* Def. Br. at 35 (referring to Mr. Rogers as a "specialist in pollution control technology"); Def. Br. Ex. 4 at Ex. 1 (Rogers

---

[9] Notably, DTE chose not to have its expert modelers make their own projections of how Monroe's illegal emissions will impact downwind areas. Plaintiff's witnesses respond to the technical critique in the attached declaration from Lyle Chinkin, Ex. 21, but it is beyond dispute that the pollution is going somewhere and harming the people that breathe it.

Resume). Rather than propose a plan, however, Mr. Rogers simply criticizes the potential plan offered by the United States without proposing an alternative.[10] DTE fails to provide this Court what it believes the true cost of the remedy would be or quantify the impact on customers or the company. DTE's claims of hardship must also be treated skeptically given that the company complains in its brief that obtaining NSR permits would be "pointless" and would "consume thousands of man-hours" – even though it had already applied for an NSR permit for the same units. *See* Def. Br. at 34-35.

No matter what the cost of the interim reduction plan, DTE will not be harmed and the public need not be harmed by the cost. Just two days before filing its opposition brief, DTE trumpeted its expectations for 5% to 6 % annual growth and more than $400 million in revenue this year. Ex. 13-D, November 1-2, 2010, DTE Energy Business Update to EEI Financial Conference ("DTE Business Update"). If the company is truly worried about its customers, *see* Def. Br. at 36, it could simply absorb the cost of emissions reductions rather than seeking to increase rates.[11] Def. Br. Ex. 3 ¶24 (emissions reduction cost to be "borne by Detroit Edison [if not] passed through to its customers."); Ex. 18, Kahal Reply Dec. ¶13. If the company instead decides to seek a rate increase, the impact will be unwelcome but relatively small. Ex. 18, Kahal Reply Dec. ¶11-13. Finally, DTE was on notice when it started the project that EPA would likely object, and indeed EPA did object before DTE restarted the unit. In considering the equities, the Court must take account of the fact that DTE assumed the risk that it would be

---

[10] Notably, DTE does *not* argue that it is infeasible to achieve the necessary emissions reductions from its fleet. Should DTE credibly contend that *no* emissions reduction program at its other coal-fired plants is feasible, there are other options for reductions. For instance, DTE could buy and retire emissions allowances under programs that cover the eastern part of the United States. DTE could also minimize the harm from Monroe Unit 2 by running the unit less. Ex. 18, Kahal Reply Dec. ¶¶14-15.

[11] If it chooses to seek a rate increase to cover the costs, however, it will earn a double-digit return on the investment. Ex. 13-D, DTE Business Update at 10.

13

forced to answer for the violation. *See Crutchfield v. U.S. Army Corps of Engineers*, 192 F. Supp. 2d 444, 463 (E.D. Va. 2001).

Courts have often granted preliminary injunctive relief where the harm was less serious or the likelihood of success less strong. For instance, Judge Lawson issued a preliminary injunction preventing oil and gas drilling in Huron/Manistee National Forest based on alleged violations of the National Environmental Policy Act. *Anglers of the AU Sable v. U.S. Forest Service*, 402 F. Supp. 2d 826 (E.D. Mich. 2005); *see also Crutchfield*, 192 F. Supp. 2d 444; *Army Corps* (Appendix B). None of these cases presented the severity of harm threatened by DTE's violation.

## CONCLUSION

DTE should not be allowed to set the timetable by which it complies with the law, and the public should not have to suffer the harm from four years of illegal emissions. This Court should order DTE to (1) complete the NSR permit process and installation of pollution controls that DTE has already started; (2) remain at pre-project emissions levels until the new controls are operating pursuant to the permit; and (3) reduce emissions elsewhere in its fleet to make up for the illegal emissions from Monroe Unit 2.

                Respectfully Submitted,

                IGNACIA S. MORENO
                Assistant Attorney General
                Environment & Natural Resources Division

Dated: November 18, 2010        */s/ Thomas A. Benson*
                JUSTIN A. SAVAGE
                Senior Counsel
                THOMAS A. BENSON (MA Bar # 660308)
OF COUNSEL:               Trial Attorney
SABRINA ARGENTIERI       Environmental Enforcement Section
MARK PALERMO             U.S. Department of Justice
SUSAN PROUT              P.O. Box 7611

Associate Regional Counsel
U.S. EPA Region 5
Chicago, IL
77 W. Jackson Blvd.

APPLE CHAPMAN
Attorney Advisor
U.S. EPA
1200 Pennsylvania Ave. NW
Washington D.C. 20460

Washington, D.C. 20044-7611
 (202) 514-5261
thomas.benson@usdoj.gov

BARBARA McQUADE
United States Attorney
Eastern District of Michigan

ELLEN CHRISTENSEN
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226

**CERTIFICATE OF SERVICE**

      I hereby certify that on November 18, 2010, the foregoing brief was filed electronically using the Court's ECF system and automatically served through the Court's ECF system on counsel of record.

                                        */s/ Thomas A. Benson*_____
                                        Counsel for the United States