# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

      Plaintiff,

And

NATURAL RESOURCES DEFENSE
COUNCIL, INC. AND SIERRA CLUB,

      Intervenor-Plaintiffs,

      v.

DTE ENERGY COMPANY AND
DETROIT EDISON COMPANY,

      Defendants.

Civil Action No.
2:10-cv-13101-BAF-RSW

Judge Bernard A. Friedman

Magistrate Judge R. Steven Whalen

## DEFENDANTS' MOTION FOR PROTECTIVE ORDER

Defendants DTE Energy Company and Detroit Edison Company, by counsel, respectfully submit this motion pursuant to Fed. R. Civ. P. 26(c) and Loc. R. 37.2 for a protective order that limits the scope of discovery in this case to the projects specifically identified in Plaintiff's ("EPA") section 113(a) Notice of Violation ("NOV"). The NOV is a jurisdictional prerequisite to suit.

As explained in the accompanying Memorandum of Law, EPA cannot expand its case to assert violations that are not specified in the NOV. By extension, it cannot expand discovery to encompass projects that are not at issue in the case. But EPA has made clear that it intends to expand its case to reach projects other than the three tube replacement projects that were specifically identified in the NOV and, until recently, have been the focus of EPA's case. To avoid undue delay and to allow for the efficient completion of discovery, Defendants respectfully

request that the Court enter a protective order that confines the case to the limits set by EPA itself in its NOV.

In accordance with Loc. R. 7.1(a)(2), counsel for Defendants conferred with counsel for EPA, and explained the nature of this motion and its legal basis.  EPA did not concur in the relief sought.

Respectfully submitted, this 23rd day of March 2011.

HUNTON & WILLIAMS LLP

Matthew J. Lund (P48632)
Pepper Hamilton LLP
100 Renaissance Center, 36th Floor
Detroit, Michigan 48243
lundm@pepperlaw.com
(313) 393-7370

Michael J. Solo (P57092)
Office of the General Counsel
DTE Energy
One Energy Plaza
Detroit, Michigan
solom@dteenergy.com
(313) 235-9512

/s/ F. William Brownell
F. William Brownell
bbrownell@hunton.com
Mark B. Bierbower
mbierbower@hunton.com
Makram B. Jaber
mjaber@hunton.com
Brent A. Rosser
brosser@hunton.com
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
(202) 955-1500

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2011, the foregoing **DEFENDANTS' MOTION FOR PROTECTIVE ORDER** was electronically filed with the Clerk of Court using the ECF system, which will automatically send notification to the following attorneys of record:

> Ellen E. Christensen
> U.S. Attorney's Office
> 211 W. Fort Street
> Suite 2001
> Detroit, MI  48226
> 313-226-9100
> Email:  ellen.christensen@usdoj.gov
>
> James A. Lofton
> Thomas Benson
> Justin A. Savage
> Kristin M. Furrie
> U.S. Department of Justice
> Environmental and Natural Resource Div.
> Ben Franklin Station
> P.O. Box 7611
> Washington, DC  20044
> 202-514-5261
> Email:  thomas.benson@usdoj.gov
>         justin.savage@usdoj.gov
>         kristin.furrie@usdoj.gov
>         jim.lofton@usdoj.gov
>
> Holly Bressett
> Sierra Club Environmental Law Program
> 85 Second St., 2nd Floor
> San Francisco, CA  94105
> Phone: (415) 977-5646
> Email:  Holly.Bressett@sierraclub.org
>
> Andrea S. Issod
> Sierra Club
> 85 2nd Street, 2nd Floor
> San Francisco, CA  94105
> 415-977-5544
> Email:  andrea.issod@sierraclub.org

/s/ F. William Brownell_____

3

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>And<br><br>NATURAL RESOURCES DEFENSE<br>COUNCIL, INC. AND SIERRA CLUB,<br><br>        Intervenor-Plaintiffs,<br><br>        v.<br><br>DTE ENERGY COMPANY AND<br>DETROIT EDISON COMPANY,<br><br>        Defendants. | Civil Action No.<br>2:10-cv-13101-BAF-RSW<br><br>Judge Bernard A. Friedman<br><br>Magistrate Judge R. Steven Whalen |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PROTECTIVE ORDER**

## **TABLE OF CONTENTS**

STATEMENT OF ISSUE PRESENTED ........................................................................ iv

CONTROLLING OR OTHER APPROPRIATE AUTHORITY ................................... v

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ..........................................................................................................2

     I.     Work Performed During the March - June 2010 Outage........................................2

     II.    EPA's Notice of Violation to Detroit Edison Focuses Only on the Tube Projects....................................................................................................................3

     III.   EPA's Complaint Focuses Only on the Tube Projects. ..........................................4

     IV.   EPA's Preliminary Injunction Briefing and Supporting Declarations Focus Only on the Tube Projects.......................................................................................4

     V.    EPA Has Represented to the Court That Its Case Is Limited to the Tube Projects....................................................................................................................6

     VI.   Discovery Commences, and EPA Changes Its Tune. .............................................7

ARGUMENT ...............................................................................................................8

     I.     The Scope of EPA's Case Is Limited by the Scope of the NOV ...........................8

          A.     The Court's Jurisdiction Is Limited to the Projects Specified in the NOV..........................................................................................................8

          B.     The NOV Identified the Tube Projects Only ............................................10

     II.    The Court Should Enter a Protective Order Limiting Discovery in the Case to the Three Tube Projects Listed in the NOV. ....................................................18

CONCLUSION...........................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*American Communications Ass'n. Local 10, I.B.T. v. Retirement Plan for Employees of RCA Corp.*, 488 F. Supp. 479 (S.D.N.Y. 1980) ...........................................20

*Green v. Nevers*, 196 F.3d 627 (6th Cir. 1999)................................................................19

*Hallstrom v. Tillamook County*, 493 U.S. 20 (1989) ......................................................8

*McLaughlin v. Copeland*, 455 F. Supp. 749 (D. Del. 1978).........................................20

*National Parks Conservation Association v. Tennessee Valley Authority*, No. 3:01-CV-71, 2010 WL 1291335 (E.D. Tenn. Mar. 31, 2010) .................................3, 15, 16

