IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:10-cv-13101-BAF-RSW |
| and | ) | |
| | ) | Judge Bernard A. Friedman |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, and SIERRA CLUB | ) | Magistrate Judge R. Steven Whalen |
| | ) | |
| Plaintiff-Intervenors | ) | |
| v. | ) | |
| | ) | |
| DTE ENERGY COMPANY, and | ) | |
| DETROIT EDISON COMPANY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT BASED ON THE 2002 NSR REFORM RULES**

## ISSUES PRESENTED

The leading authority supporting Plaintiff's argument is set forth on the next page.

1.      Is EPA foreclosed from enforcing New Source Review until *after* a project.

*Plaintiff's Answer:* No.

2.      Do the undisputed facts show that DTE's pre-project notice was sufficient where the company mailed the notice hours before starting the outage (and after spending millions of dollars and thousands of labor hours on pre-outage work) and failed to provide any specific explanation of its emission calculations, as required under the rules.

*Plaintiff's Answer:* No.

## LEADING AUTHORITY FOR THE RELIEF SOUGHT

### *Statutory Provisions*

42 U.S.C. § 7475(a)

42 U.S.C. § 7477

### *Federal Regulations and Related EPA Guidance*

40 C.F.R. § 52.21

57 Fed. Reg. 32,314 (July 21, 1992)

67 Fed. Reg. 80,186 (Dec. 31, 2002)

### *Michigan Regulations*

MICH. ADMIN. CODE R. 336.2801

MICH. ADMIN. CODE R. 336.2802

MICH. ADMIN. CODE R. 336.2818

### *Case Law*

*Envtl. Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007)

*First Pacificorp Bankcorp, Inc. v. Helfer*, 224 F.3d 1117 (9th Cir. 2000)

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005)

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003)

*United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d. 1106 (D. Minn. 2010)

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990)

# TABLE OF CONTENTS

**STATEMENT OF UNDISPUTED MATERIAL FACTS** ........................................................1

**MATERIAL FACTS IN DISPUTE** ........................................................3

**ARGUMENT** ........................................................4

   I.   A Source Cannot Preclude Pre-Project Review Under NSR ................................................4

      A. The Statute Requires Enforceable Preconstruction Review ...........................................5

      B. The 2002 Rules and EPA's Reasonable Interpretations of its Regulations
         Foreclose DTE's Argument .......................................................................................6

            1. The 2002 Rules ................................................................................................6

            2. The 2002 Rules cannot support DTE's interpretation ..................................8

            3. The rules must be read in light of the statutory requirements and
               EPA's long-standing interpretation ............................................................12

      C. Courts Have Consistently Rejected DTE's Argument ...............................................13

      D. DTE and the Utility Industry Once Agreed with EPA's Interpretation ....................14

      E. DTE's Interpretation Would Make New Source Review Unenforceable .................16

  II.  Even If Its Legal Theory Were Correct, DTE's Notice Letter Does Not Suffice .............18

      **CONCLUSION** ........................................................19

# TABLE OF AUTHORITIES

## Federal Cases

*Anthony v. United States*, 520 F.3d 374 (5th Cir. 2008).................................................12

*Auer v. Robbins*, 519 U.S. 452 (1997) .............................................................................12

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) ...........................................12

*Envtl. Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007) ...........................................11

*First Pacificorp Bankcorp, Inc. v. Helfer*, 224 F.3d 1117 (9th Cir. 2000) ....................16

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) ...........................................6, 7, 13, 16

*Pub. Citizen v. Fed. Trade Comm'n*, 869 F.2d 1541 (D.C. Cir. 1989)............................6

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994)...............................................12

*Time Warner Entm't Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039
(10th Cir. 2004)................................................................................................................12

*United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272 (S.D. Ind. 2005)......................13

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006) ......................................13

*United States v. Duke Energy Corp.*, No. 00CV1262, 2010 WL 3023517
(M.D.N.C. July 28, 2010) ...............................................................................................13

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) ...................13

*United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692 C-M/F, 2002 WL 1629817 (S.D. Ind.
July 18, 2002)...............................................................................................................13-14

*United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d 1106 (D. Minn. 2010)................. 6, 14, 16-17

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) .........................................5

*Wolf Creek Collieries v. Robinson*, 872 F.2d 1264 (6th Cir. 1989)................................12

## Federal Statutes and Legislative History

42 U.S.C. § 7411(a)(4)......................................................................................................10

42 U.S.C. § 7471(1) ..................................................................................................6

42 U.S.C. § 7471(5) ..................................................................................................6

42 U.S.C. § 7475(a) ..................................................................................................5

42 U.S.C. § 7477 ......................................................................................................6

Stat. of Rep. Rogers, Clean Air Conf. Rep. (1977): Stat. of Intent; Clarification of Select
Provisions, H. Consideration of the Rep. of the Conf. Comm., 123 CONG. REC. 27,070 (1977)....5

## Federal Regulations

40 C.F.R. § 52.21(a)(2)(iii) ......................................................................................8

40 C.F.R. § 52.21(b)(2)(i) ........................................................................................8

40 C.F.R. § 52.21(b)(41)(i) ....................................................................................18

40 C.F.R. § 52.21(r)(1) ............................................................................................8

40 C.F.R. § 52.21(r)(6) ........................................................................................8, 10


57 Fed. Reg. 32,314 (July 21, 1992) ..................................................................7, 12

67 Fed. Reg. 80,186 (Dec. 31, 2002) ...........................................................7, 8, 9, 10

## State Administrative Code

MICH. ADMIN. CODE R. 336.2801a(a)(ii) ................................................................8

