IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA )
           )
       Plaintiff, )      Civil Action No. 2:10-cv-13101-BAF-RSW
   and )
           )      Judge Bernard A. Friedman
NATURAL RESOURCES DEFENSE )
COUNCIL, and SIERRA CLUB )      Magistrate Judge R. Steven Whalen
           )
      Plaintiff-Intervenors )
       v. )
           )
DTE ENERGY COMPANY, and )
DETROIT EDISON COMPANY )
           )
       Defendants. )
_____ )

## UNITED STATES MOTION FOR PARTIAL SUMMARY JUDGEMNT ON THE LEGAL STANDARDS AT ISSUE IN THIS CASE

Plaintiff United States of America, by its undersigned counsel, moves this court for

partial summary judgment pursuant to Fed. R. Civ. P. 56 regarding the legal standards at issue in

this case.  Specifically, Plaintiffs request a ruling that

(1) Defendants DTE Energy Company and Detroit Edison Company bear the burden of proof with regard to EPA's regulatory "routine maintenance" and "demand growth" provisions, *see* 40 C.F.R. § 52.21(b)(2)(iii)(A) &  MICH. ADMIN. CODE R. 336.2801(aa)(iii)(A) (routine maintenance exception); 40 C.F.R. § 52.21(b)(41)(ii)(c) & MICH. ADMIN. CODE R. 336.2801(ll)(ii)(C) (demand growth exception);

(2)  This Court will apply EPA's narrow interpretation of the exemption for routine maintenance, repair, and replacement; and

(3) This Court will apply EPA's interpretation of the demand growth exception, which allows Defendants to exclude only that portion of a predicted emissions increase that (a) a changed unit would have been able to physically and legally accommodate prior to the change, and (b) is  unrelated to, *i.e.*, not caused or enabled by, the change.

This motion is supported by the brief and exhibits filed herewith.

Respectfully Submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

Dated: July 18, 2011                            *s/ Elias L. Quinn*_____
                                                JAMES A. LOFTON
                                                JUSTIN A. SAVAGE
OF COUNSEL:                                      JAMES W. BEERS, JR.
SABRINA ARGENTIERI                              THOMAS A. BENSON (MA Bar # 660308)
MARK PALERMO                                    KRISTIN M. FURRIE
SUSAN PROUT                                     ELIAS L. QUINN (CO Bar # 42159)
Associate Regional Counsel                      Environmental Enforcement Section
U.S. EPA Region 5                               U.S. Department of Justice
Chicago, IL                                     P.O. Box 7611
77 W. Jackson Blvd.                             Washington, D.C. 20044-7611
                                                 (202) 514-5261
APPLE CHAPMAN                                   thomas.benson@usdoj.gov
Associate Director
Air Enforcement Division
U.S. EPA
1200 Pennsylvania Ave. NW                       BARBARA McQUADE
Washington D.C. 20460                           United States Attorney
                                                Eastern District of Michigan

                                                ELLEN CHRISTENSEN
                                                Assistant United States Attorney
                                                211 W. Fort St., Suite 2001
                                                Detroit, MI 48226

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:10-cv-13101-BAF-RSW |
| and | ) | |
| | ) | Judge Bernard A. Friedman |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, and SIERRA CLUB | ) | Magistrate Judge R. Steven Whalen |
| | ) | |
| Plaintiff-Intervenors   ) | | |
| v. | ) | |
| | ) | |
| DTE ENERGY COMPANY, and | ) | |
| DETROIT EDISON COMPANY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE LEGAL STANDARDS AT ISSUE IN THIS CASE

July 18, 2011

# TABLE OF CONTENTS

INTRODUCTION AND PURPOSE OF MOTION ........................................................................1

STANDARD FOR SUMMARY JUDGMENT ............................................................................2

STATUTORY BACKGROUND ..................................................................................................3

ARGUMENT ..............................................................................................................................4

I. THE APPLICABLE BURDENS OF PROOF ........................................................................4

II. DEFERENCE TO EPA'S INTERPRETATION OF ITS OWN REGULATIONS ..................6

III. THE ROUTINE MAINTENANCE EXCEPTION .................................................................7

    1. The Routine Maintenance Exception is Necessarily Narrow .........................................8

    2. The Routine Maintenance Exception Covers Only Those Activities That Are
       Routine for Individual Units ..........................................................................................9

    3. There are No Categorical Exemptions for Routine Maintenance .................................12

    4. Aggregation .................................................................................................................13

IV. THE DEMAND GROWTH EXCEPTION .........................................................................14

    1. Projecting Emissions to Evaluate NSR Applicability ..................................................15

    2. Excluding Emissions Under the Demand Growth Exception ........................................16

    3. Claimed Exclusions Must Be Adequately Justified Before a Project Is
       Undertaken ..................................................................................................................18

CONCLUSION ..........................................................................................................................20

# TABLE OF AUTHORITIES

## Federal Cases

*Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979) ................................................ 4, 8-9

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................................6, 7

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) ...........................................................6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................................... 2-3

*Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871 (2011) ................................................................6

*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) .....................................................................6

*Coeur Alaska, Inc. v. Se Alaska Conservation Council*, 129 S. Ct. 2458 (2009) ...........................6

*Envtl. Def. v.  Duke Energy Corp.*, 549 U.S. 561 (2007)..........................................................3, 16

*FTC v. Morton Salt Co.*, 334 U.S. 37 (1948)..................................................................................4

*In re Donald J. Trump Casino Sec. Litig.- Taj Mahal Litig.,* 7 F.3d 357 (3d Cir. 1993) .............19

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.,* 618 F. Supp. 2d 815
(E.D. Tenn. 2009) .........................................................................................................................5

*New York v. Am. Elec. Power Serv. Corp.*, No. 2:04-cv-1098, 05-cv-360, 2007 WL
539536 (S.D. Ohio Feb. 15, 2007)...............................................................................................9

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) .................................................................... *passim*

*New York v. EPA*, 443 F.3d 880 (D.C. Cir. 2006) ......................................................................7, 9

*NLRB v. Ky. River Comm. Care, Inc.*, 532 U.S. 706 (2001)....................................................4, 5, 6

*Sierra Club v. Morgan*, No. 07-C251S, 2007 WL 3287850 (W.D. Wis. Nov. 7, 2007) ................5

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994).......................................................... 6-7

*United States v. Ala. Power Co.*, 681 F. Supp. 2d 1292 (N.D. Ala. 2008) ....................................5

