UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>And<br><br>NATURAL RESOURCES DEFENSE COUNCIL, INC. AND SIERRA CLUB,<br><br>    Intervenor-Plaintiffs,<br><br>    v.<br><br>DTE ENERGY COMPANY AND DETROIT EDISON COMPANY,<br><br>    Defendants. | Civil Action No. 2:10-cv-13101-BAF-RSW<br><br>Judge Bernard A. Friedman<br><br>Magistrate Judge R. Steven Whalen |

**INTERVENOR-PLAINTIFFS' RESPONSE TO DEFENDANTS' "MOTION TO ESTABLISH CORRECT LEAGL STANDARD ON THE ISSUE OF 'ROUTINE MAINTENANCE, REPAIR AND REPLACEMENT' ('RMRR')"**

## Statement of Issues

1. Consistent with the extremely limited legal authority to exempt physical changes from the broad application of the Clean Air Act in 42 U.S.C. § 7411(a)(4), should the Court apply the United States Environmental Protection Agency's long-held narrow interpretation of the "routine maintenance" exemption, as exempting only day-to-day minor maintenance and insignificant replacement activities that frequently occur at a unit?

Intervenor-Plaintiffs' answer: Yes.

**Argument**

### I.  CONGRESS INTENDED THAT ALL PLANTS WOULD EVENTUALLY BE SUBJECT TO NSR.

This case involves modifications made by Defendants to its Monroe power plant without complying with the pollution control and air quality protecting requirements of parts C and D of Clean Air Act Title I, 42 U.S.C. §§ 7470-7492, 7501-7515.  Compl., Dkt. # 1.  Specifically, by replacing huge parts of a boiler in 2010, Defendants triggered the pollution control and air quality protection requirements of the Clean Air Act.  Compl., Dkt. # 1 ¶¶ 46-58.

When Congress created Parts C and D to Title I of the Clean Air Act, it did not limit the important pollution reduction and air protection requirements in those subparts to only new units, or even to existing units "modified to such an extent as to become essentially 'new' source of pollution," as Defendants would have the Court believe.  (Def. Br., Dkt. #116 at 2.)  Rather, Congress required that all major air pollution sources be subject to the requirements at the first instance that the plant was "modified."  42 U.S.C. §§ 7475(a) (making the requirements applicable upon "construction"), 7479(2)(C) (defining "construction" to include "modification"), 7502(c)(5) (requiring that the nonattainment program apply to "construction and operation of new *or modified* major stationary sources" (emphasis added)).  And Congress created no threshold for how significant the modification needs to be.  Rather, it defined a "modification"—which triggers the requirements of Parts C and D—as "*any* physical change in, or change in the method of operation of, a stationary source…"  42 U.S.C. §§ 7411(a)(4) (emphasis added); *see also* 42 U.S.C. §§ 7479(2)(C) (adopting the statutory definition from § 7411(a)), 7501(4) (same). The phrase "physical change" includes, of course, "equipment replacements." *New York v. EPA*, 443 F.3d 880, 885 (D.C. Cir. 2006) ("New York II").  By using the word "any" to preface which

physical or operational changes trigger the requirements of Parts C and D for existing sources, Congress intended the definition of modification to apply to every possible "emission-increasing activity that fits within one of the ordinary meanings of 'physical change'." *Id.*; *see also Massachusetts v. EPA,* 549 U.S. 497, 127 S. Ct. 1438, 1460 (2007) (the "repeated use of the word 'any,'" demonstrates that the statutory language has "sweeping" protective reach).

Courts have therefore correctly noted that by giving air pollution sources only until their first modification to comply with the important pollution reduction and air quality protections in Parts C and D, Congress intended the initial reprieve to be short-lived so as to further its goal of reducing air pollution by requiring modern pollution controls on these sources. *See e.g., Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909-10 (7th Cir. 1990) ("WEPCO").

