IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
|       Plaintiff, | ) | Civil Action No. 2:10-cv-13101-BAF-RSW |
|   and | ) | |
| | ) | Judge Bernard A. Friedman |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, and SIERRA CLUB | ) | Magistrate Judge R. Steven Whalen |
| | ) | |
|       Plaintiff-Intervenors | ) | |
|     v. | ) | |
| | ) | |
| DTE ENERGY COMPANY, and | ) | |
| DETROIT EDISON COMPANY | ) | |
| | ) | |
|       Defendants. | ) | |
| | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO ESTABLISH CORRECT LEGAL STANDARD ON THE ISSUE OF "ROUTINE MAINTENANCE, REPAIR AND REPLACEMENT"

## ISSUE PRESENTED

Whether this Court should apply EPA's longstanding interpretation of the regulatory exception for "routine maintenance, repair or replacement" because EPA has reasonably interpreted its own regulations

*Plaintiff's answer: Yes*

## LEADING AUTHORITY FOR THE RELIEF SOUGHT

**Statutory Provisions**:

42 U.S.C. § 7411(a)(4)
42 U.S.C. § 7470

**Cases**:

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994)

*New York v. EPA*, 443 F.3d 880 (D.C. Cir. 2006)

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990)

*Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098 (4th Cir. 1985)

*Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979)

# TABLE OF CONTENTS

ARGUMENT .................................................................................................................2

I.   DTE'S ARGUMENTS PRESENT A FALSE DICHOTOMY AND CONTRAVENE
     EPA'S HISTORIC INTERPRETATION ...........................................................2

II.  DTE'S APPROACH TO ASSESSING ROUTINE MAINTENANCE CLAIMS IS
     CONTRARY TO THE CLEAN AIR ACT, CASE LAW, AND COMMONE SENSE .....5

     1. Emphasizing Industry-Wide Tallies of Projects Creates a Shifting Standard
        Controlled by Industry Members ...................................................................6

     2. DTE's Approach Seeks to Expand the Routine Maintenance Exception Contrary to
        the Language and Purposes of the Clean Air Act .........................................9

     3. DTE's Approach Frustrates the Purposes and Structure of the NSR Program ...........11

III. EPA NEITHER ADOPTED DTE'S "ROUTINE IN THE INDUSTRY" TEST NOR
     CHANGED ITS INTERPRETATION OF ROUTINE MAINTENANCE ......................12

     1. The WEPCo Determination and Seventh Circuit Opinion Emphasize the History
        and Procedures of Individual Units Over Industry-Wide Tallies ...............................13

     2. EPA Never Adopted DTE's "Routine in the Industry" Test .....................................15

     3. DTE's Argument That EPA Changed Its Interpretation of the Routine
        Maintenance Exception in 1999 is Without Merit ......................................................17

CONCLUSION.............................................................................................................20

# TABLE OF AUTHORITIES

**Federal Cases**

*Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979) .......................................2, 7, 10, 13

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................................ 4-5

*Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871 (2011) ...............................................................5

*Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098 (4th Cir. 1985).......................................20

*Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007)...............................................................11

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 618 F. Supp. 2d 815 (E.D. Tenn. 2009) ...8

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, No. 3:01-CV-71, 2010 WL 1291335
(E.D. Tenn. Mar. 31, 2010)..........................................................................................................5, 9

*New York v. Am. Elec. Power Serv. Corp.*, Nos. 2:04CV1098, 2:05CV360, 2007 WL 539536
(S.D. Ohio Feb. 15, 2007)..............................................................................................................10

*New York v. EPA*, 443 F.3d 880 (D.C. Cir. 2006) ............................................................2, 10, 13

*Penn. Dept. of Envtl. Protection v. Allegheny Energy, Inc.*, No. 05-885, 2008 WL 4960100
(W.D. Penn. Sept. 2, 2008) ..........................................................................................................5, 8

*Stinson v. United States*, 508 U.S. 36 (1993)..................................................................................5

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994)..............................................................5

*United States v. Ala. Power Co.*, 681 F. Supp. 2d 1292 (N.D. Ala. 2008) ....................................8

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006) ....................................................12

*United States v. Duke Energy Corp.*, No. 1:00CV1262, 2010 WL 3023517
(M.D.N.C. July 28, 2010) ........................................................................................................ 6, 8-9

*United States v. E. Ky. Power Co-op., Inc.*, 498 F. Supp. 2d 976 (E.D. Ky. 2007)........................8

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) ....................................4

*United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/S, 2002 WL 3427523
(S.D. Ind. Oct. 24, 2002)..................................................................................................................3

*United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994
(S.D. Ind. 2003) ................................................................................9-10, 14-20

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) .............................................. *passim*

**Federal Statutes**

42 U.S.C. § 7411(a)(4)..............................................................................9

42 U.S.C. § 7470..............................................................................9

42 U.S.C. § 7470(1) ..............................................................................11

**Federal Regulations**

57 Fed. Reg. 32,314 (July 21, 1992)........................................................... 4, 14-15, 20

**Federal Rules**

Fed. R. Evid. 803(16)..............................................................................18

By structuring its arguments around catchphrases, DTE presents a false dichotomy and urges this Court adopt one extreme test for assessing routine maintenance claims instead of another.  What DTE calls the "routine at the unit" test is *not* EPA's interpretation, and DTE's proffered "routine in the industry" test is contrary to the Clean Air Act, regulations, and long-standing EPA guidance.