*Sierra Club v. Johnson*, 541 F.3d 1257 (11th Cir. 2008)................................................9

*TVA v. Whitman,* 336 F.3d 1236 (11th Cir. 203) ..........................................................16

*United States v. AM General Corp.*, 808 F. Supp. 1353 (N.D. Ind. 1992) ...................10

*United States v. Brotech Corp.*, No. Civ. A. 00-2428, 2000 WL 1368023 (E.D. Pa. Sept. 19, 2000) ......................................................................................................10

*United States v. Cinergy Corp.,* 495 F. Supp. 2d 909 (S.D. Ind. 2007)........................15

*United States v. Cinergy Corp.*, No. 1:99-cv-1693-LJM/VSS, slip op. at 4 (S.D. Ind. March 21, 2005) ..............................................................................................19

*United States v. E. Ky. Power Cooperative*, No. 5:04-cv-00034 (E.D. Ky. June 17, 2005) ...........................................................................................................13, 14, 19

*United States v. Ford Motor Co.*, 736 F. Supp. 1539 (W.D. Mo. 1990) ......................10

*United States v. LTV Steel Co.*, 116 F. Supp. 2d 624 (W.D. Pa. 2000) .........................9

*United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 1122 (D. Colo. 1987)..............2

*United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 1141 (D. Colo. 1988)............10

*United States v. Pan American Grain Manufacturing Co.*, 29 F. Supp. 2d 53 (D.P.R. 1998) .....................................................................................................10, 11

*Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990)..............................15

**FEDERAL CODE, REGULATIONS & OTHER MATERIALS**

40 C.F.R. pt. 51, App. S ...................................................................................11

42 U.S.C. § 7413(a)(1) .................................................................................8, 9, 10

42 U.S.C. § 7413(b)(1) ....................................................................................9, 10

57 Fed. Reg. 32,314 (July 21, 1992) ...............................................................15

71 Fed. Reg. 54,235 (Sept. 14, 2006) .............................................................17

74 Fed. Reg. 2,376 (Jan. 15, 2009) .............................................................17, 18

**STATE STATUTES, REGULATIONS & OTHER MATERIALS**

Mich. Admin. Code R. 336.2801(aa)........................................................11, 15, 16

Mich. Admin. Code R. 336.2802.....................................................................11

**RULES**

Fed. R. Civ. P. 26(c)(4).....................................................................................19

Fed. R. Civ. P. 26(b)(1).....................................................................................19

## STATEMENT OF ISSUE PRESENTED

1.  Section 113(a) of the Clean Air Act requires, as a mandatory jurisdictional prerequisite to suit for enforcement of violations of a State Implementation Plan, that Plaintiff ("EPA") send a "Notice of Violation" to the Defendants and the State.  In the context of a claim that an operator has performed a "major modification" without satisfying New Source Review permitting requirements, stating a violation requires EPA to specify the projects that it contends constitute major modifications.

Where EPA identified only three independent projects as "major modifications" undertaken by Detroit Edison in violation of Michigan's SIP, can EPA expand its case to address projects not identified in its Notice of Violation?

Defendants' Answer:  No.

<u>**CONTROLLING OR OTHER APPROPRIATE AUTHORITY**</u>

**The Jurisdictional NOV Requirement**

*United States v. AM General Corp.*, 808 F. Supp. 1353, 1362 (N.D. Ind. 1992)
*United States v. Ford Motor Co.*, 736 F. Supp. 1539 (W.D. Mo. 1990)
*United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 1122 (D. Colo. 1987)
*United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 2d  1141 (D. Colo. 1988)
*United States v. LTV Steel Co.*, 116 F. Supp. 2d 624 (W.D. Pa. 2000)
*United States v. Pan American Grain Mfg. Co.*, 29 F. Supp. 2d 53 (D.P.R. 1998)

42 U.S.C. § 7413

**The Scope of NSR Cases Involving Alleged "Major Modifications" Is Limited by the NOV**

*United States v. E. Ky. Power Cooperative*, No. 5:04-cv-00034 (E.D. Ky. June 17, 2005)
*United States v. Cinergy Corp.*, No. 1:99-cv-1693-LJM/VSS (S.D. Ind. March 21, 2005)

**The Unit of Measure for NSR "Major Modification" Analysis**

*Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Authority*, No. 3:01-CV-071, 2010 WL 1291335 (E.D. Tenn. Mar. 31, 2010)

57 Fed. Reg. 32,314, 32,326 (July 21, 1992)
71 Fed. Reg. 54,235, 54,244-54,248 (Sept. 14, 2006)
74 Fed. Reg. 2,376, 2,378 (Jan. 15, 2009)

## PRELIMINARY STATEMENT

This motion asks the Court to confine EPA's case to the alleged violations specified in the mandatory "Notice of Violation" it sent to Defendants before filing suit.  Before it could file this action against Defendants DTE Energy Company and Detroit Edison Company (collectively, "Detroit Edison"), EPA was required under section 113(a) of the Clean Air Act to provide Detroit Edison and the State of Michigan with a Notice of Violation that specified the violations of Michigan's Clean Air Act State Implementation Plan ("SIP")[1] that it believed Detroit Edison had committed.  EPA served that Notice on June 4, 2010.  (Ex. 1)  In it, EPA identified three boiler tube projects (the "Tube Projects") that it contends constitute "major modifications" to Detroit Edison's Monroe Unit 2 undertaken without first satisfying New Source Review ("NSR") permitting requirements:  (1) the replacement of the economizer; (2) the replacement of reheat pendants; and (3) the replacement of a section of waterwall tubes.  These Tube Projects were performed during a planned outage at Monroe Unit 2 from March to June 2010 that included dozens of other routine repair and replacement projects.

Until recently, EPA has confined its case to the Tube Projects.  The specific projects identified in the Complaint are the Tube Projects.  The focus of its briefing on its motion for a preliminary injunction was the Tube Projects.  The expert declarations that supported EPA's preliminary injunction motion focused on the Tube Projects.  EPA, in its description of its claims in its portion of the parties' Rule 26(f) report, only identified the Tube Projects.  And EPA's lawyers represented to the Court when advocating for an accelerated trial schedule that the evidentiary record developed during briefing on EPA's motion for preliminary injunction — which fo-

---

[1] At the Court's suggestion at the January 19, 2011 hearing, Detroit Edison is attaching as Ex. 11 a glossary of acronyms referenced in this brief.

cused exclusively on the Tube Projects — would need little supplementation.