MICH. ADMIN. CODE R. 336.2801(aa) ...............................................................8, 11

MICH. ADMIN. CODE R. 336.2801(ll) ...................................................................18

MICH. ADMIN. CODE R. 336.2801(ll)(i) ...............................................................18

MICH. ADMIN. CODE R. 336.2802(3) ...................................................................7, 8

MICH. ADMIN. CODE R. 336.2802 (4)(b) .............................................................7, 11

MICH. ADMIN. CODE R. 336.2809(c) .....................................................................9

Mɪᴄʜ. Aᴅᴍɪɴ. Cᴏᴅᴇ R. 336.2818(3) ................................................................8, 10, 18

Mɪᴄʜ. Aᴅᴍɪɴ. Cᴏᴅᴇ R. 336.2818(3)(a)(iii).............................................................18

Mɪᴄʜ. Aᴅᴍɪɴ. Cᴏᴅᴇ R. 336.2818(3)(b)........................................................................8

## Miscellaneous References

MDEQ PSD Workbook: A Practical Guide to Prevention of Significant Deterioration
(Oct. 2003) ............................................................................................................................9

Defendants seek a free pass from the New Source Review program.  DTE argues that by sending a boilerplate letter to MDEQ less than 24 hours before beginning the massive boiler rehabilitation at issue it earned immunity from the preconstruction requirements of NSR.  As a factual matter, DTE's letter falls short of what the rules require in a pre-project notice.  More importantly, NSR is – by statute, regulation, caselaw, and practice – a preconstruction review program.  The purpose is to require facilities to install new controls as they perform construction work.  EPA and Michigan have the authority to assess whether a given project triggers NSR as of the beginning of the work – just as they have throughout the three decades of the NSR program,.

By contrast, DTE urges that its own pre-project emissions calculations are immune from judicial review based on the unsupported claim that the extreme makeover at Monroe Unit 2 would have no impact on generation or emissions.  In the company's view, liability cannot attach until at least a year after the completion of the project potentially triggering NSR.  DTE's newly-minted argument is an attempt to evade the regulations so that it may install pollution controls at its own convenience and in accordance with its own business plan rather than at the time dictated by Congress.  DTE's exemption-by-notification argument contravenes the clear language of the Clean Air Act, EPA's reasonable interpretation of its own regulations, and DTE's prior briefs to the D.C. Circuit.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

In July of 2009 — while the Company was planning the 2010 boiler renovation project at Monroe Unit 2[1] — EPA issued an NSR Notice of Violation ("NOV") to DTE for construction projects undertaken at several of its coal-fired power plants.  *See* Doc.  8-3 (Declaration of Ethan Chatfield) at ¶ 23.  In September 2009, DTE and EPA met to discuss the NOV.  *See id.* at ¶ 24.

---

[1] *See* Ex. 1 (Defendants' Notes for June 23, 2011 Rule 30(b)(6) Dep., Ex. 92) at 4-5, 11, 23-27; Ex. 2 (Monroe 2 Short Form Outage Report) at 24.

There, DTE indicated it had sent a series of "notification" letters to the state permitting agency before the outages associated with the challenged projects, which purported to explain why the projects did not trigger NSR review. *See id.* at ¶¶ 13, 25. EPA informed DTE that the analysis contained within these letters was insufficient and contrary to the applicable Clean Air Act implementing regulations. *See id.* at ¶¶ 26; *see also* Doc. 107 ("Def. Br.") Ex. 1 at ¶ 16 (admitting that EPA informed DTE its notification procedures were deficient).

Shortly after meeting with EPA to discuss the NOV, DTE began pre-outage work on a massive boiler renovation effort to be completed during the Spring 2010 outage. Ex. 1 (Ex. 92 to June 23, 2011 30(b)(6) Dep.) at 23-27. The rehabilitation was part of "one of the largest maintenance outages ever performed at the Monroe Power Plant in terms of cost and scope of work." *See* Ex. 3 (Monroe Unit 2 Outage Facts). As the company vice president overseeing the coal-fired fleet said in an email to several senior DTE officials, including the CEO: Monroe Unit 2 "is in the middle of the largest outage that I can remember." Ex. 4 (Apr. 27, 2010 Fessler Email). Months in advance of the outage, replacement components for the project were commissioned, manufactured, and received from China at an expense of $8 million. *See* Ex. 1 (Ex. 92 to June 23, 2011 30(b)(6) Dep.) at 1, 23-27 (indicating receipt of the components between December 2010 and February 2011). "Physical Plant Preparation" for the boiler renovation project began months before the outage, including making structural steel changes to platforms, cutting and installing an access door, removing a two-floor section of the boiler skin, and expending roughly 4,000 hours of pre-outage labor. *Id.*

On March 12, 2010, DTE mailed a "pre-project notification" letter to MDEQ ("Notice Letter") informing the agency of the boiler renovation work at issue. Ex. 5. The outage began at 1:30 am on March 13, 2011. Ex. 2 (Monroe Unit 2 Outage Report) at 8. Because the letter was

sent by certified mail the day before the outage began, it would have been received several days after the work started. The Notice Letter predicted emissions increases of 3,701 tons of SO$_2$ and 4,096 tons of NO$_x$ per year. Ex. 5 (Notice Letter) at Table 1. The letter asserted, however, that the entire emissions increase was unrelated to the project – without any project-specific analysis. *See* Def. Br. at 16-17 (providing long quote from Notice Letter).