*United States v. Cinergy Corp.*, No. 1:99CV1693LJMVSS, 2005 WL 3018688
(S.D. Ind. Nov. 9, 2005)..........................................................................................................16, 18

*United States v. Cinergy Corp.*, No. 1:99CV1693LJMVSS, 2006 WL 372726
(S.D. Ind. Feb. 16, 2006) .................................................................................................5

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006) ....................................16

*United States v. Cinergy Corp.*, 495 F. Supp. 2d 909 (S.D. Ind. 2007) .........................8

*United States v. Duke Energy Corp.*, No. 1:00CV1262, 2010 WL 3023517
(M.D.N.C. July 28, 2010) ......................................................................................5, 11, 18

*United States v. E. Ky. Power Co-op, Inc.*, 498 F. Supp. 2d 976 (E.D. Ky. 2007) .........5

*United States v. First City Nat'l Bank of Houston*, 386 U.S. 361 (1967) ........................4

*United States v. Murphy Oil USA, Inc.*, 155 F. Supp. 2d 1117 (W.D. Wis. 2001) ........13

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) ....... 4, 5, 7-9, 11, 12, 14

*United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994 (S.D. Ind. 2003) ... 2-3, 9, 11,12, 13

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) .............................. *passim*

## Federal Statutes

42 U.S.C. § 7411(a)(4) ...................................................................................................3

42 U.S.C. § 7470 .............................................................................................................3

42 U.S.C. §§ 7470-7479 .................................................................................................3

42 U.S.C. § 7475(a) ........................................................................................................3

42 U.S.C. § 7479(2)(C) ...................................................................................................3

42 U.S.C. §§ 7501-7515 .................................................................................................3

## Federal Regulations

40 C.F.R. § 52.21(b)(41)(i) ............................................................................................19

40 C.F.R. § 52.21(b)(41)(ii)(a) ......................................................................................16

40 C.F.R. § 52.21(b)(41)(ii)(b) ......................................................................................16

40 C.F.R. § 52.21(b)(41)(ii)(c) ......................................................................................19

40 C.F.R. § 52.21(r)(6)(i)(c) ................................................................19

57 Fed. Reg. 32,314 (July 21, 1992) ........................... 11, 14, 15, 17-19

61 Fed. Reg. 38,250 (July 23, 1996) ......................................................18

63 Fed. Reg. 39,857 (July 24, 1998) ......................................................11

67 Fed. Reg. 80,186 (Dec. 31, 2002) ..........................................15, 16, 18

72 Fed. Reg. 72,607 (Dec. 21, 2007) ......................................................19

75 Fed. Reg. 19,567 (Apr. 15, 2010) ......................................................13

## Federal Rules

Fed. R. Civ. P. 56(a) .............................................................................2

## Legislative History

Stat. of Rep. Rogers, Clean Air Conf. Rep. (1977), 123 CONG. REC. 27,070 (1977)...................3

## State Administrative Code

MICH. ADMIN. CODE R. 336.2801(aa) ......................................................14

MICH. ADMIN. CODE R. 336.2801(aa)(iii)(A) ..................................... 4-5, 7

MICH. ADMIN. CODE R. 336.2801(b)(i) ...................................................15

MICH. ADMIN. CODE R. 336.2801(ll)(ii)(A) ....................................... 16, 18-19

MICH. ADMIN. CODE R. 336.2801(ll)(ii)(C) ..........................................5, 14

MICH. ADMIN. CODE R. 336.2801(ll)(i) ..................................................15

MICH. ADMIN. CODE R. 336.2818(3)(a)(iii) ............................................15

MICH. ADMIN. CODE R. 336.2818(3)(a)(f) .............................................19

MICH. ADMIN. CODE RS. 336.2818(4) ....................................................19

**Miscellaneous**

MDEQ PSD Workbook: A Practical Guide to Prevention of Significant Deterioration (Oct. 2003) ...................................................................................................................................15

WEBSTER'S THIRD NEW INT'L DICTIONARY 1981 (2002) ...........................................................10

v

## ISSUES PRESENTED

1. Whether Defendants bear the burden of proving their activities fall within the EPA-created "routine maintenance" and "demand growth" exceptions to the Clean Air Act's New Source Review Program.

*Plaintiff's answer: Yes*

2. Whether this Court should apply EPA's longstanding interpretation of the regulatory exception for "routine maintenance, repair or replacement" because EPA has reasonably interpreted its own regulations

*Plaintiff's answer: Yes*

3. Whether this Court should apply EPA's longstanding and reasonable interpretation of the regulatory demand growth exception

*Plaintiff's answer: Yes*

## LEADING AUTHORITY FOR THE RELIEF SOUGHT

1. *DTE bears the burden of proving its activities fall within the routine maintenance and demand grown exceptions*

**Cases**:
*NLRB v. Ky. River Comm. Care, Inc.* ("*KRCC*"), 532 U.S. 706, 711 (2001)
*United States v. Duke Energy Corp.,* No. 1:00CV1262, 2010 WL 3023517 (M.D.N.C. July 28, 2010)


2. *The routine maintenance exception must be applied narrowly to cover only de minimis activities*

**Cases**:
*Auer v. Robbins*, 519 U.S. 452 (1997)
*Alabama Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979)
*New York v. EPA*, 443 F.3d 880 (D.C. Cir. 2006)

**Regulations**:
40 C.F.R. § 52.21(b)(2)(iii)(A)
MICH. ADMIN. CODE R. 336.2801(aa)(iii)(A)

**Other Authority**:
Memo from Don Clay, Acting EPA Ass't Adm'r (Sept. 9, 1988) (Ex. 2)
Letter from Francis Lyons, (EPA Region V) to Henry Nickel (DTE Counsel, Hunton & Williams) on (May 23, 2000) (Ex. 4)


3. *The demand growth exception only covers only unrelated emissions increases that the unit actually could have accommodated before undertaking the projects*

**Cases**:
*Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007)
*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005)
*United States v. Cinergy Corp.*, 1:99CV1693LJM-VSS, 2005 WL 3018688 (S.D. Ind. Nov. 9, 2005)

**Regulations**:
40 C.F.R. § 52.21(b)(41)(ii)(c)
MICH. ADMIN. CODE R. 336.2801(ll)(ii)(C)

**Other Authority**:
Letter from Dianne McNally (EPA Region III) to Mark Wejkszner (Penn. Dep't Envtl. Protection) (Apr. 20, 2010) (Ex. 8)

## INTRODUCTION AND PURPOSE OF MOTION

This motion seeks to establish the rules of law that the Court will use to determine whether DTE's boiler overhaul constituted a "modification" under the New Source Review (NSR) program.