II.  **The Routine Maintenance Exemption Conflicts With Congress' Enactment, And Therefore Must Be Construed Extremely Narrowly**

EPA's regulations provide an exemption from the New Source Review requirements in Parts C and D for "routine maintenance, repair and replacement." *E.g.,* 40 C.F.R. § 52.21(b)(2)(iii)(a); Mich. Admin. Code R. 336.2801(aa)(iii). Since the statute is explicit that "any physical change in, or change in method of operation of" a plant, *without exception*, triggers Part C and D's requirements, the only possible legal authority for EPA creating an exemption through rulemaking is the "*de minimis*" theory. Indeed, this is the only legal basis that EPA has ever claimed. 68 Fed. Reg. 61,248, 61,727 (Oct. 27, 2003); *New York II*, 443 F.3d at 884 ("EPA has for over two decades defined the RMRR exclusion as limited to '*de minimis* circumstances.'"), 888 (noting that EPA's historic rationale for the "routine maintenance" exemption was the "*de minimis* rationale").[1] Absent EPA's "*de minimis*" legal rationale, the

---

[1] EPA did not provide a basis in the public record for the "routine maintenance" exemption in 1978, nor when the overall program was generally revised following a D.C. Circuit remand of the 1978 rules. *See generally* 42 Fed. Reg. 57471 (Nov. 3, 1977) (proposing a version a "routine maintenance" exemption but omitting any

3

exemption is patently illegal and, presumably, EPA would never have promulgated it. *New York v. EPA*, 413 F.3d 3, 41 (D.C. Cir. 2005) ("absent clear congressional delegation… EPA lacks authority to create an exemption from NSR by administrative rule.").[2]

The "de minimis" theory accepts that there is inherent congressional intent that the plain meaning of statutes not be applied where doing so would be "futile" and "pointless," and where the burdens of regulation achieve "a gain of trivial or no value." *New York II*, 443 F.3d at 888; *Shays v. FEC*, 414 F.3d 76, 113-114 (D.C. Cir. 2005) (quoting *Ass'n of Admin. Law Judges v. FLRA*, 397 F.3d 957, 962 (D.C. Cir. 2005)); *see also* 61 Fed. Reg. 38,250, 38,292/1 (July 23, 1996) ("Administrative agencies may exempt 'truly de minimis' situations from a statutory comment 'when the burdens of regulation yield a gain of trivial or no value.'").

Because the only rationale behind the "routine maintenance" exemption is "a *de minimis* rationale," based on inherent ability to exclude from regulation "changes of trivial regulatory concern," *New York II*, 443 F.3d at 888, the Court must interpret the exemption so to exclude from regulation only "trivial" projects that meet the "*de minimis*" test. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 87 (2000) (agency exemptions to a statute must be narrowly construed); *Rugiero v. United States DOJ*, 257 F.3d 534, 543 (6th Cir. 2001); *Shays*, 414 F.3d at 113-14

---

discussion of its legal basis); 43 Fed. Reg. 26379 (June 19, 1978) (adopting a revised version of the exemption from the proposed rule but omitting any discussion of its basis or purpose); 44 Fed. Reg. 51924 (Sept. 5, 1979) (proposing rules, including the "routine maintenance" exemption following the D.C. Circuit remand but not discussing the exemption); 45 Fed. Reg. at 52,703-04 (adopting the final version of the exemption, noting that EPA received "few comments" on the exemptions, generally, but otherwise providing no background or legal basis for the "routine maintenance" exemption).

[2] It is not clear that the "routine maintenance" exemption is even lawful based on the *de minimis* rationale. No court has ever been asked to address it in a specific challenge to the exemption. *E.g., Alabama Power*, 636 F.2d at 361 (noting that EPA's exemption authority was not challenged by petitioners except for a provision not at issue in this case). The D.C. Circuit did not address it in *New York II*, because the existing exemption was not before the court. However, it did suggest that the limits on the *de minimis* doctrine set out in *Shays*, 414 F.3d at 113-14, may not support the exemption. 443 F.3d at 888. Moreover, in striking down EPA's attempt to expand the "routine maintenance" exemption, the D.C. Circuit held that because Congress created a single exemption in the statute -- "only physical changes that do not result in emission increases are excluded from NSR"—no other exemptions by regulation are allowed. *Id.* at 887.

("situations covered by a *de minimis* exemption must be truly *de minimis*."). Defendants' interpretation—that projects are exempt if sufficiently prevalent in the industry—cannot be squared with the "*de minimis*" rationale for the exemption. More to the point, requiring pollution controls and air quality protections for Defendants' over $30,000,000 boiler overhaul project in this case, more than thirty years after Congress applied these requirements to modifications, is hardly "trivial" and "pointless." It satisfies the purpose of the statute and finally provides the significant public health and welfare benefits Congress promised more than three decades ago.