Rather than focusing on which is the appropriate name for the test—names which have been applied and employed differently by different courts—the United States respectfully asks that this Court directly examine the underlying substantive argument and the statute, regulations, and agency guidance upon which the argument is based.  Fundamentally, issue concerns the kinds of things that should be considered when analyzing routine maintenance claims, especially when addressing the "frequency" factor of the established framework for analysis.  Under DTE's view, this Court should be primarily concerned with industry-wide tallies of allegedly similar projects.  Under EPA's longstanding interpretation, whether a project qualifies for the narrow exception in EPA's regulations for "routine maintenance" should be considered relative to the history and practices of the units at issue as well those of other *individual* units in the industry.  Importantly, EPA does not interpret the exception to mean that the practices of the unit at issue should be the Court's sole concern.

As the D.C. Circuit has definitively held, exceptions to the Clean Air Act's broad mandate *must* be limited to *de minimis* activities.  EPA has always interpreted the routine maintenance exception narrowly, and this Court should defer to the Agency's reasonable interpretation of its own regulations.  DTE's proposed test would impermissibly expand the routine maintenance exception to cover even unprecedented and costly renovation projects that

cannot fairly be considered *de minimis*.  As such, the United States thus respectfully requests that DTE's Motion for Partial Summary Judgment be denied.

## ARGUMENT

### I.   DTE'S ARGUMENTS PRESENT A FALSE DICHOTOMY AND CONTRAVENE EPA'S HISTORIC INTERPRETATION

The routine maintenance exception exempts certain activities from the Clean Air Act's broad mandate which imposes NSR requirements on "*any* physical change" that would increase emissions.  *New York v. EPA* ("*New York II*"), 443 F.3d 880, 883 (D.C. Cir. 2006).  As the D.C. Circuit has now twice held, exceptions to this mandate are necessarily narrow and limited to *de minimis* circumstances.  *New York II*, 443 F.3d at 884, 890; *Ala. Power Co. v. Costle*, 636 F.2d 323, 361, 400 (D.C. Cir. 1979); *see also* Plaintiff's Memorandum in Support of its Motion for Partial Summary Judgment ("United States' MPSJ," ECF No. 117) at 8-9.

An agency's ability "to exempt *de minimis* situations from a statutory command is not an ability to depart from the statute, but rather a tool to be used in implementing the legislative design."  *Ala. Power*, 636 F.2d at 360 (italics added).  As such, the application of the routine maintenance test must reflect the exception's narrow scope and facilitate the Clean Air Act's purposes.  That is exactly how EPA has interpreted this exception for decades, beginning with the 1975 Weyerhaeuser Determination,[1] detailed in EPA's authoritative "Clay Memo,"[2] upheld in the Seventh Circuit's decision in *United States v. Wisconsin Electric Power Company v. Reilly*

---

[1]  Regional Counsel Opinion, Request for Ruling Regarding Modification of Weyerhauser's Springfield Operations (Aug. 18, 1975) (Ex. 3-A to United States' MPSJ, ECF No. 117-5).

[2]  *See* Memo from Don Clay (Acting EPA Ass't Adm'r) (Sept. 9, 1988) ("Clay Memo") (Ex. 1); Letter from Lee Thomas (EPA Adm'r) at 3 (Oct. 14, 1988) (Ex. 3-K to United States' MPSJ, ECF No. 117-15) (adopting "*in toto*" the Clay Memo's assessment of WEPCo's routine maintenance claim).

("*WEPCo*"),[3] and reiterated in the applicability determination issued to DTE in 2000.[4]   Under this longstanding approach—and consistent with the Act's mandate and the D.C. Circuit's holdings—routine maintenance must be understood as a "very narrow exclusion" evaluated on a "case-by-case" basis by considering the "nature, extent, purpose, frequency, and cost" of the activity "to arrive at a common-sense finding."  Clay Memo (Ex. 1) at 3; *see also* DTE Determination (Ex. 2) at 2.

Guiding the application of these "WEPCo factors," is the understanding that "routine" projects are "regular, customary, or standard undertaking[s] for the purpose of maintaining the plant in its present operating condition."  *See* Clay Memo (Ex. 1) at 3-4; DTE Determination (Ex. 2) at 2.  For example, in the Clay Memo, EPA assessed the utility's proposal under the WEPCo factors and noted among other things that the project would involve the replacement of "components that are essential to the operation of" the plant, that the work was not considered "repetitive maintenance" by the companies own documents, and that the project included work items "that would normally occur only once or twice during a unit's expected life cycle."  *Id.* at 3-6.  As such, EPA concluded WEPCo's projects were "far from" routine.  *Id.* at 3.  Similarly, in the DTE Determination, EPA evaluated the utility's proposed project under the multifactor test and determined that the project went "significantly beyond both historic turbine work at Detroit Edison, and what would otherwise be considered a regular, customary, or standard undertaking for the purpose of maintaining" the unit.  DTE Determination (Ex. 2) at 2.  Importantly, EPA

---

[3] 893 F.2d 901, 910-13 (7th Cir. 1990).

[4] Letter from Francis Lyons, (EPA Region V) to Henry Nickel (DTE Counsel, Hunton & Williams) on (May 23, 2000) (DTE Determination) (Ex. 2); *see also United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/S, 2002 WL 31427523, at *10 (S.D. Ind. Oct. 24, 2002) (holding the DTE Determination is consistent with EPA's approach in the WEPCo determinations).

noted that "Detroit Edison ha[d] not provided any information to suggest that [similar projects are] conducted frequently at Monroe or at any other individual utility." *Id.* at 3. EPA further told the Company that industry practice does not "define routineness," *id.* at Encl. p. 15, and that the "frequency" factor is assessed based on "whether the change is performed frequently in a typical unit's life." *Id.* at Encl. p. 11.