But now, EPA has made clear that it intends to expand its case beyond the projects identified in its notice. It now contends that all of the work performed during the 2010 outage constitutes a single "project," and that this "project" is the major modification that is the subject of this dispute. Having re-characterized its case in this way, EPA argues that it is entitled to expand discovery beyond the Tube Projects.

Section 113(a) limits this case to the three Tube Projects, because those are the "modifications" EPA identified in its NOV. The notice requirement is jurisdictional. "[T]o allow the EPA to notify the alleged offender of one violation, and then bring a civil action on the basis [of] another violation (different than that alleged in the notice) . . . would completely frustrate the notice requirement created by Congress." *United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 1122, 1128 (D. Colo. 1987) ("*Louisiana-Pacific I*"). Detroit Edison accordingly asks the Court to limit EPA's case to the violations specified in the NOV and enter a protective order that limits EPA's discovery to the Tube Projects that are properly the subject of this case.

## BACKGROUND

### I.   Work Performed During the March - June 2010 Outage

Detroit Edison performed a number of distinct maintenance activities during the March - June 2010 outage (the "Outage"). Detroit Edison described the more significant activities in the March 12, 2010, Planned Outage Notification it sent to the Michigan Department of Environmental Quality ("MDEQ"):

> The following activities will be performed during the outage scheduled to begin on or about March 13, 2010 . . . :
>
> • **Boiler System Repairs and Replacements** — replacement of economizer tubes; replacement of reheat pendants; replacement of a section of water wall tubes and burner cells; and boiler tube chemical cleaning with the replacement of 210 valves. . . .

2

- **Turbine System Repairs and Replacements** — rewind MTG rotor; install static exciter; replacement of generator lead box; overhaul of north boiler feed pump turbine & rebuild south boiler feed pump; and install boiler feed pump TSI. . . .

- **Electrical System Repairs and Replacements** — Replace system service transformer #62; replace 4160V cables from system service transformers; rebuild 9-4160V circuit breakers. . . .

- **Draft & Fuel Burning Repairs and Replacements** — Replace ten air heater gas side expansion joint[s]. . . . .

But this was not the only work that Detroit Edison performed. As is typical in the industry, Detroit Edison also performed a host of other routine maintenance, repair and replacement projects during the Outage. *See* Ex. 2, Monroe Power Plant Unit #2 2010 Periodic Outage Preparation Status Report at 6-7; Attachment A to Declaration of Jerry Golden (Docket Entry No. 46-10) at 57; *see also Nat'l Parks Conservation Ass'n v. Tennessee Valley Auth.*, No. 3:01-CV-71, 2010 WL 1291335, *9 (E.D. Tenn. Mar. 31, 2010) (describing the types of maintenance performed during a planned outage); Declaration of Alan Michael Hekking (Docket Entry No. 8-17) ¶ 24 (same).

## II.    EPA's Notice of Violation to Detroit Edison Focuses Only on the Tube Projects.

In the "Notice and Finding of Violation (Notice) under Section 113(a)(1) and 113(a)(3) of the Clean Air Act" ("Notice" or "NOV") that EPA sent Detroit Edison on June 4, 2010, EPA identified only three projects falling within the "Boiler System Repairs and Replacements" category as constituting major modifications performed in violation of Michigan's SIP. Specifically, in Paragraph 20 of the NOV, EPA states:

> 20.  The construction activities that DTE commenced on or about March 13, 2010, include, but are not limited to the following work on the unit's boiler:  [1] replacement of economizer tubes; [2] replacement of reheat pendants; and [3] replacement of a section of waterwall tubes and burner cells."

3

(Ex. 1 at 4.)  In the next paragraph, EPA states its conclusion that these "replacement projects"

are the "major modifications" that are the subject of the NOV:

> 21.  EPA has calculated that the replacement projects iden-
> tified in Paragrpah [sic] 20 are major modifications under the
> Clean Air Act and the Michigan implementing regulations, as they
> will result in projected emissions increases in excess of 40 TPY of
> NOx and $SO_2$.

(*Id.*)  No other projects performed during the Outage (the "Non-Tube Projects") are similarly

identified as "major modifications."

### III.   EPA's Complaint Focuses Only on the Tube Projects.

In its Complaint, EPA again focused on boiler system tube replacements.  In Paragraph

46, it alleges:

> On or about March 13, 2010, DTE began a major overhaul project
> at Monroe Unit 2.  This overhaul project included the complete re-
> placement of two major boiler components:  the high temperature
> reheater and the economizer, at a cost of approximately $30 mil-
> lion.  The project as a whole cost approximately $65 million and
> was unprecedented in the 40-year history of the Monroe Power
> Plant.

EPA then alleges more generally in its First and Second Claims for Relief:

> On or about March 13, 2010, Defendants commenced construction
> of a major modification, as defined by the Act and the Michigan
> SIP, that included the overhaul work described above.  This major
> modification included one or more physical changes or changes in
> the method of operation at Monroe Unit 2.  This major modifica-
> tion resulted in significant net emissions increases, as defined by
> the relevant PSD regulations, of one or more of the following pol-
> lutants:  NOx and $SO_2$.

(Compl. ¶¶ 50, 55.)  So like the NOV, the Complaint is focused specifically on the three Tube

Projects.

### IV.   EPA's Preliminary Injunction Briefing and Supporting Declarations Focus Only on the Tube Projects.

The briefing and expert declarations that EPA submitted in support of its motion for a

preliminary injunction also focused on the three Tube Projects.  In purporting to apply the

"WEPCO" factors for assessing whether these projects were routine maintenance, repair or re-

placement," EPA focused exclusively on the Tube Projects:

- With respect to the "nature and extent" of the work, EPA noted that "[b]oth the *economizer and pendant reheater replacements* were considered major capital projects by [Detroit Edison], and required the approval of senior company officials";

- With respect to "purpose," EPA explained: "After nearly 40 years of operation, *the pendant reheater and economizer* had reached the end of their useful life. . . . The purpose of the project was to replace *those components* with upgraded designs and materials in order to avoid forced outages and thus improve the ability of the plant to generate electricity."