DTE's assertion that the project has no impact on generation and emissions is boilerplate from prior outage notifications. For example, the company used virtually the same language before Monroe Unit 2's 2005 outage. Ex. 6 (Feb. 7, 2005 Outage Notification Letter). DTE's belief is that the piecemeal rebuilding of old, coal-fired plants – no matter how extreme the makeover – can *never* cause an emissions increase. The DTE employee charged with assessing NSR applicability for the Monroe 2 project testified that an economizer replacement such as the one at issue here *could not* result in an emissions increase for NSR purposes:

> Q.    I'm just trying to find out could an economizer replacement have an emissions increase related to it?
>
> A.    We don't believe that it does.

Ex. 7 (June 21, 2011 Rugenstein Dep.) at 167; *see also id.* at 113-114 (company does "not believe boiler tubes cause an emissions increase of themselves.").

## MATERIAL FACTS IN DISPUTE

DTE asserts several "facts" in its brief that are contradicted by record evidence and immaterial:

1.    DTE cites Mr. Skiles Boyd's declaration for the proposition that the company "discusse[d]" the Monroe 2 Spring 2010 outage with Michigan Department of Environmental Quality ("MDEQ") before beginning work. Def. Br. at 14 and n.17. Yet Mr. Boyd actually testified that he has no knowledge of whether DTE had any discussions with MDEQ before the

3

outage related to the work.  Ex. 8 (June 30, 2011 Rule 30(b)(6) Dep. of Skiles Boyd, Vol. 2) at 221.

2.      Similarly, DTE's claims that it submitted the Notice Letter to MDEQ before "commencing work on the projects," but the company spent more than $8 million on materials before the outage began, and worked approximately 4,000 labor hours before the notice went out and the outage began, as described above.

3.      DTE states that the Notice Letter met each of the requirements of the rules, including "explain[ing] why" the routine maintenance exemption applied and why the project would not result in a significant net emissions increase.  Def. Br. at 14.  This is a legal conclusion rather than a statement of fact, and the United States disagrees, as discussed further in Section II of the Argument.

## ARGUMENT[2]

The NSR program has always been premised on enforceable pre-project review, and nothing in DTE's new reading of the 2002 Rules changes the fundamental structure reflected in the statute, regulations, and EPA's long-standing interpretation.  Summary judgment is also inappropriate on the facts because DTE cannot prove that its entirely conclusory notice was sufficient.

## I.      A Source Cannot Preclude Pre-Project Review Under NSR

DTE argues that EPA turned the preconstruction review program mandated by Congress into a wait-and-see program.  *See*, *e.g.*, Def. Br. at 18.  The language of the regulations provide

---

[2] A description of the statutory background of NSR is set forth in the United States' briefing for the preliminary injunction motion.  Doc. # 8 at 3-10.  This brief focuses on the aspects of the statute and regulations that are relevant to when liability attaches.

4

no such immunity from the preconstruction nature of NSR.  Indeed, such a shift would be contrary to the statute's language and EPA's prior interpretations.

### A.      The Statute Requires Enforceable Preconstruction Review

The heart of NSR is set forth in Section 165 of the Clean Air Act,[3] which states that no unit can be constructed (including modifications like those at issue here) unless eight requirements are met.  42 U.S.C. § 7475(a).  Those requirements include that the facility must obtain a permit that requires best available control technology – before construction begins.  *Id*. These obligations continue for the operational life of the facility.  By requiring assessment of projects before their implementation, the Act illustrates an emphasis on preventing harm to the public and best serves its "overriding commitment" to the protection of the public health and welfare.  Stat. of Rep. Rogers, Clean Air Conf. Rep. (1977): Stat. of Intent; Clarification of Select Provisions, H. Consideration of the Rep. of the Conf. Comm., 123 CONG. REC. 27,070 (1977); *see also Wis. Elec. Power Co. v. Reilly* ("*WEPCo*"), 893 F.2d 901, 909 (7th Cir. 1990) (NSR aimed "to ensure that pollution control measures are undertaken when they can be most effective, at the time of new or modified construction.") .  DTE's wait-and-see approach is contrary to the statutory mandate to design, engineer, and install pollution controls at grandfathered sources at the most cost-effective time – upon modification.

The explicit purposes of the law reinforce the preconstruction nature of the NSR process. Congress articulated the purposes of NSR as including "to protect public health and welfare from any actual or potential adverse effect which . . . may reasonably be *anticipated* to occur from air pollution," and "to assure that any decision to *permit* increased air pollution . . . is made only

---

[3] Section 165 sets forth the requirements under the Prevention of Significant Deterioration ("PSD") program.  As relevant here, the requirements under the parallel Nonattainment New Source Review ("NNSR") program are the same.   There is no dispute between the Parties on this point.  *See* Doc. 46 (DTE Brief) at p. 5 (relevant language is same under both programs).