The Clean Air Act (CAA) and applicable implementing regulations broadly impose permitting and operation requirements on sources that undergo (1) "any" physical or operational change that (2) would result in increased emissions. There is no dispute that the extensive renovation of the Monroe Unit 2 boiler is a "physical change" contemplated by the Act, or that DTE expected the unit's emissions to significantly increase after the project. Rather, the Company has incorrectly suggested that its multimillion dollar capital improvement project is entitled to the benefit of two regulatory exemptions. First, DTE urges that its massive project was "routine maintenance." Second, DTE asserts that all of its roughly 4,000 tons of expected emissions increases should be excluded from the applicability analysis as unrelated to the project. DTE is mistaken on both counts.

DTE's arguments rely on deeply flawed interpretations of EPA's Clean Air Act regulations. First, the D.C. Circuit has definitively held—*twice*—that EPA's regulatory exceptions are necessarily "narrow" and apply only to *de minimis* activities, squarely contradicting DTE's suggestion that the routine maintenance exception is so broad as to exempt even multimillion dollar capital improvement projects performed at most once or twice in the lifetime of any given generating unit. Moreover, DTE's interpretation of the routine maintenance exception is contrary to EPA's longstanding implementation of its own regulations—indeed, it ignores the applicability determination issued to *this company* in 2000 regarding then-proposed projects *at this plant*. DTE's attempt to inject uncertainty into these

1

proceedings by a process of selective memory should be rejected.

Second, the plain language of the so-called "demand growth" exception excludes only those portions of anticipated emissions increases that are "not related to" the projects at issue. Furthermore, emissions increases—and so NSR applicability—must be measured against a unit's *actual* past and projected operating practices; it is not a purely speculative inquiry regarding the unit's *potential* emissions.

The United States has prepared this motion for partial summary judgment regarding the proper legal tests that should be employed when assessing the Monroe Unit 2 project.  The United States seeks a ruling that (1) DTE bears the burdens of production and persuasion with regard to the routine maintenance and demand growth provisions; (2) the routine maintenance exception, which is assessed in light of EPA's longstanding "WEPCo factors," is necessarily narrow and applies only to *de minimis* activities; and (3) as a matter of law, the demand growth exception allows DTE to exclude only those emissions that the unit was actually capable of accommodating before the project and that were unrelated to, *i.e.*, not caused or enabled by, the capital projects at its units.

## STANDARD FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is proper where the court finds that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[1]  "As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules . . . which are designed to secure the just, speedy, and inexpensive determination of every action."  *United States v. S. Ind. Gas &*

---

[1] Federal Rule of Civil Procedure 56 was amended effective December 1, 2010.  However, the applicable legal standard remains unchanged.

*Elec. Co.* (*SIGECO*), 245 F. Supp. 2d 994, 1006 (S.D. Ind. 2003) (citing *Celotex*, 477 U.S. at 327).

## STATUTORY BACKGROUND

The NSR program was added by the 1977 Clean Air Act Amendments after earlier programs failed to achieve the statutory goals. *See Envtl. Def. v. Duke Energy Corp.* (*Duke Energy III*), 549 U.S. 561, 567-68 (2007). When enacting this program,[2] Congress underscored its predominant focus: "First, and foremost, protection of the public health remains the paramount purpose and value under the Act . . . [T]he overriding commitment of the 1977 Act (just as the 1970 legislation) is to the protection of public health." Stat. of Rep. Rogers, Clean Air Conf. Rep. (1977), 123 CONG. REC. 27,070 (1977); *see also* 42 U.S.C. § 7470.

In furtherance of this objective, NSR provisions require a source to obtain permits and install state-of-the-art pollution controls whenever the source undergoes a modification. *See* 42 U.S.C. §§ 7475(a), 7479(2)(C). "Modification" is in turn defined as "any physical change in, or change in the method of operation of, a stationary source which increases" emissions. 42 U.S.C. § 7411(a)(4). The breadth of this definition—which captures "any" physical change—is in keeping with Congress' express focus on human health and welfare. *See Wis. Elec. Power Co. v. Reilly* (*WEPCo*), 893 F.2d 901, 905 (7th Cir. 1990); *SIGECO*, 245 F. Supp. 2d at 1009-10 (broad "modification" definition illustrates Congress' intent for broad NSR applicability).

In order to ease the initial burden of complying with these requirements, existing sources were "grandfathered." *New York v. EPA* (*New York I*), 413 F.3d 3, 13 (D.C. Cir. 2005).

---

[2] The NSR program is comprised of two components, the Prevention of Significant Deterioration (PSD) provisions and the Nonattainment New Source Review (NNSR) provisions. *See* 42 U.S.C. §§ 7470–7479 (PSD); 42 U.S.C. §§ 7501–7515 (NNSR). While both programs are implicated by this case, their applicability can be treated together for the purposes of this motion. *See* Plaintiff's Motion for a Preliminary Injunction (ECF No. 8) at 5–6.

However, the expectation was that these existing units would either be retired or overhauled, at which time the sources would be required to install up-to-date pollution controls on those units—grandfathered sources were not granted "perpetual immunity" from the Act's requirements. *Alabama Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979); *see also United States v. Ohio Edison Co.,* 276 F. Supp. 2d 829, 850 (S.D. Ohio 2003) ("Congress did not . . . intend that such existing sources be forever spared the burden and expense of installing pollution control devices."). Instead, by requiring that sources install and operate state-of-the-art pollution control technology, the NSR program aimed "to ensure that pollution control measures are undertaken when they can be most effective, at the time of new or modified construction." *See WEPCo*, 893 F.2d at 909.

## ARGUMENT[3]

### I.   THE APPLICABLE BURDENS OF PROOF

DTE claims that its Monroe Unit 2 boiler renovation project did not constitute a "change" under the Clean Air Act because it qualifies for the regulatory routine maintenance exclusion, and further that the Company's expected post-project emissions increases did not trigger the NSR program's significance thresholds because they qualify for the regulatory "demand growth" exclusion. Supreme Court precedent dictates that the party asserting the benefit of a regulatory exclusion bears the burden of proof. *See NLRB v. Ky. River Comm. Care*, *Inc.* ("*KRCC*"), 532 U.S. 706, 711 (2001); *United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967); *FTC v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948).