**III.    Consistent With The "De Minimis" Rationale And Narrow Scope of the Exemption, EPA Has Historically Interpreted The "Routine Maintenance" Exemption Based On How Repetitive The Project Is At A Particular Unit.**

Under the third factor in the typical four-factor "routine maintenance" analysis—frequency—the analysis looks to how often the same project recurs per unit. EPA has long explained that "routine maintenance" only exempts "day-to-day maintenance and repair of equipment and the replacement of relatively small parts of *a plant* that frequently require replacement. 68 Fed. Reg. at 61,270 (emphasis added).[3] Routine maintenance projects are "regular, customary, or standard undertaking[s] for the purpose of maintaining *the plant* in its present condition." Dkt # 116-4, Memorandum from Don R. Clay at 3-4 (Sept. 9, 1988) (emphasis added); *see also id*. at 5 (noting that a project was not "frequently done" when it recurred "only once or twice during *a unit's* expected life cycle") (emphasis added).

EPA's preamble to the 1992 WEPCO rule does not address the controversy, as suggested by Defendants. (Defs' Br. at 14-15). That is, it only mentions *looking* at the industry. It does not answer the relevant question of *what should be looked for*: the number of occurrences of a certain project at individual plants, or at the average or median plant, or (as Defendants

---

[3] EPA explained this historical interpretation in a rulemaking that attempted to expand the historical interpretation. That attempted expansion was roundly rejected by the D.C. Circuit *New York II*, 443 F.3d 880, thereby restoring EPA's historical interpretation.

5

suggest) only at the raw number of occurrences of a certain project throughout the industry. While the preamble Defendants cite does not answer this question, EPA's other guidance has consistently answered that it is the frequency of recurrence and not a measure of how often across the industry.

> As a general matter, frequency is not a tally of how many times an event has *occurred* in the industry; rather, it is a measure of how often that event *recurs*, that is, a measure of the event's periodic character. The distinction between *how many* and *how often* is an important one.

*In re Tenn. Valley Auth.*, Order Responding to Petition to Object to Title V Permit at 12- (EPA Adm'r, May 2, 2011) (emphasis original) (attached as Exhibit 1).[4] EPA has therefore regularly interpreted the "routine maintenance" exemption as applying only to projects that recur regularly at an individual unit. *See In re Tenn. Valley Auth*, 9 E.A.D. 357, 395-96 (EAB 2000) (holding that the fact that a project is unusual "for an individual unit" and occurs only "once or twice-in-a-lifetime" is more instructive than "[t]he mere fact that a number of different facilities within an industry may have undertaken [a] project[]"), 407 ("Although TVA introduced evidence that it and others in the industry had made similar replacements at other facilities, the evidence did not show that these replacements were other than uncommon *in the lifetime of the unit*." (emphasis added)) , *appeal dismissed for lack of jurisdiction in TVA v. Whitman*, 336 F.3d 1236 (11th Cir. 2003); Dkt. 117-17 at 4 of 30 (Letter to Henry Nickel, Counsel for Detroit Edison at 3) (noting that frequency of the project across the industry did "not indicate that the replacement [project] is frequent at the typical utility source; to the contrary, the only available information reflects that projects like [the one at issue] have been performed only one time, if ever, at individual sources."), *id*. at 25 of 30 (Enclosure p. 17) (determining that the project was "performed rarely,

---

[4] Also available at
http://www.epa.gov/region7/air/title5/petitiondb/petitions/tva_paradise_response2010.pdf.