DTE's motion (ECF No. 116) mischaracterizes EPA's approach. EPA does not assess whether an activity is routine maintenance *solely* by looking at the unit in question. As noted in the United States' MPSJ, "information concerning the frequency of similar projects in the lives of other individual units within the same industry can inform the routine maintenance analysis." (ECF No. 117) at 11; *see also id.* at 11 n.11. Although EPA considers the history and procedures of the unit in question to be those most instructive under its case-by-case approach to evaluating routine maintenance claims, *see United States v. Ohio Edison Co.,* 276 F. Supp. 2d 829, 856 (S.D. Ohio 2003), EPA has long understood that routine maintenance assessments would contemplate the practices of other, individual generating units throughout the electric industry. *See* DTE Determination (Ex. 2) at Encl. pp. 11, 15; Clay Memo (Ex. 1) at 6 n.2; Letter from Don Clay, Acting EPA Ass't Adm'r (Feb. 15, 1989) ("Clay Letter") (Ex. 3-L to United States' MPSJ, ECF No. 117-16) at 7 n.6; *see also* 57 Fed. Reg. 32,314, 32,326 (July 21, 1992).

While EPA's decades-old interpretation faithfully implements the Act's public welfare mandate, DTE's interpretation, as detailed in the sections that follow, seeks to expand the scope of the exception and frustrate the Act's public health protections by casting even rare and costly facility overhauls as "routine maintenance." This Court should defer to EPA's reasonable interpretation of its own regulations. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also* United States MPSJ (ECF No. 117) at 6-7. In fact, Supreme Court precedent dictates that, unless

EPA's interpretation is "plainly erroneous or inconsistent with the regulation," it should be afforded "controlling weight." *Auer*, 519 U.S. at 453; *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880-82 (2011); *Stinson v. United States*, 508 U.S. 36, 45 (1993). Where, as here, the subject is both technical and complex, "[t]he principle of deference has particular force." *WEPCo*, 893 F.2d at 907. Indeed, even if DTE's suggested test could be squared with the statute's mandate (it cannot) or the Company's arguments were consistent with binding precedent (they are not), this Court should nonetheless apply EPA's longstanding interpretation of the Agency's routine maintenance exception. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994) (agency's interpretation would be given "controlling weight" even if it was not "more consistent" with the regulations than petitioner's).

## II. DTE'S APPROACH TO ASSESSING ROUTINE MAINTENANCE CLAIMS IS CONTRARY TO THE CLEAN AIR ACT, CASE LAW, AND COMMON SENSE

It its Motion, DTE asks this Court to adopt a "routine in the industry" test for evaluating routine maintenance claims. The Company does not delineate just how its proposed test would operate in practice (nor even cite the 2000 DTE Determination in which EPA explained *to this company* just how routine maintenance claims should be assessed). Moreover, the courts DTE cites vary dramatically in the degree to which they considered industry practice when assessing routine maintenance claims. *Compare Penn. Dept. of Envtl. Protection v. Allegheny Energy, Inc.*, No. 05-885, 2008 WL 4960100, at * 22, *24 (W.D. Penn. Sept. 2, 2008), *with Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.* ("*NPCA II*"), No. 3:01-CV-71, 2010 WL 1291335, at *25-26 (E.D. Tenn. Mar. 31, 2010). As described and applied by its own expert, though, DTE's proposed test all but ignores the history and practices of Monroe Unit 2 or other individual units in the industry, preferring instead to focus on industry-wide tallies of allegedly similar projects. *See* Declaration of Jerry Golden (ECF. No. 46-10) at 59–61.

5

Rather than address EPA's longstanding approach to routine maintenance which contemplates the history and practices of *individual* units throughout the relevant industry, DTE erects a straw man from which it distinguishes its own untenable position.   By urging the court to adopt its version of a "routine in the industry" test instead of its own characterization of a "routine at a particular unit" test, DTE erects a "false dichotomy" and asks that this Court shun one extreme in favor of another.  *See United States v. Duke Energy Corp.* ("*Duke Energy IV*"), No. 1:00CV1262, 2010 WL 3023517, at *7 (M.D.N.C. July 28, 2010).  DTE's proposed test is contrary to the purposes and provisions of the Clean Air Act, contrary to the interpretations of many of the very courts to which DTE cites for support, and indeed contrary to common sense.

## 1.  Emphasizing Industry-Wide Tallies of Projects Creates a Shifting Standard Controlled by Industry Members

DTE urges that the Court adopt a "routine in the industry" test instead of a "routine at the unit" test.  In so doing, DTE seeks to underscore evidence of allegedly similar projects undertaken throughout the industry while downplaying or ignoring the unit-to-unit comparisons that a common sense, case-by-case review requires.

To illustrate DTE's approach to the routine maintenance exception, consider an aging fleet of cars in which each car was purchased the same year.  As the fleet ages, the owner will be faced with a choice as major components like the transmission wear out:  replace the cars with new ones that meet modern emissions requirements, or replace the failing components in the existing fleet.  Unless replaced with new cars, as the existing fleet continues to age the number of transmission replacements performed within the fleet will likely increase and accelerate, with each replacement giving the old car a new lease on life.  Of course, a transmission replacement is a far cry from the kind of maintenance routinely performed on vehicles such as changing the oil, replacing a headlight, or putting on new tires.  Moreover, a cross-fleet tally of all the

transmission replacements performed within the fleet does not capture the fact that new

transmissions will likely only ever be installed once or twice in the lifetime of any given car, and

it glosses over potentially important vehicle-to-vehicle differences such as variations in their use

or whether a car has an automatic or manual transmission.  Under DTE's view, the rising tally of

transmission replacements would indicate that such work was growing to be "routine" within the

fleet.  Under EPA's longstanding interpretation, a raw tally of how many transmission

replacements have been performed may say something about the age of the fleet and the size of

the fleet, but, without more, it says precious little about how "routine" such replacements are.