- With respect to "frequency," EPA again pointed to two of the three tube projects:  "[I]t is the first time [Detroit Edison] has completely replaced the economizer or pendant reheater at Monroe Unit 2. . . . [I]t is the first time that [Detroit Edison] has performed work on *both* the *economizer and the reheater* at the same time."

- And with respect to "cost," EPA again emphasized the Tube Projects:  "The total cost of the March to June 2010 Outage work at Monroe Unit 2 was approximately $65 million, of which approximately $30 million was spent on replacing the *pendant reheater and the economizer.  The reheater and economizer replacements were capital improvement projects*. . . . Such large capital expenditures are not routine.

*See* Mem. in Support of Pl.'s Mtn. for Prelim. Injunction (Docket Entry No. 8) at 19-20.

(emphases added).  EPA took the same approach with respect to its arguments relating to

"emissions increase."  It explained that "the company's project justification documents stated

that replacing the economizer and pendant reheater was necessary to eliminate forced outages

and improve unit availability. . . . In the future, [Monroe Unit 2] will run during the additional,

available hours recovered by replacing the worn out economizer and pendant reheater."  *Id.* at

23-24.  In contrast to its emphasis on the economizer and pendant reheater projects, EPA *never*

mentions any of the other projects performed during the Outage.

5

The expert declarations that EPA used to support its motion for preliminary injunction also focused exclusively on the Tube Projects. Myron Adams, in supporting his opinion that "major refurbishment on a sizeable generating unit component or subsystem . . . can be expected to improve the availability of that component or subsystem," specifically identifies the economizer and the reheater. *See* Decl. of Myron Adams (Docket Entry No. 8-21) at ¶ 9. And in his reply declaration, he narrowed his focus yet further: "My focus in this analysis is on the replacement and upgrade of the economizer, one of several projects [Detroit Edison] performed during the outage." *See* Reply Decl. of Myron Adams (Docket Entry No. 58-12) at ¶ 4. Alan Hekking likewise described the Tube Projects as projects that are not "routine." *See* Decl. of Alan Michael Hekking (Docket Entry No. 8-17) at ¶¶ 38-41. And Robert Koppe and Ranajit Sahu, EPA's experts on emissions, focused only on the economizer and reheater when performing their emissions increase calculations. As Dr. Sahu explained:

> I looked at the component-specific GADS availability loss data (in megawatt-hours) for each of the 24-month baseline periods prior to the modification. This data was gathered by Robert Koppe and is explained in his declaration. ***To simplify matters, we only considered GADs availability loss data for the economizer and pendant reheater.***

Declaration of Ranajit Sahu (Docket Entry No. 8-13) at ¶ 9 (emphasis added).

## V.    EPA Has Represented to the Court That Its Case Is Limited to the Tube Projects.

Consistent with its NOV, its Complaint, its briefing in support of its preliminary injunction motion, and its expert declarations, EPA has repeatedly represented to the Court that this case is about the three Tube Projects. At the hearing on January 19, 2011, when the Court was evaluating how long it would take the parties to prepare the case for a trial on liability, EPA made clear that the case would be limited in scope to the projects that were the subject of the briefing on the preliminary injunction motion. (Ex. 3, Jan. 19, 2011 Hr. Tr. at 142-145.) EPA

claimed it would be a case that "we can [try] in another 90 days as the Court has suggested." (*Id.* at 144.) And EPA confirmed that it would focus on the three Tube Projects in its portion of the parties' Rule 26(f) report under the heading, "Description of the Claims":

> Plaintiff alleges that the replacement of the economizer, high tem-
> perature reheater, and waterwalls at Monroe Unit 2 should have
> been expected to result in a significant net emissions increase in
> sulfur dioxide and oxides of nitrogen, and were therefore a major
> modification (or major modifications) under NSR.

Rule 26(f) Report (Docket Entry No. 40) at 2-3.

## VI.   Discovery Commences, and EPA Changes Its Tune.

The parties are now in the early stages of discovery as part of an aggressive pre-trial schedule for a case of this magnitude, and EPA has made clear that it intends to expand its case beyond the Tube Projects that are specifically identified in its NOV. In its first round of discovery requests, EPA purported to define the "Project" that it will contend qualifies as a "modification" under the NSR regulations as the entire collection of projects performed during the 2010 Outage. (Ex. 4a, Plaintiff United States' First Set of Interrogatories to Defendants DTE Energy and Detroit Edison at 8; Ex. 4b, Plaintiff United States' First Set of Document Requests to Defendants DTE Energy and Detroit Edison at 8.) According to EPA, the three Tube Projects are not "projects" in and of themselves, but rather are elements of the larger project. (*Id.* at 6-7.) EPA thus seeks discovery not only as to the Tube Projects, but also as to every other piece of work conducted at Monroe 2 during the Outage. (*See, e.g.*, *Id.* (Interrogatories 2, 5-8, 12-13, 15-16, 18).) According to EPA:

> All of this work was performed as part of the overhaul project con-
> structed by Defendants during the Spring 2010 outage at Monroe
> Unit 2. ***It is not for Defendants to define what aspect of the work
> done during the outage count for [NSR] purposes.***

(Ex. 5, March 8, 2010 Ltr. from Tom Benson (emphasis added).)[2]

On this point, Detroit Edison agrees.  It is not Detroit Edison's responsibility to define the scope of this case.  Under Section 113(a), that was EPA's job, and it chose to limit this case to the three Tube Projects.  The scope of discovery should be similarly confined.

## ARGUMENT

I.    **The Scope of EPA's Case Is Limited by the Scope of the NOV.**

A.    **The Court's Jurisdiction Is Limited to the Projects Specified in the NOV.**

This Court's subject matter jurisdiction over EPA's claims is limited by the content of the notice of violation required by 42 U.S.C. § 7413(b).  The scope of EPA's complaint is likewise limited.  Because the EPA failed to provide pre-suit notice to Detroit Edison regarding the Non-Tube Projects, those claims are not a part of the case.

The basic legal standards governing the pre-suit notice provisions of environmental laws are well established.  The general rule is that compliance with a notice provision is "a mandatory, not optional, condition precedent for suit," and any claim brought without the proper notice "must be dismissed."  *Hallstrom v. Tillamook County*, 493 U.S. 20, 26, 31 (1989) (applying the 60-day notice requirement for citizen suits under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972).