*after* careful evaluation of all the consequences of such a decision." *See* 42 U.S.C. § 7470(1), (5) (emphasis added). As the D.C. Circuit found, the 1977 Clean Air Act "amendments strengthened the Act by . . . expressly creating a preconstruction review process for new or modified major sources." *New York v. EPA* ("*New York I*"), 413 F.3d 3, 12 (D.C. Cir. 2005).

Another provision of the PSD statute further makes clear that preconstruction review and enforcement is appropriate. Section 167 of the Clean Air Act empowers EPA and the state to prevent construction or modification of any source that fails to comply with the PSD requirements. 42 U.S.C. § 7477. If Section 167 grants the authority to stop a project from proceeding, that authority allows EPA and the state to review NSR applicability *before* the project begins. *See United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d 1106, 1113 (D. Minn. 2010) (finding Section 167 "clearly accords EPA the authority to investigate, and then to prevent through appropriate legal remedies, violations committed before construction commences.").

Tellingly, DTE never mentions the statutory NSR requirements. By statute, the NSR program requires preconstruction review and enforceability. Nothing in the regulations could change that, and, as explained in the next subsection, nothing did. *See, e.g.*, *Pub. Citizen v. Fed. Trade Comm'n*, 869 F.2d 1541, 1557 (D.C. Cir. 1989) ("absent an express grant of authority to change the terms of the statute, we will not imply agency authority to alter the statutory mandate.").

    **B.**    **The 2002 Rules and EPA's Reasonable Interpretations of Its Regulations Foreclose DTE's Argument**

          **1.**    **The 2002 Rules**

The 2002 Rules essentially expanded the regulations that had been in place for electric utility units like Monroe 2 to all sources.

Beginning in 1992, in the rule commonly known as the WEPCo Rule, EPA allowed existing electric utilities to make their initial NSR applicability determinations based on comparing baseline actual emissions to a projection of future actual emissions.[4]  *See* 57 Fed. Reg. 32,314, 32,317, 32,325 (July 21, 1992); *see also New York I*, 413 F.3d at 16.  Under the test provided for in the WEPCo Rule, "known as the 'actual-to-projected-actual test,' utilities would determine whether they had post-change increases in emissions — and thus whether they needed NSR permits — by comparing actual emissions before the change to their projections of actual post-change emissions." *New York I*, 413 F.3d at 16 (citing 57 Fed. Reg. at 32,323–26). However, EPA was concerned that facilities might "under-project" their future actual emissions. 57 Fed. Reg. at 32,325.  As part of the same rule allowing a more flexible projection method, EPA required that any facility electing to use that approach must submit emissions totals for five to ten years after the project.  *Id*.  Importantly, the recordkeeping requirement was not intended to create an "annual[ly] revisiting [of] the issue of NSR applicability," but rather as a safeguard necessary to protect the integrity of the requisite preconstruction analysis.  *Id*.

In 2002, EPA promulgated the NSR Reform Rules, which made the future projected-actual test available to facilities other than electric generating units.  *New York I*, 413 F.3d at 16 (citing 67 Fed. Reg. 80,186, 80,275 (Dec. 31, 2002)).  As had always been the case, sources were required under the Rules to project their post-change emissions prior to commencing construction.  *See* 67 Fed. Reg. at 80,194; MICH. ADMIN. CODE R. 336.2802(3), (4)(b).  The 2002 Rules also codified the WEPCo backstop recordkeeping and reporting obligation for all sources. Specifically, "[r]eporting and recordkeeping for a project is required when three criteria are met: (1) You elect to project post-change emissions rather than use [the potential-to emit

---

[4] The prior rules required a comparison of baseline actual emissions to *potential* future emissions.

7

methodology]; (2) there is a reasonable possibility that the project will result in a significant emissions increase; and (3) the project will not constitute a major modification." *See* 67 Fed. Reg. at 80,197 (emphasis added). *See also* 40 C.F.R. § 52.21(r)(6);[5] MICH. ADMIN. CODE R. 336.2818(3).

Under the 2002 Rules, the threshold question for NSR applicability remains whether a project constitutes a "major modification," which is in turn determined in accordance with actual-to-projected-actual test for projecting post-project emissions. If the project is a major modification, *i.e.*, "would result" in a significant emissions increase,[6] then a source must seek and await a preconstruction permit. *See* 40 C.F.R. § 52.21(r)(1); MICH. ADMIN. CODE R. 336.2802(3). If it is not, then a source may commence construction, but must nonetheless record and report its post-project emissions. *See* 40 C.F.R. § 52.21(r)(6); MICH. ADMIN. CODE R. 336.2818(3)(b).

### 2.    The 2002 Rules cannot support DTE's interpretation

Nothing in the 2002 Rules supports converting a pre-project program into a program in which simply sending a notice provides immunity.

The rules themselves make clear that each modified source must get a permit before beginning construction. *See, e.g.*, 40 C.F.R. § 52.21(a)(2)(iii) ("No . . . major modification . . . shall begin actual construction without a permit that states that" it will meet NSR requirements); MICH. ADMIN. CODE R. 336.2802(3) (same). Importantly, the Michigan PSD rules *do* include a provision exempting *temporary* sources from getting new NSR permits where several

---

[5] The relevant Michigan rules adopt 40 C.F.R. § 52.21 by reference. *See* MICH. ADMIN. CODE R. 336.2801a(a)(ii).