Here, as in *KRCC*, both regulatory exceptions at issue exclude from consideration

---

[3] As this motion seeks the determination of a purely legal matter, the United States has not set forth a statement of undisputed material facts.

activities that would otherwise be covered by the statute and regulatory program.  *See* Mich.
Admin. Code Rs. 336.2801(aa)(iii)(A) (routine maintenance exception)[4] & 336.2801(ll)(ii)(C)
(demand growth exception); *c.f. KRCC*, 532 U.S. at 711 (noting that, under the National Labor
Relations Act, "supervisors" would fall within the covered class of employees were they not
expressly exempted and assigning the burden of proof to the party seeking the benefit of the
"supervisor" designation).  Following the Supreme Court's guidance, those courts that have
addressed the issue in the NSR context have *unanimously* imposed the burdens of proof on the
electric utilities seeking the benefit of the exceptions.  *See United States v. Duke Energy Corp.*,
No. 1:00CV1262, 2010 WL 3023517, at *7–8 (M.D.N.C. July 28, 2010) (*Duke Energy
IV*)(holding that Duke Energy bore the burden of proving its projects were routine maintenance
after noting that "[n]othing in the statute, regulations, or legislative history provides an adequate
reason for departing from the general rule widely applied by the Supreme Court . . . that the party
seeking the exception bears the burden of proof")[5]; *United States v. Cinergy Corp.*, 1:99-cv-
01693-LJM-JMS (S.D. Ind.), Final Jury Instructions, Dkt. 1335, May 21, 2008 (Ex. 1) at 27
("The burden is on Defendants to prove by a preponderance of the evidence that the demand
growth exclusion applies to an emissions increase.").  Moreover, allocating the burden of proof
to DTE better fits the "practical" realities of information access and avoids the conundrums of
logic that would arise were the Government required to prove a negative, *i.e.*, that DTE's

---

[4] *See also WEPCo*, 893 F.2d at 910 (noting that the routine maintenance regulation exempts
activities from the "broader definition" of "physical change").

[5] *See also Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 618 F. Supp. 2d 815, 824 (E.D.
Tenn. 2009); *United States v. Ala. Power Co.*, 681 F. Supp. 2d 1292, 1313 (N.D. Ala. 2008);
*Sierra Club v. Morgan*, No. 07-C251S, 2007 WL 3287850 at *12 (W.D. Wis. Nov. 7, 2007);
*United States v. E. Ky. Power Co-op, Inc.*, 498 F. Supp. 2d 976, 994-95 (E.D. Ky. 2007); *United
States v. Cinergy Corp.*, No. 1:99CV1693LJMVSS, 2006 WL 372726, at *4 (S.D. Ind. Feb. 16,
2006); *Ohio Edison Co.,* 276 F. Supp. 2d at 856.

5

projects were *not* routine maintenance or that expected resultant emissions were *not* excludable. *See KRCC*, 532 U.S. at 711.   Thus, as the party asserting the benefit of a regulatory exceptions—not to mention the party with substantially greater access to the relevant information concerning its own projects—DTE should bear the burden of proving that its renovation work and expected emissions increases fall within the regulatory exclusions it invokes for protection.

## II.    DEFERENCE TO EPA'S INTERPRETATION OF ITS OWN REGULATIONS

There is no dispute that DTE is seeking shelter under regulatory provisions created by EPA or that DTE's interpretation of those EPA-created provisions differs sharply from that of the Agency.   First, EPA's interpretation of the statute it administers is entitled to judicial deference.  *See New York I*, 413 F.3d at 23.   "[I]n enacting the NSR program, 'Congress sought to accommodate the conflict between the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality,' and *delegated the responsibility of balancing those interests to EPA*."  *Id.* (emphasis added) (discussing EPA's interpretation of "increases" and quoting *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 851 & 865 (1984)).

Additionally, where an agency implements its mandate through regulations and the meaning of a regulation itself is questioned, courts give substantial deference to the agency's interpretation, which carries "controlling" weight unless "plainly erroneous or inconsistent with the regulation."  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *see also Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880-82 (2011); *Coeur Alaska*, *Inc. v. Se Alaska Conservation Council*, 129 S.Ct. 2458, 2473 (2009). The Supreme Court's reasoning in *Thomas Jefferson University v. Shalala* illustrates this point:

> "The [Agency's] interpretation . . . is thus far more consistent with the regulation's unqualified language than the interpretation advanced by petitioner. But even if this were not so, the [Agency's] construction is, at the very least, a reasonable one, and we are required to afford it controlling weight."

512 U.S. 504, 515 (1994) (internal quotations omitted).  "The principle of deference has particular force where, as is the case here, the subject being regulated is technical and complex." *WEPCo*, 893 F.2d at 907; *see also New York I*, 413 F.3d at 24.  As explained in more detail in the following sections, both regulatory exceptions cited by DTE have been consistently interpreted and implemented by EPA for decades.  Far from showing them to be "plainly erroneous," the language of the regulations in fact "comfortably bears" EPA's longstanding interpretations.  *Auer*, 519 U.S. at 461.  As such, EPA's interpretation of its own regulations should be accorded substantial deference.

## III.    THE ROUTINE MAINTENANCE EXCEPTION

Since the inception of the NSR program, EPA has exempted "routine maintenance, repair and replacement" activities from the definition of "physical change."  *New York v. EPA* (*New York II*), 443 F.3d 880, 883 (D.C. Cir. 2006).  This exemption has been incorporated into Michigan's SIP.  *See* MICH. ADMIN. CODE R. 336.2801(aa)(iii)(A).  Thus, routine maintenance activities are not "modifications" and therefore do not trigger NSR requirements.

EPA has long assessed a company's routine maintenance claims on a "case-by-case" basis, taking into account the "[1] nature [and] extent, [2] purpose, [3] frequency, and [4] cost" of the activity "to arrive at a common-sense finding."  *See* Memo from Don Clay, Acting EPA Ass't Adm'r ("Clay Memo") (Sept. 9, 1988) (Ex. 2) at 2; *see also WEPCo*, 893 F.2d at 910 (upholding EPA's interpretation and application of the routine maintenance exception set forth in the Clay Memo).  As the summarized by the *Ohio Edison* court, EPA's interpretation readily fits within the common-sense meaning of "routine maintenance":

> While the analysis required to distinguish between a modification sufficient to trigger compliance from routine maintenance, repair and replacement is complex, the distinction is hardly subtle. Routine maintenance, repair and replacement occurs regularly, involves no permanent improvements, is typically limited in expense, is usually performed in large plants by in-house employees, and is treated for accounting purposes as an expense. In contrast to routine maintenance stand capital improvements which generally involve more expense, are large in scope, often involve outside contractors, involve an increase of value to the unit, are usually not undertaken with regular frequency, and are treated for accounting purposes as capital expenditures on the balance sheet.