if ever, in the course of a utility source's life," that there was no evidence that "individual facilities in the industry frequency conduct" the same project, and that "the central question" is "whether it is industry practice that a typical facility will frequently conduct the project in question."); Dkt. 117-6, Letter from Robert Miller to Steve Dunn, at p. 2 ("Moreover, the infrequency of such replacement *at this boiler* supports our understanding that complete boiler tube replacements are not performed on a frequent basis." (emphasis added)); Letter from Winston A. Smith, EPA, to James P. Johnson, Georgia Envtl. Protection Dept. at 4 (finding that frequency did not support a finding of routine where "the previous owner of the mill never performed the same changes *at the No. 3 Recovery Boiler* during its entire 17-year operating history." (emphasis added)) (attached as Exhibit 2)[5]; Dkt. # 117-14, Letter from Doug Cole, EPA, to Alan Newman, Washington Dept. of Ecology at 4 (finding a project not routine because "EPA is not aware of [this specific unit] undergoing such an extensive boiler tube replacement project since it started up . . . more than twenty years ago"); Dkt. # 117- 7, Letter from Gregg M. Worley, EPA, to Barry R. Stephens, Tenn. Dept. of Envt. and Conservation at 4 (finding a project not routine where it has only occurred once in the "entire 40-year operating history" of the unit).

Courts that have similarly applied the "routine maintenance" analysis have found that the touchstone for the frequency factor is whether the project is routine for the particular facility at issue. In *SIGECO*, for example, the District Court agreed with EPA's interpretation that the "routine maintenance" exemption "applies only to activities that are routine for a generating unit . . . [not] the industry as a whole." *U.S. v. So. Indiana Gas and Elec. Co.*, 245 F.Supp.2d 994, 1008 (S.D.Ind. 2003); *see also U.S. v. Ohio Edison,* 276 F. Supp. 2d 829, 861 (S.D.Ohio 2003)

---

[5] Also available at http://www.epa.gov/region7/air/nsr/nsrmemos/20020128.pdf

(concluding that an "industry-wide standard" as to what is routine would "*render the exemption meaningless*" (emphasis added))*; Sierra Club v. Morgan,* 2007 U.S. Dist. LEXIS 82760, *36-37 (W.D.Wis. Nov. 7, 2007).  Additionally, the Seventh Circuit in *WEPCO* did not hold that the relevant consideration was "routine in the industry," as Defendants suggest.  (Def. Br. at 9.) Rather, the *WEPCO* court simply noted the absence of any other project at any of its plants—not that such absence was a necessary requirement.  893 F.2d at 911-912.  In fact, what Defendants fail to acknowledge is that when the *WEPCO* court actually addressed the issue directly, it held, consistent with EPA's interpretation, that projects that "normally occur once or twice during *a unit's* expected life cycle" are not routine.  *Id.* at 912 (emphasis added).

      While some courts have noted that experience in the industry is relevant—including most of the courts cited by Defendants—the inquiry still focuses on the recurrence at individual or typical units.  For example, while the court in *U.S. v. East Kentucky Power Cooperative* held that it would apply routine maintenance "with reference to the industry as a whole," it was clear that this did not mean the project would be routine based on "whether a particular replacement project has ever occurred in the industry or even necessarily the number of times it has occurred within the industry" 498 F.Supp.2d 976, 993-94 (E.D.Ky. 2007).  Rather, the court would consider facts including "the work conducted at the particular EKPC unit, the work conducted by others in the industry, and the work conducted *at other individual units* within the industry." *Id*. (emphasis added).  Similarly, in *U.S. v. Duke Energy*, the district court refused to adopt "whole cloth" the same interpretation urged by the Defendants in this case: that "frequency within an industry category by itself allows a utility to fall under the RMRR exception." 2010 U.S. Dist. LEXIS 77956, *21 (M.D.N.C. July 28, 2010).  Instead, it adopted the *East Kentucky* court's interpretation—to look at work done *at individual units* in the industry. *Id*. at *22.  In other

words, even those courts that have looked at industry-wide experience consider frequency based on how often the project recurs at individual, typical, or average units within the industry.