Like the fleet of cars, the fleet of grandfathered power plants is aging.  These plants were

originally exempted from modern pollution control requirements, but must meet such

requirements once they are modified.  *See Ala Power*, 636 F.2d at 400.  Under DTE's approach

to the routine maintenance exception, massive renovations aimed at rehabilitating those "power

generating units whose capacity has significantly deteriorated over a period of years" would

become more "routine" as the fleet ages and other similar renovations are implemented.  *Cf.* Clay

Memo (Ex. 1) at 4.  By focusing on industry-wide practices, DTE is attempting to establish a

standard whereby, as more massive modifications are undertaken by the electric industry, fewer

trigger the health- and welfare-protecting requirements of the NSR program.[5]  Such a result is far

from common-sense.  *Cf. WEPCo*, 893 F.2d at 910; Clay Memo (Ex. 1) at 3.  As EPA explained

---

[5] In order to avoid the absurd result that comes with DTE's industry-centric approach that massive renovations become more "routine"—and the Clean Air Act's protections more obsolete—over time, routine maintenance claims would have to be evaluated in light of what was "routine in the industry" as of a certain benchmark year (for example 1980, the year the NSR regulations were finalized).  Of course, under EPA's longstanding interpretation, the Court need not determine which year should be used as the industry benchmark for analysis, nor how many similar projects across the entire industry must be identified before the count weighs in favor of a determination that a give project is routine.  Rather, under EPA's approach, once- or twice-in-a-lifetime projects are infrequent no matter what year they were performed or how many other plants may have undergone such renovations in the past.

in the Clay Memo, "[i]n adopting the [NSR] . . . program[], Congress sought to focus air pollution control efforts at an efficient and logical point: the making of long-term decisions regarding the creation or renewal of major stationary sources." Clay Memo (Ex. 1) at 12; *see also WEPCo*, 893 F.2d at 909.  DTE's proposed test would obscure the importance and rarity of such long-term decision points at any one plant, it would severely erode NSR applicability, and it would undermine Congress' effort to drive the industry to install better pollution controls.

Recognizing the difficulties presented by such an approach, not even those cases cited by DTE support its position that industry-wide statistics should form the cornerstone of the routine maintenance determination.  *See, e.g., Allegheny*, 2008 WL 4960100 at *22, *24 (finding the utility's proffered industry-wide tallies lacking sufficient detail to be persuasive where the projects at issue had never before been performed in the history of the generating units).  Indeed, many of the very courts on which DTE relies have explicitly held that "[t]he test does not turn on whether a particular replacement project has *ever* occurred in the industry or even necessarily the number of times it has occurred within the industry."  *United States v. E. Ky. Power Co-op., Inc.* ("*EKPC*"), 498 F. Supp. 2d 976, 993 (E.D. Ky. 2007) (emphasis original); *see also United States v. Ala. Power Co.*, 681 F. Supp. 2d 1292, 1312 (N.D. Ala. 2008) (adopting the quoted language from *EKPC*); *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 618 F. Supp. 2d. 815, 825 (E.D. Tenn. 2009) (same).  The Court in *Duke Energy IV* further elaborated:

> Although the WEPCO factors will be evaluated with reference to the industry, the WEPCO test, which this Court has held is entitled to deference, dictates that the Court make a fact intensive, "common sense" evaluation. *See WEPCO,* 893 F.2d at 910-11.

> This means that the Court will not forego any consideration of what occurs at individual units and look solely at industry practice to determine whether a project is RMRR. Instead, "the Court will consider all of the WEPCO factors, including frequency, taking into consideration the work conducted at the particular [Duke Energy] unit, the work conducted by others in the industry, and the work

conducted at other individual units within the industry." [*EKPC,* 498 F. Supp. 2d at 993-94.] *To do otherwise would be to defy common sense, ignore the "case-by-case" determination required by the WEPCO test, and allow the industry to render the PSD program a nullity by making its own practice the sole standard.*

2010 WL 3023517 at *7 (emphasis added). In fact, of all the courts to address this issue, only one arguably relied on industry-wide statistics to the degree urged by DTE in this case. *See NPCA II,* 2010 WL 1291335.[6] Thus, far from the majority holding or modern trend, DTE's proposed version of the "routine in the industry" test is neither practicable nor in line with precedent.

## 2. DTE's Approach Seeks to Expand the Routine Maintenance Exception Contrary to the Language and Purposes of the Clean Air Act

In addition to being contrary to both common sense and case law, DTE's approach to the routine maintenance exception runs contrary to the language and purposes of the Clean Air Act itself. As discussed in Plaintiff's Motion for Partial Summary Judgment,[7] the Act imposes its requirements on "*any* physical change" that would result in an emissions increase. 42 U.S.C. § 7411(a)(4) (emphasis added). The sweeping scope of this definition is consistent with Congress' express purpose of protecting human health and welfare. *See* 42 U.S.C. § 7470; *WEPCo,* 893 F.2d at 905 ("Even at first blush, the potential reach of these modification provisions is apparent: the most trivial activities-the replacement of leaky pipes, for example-may trigger the modification provisions if the change results in an increase in the emissions . .