The applicable notice requirement for this case is found in section 113 of the Act.  *See* 42 U.S.C. § 7413(a)(1).  Section 113(a)(1) requires EPA to provide notification to any person al-

---

[2] At the same time that EPA is putting Detroit Edison to the burden of providing discovery as to projects beyond the Tube Projects identified in the NOV, EPA is also demanding that Detroit Edison do the work that EPA is required to do to in responding to Detroit Edison's discovery requests.  For example, EPA recently produced 4.5 million pages of documents that supposedly relate to other NSR cases without appearing to conduct any meaningful review of them to determine whether they are relevant to the issues in this case or responsive to Detroit Edison's discovery requests.  In further violation of Rule 34 of the Federal Rules of Civil Procedure, EPA also failed to "organize and label [the documents] to correspond to the categories in the request."  Fed. R. Civ. P. 34; *see also* Ex. 6, Mar. 18, 2011, Ltr. from Brent Rosser to Tom Benson.

leged to be in violation of any requirement or prohibition of an applicable SIP. 42 U.S.C. §

7413(a)(1) ("Whenever . . . the Administrator finds that any person has violated . . . an applicable

implementation plan . . . the Administrator shall notify the person and the State in which the plan

applies of such finding.") (emphasis added). That same section further provides that "[a]t any

time *after the expiration of 30 days following the date on which such notice of a violation is*

*issued*, the Administrator may . . . bring a civil action in accordance with subsection (b) of this

section." *Id.* (emphasis added). Following up on that notice requirement, subsection (b) states:

> (b) Civil judicial enforcement
>
> The Administrator shall, as appropriate, in the case of any person
> that is the owner or operator of an affected source, a major emit-
> ting facility, or a major stationary source, and may, in the case of
> any other person, commence a civil action . . . in any of the follow-
> ing instances:
>
> (1) Whenever such person has violated, or is in violation of, any
> requirement or prohibition of an applicable implementation plan or
> permit. Such an action shall be commenced (A) during any period
> of federally assumed enforcement, or (B) *more than 30 days fol-*
> *lowing the date of the Administrator's notification under subsec-*
> *tion (a)(1) of this section that such person has violated, or is in*
> *violation of, such requirement or prohibition.*

*Id.* § 7413(b)(1) (emphasis added); *see also Sierra Club v. Johnson*, 541 F.3d 1257, 1262 (11th

Cir. 2008) ("Thirty days after the issuance of a violation notice, the statute authorizes the EPA to

bring a civil action seeking injunctive relief and the imposition of civil fines. [42 U.S.C.] §

7413(a)(1)(C)), (b)."").

   The statutory authority for bringing a lawsuit, and this Court's jurisdiction to hear it, are

thus premised on EPA's providing the required pre-suit notice. This requirement is jurisdic-

tional. *See United States v. LTV Steel Co.*, 116 F. Supp. 2d 624, 632 (W.D. Pa. 2000) ("A juris-

dictional prerequisite to the U.S. EPA's filing suit, however, is that it comply with the CAA's

notice requirement at 42 U.S.C. Section 7413(a)(1)."); *United States v. AM General Corp.*, 808

F. Supp. 1353, 1362 (N.D. Ind. 1992) ("Section 113 clearly requires that the EPA must serve

AM General with a NOV before it may proceed with judicial enforcement proceedings. §

113(a)(1). The requirement is jurisdictional[.]"); *United States v. Ford Motor Co.*, 736 F. Supp.

1539, 1550 (W.D. Mo. 1990) (holding that the notice requirement in 42 U.S.C. § 7413(a) "is ju-

risdictional").  Accordingly, EPA is only authorized to bring civil actions under 42 U.S.C. §

7413(b) based on the "specific violation[s] alleged in the NOV."  *AM General Corp.*, 808 F.

Supp. at 1362; *see also United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 2d  1141, 1155

(D. Colo. 1988) ("EPA is empowered to bring . . . a civil suit only on the basis of the specific

violation alleged in the NOV . . . .") ("*Louisiana-Pacific II*"); *United States v. Brotech Corp.*,

No. Civ. A. 00-2428, 2000 WL 1368023, at *2 (E.D. Pa. Sept. 19, 2000).

    The scope of EPA's NOV thus defines the permissible scope of any subsequent com-

plaint.  EPA cannot "expand [the suit] beyond the specific violations alleged in th[e] letter."

*Louisiana-Pacific II*, 682 F. Supp. 1155.  "As a result, ***not every violation of the PSD provisions***

***is actionable***, but only those where the alleged offender is notified of the violation . . . ."  *Id.*

(emphasis added).  "[T]o allow the EPA to notify the alleged offender of one violation, and then

bring a civil action on the basis [of] another violation (different than that alleged in the notice) . .

. would completely frustrate the notice requirement created by Congress."  Therefore, failure to

abide by the presuit notice requirements set forth in 42 U.S.C. § 7413(a) and (b) warrants dis-

missal for lack of subject matter jurisdiction.  *See United States v. Pan American Grain Mfg.*

*Co.*, 29 F. Supp. 2d 53, 56 (D.P.R. 1998) (stating that the "Court will lack jurisdiction" if EPA

fails to comply with CAA notice requirements); *Ford Motor Co.*, 736 F. Supp. at 1550.

    **B.**    **The NOV Identified the Tube Projects Only.**

    The irreducible minimum in terms of specificity in a "notice of violation" is that the no-

tice actually identify the precise activity that constitutes a violation of the Act.  Here, EPA's al-

leged violation is that Detroit Edison has not complied with the NSR rules[3] that require that an operator obtain a preconstruction permit whenever a new source is to be built or when an existing major stationary source is to undertake a project that constitutes a "major modification" to that source. *See, e.g.*, MICH. ADMIN. CODE R. 336.2802. As relevant here, the definition of "major modification" tracks the statutory language in requiring that, for a proposed activity to constitute a "modification," there must be (i) a "physical or operational change" that (ii) "results in" (*i.e.*, causes) (iii) a "significant emissions increase." *Id.* 336.2801(aa)(i); 40 C.F.R. pt. 51, App. S. So to state a violation in its NOV, EPA was required to identify the specific "physical or operational change" that will cause an emissions increase.