[6] *See* 40 C.F.R. § 52.21(b)(2)(i); MICH. ADMIN. CODE R. 336.2801(aa).

requirements are met, including notice to the state at least 10 days before the change of location. MICH. ADMIN. CODE R. 336.2809(c).  Thus where a notice-based exemption from the usual pre-project review applies, Michigan said so explicitly in the rules.  No parallel language exists for major stationary sources like Monroe 2.

The language of the 2002 Rules is reinforced by EPA's statements in issuing the new rules, where the agency made perfectly clear that preconstruction review – and liability – remained in effect.  As the agency said in the preamble to the rules, "If you are subsequently determined not to have . . . properly project[ed] emissions . . . you will be subject to any applicable enforcement provisions."  67 Fed. Reg. at 80,190.  In its official response to comments on the 2002 revisions to the PSD regulation, EPA explained that:

> *The NSR program remains a pre-construction review program.* To ensure a level playing field between sources that may approach the pre-construction projection of post-change emissions with different degrees of conscientiousness, monitoring the quality of pre-construction projections is important.

Ex. 9 (Excerpts of EPA Technical Support Document for 2002 Rules) ("NSR TSD") at I-4-41-42 (emphasis added).  In response to another comment regarding "enforcement ramifications" of a source's projection, EPA stated that "[t]here are no provisions in the final rules to protect from civil or criminal penalties the owner or operator of a source that constructs a 'major modification' without obtaining a major NSR permit."  *Id.*  at I-4-24, I-4-26.  Similarly, the very Michigan NSR guidance that DTE relies on confirms that modifications "are required by the Clean Air Act to undergo a new source review and obtain a permit before construction."  MDEQ PSD Workbook: A Practical Guide to Prevention of Significant Deterioration (Oct. 2003) at 1-1, available at http://www.deq.state.mi.us/aps/downloads/permits/PSD%20Workbook.pdf (cited in Def. Br. at 1, 13).

The recordkeeping provisions in the regulation do nothing to preclude enforcement review.  Post-project recordkeeping — as opposed to pre-project permitting — is available only to those projects that *would not* be expected to result in an emissions increase.  40 C.F.R. § 52.21(r)(6); MICH. ADMIN. CODE R. 336.2818(3).  A source cannot justify its decision to avoid pre-project permits on its own unreviewable belief that emissions will not go up.  Rather, EPA has made clear that the Rules' recordkeeping requirements are an accountability measure layered on top of the traditional pre-project review.  EPA explained in 2002 that,

> [t]he main purpose of the annual tracking requirements is to maintain adequate information to ascertain whether the source's initial estimate of post-change actual emissions is accurate, but such a tracking requirement should also promote careful and accurate projections so that sources will not have to face the *risk of retroactive NSR applicability* and possible enforcement actions.

Ex. 9 (NSR TSD) at I-4-18.[7]  As EPA stated in adopting the 2002 Rules, the recordkeeping provisions do not exempt construction without a permit simply because a source has notified the permitting agency of its plans.  If emissions should have been expected to increase as a result of the project, NSR is triggered.

In its brief, DTE effectively ignores the preconstruction requirements of the statute, regulations, and guidance, and relies instead in large part on the verb tenses used out of context from snippets of statutory and regulatory provisions.  For example, DTE stresses the language of the statutory modification definition.  *See* Def. Br. at 19 (citing 42 U.S.C. § 7411(a)(4)).  DTE's point appears to be that the tenses used in the definition (or possibly verbs like "cause" or

---

[7] EPA had proposed to require that sources that choose to project post-change emissions obtain an enforceable emissions limitation on future actual emissions to assure that the project complied with the source's post-change emissions projections.  Ultimately, the Agency opted instead for a pre-project notification and post-project recordkeeping and reporting requirement for utilities, relying on the "ample authority to enforce the major NSR requirements" available under the Act.  *See* 67 Fed. Reg. at 80,204.  The Agency clearly meant for the notification requirement to aid enforcement, not preclude it.

"result") suggest a post-project review. However, the modification definition has remained the same for four decades, and has been uniformly held to require pre-project review and allow pre-project enforcement. Indeed, the very Supreme Court case DTE cites held that the NSR program "required a PSD permit before" construction or modification of a source. *Envtl. Defense v. Duke Energy Corp.*, 549 U.S. 561, 568 (2007) (cited in Def. Br. at 19). Importantly, the Supreme Court was interpreting the 1987 version of the regulations, which included the very same language DTE now relies upon. *Id.* In other words, the very language DTE now says means only post-project actual emissions can trigger NSR has been definitively interpreted by the highest court in the land to impose a pre-project regime. Finally, DTE points to regulatory language confirming the "causation" requirement included in the NSR regulations. *See* Def. Br. at 19. However, DTE's reliance on this snippet ignores the actual regulatory definition of "major modification," which is explicitly referenced in the provision that DTE cites, and which provides that a major modification is any physical change that "would result" in a significant emissions increase. MICH. ADMIN. CODE R. 336.2801(aa). Like the preconstruction nature of the program itself, use of the subjunctive "would result" clearly indicates that initial liability turns on whether emissions should have been expected to result from a change, consistent with the Supreme Court's holding in *Duke*.