276 F. Supp. 2d at 834. EPA's interpretation, as implemented through the multifactor "WEPCo test," faithfully carries out the statute's broad language and overriding mandate to protect the public health and welfare. This interpretation has three hallmarks: (1) the exception must be narrowly applied, (2) it covers activities which are routine for individual generating units, and (3) no activity is categorically exempted under the exception. *See United States v. Cinergy Corp.*, 495 F. Supp. 2d 909, 931 (S.D. Ind. 2007).

### 1. The Routine Maintenance Exception is Necessarily Narrow

Although "routine maintenance, repair and replacement" is not specifically defined by the regulations, courts have concluded that exemptions to the CAA's modification provisions must be narrow, *see, e.g.*, *New York II*, 443 F.3d at 884 & 888, and EPA has consistently construed the routine maintenance exception narrowly.[6]

The statute *compels* a narrow reading of the exemption; the Act's definition of modification applies to "any physical change" and contains no exception to the NSR program's requirements. *See Ala. Power*, 636 F.2d at 400 (" '[M]odification' is nowhere limited to physical changes exceeding a certain magnitude."). EPA's discretion to exempt some

---

[6] EPA has applied the routine maintenance exception narrowly since the 1970's. *See, e.g.*, EPA Region X Regional Counsel Opinion to Weyerhauser (Aug. 18, 1975) (increasing the surface area of boiler components considered non-routine physical changes) (Ex. 3-A). Plaintiffs provide an indexed appendix of EPA's discussions on this issue at Exhibit 3.

modifications in its regulations is therefore "tightly bounded by the need to show that the situation is genuinely *de minimis* or one of administrative necessity." *Ala. Power*, 636 F.2d at 361; *see also New York II*, 443 F.3d at 890 ("As Congress limited the broad meaning of 'any physical change,' directing that only changes that increase emissions will trigger NSR, no other limitation (other than to avoid absurd results) can be implied.").  To remain consistent with the plain language of the NSR provisions, the routine maintenance exception must be interpreted narrowly "as limited to '*de minimis* circumstances.' "  *New York II*, 443 F.3d at 884, 890; *see also Ala. Power*, 636 F.2d at 400 (holding that, however "inconvenient and costly" the requirements of the modification provisions may be to regulated industries, the "clear language of the statute unavoidably imposes" those costs broadly); *New York v. Am. Elec. Power Serv. Corp.,* 2:04-cv-1098, 05-cv-360, 2007 WL 539536, at *2 (S.D. Ohio Feb. 15, 2007); *Ohio Edison*, 276 F. Supp. 2d at 855; *SIGECO*, 245 F. Supp. 2d at 1009.  DTE cannot escape the fact that the routine maintenance exception is constrained by the *de minimis* doctrine, nor, ultimately, can the Company avoid the fundamental question of whether its multimillion dollar boiler renovation project can "fairly be considered *de minimis*."  *Ala. Power*, 636 F.2d at 360.

### 2.  The Routine Maintenance Exception Covers Only Those Activities That Are Routine for Individual Units

As mentioned earlier, EPA assesses a company's routine maintenance claim by evaluating the proposed project's nature and extent, purpose, frequency, and cost—the so-called "WEPCo factors"—in order to arrive at a common-sense conclusion.  *See New York II*, 443 F.3d at 883-84.  Two predominant applicability determinations serve to illustrate EPA's longstanding interpretation of this test; the first was issued to Wisconsin Electric Power Company ("WEPCo") in 1988 (the "Clay Memo," Ex. 2), the second to DTE in 2000 (the "DTE Determination," Ex. 4).  The former was upheld by the Seventh Circuit in *WEPCo*, 893 F.2d 901; the latter has been

widely referred to by EPA as a preeminent statement of the Agency on the routine maintenance exception in the years since.[7] In 2004, Michigan highlighted the DTE Determination as a central source of guidance in implementing the state's NSR program. *See* Michigan New Source Review Program Review (Ex. 5) at 24-27.

As detailed in these applicability determinations, the routine maintenance exception covers activities which are considered—in light of the specific circumstances surrounding the project at issue—to be routine for the units in question and other typical generating units; it does not turn on simply whether an activity is prevalent in the industry as a whole. *See, e.g.*, Clay Memo (Ex. 2) at 5 (considering how often a project would normally occur during a unit's expected life cycle). Indeed, as EPA told DTE in 2000, the Agency considers "whether a typical source in the relevant industry undertakes the proposed activity as a routine matter. This does not mean, however, that whatever activity members of a particular industry have done—no matter how infrequent, costly, sizable, or capable of expanding the source's operations or extending its useful life—is necessarily routine." DTE Determination (Ex. 4) at Encl. 15.

This point is perhaps best illustrated in relation to the "frequency" factor of the WEPCo test. Consistent with the plain meaning of both "routine"[8] and "frequency,"[9] EPA considers *how often* similar projects have been undertaken at individual units rather than *how many* such

---

[7] *See, e.g.*, Glatfelter Determination (Ex. 3-B) at 1; Letter from Greg M. Worley (EPA Region 4) to Barry R. Stephens (Tenn. Dep't of Conservation) at 2 (Sept. 14, 2001) (Ex. 3-C); Letter from Richard R. Long (EPA Region 8) to Gary D. Helbling (N.D. Dep't of Health) at 1 (Apr. 17, 2001) (Ex. 3-D) (attachments excluded).

[8] See WEBSTER'S THIRD NEW INT'L DICTIONARY 1981 (2002) ("of a commonplace or repetitious character: ordinary, usual").

[9] WEBSTER'S at 909 ("occurrence often repeated" or "the number of repetitions of a periodic process in a unit of time").

projects have been implemented industry wide. *See*, *e.g.*, DTE Determination (Ex. 4) at Encl. 11, 15. Although information concerning the frequency of similar projects in the lives of other individual units within the same industry can inform the routine maintenance analysis, 57 Fed. Reg. 32,314, 32,326 (July 21, 1992), merely tallying the number of times allegedly similar projects have occurred across the entire industry is not determinative of whether the projects constitute routine maintenance under the regulations. *See Ohio Edison,* 276 F. Supp. 2d at 855; *SIGECO*, 245 F. Supp. 2d at 1009.[10] In other words, all else being equal, projects that are performed only once or twice in the lifetime of a given unit should be considered infrequent, and so unlikely to qualify for the routine maintenance exception. *See WEPCo*, 893 F.2d at 909.