The few courts that have focused on the number of occurrences in the industry—detached from any context of how many units are in the industry and over how many years of operation project occur— are the clear *minority*, and fail to give weight to the Act's plain language or deference to EPA's longstanding interpretation of its own regulation. *See, e.g., Nat'l Parks Conserv. Ass'n v. TVA,* 2010 U.S. Dist. LEXIS 31682, *49 (E.D. Tenn. March 31, 2010).[6] If this minority interpretation of the "routine maintenance" exception is applied, it would drag the exception out of the narrow category of exemptions allowed by the *de minimis* doctrine, making the rule itself unlawful. *See New York II,* 443 F.3d at 883-84, 888; *Shays,* 414 F.3d at 113-14. It would also turn the Clean Air Act on its head, exempting virtually all existing facilities from the PSD program by granting them "indefinite immunity" from its pollution control requirements - the opposite of what Congress intended. *WEPCO*, 893 F.2d at 909 (warning that the "routine maintenance" exemption cannot be interpreted to "open vistas of indefinite immunity from the provisions of … PSD"); *see also New York II,* 443 F.3d at 883-84, 888; *Alabama Power*, 636 F.2d at 360-61, 400; *TVA*, 9 E.A.D. at 410-11 (rejecting an interpretation of "routine maintenance" that would "constitute 'perpetual immunity' for existing plants[.]").

---

[6] The TVA district court decision was appealed to the Sixth Circuit. *See* Case No. 10-5626 (6th Cir.). However, the parties resolved the appeal in "a landmark multi-party settlement." TVA Order, at 15; *see also* 76 Fed. Reg. 22095 (April 20, 2011). The settlement resolved the appeal to the Sixth Circuit and requires the Bull Run plant (at issue in the district court case) to install the pollution controls sought by the plaintiffs in the district court. *See* Consent Decree Among TVA, States and Citizen Groups; Federal Facilities Compliance Agreement Between EPA and TVA; and EPA's Proposed Consent Agreement and Final Order, available at http://www.epa.gov/compliance/resources/cases/civil/caa/tvacoal-fired.html. Defendants' reliance on the *TVA* district court decision as their only authority finding routine maintenance is especially spurious when that decision was appealed and then resolved favorably for the plaintiffs through settlement.

## CONCLUSION

For the foregoing reasons, the Defendants' motion is not well taken and should be denied.

Respectfully submitted this 28th day of July, 2011.

                Counsel for Intervenor-Plaintiffs Natural Resources Defense Council and Sierra Club

                ___s/ Holly D. Bressett___

                Holly D. Bressett
                Sierra Club Environmental Law Program
                85 Second Street
                2nd Floor
                San Francisco, CA 94105-3441
                415-977-5646
                Fax: 415-977-5793
                Email: holly.bressett@sierraclub.org

## Index of Exhibits Attached to Brief

| | |
|---|---|
| 1. | *In re Tenn. Valley Auth.*, Order Responding to Petition to Object to Title V Permit at (EPA Adm'r, May 2, 2011). |
| 2. | Letter from Winston A. Smith, EPA, to James P. Johnson, Georgia Envtl. Protection Dept. (Jan. 28, 2002). |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **INTERVENOR-PLAINTIFFS' RESPONSE TO DEFENDANTS' "MOTION TO ESTABLISH CORRECT LEAGL STANDARD ON THE ISSUE OF 'ROUTINE MAINTENANCE, REPAIR AND REPLACEMENT' ('RMRR')"** was electronically filed with the Clerk using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Ellen F. Christensen
U.S. Attorney's Office
Email: Ellen.christensen@usdoj.gov

James A. Lofton
Thomas Benson
Kristin M. Furrie
U.S. Department of Justice
Email: Thomas.benson@usdoj.gov
       Justin.savage@usdoj.gov
       Kristin.furrie@usdoj.gov
       Jim.lofton@usdoj.gov


Brent A. Rosser
Hunton & Williams LLP
Email: brosser@hunton.com

F. William Brownell
Hunton & Williams, LLP
Email: bbrownell@hunton.com

George P. Sibley
Hunton & Williams
Email: gsibley@hunton.com

Harry M. Johnson
Hunton & Williams
Email: pjohnson@hunton.com

James W Rubin
Hunton & Williams LLP
Email: jrubin@hunton.com

Lucinda M. Langworthy
Hunton & Williams LLP
Email: clangworthy@hunton.com
Makram B Jaber
Hunton & Williams LLP
Email: mjaber@hunton.com

Mark B Bierbower
Hunton & Williams LLP
Email: mbierbower@hunton.com

Matthew J. Lund
Pepper Hamilton
Email: lundm@pepperlaw.com

Michael J. Solo
DTE Energy Company
Email: solom@dteenergy.com

Dated this 28th day of July, 2011.

                    ___s/ Holly D. Bressett___