---

[6] The *NPCA* Court turned the routine maintenance analysis on its head by comparing the challenged projects to all other capital investment projects and essentially asking whether the projects were not "extraordinary" rather than whether they were routine maintenance. *NPCA II,* 2010 WL 1291335 at *25. This approach not only eviscerates the necessarily narrow character of the routine maintenance exclusion, it turns the exclusion into an empty tautology under which similar replacement activities at similar sources will by definition have similar characteristics and so always be judged "routine." The internal inconsistencies of the *NPCA* decisions, along with the subsequent *Duke Energy IV* ruling, leave it unpersuasive and of little precedential value.

[7] *See* (ECF No. 117) at 8–9.

9

."); *United States v. S. Ind. Gas & Elec. Co.* ("*SIGECO*"), 245 F. Supp. 2d 994, 1009-10 (S.D. Ind. 2003) (the broad definition of "modification" is illustrative of Congressional intent for broad NSR applicability); Clay Memo (Ex. 1) at 3 ("The clear intent of the [NSR] regulations is to construe the term 'physical change' very broadly, to cover virtually any significant alteration to an existing plant.").

Critically, the D.C. Circuit has twice ruled that the statute's broad mandate will admit exceptions only for *de minimis* activities. *See New York II*, 443 F.3d at 890; *Ala Power*, 636 F.2d at 400. EPA's discretion to exempt some modifications in its regulations is "tightly bounded by the need to show that the situation is genuinely *de minimis* or one of administrative necessity." *Ala. Power*, 636 F.2d at 361; *see also New York II*, 443 F.3d at 888. To remain consistent with the plain language of the NSR provisions, EPA must thus interpret the "routine maintenance" exception narrowly "as limited to '*de minimis* circumstances.'" *New York II*, 443 F.3d at 884; *see also Ala. Power*, 636 F.2d at 400; *New York. v. Am. Elec. Power Serv. Corp.*, Nos. 2:04CV1098, 2:05CV360, 2007 WL 539536, at *2 (S.D. Ohio Feb. 15, 2007).

Emphasizing industry-wide tallies over the operating histories and procedures of individual units would untether the routine maintenance exception from its limitation to *de minimis* activities. Intuitively, evidence that certain kinds of projects are performed frequently at individual units throughout the industry tends to indicate that the work is not undertaken as the result of long-term decisions regarding the rehabilitation of a generating unit, and so suggests the work is *de minimis* in its scope. *Cf.* Clay Memo (Ex. 1) at 12. By contrast, even where tallies indicate that a number of other plants have undertaken similar work, such work may nevertheless involve massive capital investment projects that are developed over a period of years and aim to benefit a plant for decades. In arguing that this Court consider what is "routine in the industry,"

10

DTE in fact asks this Court to ignore the context of the industry's day-to-day operations so that

huge and relatively rare undertakings may appear more "routine."  Were the Court to adopt such

an expansive view of the routine maintenance exception "the application of . . . [NSR] to

important facilities might be postponed into the indefinite future."  *WEPCo*, 893 F.2d at 909.

### 3.  DTE's Approach Frustrates the Purposes and Structure of the NSR Program

Contrary to DTE's unsupported effort to paint the NSR program as regulating existing

sources "only as necessary to meet national air quality standards," DTE MPSJ (Doc. 116) at 3,

the Supreme Court has explained that NSR requires sources to install and operate state-of-the-art

pollution controls "*notwithstanding* attainment and maintenance of the [air quality standards]."

*Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 567-68 (2007) (quoting 42 U.S.C. § 7470(1))

(emphasis added).  Indeed, the NSR program was added to the Clean Air Act when it became

clear that earlier programs "did too little to achieve the ambitious goals" of the statute.  *Id.*

(internal quotations omitted).  Thus, fundamentally, the NSR program was designed to be

"technology forcing," that is, "to stimulate the advancement of pollution control technology;" it

was not adopted in order to maintain the status quo and cannot be read to categorically exempt

the replacement of deteriorated components.  *WEPCo*, 893 F.2d at 909.

EPA's interpretation—as explained in the Clay Memo and DTE Determination and as

implemented in at least a dozen other applicability determinations[8]—confines the exception to *de*

*minimis* activities and so remains consistent with the Act's technology directive.  *See* United

States' MPSJ (ECF No. 117) at 10–12.  On the other hand, DTE's broad interpretation of routine

maintenance—one which exempts even extensive, multi-million dollar capital improvement

projects so long as similar work was performed at other plants—would tend to stagnate the

---

[8] *See* United States MPSJ Ex. 3 (ECF No. 117-4)  (collecting EPA determinations implementing
the routine maintenance exception).

development of pollution control technology rather than drive the diffusion of new technology.

By increasing the scope of the exception beyond *de minimis* activities, state-of-the-art pollution

controls would be required of fewer modifications, and so the market for—and the incentive to

develop—new pollution control technologies would be substantially reduced.  Moreover, DTE's

interpretation "distort[s] the choice between  rebuilding an old plant and replacing it with a new

one" by "giv[ing] the [C]ompany an artificial incentive to renovate a plant and by so doing

increase the plant's hours of operation, rather than to replace the plant."  *United States v. Cinergy

Corp.*, 458 F.3d 705, 709 (7th Cir. 2006) (addressing a utility's similarly flawed interpretation of

other NSR provisions).  As the Seventh Circuit noted when it rejected WEPCo's construction of

the NSR modification provisions twenty years ago, "[t]he development of emissions control

systems is not furthered if operators could, without exposure to the standards of the 1977

Amendments, increase production (and pollution) through the extensive replacement of

deteriorated generating systems."  *WEPCo*, 893 F.2d at 910.