EPA here only identified the Tube Projects in its NOV as the projects that constituted "major modifications" undertaken in violation of the Michigan SIP. (Ex. 1, NOV at 4 ¶¶ 20-21.) It specifically enumerated these replacement projects in Paragraph 20 and explained in Paragraph 21 that these "replacement projects . . . are major modifications under the Clean Air Act and the Michigan implementing regulations . . . ." (*Id.*) So the Court only has jurisdiction over claims that these specific projects individually constitute major modifications. Conversely, the Court lacks jurisdiction to entertain any claim that any Non-Tube Project — whether considered independently or in combination with other projects — constitutes a major modification undertaken in violation of Michigan's SIP. *See Pan American Grain*, 29 F. Supp. 2d at 56.

EPA now contends that the NOV was broad enough to encompass the Non-Tube Pro-

---

[3] Two different NSR programs are at issue here. The first is the Prevention of Significant Deterioration ("PSD") program, and the second is the Non-Attainment New Source Review ("NNSR") program. EPA has approved Michigan's SIP with respect to the PSD regulations, but not as to the relevant NNSR regulations. Accordingly, the Michigan SIP contains the controlling PSD regulations at issue in this case, while the federal regulations control as to NNSR. Regardless, both sets of the regulations are the same as they pertain to NSR applicability issues, and Detroit Edison refers to them collectively as the "NSR rules" in this Memorandum.

11

jects.  After Detroit Edison objected to discovery requests targeting the Non-Tube Projects, EPA explained its new position:  "We note that Defendants are incorrect in alleging that the notice of violation was limited to three of the replacements performed during the project.  The NOV refers to a major modification that includes but is not limited to the three boiler component replacements for which Defendants would allow discovery."  (Ex. 5, Benson Letter at 2 n.2. (citing NOV ¶¶ 20, 23.)  EPA specifically references Paragraph 20 of the NOV, where EPA states that "[t]he construction activities" undertaken during the Outage "include, but are not limited to . . . replacement of economizer tubes; replacement of reheat pendants; and replacement of waterwall tubes and burner cells."  The exact theory is unclear, but EPA appears to argue that either (a) the generic reference to "construction activities" performed during the Outage is sufficient to satisfy the notice requirement as to any individual Non-Tube Project; or (b) that the entire Outage should be treated as a single "project" for purposes of NSR analysis, and the notice adequately identifies the Outage.  Both theories should be rejected.

### 1.    The Notice Is Insufficient as to Any Specific Non-Tube Project.

EPA's generic reference to "construction activities" performed during the Outage does not satisfy the notice requirement as to any individual Non-Tube Project.  As EPA's expert witness Alan Hekking has explained, operators like Detroit Edison will perform a host of indisputably routine maintenance activities during a planned outage:

- Cleaning of boiler and related ductwork to facilitate maintenance access and inspections;
- Inspection of the furnace and gas path;
- Inspection including non-destructive examination of known trouble areas;
- Individual tube repair/replacement;
- Inspection of tube shields and high erosion areas;

- Inspection, repair and replacement of refractory in the slag necks and troughs;

- Inspection and repair of ductwork and expansion joints;

- Cleaning and inspection of boiler penthouses;

- Water blasting, inspection, stud replacement and new refractory (cyclone fired boilers);

- Inspection and repair of boiler casings, doors and inspection ports;

- Inspection and repair of gas path deflection baffles and flow distributors;

- Inspection and repair of all dampers (air and gas);

- Remove, disassemble, inspect and repair ignitors;

- Cleaning, inspection and repair of external steam header vestibules;

- Pressure test of water and steam tubing components; and

- Chemical cleaning of water-side tubing to remove internal deposits.

Hekking Decl. ¶ 24. Detroit Edison's Outage was no different. Even within the category of "capital projects," Detroit Edison conducted a number of other projects that are routine maintenance, repair and replacement, including the replacement of battery chargers, upgrades to circuit breakers, asbestos removal and lead abatement. (Ex. 2)

If EPA's general reference to "work performed during an outage" is sufficient to meet its notice requirement as to any of the dozens of projects performed during the outage, then the requirement is illusory. EPA could be alleging that one of these projects constitutes a violation, or that they all do. Detroit Edison and the Michigan regulators are left to guess.

Courts have rejected precisely the tactic that EPA employs here. *United States v. East Kentucky Power Cooperative*, a NSR enforcement case like this one, is instructive. *See United States v. E. Ky. Power Cooperative*, No. 5:04-cv-00034 (E.D. Ky. June 17, 2005) (order granting motion for protective order) (Ex. 7). There, as here, EPA specifically referenced four projects in

13

its NOV that it contended were undertaken in violation of the NSR rules.  There, as here, EPA

alleged in its complaint that the work performed by the Defendant constituted "one or more

major modifications."  *Id.* at 6.  And there, as here, EPA sought to expand discovery beyond the

projects specifically identified in the notice.  In granting EKPC's motion for protective order, the

Court rejected EPA's argument that the its general reference to "one or more major

modifications" provided sufficient notice:

> Based on well-settled law that the EPA may only bring a civil ac-
> tion against an alleged violator of the Act on the basis of the
> charged violation(s) contained in a NOV previously issued to that
> alleged violator, the [Court] concludes that plaintiff lacks jurisdic-
> tion to assert any claims against EKPC that were not contained in
> the NOVs to EKPC.
>
> . . .
>
> Plaintiff's statement that EKPC undertook "one or more major
> modifications" is too broad and too vague to comply with the re-
> quirements of notice pleading.  In a nutshell, plaintiff is not free
> simply to recharacterize its complaint as being "broad" enough to
> permit it to obtain discovery from EKPC on projects not identified
> in the complaint.

*Id.* at 5-6.

EPA's catch-all reference to "construction activities" that "include, but are not limited to"

the Tube Projects is just as deficient as the catch-all language EPA used in *EKPC*.  If that

language is insufficient under liberal notice pleading standards, it is certainly insufficient under

the more exacting standards that govern Section 113(a) NOVs.