The relevant regulations make clear that initial liability turns on "preconstruction projections" and post-project actual emissions are a second, supplementary basis of liability. MICH. ADMIN. CODE R. 336.2802(4)(b). In other words, the regulations provide a safety "backstop" that imposes liability even when there is a valid pre-project prediction of no increase, if a project actually does end up causing an emissions increase. That backstop does nothing to vitiate the inherent preconstruction nature of the NSR program or the plain meaning of the

11

"major modification" definition.  Similarly, the recordkeeping requirements have always been

supplemental to — and not a replacement for — a source's preconstruction projections.  In fact,

EPA expressly stated that "the intent [of the recordkeeping and reporting requirements] is to

confirm the utility's initial projections rather than annually revisiting the issue of NSR

applicability."  57 Fed. Reg. at 32,325.  Certainly, neither Congress nor EPA intended that a

source take the unit out of service to construct the modification, place the unit back into service

to see if emissions increase, and once again take it back out of service to construct the required

pollution controls.

### 3.    The rules must be read in light of the statutory requirements and EPA's long-standing interpretation

To the extent DTE's reading of the rules contradicts the Clean Air Act, it cannot stand:

"[A] regulation must be interpreted in such a way as to not conflict with the objective of its

organic statute."  *Time Warner Entm't Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d

1039, 1050 (10th Cir. 2004); *see also Anthony v. United States*, 520 F.3d 374, 380 (5th Cir.

2008) ("[C]ourts should not interpret an agency regulation to thwart the statutory mandate it was

designed to implement." (internal quotations omitted));  *Wolf Creek Collieries v. Robinson*, 872

F.2d 1264, 1268 (6th Cir. 1989) (noting that interpretations of regulations must be consistent

with statutory language).

Moreover, Supreme Court precedent dictates that courts extend substantial deference to

an agency's interpretation of its own regulations.  The agency interpretation carries "controlling"

weight unless "plainly erroneous or inconsistent with the regulation."  *Auer v. Robbins*, 519 U.S.

452, 461 (1997) (citing *Bowles v. Seminole Rock & Sand Co*., 325 U.S. 410, 414 (1945)); *see

also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994) (concluding that an agency's

interpretation of a regulatory provision was "far more consistent with the regulation's

unqualified language than the interpretation advanced by petitioner.  But even if this were not so, the [agency's] construction is, at the very least, a reasonable one, and we are required to afford it controlling weight."  (internal quotations omitted)).

### C.     Courts Have Consistently Rejected DTE's Argument

While previously opposing preliminary relief because this case "is no different from the thirty or so other[ ]" NSR cases, Doc. 46 at 1, DTE now calls this a "first of its kind" case.    Def. Br. at 1.  But in reality, the rules for electric utilities have changed little since 1992.  *See New York I*, 413 F.3d at 16 (describing preconstruction projection requirement for electric utilities under both WEPCo and 2002 Reform Rules).  Several courts have rejected precisely the argument that DTE makes here: that there is no violation until there is an *actual* increase in pollution.

For instance, the *Ohio Edison* court found the defendants' argument that only actual emissions measured after the project could trigger NSR was "inconsistent with Defendant's obligation under the statute to project future emissions *prior* to an activity being undertaken." *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 881 (S.D. Ohio 2003) (emphasis in original).  As the *Cinergy* court held, "[I]n line with the purpose and logical interpretation of the [NSR] permit requirement, . . . an owner or operator must make a preconstruction projection of whether and how much emissions will increase at a particular unit following construction." *United States v. Cinergy Corp*, 384 F. Supp. 2d 1272, 1276 (S.D. Ind. 2005) *aff'd* 458 F.3d 705, 708 (7th Cir. 2006) (noting that any difference between 1992 and 2002 rules "would not affect our analysis"); *see also United States v. Duke Energy Corp.*, No. 00CV1262, 2010 WL 3023517, at *5 (M.D.N.C. July 28, 2010) (holding that NSR, as a preconstruction program, requires a

projection of emissions); *United States v. S. Ind. Gas & Elec. Co.*, ("*SIGECO*"), No. IP99-1692 C-M/F, 2002 WL 1629817, at *2-*3 & n.3 (S.D. Ind. July 18, 2002) (same).

DTE also ignores the *Xcel Energy* decision, where the court ordered the utility to provide information related to future construction projects to allow EPA to assess NSR applicability. *Xcel Energy*, 759 F. Supp. 2d 1106 (D. Minn. 2010). The PSD rules at issue in *Xcel* were the 2002 rules that Michigan has adopted. Just as DTE does here, Xcel argued that its emissions projections should have conclusive weight, and that EPA's investigation of its projections served no useful purpose. The court disagreed, finding that EPA's statutory authority "clearly accords EPA the authority to investigate, and then to prevent through appropriate legal remedies, violations commenced *before construction commences*." *Id.* at 1113 (emphasis added). Notably, the *Xcel* court found it was "an instance in which this Court must defer to reasonable agency interpretation." *Id.*

### D.    DTE and the Utility Industry Once Agreed with EPA's Interpretation

DTE's newly-minted position that only actual emissions count for NSR cannot be squared with its prior filings in this case and others. In opposing preliminary relief in this case, DTE argued that "in order to establish a violation," EPA would have to establish certain elements regarding DTE's "projected emissions increase." Doc. 46, at 27; *see also id.* at 16 and 18. While the parties disagreed over what types of projected emissions increases were a violation, the disputes were all over the projections, not whether the public and EPA had to wait five years to see what happens. Nothing in the law has changed to justify DTE's eleventh hour interpretation. Indeed, one of DTE's principal employees charged with NSR compliance confirmed in deposition testimony that the NSR program remains a preconstruction review program. Ex. 7 (Rugenstein Dep.) at 124-125.