The frequency factor is not unique in this respect; each of the WEPCo factors is assessed in light of the historical practices of the units at issue as well as those of other typical generating units within the industry. *See* Clay Memo (Ex. 2) at 4-6; DTE Determination (Ex.4) at Encl. 10-11, 15.[11] Importantly, the EPA's emphasis on individual units rather than industry practices is a natural result of the necessarily narrow scope of the routine maintenance exclusion. *See Duke Energy IV*, 2010 WL 3023517 at *7 ("[T]the Court will not forego any consideration of what occurs at individual units and look solely at industry practice to determine whether a project is [routine maintenance]. . . . To do [so] would be to defy common sense, ignore the 'case-by-case' determination required by the WEPCO test, and allow the industry to render the PSD program a nullity by making its own practice the sole standard."); EAB Final Order (Ex. 6) at 394, 395

---

[10] *See also* 63 Fed. Reg. 39,857, 39,860 (July 24, 1998) (many activities will be considered "non-routine" for NSR purposes, even though sources in the electric utility industry "generally" undertake them for business reasons).

[11] In its preliminary injunction briefing, DTE sought to erect a "false dichotomy" in which the court was asked to choose between whether a project is "routine in the industry" or routine at the particular unit at issue. *C.f. Duke IV*, 2010 WL 3023517 at *7; Def's PI Opp. (ECF No. 46) at 12–13. Such a choice is neither necessary nor even appropriate.

("TVA's construction of the exception would, carried to its logical conclusion, allow TVA to rebuild an entire facility without triggering new source review so long as it did so in increments that can be identified elsewhere in the industry. . . . Accepting TVA's view risks allowing routine maintenance, repair and replacement to become the exception that swallows the rule . . ."). The regulatory routine maintenance exception should not be allowed to swallow the statutory rule that physical changes trigger NSR requirements, lest electric utilities be permitted to "open vistas of indefinite immunity" from the Clean Air Act's protections of public health and welfare. *WEPCo*, 893 F.2d at 909; *see also Ohio Edison*, 276 F. Supp. 2d at 855; *SIGECO*, 245 F. Supp. 2d at 1014-15.

### 3.  There Are No Categorical Exemptions for  Routine Maintenance

Finally, no activity is categorically exempt under the routine maintenance exception. *See*, *e.g.*, Clay Memo (Ex. 2) at 2 & 6 n.2 (indicating that "determinations of PSD…applicability are fact-specific"); DTE Determination (Ex. 4) at Encl. 9; *see also* Defendant's Opposition to Plaintiffs Motion for a Preliminary Injunction  (Def's PI Opp.) (ECF No. 46) at 11 (noting routine maintenance claims require case-by-case analysis).  Rather, EPA examines each activity on a case-by-case basis, looking at the nature and extent, purpose, frequency, and cost of the activity.  *See id*. at 3; *Ohio Edison,* 276 F. Supp. 2d at 856; *SIGECO*, 245 F. Supp. 2d at 1008.

The common-sense interpretation set forth in the Clay Memo and DTE Determination is firmly grounded in the plain terms of the applicable regulations, which exclude "routine" maintenance, repair, or replacement, not "any" maintenance, repair, or replacement.  Thus, the language comfortably bears EPA's interpretation of the regulation as providing a "very narrow exclusion" that relies on a "case-by-case" analysis of the "nature, extent, purpose, frequency, and cost" of the activity "to arrive at a common-sense" determination of whether the activity is

intended to "maintain[] the plant in its present condition." Clay Memo (Ex. 2), at 3-6. This reasonable interpretation furthers the purpose of the statute and is neither plainly erroneous nor inconsistent with the regulations. *See SIGECO*, 245 F. Supp. 2d at 1009. As such, this court should defer to EPA's interpretation.

### 4. Aggregation

DTE has suggested through its experts and prior briefing that its various boiler projects undertaken during the Spring 2010 outage should not be "aggregated" but rather considered separately for the purposes of the routine maintenance analysis. Simply put, there is no precedent to support the piecemeal evaluation of DTE's renovation project where all the work was undertaken at the same time as a part of a single effort to rehabilitate the Monroe Unit 2 boiler. *C.f. WEPCo*, 893 F.2d at 907–09 (considering together WEPCo's "four-year program" of renovations spanning four generating units). Rather, the matter of aggregation arises when sources perform renovation work little by little over time and so might otherwise escape NSR review. *C.f. United States v. Murphy Oil USA, Inc*, 155 F. Supp. 2d 1117, 1141 (W.D. Wis. 2001) (aggregating work performed between 1991 and 1993). In such instances, EPA considers a number of factors, including the coordinated planning or "intrinsic relationship" of the various projects. *See* Memo from John B. Rasnic (EPA) on Applicability of New Source Review Circumvention: Guidance to 3M – Maplewood, Minn. (June 17, 1993) (Ex. 7) at 4.[12] However, where projects are undertaken as a part of the same effort, EPA has made clear that the work should be considered together. *See In re Monroe Elec. Generating Plant Proposed Operating Permit*, Petition No. 6-99-2, at 11-12, 21-22 (U.S. EPA June 11, 1999) (Ex. 3-E) (confirming narrow interpretation of routine maintenance exception such that even otherwise minor work

---

[12] *See* 75 Fed. Reg. 19,567, 19,571 (Apr. 15, 2010) (noting that the 3M memo "remains EPA's most complete statement of the principles regarding grouping nominally-separate changes.").

may be non-routine if it is part of a large, extensive effort); Letter from David Howekamp (EPA) to Robert Connery (Counsel for Cyprus Case Grande Corp) (Nov. 6, 1987) (Ex. 3-F) at 6; *see also Ohio Edison*, 276 F. Supp. 2d at 840 (implicitly aggregating "eleven activities are made up of thirty-four parts replacements").

This is consistent with the technology-forcing nature of the Clean Air Act. Because sources of air pollution are directed to implement pollution control measures at the time of their construction or modification, facilities must incorporate the costs of protecting the public health into their long-term planning, thereby stimulating the advancement of control technology. *See WEPCo*, 893 F.2d at 909; *see also* Clay Memo (Ex. 2) at 12 ("In adopting the [NSR program], Congress sought to focus air pollution control efforts at an efficient and logical point: the making of long-term decisions regarding the creation or renewal of major stationary sources."). As the Seventh Circuit warned, "[t]he development of emissions control systems is not furthered if operators could, without exposure to [NSR program requirements], increase production (and pollution) through the extensive replacement of deteriorated generating systems." *WEPCo*, 893 F.2d at 910.