### III.   EPA NEITHER ADOPTED DTE'S "ROUTINE IN THE INDUSTRY" TEST NOR CHANGED ITS INTERPRETATION OF ROUTINE MAINTENANCE

In its Motion, DTE argues that EPA once adopted a "routine in the industry" test, that the

Agency is attempting to narrow its pre-existing interpretation of the routine maintenance

exception through enforcement actions, and further that such a shift in regulatory interpretation

would require notice-and-comment proceedings.

Although DTE is mistaken at each step of this argument, as detailed below, it is

important at the outset to maintain focus on the central debate.  EPA long ago made it clear that

the regulatory exception for routine maintenance, repair or replacement was to be understood as

a "very narrow exclusion."  Clay Memo (Ex. 1) at 3; *see also* Letter from David Howekamp,

EPA Region IX, at 3-6 (Nov. 6, 1987) (Ex. 3-F to United States' MPSJ, ECF No. 117-10) at 3

(describing the routine maintenance as one of a "narrow and limited set of exclusions").  The

statute's language mandates that the routine maintenance exception be a narrow one, and the

D.C. Circuit has held that such exceptions must be confined to benefit only *de minimis* activities.

*New York II*, 443 F.3d at 888; *Ala. Power*, 636 F.2d at 400.  Any test that would immunize once-

in-a-lifetime, multi-million dollar capital improvement projects that aim to rehabilitate

deteriorated generating units cannot be said be "narrow" nor properly confined to *de minimis*

activities.  Rather, such an approach would be contrary to the D.C. Circuit's rulings and—by

DTE's own argument—constitute an impermissible change from the EPA's approach outlined in

the authoritative Clay Memo.  In addition to this fundamental flaw, the details of DTE's

argument—and the assumptions upon which it rests—do not withstand scrutiny.

1.  **The WEPCo Determination and Seventh Circuit Opinion Emphasize the History and Procedures of Individual Units Over Industry-Wide Tallies**

A close reading of EPA's WEPCo determination and the Seventh Circuit's *WEPCo*

opinion illustrates that the practices of individual units—and not the entire industry—has long

been the focus of the routine maintenance analysis.

As an initial matter, DTE's argument relies on a logical misstep.  The Clay Memo noted

that WEPCo's proposed projects were "highly unusual, if not unprecedented."  (Ex. 1) at 4.

From this, DTE implies that, because EPA mentioned a project's *scarcity* across the industry

when *rejecting* a company's assertion that it was routine, EPA must also consider a project's

apparent *prevalence* across the industry to *support* a determination the project is routine.  *See*

DTE's Motion (ECF No. 116) at 9.  This is akin to arguing that, because a pig does not have

wings and thus cannot fly, it must mean that, since a penguin does have wings, it can fly.  DTE

fails to understand that, where a project is scarcely performed across the industry, it is

*necessarily* an infrequent undertaking at a typical generating unit and so *cannot* help the utility

bear its burden of proof under the routine maintenance test.[9]  Far from DTE's strained position

that EPA adopted its "routine in the industry" test, the Clay Memo's reference to industry

practice is merely the application of run-of-the-mill, summary-judgment style reasoning where

the utility's evidentiary proffer could not establish—even under the most favorable light—that its

projects were "frequent."  *See*, *e.g.*, Clay Memo (Ex. 1) at 7 n.6.

Moreover, the two mentions of industry practice in the WEPCo determinations do not

support DTE's position.  First, the EPA Administrator addressed WEPCo's "equity" argument—

*not* its routine maintenance claim—that the company was being treated inconsistently with

historic EPA determinations.  *See* Letter from Lee Thomas to John Boston (October 14, 1988)

(Ex. 3-K to United States' MPSJ, ECF No. 117-15) at 3.  In fact, WEPCo's reliance on the

practices of other electric utilities not only failed to immunize its own projects, but rather served

to illustrate the breadth of the industry's non-compliance.  *See id.* at 4.  Second, the Agency

considered WEPCo's proffered evidence of 40 other air heater projects.  *See* Clay Letter (Ex. 3-L

to United States' MPSJ, ECF No. 117-16) at 7 n.6.  However, far from squarely considering and

weighing the evidence in its routine maintenance determination, EPA concluded the evidence

was inapposite because it concerned projects that were not sufficiently similar to the projects

then at issue.  *See id.*  Moreover, where EPA did—in a footnote—consider the evidence, the

Agency took care to examine project frequency at individual units: "even at the 40 units, air

heater repair or replacement appears to have been a one-time occurrence, not routine repair."  *Id.*

at 7 n.6.  Thus, EPA's central concern in evaluating routine maintenance claims has ever been

the history and procedures of individual plants.  *See SIGECO*, 245 F. Supp. 2d at 1019-20 (Clay

---

[9] DTE's suggestion that the United States bears the burden of proving the Company's projects
were *not* routine, ECF No. 116 at 2, is contrary to Supreme Court precedent and the holding of
*every* court to have addressed the issue.  *See* United States' MPSJ (ECF No. 117) at 4-6.

Memo "put the regulated community on notice that how frequently projects occur in a unit's expected life cycle was a very significant factor in the routine maintenance inquiry.").

The Seventh Circuit's review of EPA's determinations says no different. There, the Court referred to industry-wide practices in two different contexts, and again neither support DTE's proposed emphasis of such evidence. *See id.* at 1017-18 (indicating that the *WEPCo* decision upheld EPA's interpretation, which considered a project's frequency at individual units a "significant factor"). First, the Seventh Circuit reviewed EPA's determination that the air heater tally presented by WEPCo was entirely inapposite because it counted up projects that were dissimilar to those at issue in the case. *WEPCo*, 893 F.2d at 911. The Court never considered whether—or to what extent—a list of other allegedly similar projects might weigh on a routine maintenance determination. Second, the Seventh Circuit observed that the "unprecedented" character of WEPCo's projects might have been indicative of a shift in strategy as to how to supply electricity in the future—where aging plants once would have been retired from service and replaced by more efficient units, operators were instead performing extensive life-extension projects to rehabilitate the deteriorating units. *See id.* Far from supporting DTE's argument that the Seventh Circuit considered general industry practice to be an important factor, the *WEPCo* Court's discussion illustrates an awareness that industry practice was changing, and that the NSR program's requirements must be brought to bear on such rehabilitation projects.