### 2.    The Collection of Work Performed During the Outage Cannot Be Considered a Single Project.

To the extent EPA is contending the NOV is sufficient because it identified the entire

collection of work performed at Monroe 2 during the Outage as the "modification" that triggered

NSR, EPA's theory is at odds with the language of the NSR rules.  The definition of

"modification" makes clear that the focus cannot be so broad as to encompass all of the work

performed during a given outage.  Specifically, the NSR rules provide that a "[p]hysical change ... shall not include … [r]outine maintenance, repair, and replacement [(RMRR)]."  MICH. ADMIN. CODE R. 336.2801(aa)(iii).  And in deciding what constitutes RMRR, EPA itself has treated discrete components and systems as the units of measure when evaluating whether a project is routine.  For example, in its "WEPCo Rule," EPA made clear the focus of the "routine" determination should be whether the repair or replacement of a specific type of equipment is routine in the industry:  "EPA today is clarifying that the determination of whether the repair or replacement of a particular item of equipment is "routine" under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of whether *that type of equipment* has been repaired or replaced by sources within the relevant industrial category."  57 Fed. Reg. 32,314, 32,326 (July 21, 1992) (emphasis added).  This regulatory pronouncement of EPA in the *Federal Register* has never been rescinded, withdrawn, or revoked.

So EPA itself, in construing the Clean Air Act and promulgating the regulations on which Michigan's SIP is based, has concluded that the unit of the analysis when considering what constitutes a "major modification" is the discrete type of equipment being repaired or replaced.  The definition of "major modification" does not work if the unit of analysis is the aggregation of a series of discrete projects.  For this reason, with the exception of massive "Life Extension" projects,[4] courts typically have eschewed treating a collection of replacement projects as a single "physical change" for purposes of NSR analysis.  For example, in *National Parks Conservation Association, Inc. v. Tennessee Valley Authority*, No. 3:01-CV-071, 2010 WL 1291335 (E.D. Tenn. Mar. 31, 2010), the court confronted a case very similar to EPA's case here and treated

---

[4] *See, e.g., Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 905 (7th Cir. 1990) (describing "extensive renovations" intended to extend the life of units placed into operation between 1935 and 1950); *United States v. Cinergy Corp.*, 495 F. Supp. 2d 909, 915-17 (S.D. Ind. 2007) (describing the "'full' or 'complete' life extension" projects at the Beckjord units).

discrete projects as the unit of measure when evaluating the "physical change" element of the definition of major modification.  As is the case here, the Plaintiff's case focused on separate projects performed during the same outage.  TVA had replaced two boiler components on a unit — the economizer and the superheater — and undertook numerous other projects during that outage.  *NPCA*, 2010 WL 1291335 at *13.  Like EPA here, the plaintiff identified these two projects in its notice of intent to sue.[5]  (Ex. 8, NPCA 2000 NOI at 4-5.)  The court did not aggregate all of that work as one "project" when analyzing the work under the NSR rules.  It instead went "project-by-project," first analyzing the economizer replacement and then analyzing the superheater replacement.  *Id.* at *24 -*31.   And the Court concluded that each project qualified as RMRR.

Treating an aggregation of independent projects as the unit of analysis also creates odd results that effectively nullify the RMRR exclusion to the definition of physical change.  For example, assume that an operator like Detroit Edison schedules during the same outage the replacement of two unrelated pieces of equipment — Component A and Component B.  The replacement of Component A arguably causes an increase in emissions, but it is unquestionably routine.  So considered alone, the replacement of Component A is not a "major modification."  MICH. ADMIN. CODE R. 336.2801(aa)(i).  The replacement of Component B, in contrast, does not cause an increase in emissions, but it is indisputably non-routine.  So as with the replacement Component A, the replacement of Component B is not a "major modification."  In other words, when the projects are considered separately as required by the rules, they do not trigger NSR.  But if EPA can lump the two projects together and characterize the two replacements as a single

---

[5] NPCA's notice of intent to sue is nearly identical in this respect to an NOV that EPA had previously served on TVA. (Ex. 9, TVA NOV at 12-13.)  EPA ultimately elected not to file suit, instead issuing an administrative order to TVA.  *See TVA v. Whitman*, 336 F.3d 1236 (11th Cir. 2003) (ruling the order to TVA unlawful).

"physical change," it can manufacture a violation where none otherwise exists.  Combined, the aggregated work is not routine, because it is never routine to replace Component B, and it causes an increase in emissions due to the effect of the replacement of Component A.  Thus, the operator's liability is solely a function of the happenstance that these two projects were performed during the same outage.

EPA itself has recognized the perverse results that can obtain when this type of aggregation is allowed.  In 2006, EPA announced that it would promulgate rules regarding aggregation to codify long-standing informal guidance.  71 Fed. Reg. 54,235, 54,244-54,248 (Sept. 14, 2006).  In early 2009, EPA promulgated rules that remain under review, but explained in its preamble to those rules that its longstanding guidance dictates that projects should be aggregated when they are "substantially related," and that substantial relationship is measured by technical or economic interdependence.   74 Fed. Reg. 2,376, 2,378 (Jan. 15, 2009).  EPA further explained that the mere fact that two projects are scheduled during the same outage is not evidence of a substantial relationship:

> Within certain industries, it may be common practice for certain types of activities to be done separately (though not necessarily at separate times).  A company's decision to do a series of activities at the same time — e.g., during a conventional scheduled outage, "turnaround" or "annual shutdown" — should not be viewed as evidence of their technical or economic relatedness.  In fact, absent an evaluation of the technical or economic relationship among the activities, the only presumption that should be gleaned from the practice of utilities, refineries, or other types of industry to do many activities during normally scheduled outages is that it is efficient and cost-effective to undertake multiple activities at the same time.  Some of these activities will, in fact, be unrelated, but are done simultaneously simply because it is easier to make these changes at a time when the source is not operating.  These activities should not be automatically aggregated.

*Id.* at 2,379.

Consistent with this long line of regulatory guidance and decisional law, EPA could not

17

state a violation of NSR by aggregating a series of unrelated projects performed in a single outage and calling that aggregation of work a "major modification." Instead, EPA was required to identify the discrete projects that it contends constitute major modifications. To the extent it believed that individual items of work performed during the outage should be aggregated, EPA was required to say so, identify those items in its NOV, and show (or at least allege) a substantial relationship between the projects.