DTE's earlier position in this case echoes what it told the U.S. Court of Appeals for the D.C. Circuit when the rules at issue were reviewed there.  When those rules (including the recordkeeping and reporting provisions) were challenged in the D.C. Circuit, the Utility Air Regulatory Group ("UARG") came to the Rules' defense.  DTE is a long-time member of UARG and reviewed UARG filings before they were served.[8]  Ex. 10 (June 30, 2011 Personal Dep. of Skiles Boyd) at 24-26.   Contrary to the position now urged by DTE and its lawyers that the 2002 Rules essentially obliterate EPA's ability to enforce NSR violations based on emissions projections, *see* Def. Br. at 15–17, UARG told the D.C. Circuit that

> [t]he basic approach to enforcing NSR requirements under the [2002] final rules is similar to the approach that existed previously. In either case, a source is to make an initial determination regarding whether a proposed change would result in a significant net emissions increase that, in turn, would require that the source apply for an NSR permit. If the source's determination ultimately turns out to be incorrect *in the view of EPA or a state agency,* the source may be subject to enforcement for violating NSR.

Joint Brief of Industry Intervenors, *New York v. EPA*, No. 02-1387, 2004 WL 5846442,  at *18-*19 (Oct. 26, 2004) (emphasis added).  DTE and the electric industry thus echoed EPA's own interpretation that oversight agency's would be able to review — and enforce — a source's pre-project determination to forego seeking an NSR permit.

Further, while DTE strives to convince this Court that the 2002 Rules somehow make this case "the first of its kind," UARG proclaimed on DTE's behalf that "[t]he final [2002] rules *do not change* the extensive enforcement tools and opportunities available to EPA and states." *Id.* at *19 (emphasis added).  Under the electric industry's own understanding of the 2002 Rules —although contrary to DTE's opening brief here — the instant case is no different from other NSR enforcement actions initiated against electric utilities.  As UARG recognized, a utility's

---

[8] UARG is run through the Hunton & Williams law firm, DTE's trial counsel here.

obligation to carefully project emissions increases predated the 2002 Rules, and was in no way altered by them.

### E. DTE's Interpretation Would Make New Source Review Unenforceable

In addition to its inconsistency with the language of both the statute and the regulations, DTE's approach to the 2002 Rules would render violations of the Rules' preconstruction obligations unenforceable. According to DTE, once a facility submits its emissions projections to a permitting authority, enforcement of any NSR requirements must await the collection and submission of post-project data. *See* Def. Br. at 17. In other words, no matter what the Company submits prior to construction, EPA must "wait to see" what comes out of the stacks before initiating an enforcement action. *See id*. at 18. This interpretation leaves the NSR program's requirement that companies assess their post-change emissions prior to commencing construction entirely without effect. Notably the D.C. Circuit has already held that EPA's NSR recordkeeping regime must adequately support pre-project enforcement. *See New York I*, 413 F.3d at 35. If applicability was only based on post-project actual emissions, no paper trail of the pre-project process would be relevant. There is no basis for the conclusion that the 2002 Rules "enact[ed] unenforceable requirements." *See First Pacific Bankcorp, Inc. v. Helfer*, 224 F.3d 1117, 1126 (9th Cir. 2000).

DTE's actions surrounding the Monroe Unit 2 boiler rehabilitation perfectly illustrate the danger of its reinterpretation of the 2002 Rules. First, the company's notice was practically meaningless. The Notice Letter was put in the mail just hours before starting the outage – *after* DTE had committed millions of dollars and thousands of man-hours to the renovation. While the *Xcel* court held that *two years* notice was important for NSR review, in order for the source to obtain a permit if the agency found one necessary, DTE provided less than a day. *See* 759 F.

Supp. 2d at 1115.  The letter asserts — but does not explain — DTE's belief that all of its projected emissions increases are excludable under the Rules.  Having so "notified" MDEQ of its determination, DTE now insists that EPA must "wait to see" what the unit's actual post-project emissions are.

Meanwhile, DTE has developed unique policies with the express purpose of avoiding NSR scrutiny during the recordkeeping and reporting window.  For example, the company's policy allows it to rely on an emissions baseline based *not* on actual emissions, but on a hypothetical baseline of much higher emissions.[9]  *See* Ex. 11 (June 29, 2011 Rule 30(b)(6) Dep. of Skiles Boyd, Vol. 1) at 48-49; 132-133; 142-143 (discussing baseline based on so-called "capable of accommodating" emissions).  Using such a hypothetical baseline could mean an *actual* increase in pollution without the company ever getting a permit.  The company also artificially inflates the price of electricity from time-to-time with the express purpose of temporarily depressing generation from a given unit, such that no annual emissions increase would be reported to regulatory authorities.  *See* Ex. 11 (Boyd Rule 30(b)(6) Dep. Vol. 1) at 63-65.  These tactics are temporary measures to avoid NSR, but the types of "life extension" projects at issue can add decades to the life of a power plant.