## IV.   THE DEMAND GROWTH EXCEPTION

As explained previously, the NSR program imposes permitting and operation requirements on facilities that undertake physical changes that "would result" in a significant increase in regulated emissions. MICH. ADMIN. CODE R. 336.2801(aa). DTE has invoked the so-called demand growth exception, MICH. ADMIN. CODE R. 336.2801(ll)(ii)(C), a provision which allows utilities to exclude portions of expected emissions increases the unit was actually capable of accommodating from the NSR applicability analysis when they "would in no way be caused by physical or operational changes" at the unit. *New York I*, 413 F.3d at 16 (citing 57 Fed. Reg.

at 32,326-28).  DTE's interpretation overlooks both aspects of the exception.

### 1.  Projecting Emissions to Evaluate NSR Applicability

As described more fully in the United States' Opposition to DTE's recent motion for summary judgment, the NSR program imposes preconstruction obligations on sources that seek to modify their units.  *See* ECF No. 114 at 5-6; *New York I*, 413 F.3d at 12. Because the NSR program is, a *pre*construction program, potential increases in emissions must be assessed *before* projects are undertaken.  *See* MICH. ADMIN. CODE R. 336.2818(3)(a)(iii); *see also* 67 Fed. Reg. 80,186, 80,194 (Dec. 31, 1992) (a source "must make the projection before" construction).

Emissions increases are typically evaluated under the "actual-to-projected-actual" test under which utilities "determine whether they had post-change increases in emissions—and thus whether they needed NSR permits—by comparing actual emissions before the change to their projections of actual post-change emissions."  *New York I*, 413 F.3d at 16.  Specifically, projected emissions increases are measured by comparing a "baseline" annual emissions rate to the highest annual rate of emissions expected in the five years "following the date the unit resumes regular operation."  *See* MICH. ADMIN. CODE R. 336.2801(b)(i) ("baseline actual emissions")[13]; 336.2801(ll)(i) ("projected actual emissions)).[14]  If those projections show increases above EPA-set significance levels, the source must get a permit before construction.

---

[13] *See also* MDEQ PSD Workbook: A Practical Guide to Prevention of Significant Deterioration (Oct. 2003) at 3-2–3-3, *available at* http://www.deq.state.mi.us/aps/downloads/permits/PSD%20 Workbook.pdf.

[14] Although substantively identical to the current regulations' reference to "regular operations," past NSR regulations referred to the "normal source operations," which EPA explained meant "directly responding to a demand for electricity."   57 Fed. Reg. at 32,325.  As explained in the United States' Opposition Brief to DTE's Motion for summary judgment based on the 2002 NSR Rules (ECF No. 114), artificially "managing emissions" to keep them below significance levels after a project has been implemented cannot be considered a return to "regular operations."  *See*, *e.g.*, Order of the EPA Administrator, *In re: Wiconsin Power and Light Columbia Generating Station,* Petition No. V-2008-1 (Oct. 8, 2009) (ECF No. 114-8) at 7.

When calculating these future emissions, a source must "[c]onsider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's *highest projections* of business activity, the company's filings with the state or federal regulatory authorities, and compliance plans under the state implementation plan." MICH. ADMIN. CODE R. 336.2801(ll)(ii)(A) (emphasis added); 40 C.F.R. § 52.21(b)(41)(ii)(a), (b). Importantly, increases in annual output enabled by a physical or operational change must be included in the pre-project calculus. *See Duke Energy III*, 549 U.S. at 577-78 ("'[A]ctual emissions' must be measured in a manner that looks to the number of hours the unit is or probably will be actually running."); *see also United States v. Cinergy Corp.*, 458 F.3d 705, 708 (7th Cir. 2006) (if physical change enabled plant to increase operation from 18 to 20 hours per day, then "a reasonable estimate… would be that the modification had increased the plant's annual emissions by about 10 percent").

### 2. Excluding Emissions Under the Demand Growth Exception

In order to exclude any portion of its projected emissions increase from the NSR applicability analysis, a utility must show "(1) [t]he unit could have achieved the necessary level of utilization during the consecutive 24-month period [the source] selected to establish the baseline actual emissions; and (2) the increase is not related to the physical or operation changes(s) made to the unit." *New York I*, 413 F.3d at 33 (citing 67 Fed. Reg. at 80,203); *see also United States v. Cinergy Corp.*, 1:99CV1693LJM-VSS, 2005 WL 3018688, at *3 (S.D. Ind. Nov. 9, 2005) (concluding "the Demand Growth Exclusion applies to emissions increases that could have been predicted or projected regardless of whether a physical change was to occur" and granting United States motion for partial summary judgment on this issue). A source may exclude only that *portion* of the unit's post-project emissions that is entirely attributable to a

16

projected increase in capacity utilization unrelated to the change.  *See*, *e.g.*, Letter from Dianne

McNally (EPA Region III) to Mark Wejkszner (Penn. Dep't Envtl. Protection) ("Northampton

Determination") (Apr. 20, 2010) (Ex. 8) at 4.  In other words, "if an emissions increase could not

have occurred 'but for the physical or operational change,' the increase must be considered to

result from the change" and so cannot be subtracted from the emissions projections under the

demand growth exclusion.  *See* DTE Determination (Ex. 4) at Encl. 19 (quoting 57 Fed. Reg. at

32,327).

Importantly, the capable-of-accommodating analysis, does not grant unit a blank check to

exclude *all* of the projected emissions increases based only on the unit's physical or legal

emissions limitations that applied during the baseline.  *See*, *e.g.*, Northampton Determination

(Ex. 8) at 4.  Rather, the analysis must be based on the unit's *actual* projected operating

conditions, lest the test for measuring emissions increase be transformed from an "*actual*-to-

projected-actual" test to a "*potential*-to-projected-actual" test contrary to the Clean Air Act's

mandate.  *See New York I*, 413 F.3d at 39 ("[T]he CAA unambiguously defines 'increases' in

terms of actual emissions," not potential emissions).  To illustrate this point, EPA considered the

example of a unit which is legally permitted to burn coal with two percent sulfur content, but

which has in fact and will continue to burn coal with one percent sulfur content.  For such a unit,

> [e]missions that can be excluded would be limited to emissions associated with burning one percent coal, regardless of the limit that would allow them to burn a higher sulfur coal. In other words, the emissions that "could have been accommodated" are not defined by all the many different operating conditions that could have occurred during the baseline period; rather *emissions that may be excluded are limited by the proposed operating conditions used to project emissions into the future*.