**2. EPA Never Adopted DTE's "Routine in the Industry" Test**

In the wake of the Seventh Circuit's *WEPCo* opinion, EPA altered the method it used to evaluate increases in emissions resulting from physical changes at a generating unit. In the preamble to that 1992 WEPCo Rule, EPA noted:

> A few commenters requested that EPA define or provide guidance on "routine repair, replacement and maintenance" activities. The June 14 proposal did not

> deal with this aspect of the regulations, nor do the regulatory changes promulgated today. However, the issue has an important bearing on today's rule because a project that is determined to be routine is excluded by EPA regulations from the definition of major modification. . . . EPA is today clarifying that the determination of whether the repair or replacement of a particular item of equipment is "routine" under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category.

57 Fed. Reg. 32,314, 32,326 (July 21, 1992). This is the full extent of EPA's comments on the interpretation of the routine maintenance exception in the 1992 rule.

DTE repeatedly underscores the final phrase in the paragraph in an effort to establish that EPA here adopted its "routine in the industry" test. However, nowhere does EPA discuss the details of the exception's application, nor in any way imply that it meant to overturn the approach set forth in the Clay Memo. As the Court in *SIGECO* cogently expressed:

> The only insight that this routine maintenance clarification provides about the frequency factor is contained in the last five words of the paragraph: "within the relevant industrial category." . . . As SIGECO argues, it refers to a comparison within the relevant industry, and does not specifically mention the significance of whether or not a project has been undertaken at a particular unit. However, because it is so brief, and because it was contained in a preamble to regulatory changes that had nothing to do with routine maintenance, the preamble language does not clarify much about the frequency factor, and certainly does not indicate to the regulated community that the EPA meant any change from the interpretation it advanced in the Clay Memo.

*SIGECO*, 245 F. Supp. 2d at 1021; *see also* EAB Final Order (Ex. 6 to United States' MPSJ, ECF No. 117-19) at 391-96. Indeed, this clarification is perfectly appropriate in order to maintain the fact-sensitive routine maintenance inquiry where technical terminology—like EPA's regulations—cuts across industry boundaries. *Compare* Letter to D. E. Choate (Mobil Oil Corp) from Chief, Air Compliance Branch EPA Region II (Sept. 7, 1988) (Ex. 3) (proposed cyclone replacement project considered routine maintenance at catalytic cracking unit) *with* EAB Final Order, ECF No. 117-19 at 484-86 (cyclone replacement projects at electric generating unit

16

did not qualify for the routine maintenance exception).  Thus the 1992 Preamble cannot be said to establish the "routine in the industry" test urged by DTE in this case.  Rather, it confirms that the routine maintenance exception is determined on a case-by-case basis, and explicitly recognizes that the question whether a project is routine at a particular type of unit depends on what "industrial category" is at issue.  *See* DTE Determination (Ex. 2) Encl. at 15; EAB Final Order (ECF No. 117-19) at 395-96.

Likewise, DTE's reliance on mentions of the *WEPCo* case in the GAO report (ECF No. 116-7) and in a letter to Congressman Dingell (ECF No. 116-10) is misplaced.  The comments in these documents do not even mention the routine maintenance exception, nor are they inconsistent with EPA's approach—as presented in the Clay Memo—that the histories and practices of individual units in the industry would be considered when evaluating routine maintenance claims.  These statements do not construe the routine maintenance exception nor do they profess to alter the Agency's official opinion on the matter.  *See SIGECO*, 245 F. Supp. 2d at 1019–20.  None of the documents DTE cites possess the formal status, clarity, or persuasiveness necessary to accomplish an "about face" in EPA's regulatory interpretation set forth in the Clay Memo.  In the end, it is telling that, to support its assertion that EPA implemented the Company's version of the "routine in the industry test," DTE relies exclusively on documents that contain *zero* legal analysis.  This is not the stuff of regulatory interpretation nor the legal analysis upon which a coherent permitting regime can be based; it is obfuscation.

### 3.  DTE's Argument That EPA Changed Its Interpretation of the Routine Maintenance Exception in 1999 is Without Merit

DTE argues that EPA impermissibly changed its interpretation of the routine maintenance exception in 1999, shifting its focus from industry-wide practices to "solely" considering the history of the particular unit at issue.  According to DTE, such a change in

17

EPA's interpretation policy would require the Agency to go through the notice and comment rulemaking procedures.

In addition to mischaracterizing EPA's test, DTE's argument is not a new one.  In fact, the utility industry made the same argument just after EPA issued the Clay Memo, ten years prior to EPA's NSR enforcement initiative.  In 1989, the Utility Air Regulatory Group, a conglomerate of electric utilities represented by DTE's trial counsel Hunton & Williams and a group of which DTE is a member, sent a letter to the Department of Energy describing what it perceived to be problems with EPA's routine maintenance analysis as set forth in the Clay Memo.  *See* Letter from Henry V. Nickel (June 5, 1989) [UARG1 0000090–100] (Ex. 4) ("UARG Letter"); *see also SIGECO*, 245 F. Supp. 2d at 1003, 1019 (discussing the UARG Letter as evidence of industry knowledge of EPA's narrow interpretation).[10]  After briefly outlining EPA's then-recent applicability determinations, the letter notes:

> EPA's decisions acknowledge that "routine" repairs and replacements are not subject to the NSPS and PSD modification rules.  However, the Agency has arbitrarily redefined what repair and replacement activities are "routine," such that "routine" activities include only those that (1) are *frequently done at that plant*, (2) involve no major equipment, (3) are inexpensive, and (4) do not extend the life of a plant.  This new interpretation is vastly different from past implementation of the "routine" rule, which included any repair and replacement activity that is *normal business practice*.