Against this legal backdrop, EPA's NOV can only be read to identify the three Tube Projects with the specificity that Section 113 requires. Those are the only discrete projects identified in the Notice, and there is no allegation that these projects are "substantially related" to any other work performed during the Outage. If EPA intended to state that other projects, either alone or in combination, constituted violations, Detroit Edison and the Michigan regulators are left to guess what projects are included and what the relationship is between them. And in an outage involving dozens of individual work items, where the possible combinations are staggering, EPA's "notice" is no notice at all with respect to these potential theories of liability.

The Court cannot exercise jurisdiction over any claim that any of the Non-Tube Projects, either alone or in combination with other projects, constitute violations of the NSR rules. So the Complaint cannot be construed to reach them.[6]

## II.   The Court Should Enter a Protective Order Limiting Discovery in the Case to the Three Tube Projects Listed in the NOV.

Because the Non-Tube Projects are not properly a part of the case, EPA should not be allowed to take substantial and intrusive discovery as to those projects, especially in light of the expedited schedule of this case and EPA's representations to the Court regarding the scope of

---

[6] Should the Court concludes that under these circumstances the Complaint can be read to encompass these projects, EPA's claims should be dismissed for lack of subject matter jurisdiction to the extent they exceed the scope defined by the NOV.

discovery.

Federal Rule 26(c) authorizes the Court to order that certain matters not be inquired into, or that the scope of discovery be limited to certain matters.  Fed. R. Civ. P. 26(c)(4).  A protective order that limits the scope of discovery requires a showing of good cause.

The Federal Rules of Civil Procedure were revised in December 2000 to confine discovery to matters "relevant to the claim or defense of any party[.]"  Fed. R. Civ. P. 26(b)(1).  This language was added to focus discovery on the specific issues before the courts, rather than tangential matters of questionable relevance.  As the Advisory Committee explained at the time:

> The Committee has heard that in some instances, ***particularly in cases involving large quantities of discovery***, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action. . . . The Committee intends that the parties and the court focus on the ***actual claims and defenses involved in the action***.

Fed. R. Civ. P. 26(b)(1) 2000 Amendment, Advisory Committee's Note (emphasis added).

Protection is warranted here because EPA's discovery seeks documents and information on work that is not related in any way to the projects at issue.  *Green v. Nevers*, 196 F.3d 627, 632 (6th Cir. 1999) ("[D]istrict court does not abuse its discretion in denying discovery when the discovery requested would be irrelevant to the underlying issue to be decided.").  Courts have consistently rejected efforts by EPA in similar cases to expand its case beyond the scope mandated by its NOV.  *See, e.g., EKPC* at 5-6; *United States v. Cinergy Corp.*, No. 1:99-cv-1693-LJM/VSS, slip op. at 4 (S.D. Ind. March 21, 2005) (Ex. 10).

EPA cannot justify its expansion of the case based on the vague expansiveness of its allegations in its Complaint and NOV.  As explained above, Section 113(a) dictates that EPA's case be constrained by the content of its NOV, and its NOV here is limited to the three Tube Projects.  And EPA cannot now use discovery as "a hunting license to discover whether in fact a

19

viable claim may be alleged.   The discovery rules are designed to support a ***properly pleaded cause of action and to prepare defenses to charges made*** not to discover whether a claim exists." *American Communications Ass'n. Local 10, I.B.T. v. Retirement Plan for Employees of RCA Corp.*, 488 F. Supp. 479, 484 (S.D.N.Y. 1980) (emphasis added); *see also McLaughlin v. Copeland*, 455 F. Supp. 749, 753 (D. Del. 1978) ("[W]hile a plaintiff is entitled to a full opportunity to adduce evidence in support of the cognizable claims set out in his complaint, he is not entitled to discovery for the purpose of determining whether or not there may be a factual basis for a claim [it] has not made.").

## **CONCLUSION**

For the foregoing reasons, the Court should limit the scope of the case to conform to EPA's NOV.  The Court also should enter a protective order that limits the scope of the discovery to the scope of the case as defined by EPA's NOV.

Respectfully submitted, this 23rd day of March 2011.

HUNTON & WILLIAMS LLP

Matthew J. Lund (P48632)
Pepper Hamilton LLP
100 Renaissance Center, 36th Floor
Detroit, Michigan 48243
lundm@pepperlaw.com
(313) 393-7370

Michael J. Solo (P57092)
Office of the General Counsel
DTE Energy
One Energy Plaza
Detroit, Michigan
solom@dteenergy.com
(313) 235-9512

/s/ F. William Brownell
F. William Brownell
bbrownell@hunton.com
Mark B. Bierbower
mbierbower@hunton.com
Makram B. Jaber
mjaber@hunton.com
Brent A. Rosser
brosser@hunton.com
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
(202) 955-1500

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2011, the foregoing **DEFENDANTS' MEMORAN-DUM OF LAW IN SUPPORT OF MOTION FOR PROTECTIVE ORDER** was electronically filed with the Clerk of Court using the ECF system, which will automatically send notification the following attorneys of record:

> Ellen E. Christensen
> U.S. Attorney's Office
> 211 W. Fort Street
> Suite 2001
> Detroit, MI  48226
> 313-226-9100
> Email:  ellen.christensen@usdoj.gov
>
> James A. Lofton
> Thomas Benson
> Justin A. Savage
> Kristin M. Furrie
> U.S. Department of Justice
> Environmental and Natural Resource Div.
> Ben Franklin Station
> P.O. Box 7611
> Washington, DC  20044
> 202-514-5261
> Email:  thomas.benson@usdoj.gov
>          justin.savage@usdoj.gov
>          kristin.furrie@usdoj.gov
>          jim.lofton@usdoj.gov
>
> Holly Bressett
> Sierra Club Environmental Law Program
> 85 Second St., 2nd Floor
> San Francisco, CA  94105
> Phone: (415) 977-5646
> Email:  Holly.Bressett@sierraclub.org
>
> Andrea S. Issod
> Sierra Club
> 85 2nd Street, 2nd Floor
> San Francisco, CA  94105
> 415-977-5544
> Email:  andrea.issod@sierraclub.org

/s/ F. William Brownell_____

21