EPA has rejected both of the NSR avoidance tactics DTE relies upon.  The agency has stated that the use of hypothetical baselines is not appropriate.  *See* Ex. 12 (Apr. 20, 2010 Letter from Dianne McNally (EPA Region III) to Mark Wejkszner (Penn. Dep't Envtl. Protection)).  EPA has also stated, in an applicability determination from Administrator Lisa Jackson, that a source cannot avoid NSR by artificially managing emissions to stay within its baseline.  *See* Ex. 13 (Oct. 8, 2009 Order of the EPA Administrator, *In re: Wiconsin Power and Light Columbia*

---

[9] This tactic has been foreclosed for Monroe Unit 2 going forward by the Court's order limiting DTE to pre-project emission levels.

*Generating Station,* Petition No. V-2008-1).  In that order, EPA was interpreting state

regulations that, while predating the 2002 Rules, had operative language substantively identical

to those at issue here.  *See* 40 C.F.R. § 52.21(b)(41)(i) (defining "projected actual emissions" as

"the maximum annual rate" of emissions "following the date the unit resumes *regular operation*

. . . ." (emphasis added)); MICH. ADMIN. CODE R. 336.2801(ll)(i) (same).  The Columbia

Generating order rejects precisely what DTE asks to do here: go ahead with the project and then

"manage" emissions to stay within baseline levels.  *See* Ex. 7 (Rugenstein Dep.) at 160-161.

The danger from DTE's reinterpretation of the 2002 Rules is significant.  As the Court

has already seen, these tactics to avoid NSR have real consequences for public health: the

emissions from Monroe Unit 2 cause approximately 90 premature deaths each year.  Doc. 8-23

(Declaration of Joel Schwartz) at ¶¶ 116-120.  Had DTE complied with the law and installed

pollution controls at the time of the project, these deaths would have been avoided.

## II.     Even If Its Legal Theory Were Correct, DTE's Notice Letter Does Not Suffice

Regardless of the legal standard that applies, the company has failed to provide sufficient

notice to preclude NSR enforcement. The 2002 Rules require a source to provide an emissions

analysis that includes the baseline, projected emissions, and any excluded emissions.  *See* MICH.

ADMIN. CODE R. 336.2818(3).  Under the rules, DTE may exclude a portion of the projected

emissions increase *if* the unit was capable of accommodating the emissions during the baseline

period *and* the emissions are unrelated to the project.  MICH. ADMIN. CODE R. 336.2801(ll).  If

the source excludes emissions, however, it must provide "the reason for excluding that amount."

MICH. ADMIN. CODE R. 336.2818(3)(a)(iii).

In this case, DTE projected a huge emissions increase, but failed to provide any

meaningful explanation of its basis for excluding emissions.  As described in the undisputed

18

facts, the text of the Notice Letter provides no analysis specific to the project and no explanation of *why* any emissions were excluded.   It was boilerplate repeated from earlier letters.  DTE's employees have testified that they do not believe boiler tube component replacement project *can* cause an emissions increase.  The Notice Letter does not reflect a reasoned analysis – it reflects a worldview, one that DTE recognized left it open to enforcement risk.  *See* Ex. 11 (Boyd Rule 30(b)(6) Dep. Vol. 1) at  39-41.

## CONCLUSION

DTE asks this Court to radically redefine the NSR program from a preconstruction program to one that turns on actual emissions years after the relevant project.  To do so would upend the statutory language, the regulations, and more than 30 decades of EPA and judicial interpretation.  Nothing in DTE's current argument, an argument contradicted by what the company said to this Court and the D.C. Circuit, justifies such a course.  The United States respectfully requests that this Court deny DTE's Motion for Summary Judgment.


Respectfully Submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

Dated: July 8, 2011                               *s/ Thomas A. Benson*
                                                  JAMES A. LOFTON
                                                  JUSTIN A. SAVAGE
OF COUNSEL:                                       JAMES W. BEERS, JR.
SABRINA ARGENTIERI                                THOMAS A. BENSON (MA Bar # 660308)
MARK PALERMO                                      KRISTIN M. FURRIE
SUSAN PROUT                                       ELIAS L. QUINN
Associate Regional Counsel                        Environmental Enforcement Section
U.S. EPA Region 5                                 U.S. Department of Justice
Chicago, IL                                       P.O. Box 7611
77 W. Jackson Blvd.                               Washington, D.C. 20044-7611
                                                   (202) 514-5261

APPLE CHAPMAN
Associate Director
Air Enforcement Division
U.S. EPA
1200 Pennsylvania Ave. NW
Washington D.C. 20460

thomas.benson@usdoj.gov


BARBARA McQUADE
United States Attorney
Eastern District of Michigan

ELLEN CHRISTENSEN
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2011, the foregoing brief was served via ECF on counsel of record. Those exhibits to the brief filed under seal will be served on counsel of record by email.


*s/ Thomas A. Benson*
Counsel for the United States