Northampton Determination (Ex. 8) at 4 (emphasis added).  Similarly, if an emissions unit

operated at, say, a 75% utilization rate during the baseline period, but now projects its future

actual emissions based on an 85% rate, it cannot exclude emissions based on a 100% utilization rate just because it theoretically *could* have operated at this rate during the baseline period.

As for the exclusion's requirement that an emissions increase "is not related" to the physical change, EPA has explained that "any emissions increase attributable to a physical or operational change . . . must continue to be included in the post-change emissions calculation." 57 Fed. Reg. at 32,326; *see also Cinergy*, 2005 WL 3018688 at *3 ("The Demand Growth Exclusion is another way of emphasizing, and clarifying, the causation element."); 61 Fed. Reg. 38,250, 38,268 (July 23, 1996) (where a change will "increase reliability, lower operating costs, or improve other operational characteristics of the unit," related increases in utilization can and should be attributable to the change).  Indeed, to establish a portion of its projected emissions increases should be excluded under the exception, a "facility must be able to demonstrate that excluded emissions are completely unrelated to the project."  Northampton Determination (Ex. 8) at 4.  Even if the unit was capable of accommodating the expected emissions increase, the increase cannot be excluded if it was caused or enabled by, *i.e.*, related to, the project.  *See* 57 Fed. Reg. at 32,326; *New York I*, 413 F.3d at 32-33 (quoting 67 Fed. Reg. at  80,203); *see also* DTE Determination (Ex. 4) at 4-5.

Ultimately, EPA's interpretation of the exception reflects a natural reading of the regulatory language and fidelity to the statutory purpose.   As such, the Agency's longstanding interpretation that emissions increases cannot be related to the project if they are to be excluded should be accorded substantial deference.

### 3.  Claimed Exclusions Must Be Adequately Justified Before a Project Is Undertaken

Although the NSR projection provisions do not require a source to be "prescient," *Duke Energy IV*, 2010 WL 3023517 at *6, they do impose an obligation that sources carefully consider

a broad range of "relevant information" including the unit's past operations and highest-projected business activity.  MICH. ADMIN. CODE R. 336.2801(ll)(ii)(A).  As the D.C. Circuit observed:

> By understating projections for emissions associated with malfunctions, for example, or overstating the demand growth exclusion, sources could conclude that a significant emissions increase was not reasonably possible.  Without paper trails, . . . enforcement authorities have no means of discovering whether the exercise of such judgment was indeed "reasonable."

*New York I*, 413 F.3d at 35.  To that end, EPA requires that sources memorialize their decisions before beginning construction and maintain records to substantiate any claimed exclusions. 72 Fed. Reg. 72,607, 72,610 (Dec. 21, 2007); MICH. ADMIN. CODE R. 336.2818(3)(a)(f), (4).[15] However, a utility's pre-project projections and exclusions must not only be recorded, they must be supported.  *See* 40 C.F.R. § 52.21(r)(6)(i)(c) (requiring preconstruction notification to include, *inter alia*, the amount of emissions excluded under the exception, and "an *explanation for why* such amount was excluded." (emphasis added)); *see also* DTE Determination (Ex. 4) at 5.  In fact, Michigan regulatory guidance explains that, "the absence of adequate documentation" in support of a source's projections "nullif[ies] the projection" and forecloses the facility from employing the future-actual methodology, requiring instead that it determine NSR applicability under the potential-to-emit standard.  *See* Mich. PSD Workbook (Excerpted Ex. 9) at 4-4.

Moreover, by their very definitions, projected actual emissions and subtractions under the demand growth exclusion require case-by-case, fact-specific determinations that contemplate both the details of the unit's historic operations and a project's role in the unit's future operations.  *See* 40 C.F.R. § 52.21(b)(41)(i), (ii)(c).  Courts have held time and again that

---

[15] S*ee also* 57 Fed. Reg. at 32,325 (explaining NSR recordkeeping requirements for electric utilities by noting that "without appropriate safeguards[,] increases in future actual emissions that in fact resulted from the physical or operational change could go unnoticed and unreviewed.").

boilerplate assertions are insufficient where case-by-case analyses is called for.  *See*, *e.g.*, *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.,* 7 F.3d 357, 371 (3d Cir. 1993) (holding that "cautionary statements must be substantive and tailored to . . . specific future projections" in order to overcome alleged omissions or misrepresentations, and thus that "vague or blanket (boilerplate) language" is generally "inadequate to prevent misinformation.").  As such, a source seeking the benefit of the demand growth exclusion cannot substantiate its claim with an unsupported assertion of its entitlement; rather, a source must describe with particularity how a claimed exclusion satisfies the elements of the exception.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court grant its motion for partial summary judgment and hold that (1) DTE bears the burden to establish its entitlement to the benefits of either claimed exception, (2) the routine maintenance exception, as assessed in light of the multifactor WEPCo test, must be applied narrowly, and (3) the application of the demand growth exclusion must be justified before projects are undertaken, and it covers only those emissions increases that a unit was actually capable of accommodating and that are unrelated to—*i.e.*, not caused or enabled by—the capital projects at issue.

Respectfully Submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

Dated: July 18, 2011                    *s/ Elias L. Quinn*
                                        JAMES A. LOFTON
                                        JUSTIN A. SAVAGE
OF COUNSEL:                             JAMES W. BEERS, JR.
SABRINA ARGENTIERI                      THOMAS A. BENSON (MA Bar # 660308)
MARK PALERMO                            KRISTIN M. FURRIE
SUSAN PROUT                             ELIAS L. QUINN (CO Bar # 42159)

20

Associate Regional Counsel
U.S. EPA Region 5
Chicago, IL
77 W. Jackson Blvd.

APPLE CHAPMAN
Associate Director
Air Enforcement Division
U.S. EPA
1200 Pennsylvania Ave. NW
Washington D.C. 20460

Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
 (202) 514-5261
thomas.benson@usdoj.gov


BARBARA McQUADE
United States Attorney
Eastern District of Michigan

ELLEN CHRISTENSEN
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2011, the foregoing motion and associated brief were served via ECF on counsel of record.


*s/ Elias L. Quinn*
Counsel for the United States