UARG Letter (Ex. 4), Encl. at 3 (emphasis added).  The UARG Letter juxtaposes industry's interpretation of EPA's approach in the Clay Memo—which it describes as concerned with activities "frequently done at that plant"—with what the electric industry allegedly felt had been

---

[10] DTE may attempt to argue that the UARG letter is inadmissible hearsay and should not be considered by this Court.  However, the document is not presented for the truth of the matter asserted (indeed, the United States disagrees with some aspects of the interpretation presented in the letter), but rather for its reflection of the industry's understanding of the routine maintenance test in 1989.  *See SIGECO* Evidentiary App'x (Ex. 5) at 11-12 (referenced in 245 F. Supp. 2d at 1000 n.4).  Moreover, even were the Court to conclude the document was hearsay, it would qualify for the ancient documents exception of Fed. R. Evid. 803(16).

a historical focus on "normal business practice." This supposedly "new interpretation" of the routine maintenance exception described in 1989 UARG Letter by advocates for electric utilities is precisely the same interpretation that DTE argues was sprung on the electric industry without warning a decade later in 1999. DTE is simply rehashing and repackaging the same arguments that EPA rejected over twenty years ago in the WEPCo matter, but the UARG Letter illustrates members of the electric industry understood long ago that EPA *did not* consider industry-wide practices to be an important consideration for evaluating routine maintenance claims. *See id.*; *see also SIGECO*, 245 F. Supp. 2d at 1019. Thus, the UARG letter undermines DTE's assertion that EPA narrowed its interpretation of the routine maintenance exception in 1999 "by litigation fiat." DTE's Motion (ECF No. 116) at 17.

        In sum, DTE's "impermissible change" argument is untenable for a panoply of reasons. First, DTE cannot establish a "change" in EPA's interpretation. Plaintiffs' interpretation of the routine maintenance exception as presented in the United States MPSJ (ECF No 117) is entirely consistent with the approach set forth in EPA's authoritative Clay Memo. Relatedly, DTE is essentially arguing in its Motion that the United States undervalues industry-wide business practices just as the electric industry complained that EPA was undervaluing the same information in 1989 at the time of the WEPCo determination—ten years before EPA's enforcement initiative and twenty years before projects at issue in this case. UARG Letter (Ex. 4), Encl. at 3. Plaintiffs' interpretation of the routine maintenance exception cannot be considered a new and inconsistent interpretation when the electric generating industry itself recognized EPA did not consider "normal business practices" to be dispositive in routineness determinations. Moreover, as EPA explained *to DTE* in 2000, the Preamble to the 1992 WEPCo Rule is consistent with the Agency's longstanding interpretation that the practices of individual

19

units throughout the industry supply contextual background for the consideration of specific routine maintenance claims.  *See* DTE Determination  (Ex. 2) at Encl. 15; *see also* 57 Fed. Reg. at 32,326; *SIGECO* 245 F. Supp. 2d at 1021; EAB Final Order (ECF No. 117-19) at 395-96.

Finally, even if the 1992 WEPCo Preamble was inconsistent with the Clay Memo's approach (it is not) and even if it did set out to adopt DTE's version of the "routine in the industry" test (it did not), that attempt—by DTE's own argument—would constitute an impermissible change in the Agency's policy and an illegal expansion of the exception's scope, whether measured against the language of the Clay Memo itself or the electric industry's express interpretation of the Memo at the time.  *See* 57 Fed. Reg. at 32,326 (noting that the notice of proposed rulemaking "did not deal with [the routine maintenance] aspect of the regulations"); *accord Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1104 (4th Cir. 1985) (holding that an agency's notice of proposed rulemaking "must be sufficiently descriptive to provide interested parties with a fair opportunity to comment and to participate in the rulemaking" (internal citations omitted)).   Any one of these bases is sufficient to undermine DTE's "impermissible change" argument.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests this Court deny DTE's Motion regarding the applicable legal standard for assessing routine maintenance claims.

Respectfully Submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

Dated: August 1, 2011                    *s/ Elias L. Quinn*
                                          JAMES A. LOFTON
                                          JUSTIN A. SAVAGE

OF COUNSEL:
SABRINA ARGENTIERI
MARK PALERMO
SUSAN PROUT
Associate Regional Counsel
U.S. EPA Region 5
Chicago, IL
77 W. Jackson Blvd.

APPLE CHAPMAN
Associate Director
Air Enforcement Division
U.S. EPA
1200 Pennsylvania Ave. NW
Washington D.C. 20460

JAMES W. BEERS, JR.
THOMAS A. BENSON (MA Bar # 660308)
KRISTIN M. FURRIE
ELIAS L. QUINN (CO Bar # 42159)
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
 (202) 514-5261
thomas.benson@usdoj.gov

BARBARA McQUADE
United States Attorney
Eastern District of Michigan

ELLEN CHRISTENSEN
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226

21

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2011, the foregoing brief was served via ECF on counsel of record.


*s/ Elias L. Quinn*
Counsel for the United States