IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:10-cv-13101-BAF-RSW |
| and | ) | |
| | ) | Judge Bernard A. Friedman |
| NATURAL RESOURCES DEFENSE COUNCIL, and SIERRA CLUB | ) ) | Magistrate Judge R. Steven Whalen |
| | ) | |
| Plaintiff-Intervenors | ) | |
| v. | ) | |
| | ) | |
| DTE ENERGY COMPANY, and DETROIT EDISON COMPANY | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO ESTABLISH CORRECT LEGAL STANDARD ON THE ISSUE OF
"ROUTINE MAINTENANCE, REPAIR AND REPLACEMENT"**

# EXHIBIT 4

# HUNTON & WILLIAMS

2000 PENNSYLVANIA AVENUE, N.W.

P.O. BOX 19230

WASHINGTON, D.C. 20036

TELEPHONE 202-955-1500

FAX 202-778-2201

707 EAST MAIN STREET  P.O. BOX 1535
RICHMOND, VIRGINIA 23212
TELEPHONE 804-788-8200
TELEX 684425I

FIRST VIRGINIA BANK TOWER
P.O. BOX 3889
NORFOLK, VIRGINIA 23514
TELEPHONE 804-625-5501
TELEX 755628

3050 CHAIN BRIDGE ROAD
FAIRFAX, VIRGINIA 22030
TELEPHONE 703-352-2200

2500 ONE ATLANTA PLAZA
950 EAST PACES FERRY ROAD
ATLANTA, GEORGIA 30326
TELEPHONE 404-841-2700

100 PARK AVENUE
NEW YORK, NEW YORK 10017
TELEPHONE 212-309-1000
TELEX 424549 HUNT JI

ONE HANNOVER SQUARE
P.O. BOX 109
RALEIGH, NORTH CAROLINA 27602
TELEPHONE 919-899-3000

FIRST TENNESSEE BANK BUILDING
P.O. BOX 951
KNOXVILLE, TENNESSEE 37901
TELEPHONE 615-637-4311

FILE NO

DIRECT DIAL NO. 202 955

June 5, 1989

Ms. Polly Gault
Chief of Staff to
  the Secretary
United States Department
  of Energy
1000 Independence Avenue, S.W.
Room 7A257
Washington, D.C. 20585

Dear Polly:

I appreciated the opportunity to meet with you and discuss the so-called WEPCo case and its progeny. Enclosed is a briefing paper which explains the problem and outlines how EPA could easily solve it administratively. As discussed in the enclosure, the consequences of these decisions are far reaching. Among other things,

1. WEPCo will wholly undermine any "acid rain" legislation designed to allow reductions in the most cost-effective way;

2. WEPCo is presently causing utilities to defer needed major maintenance, repair and replacement projects required for maintaining a reliable electric supply;

3. Utilities and others that want to reduce emissions by converting to natural gas are barred from doing so

UARG1 0000090

HUNTON & WILLIAMS

Ms. Polly Gault
Department of Energy
June 5, 1989
Page 2

> without a PSD new source permit
> unless they were capable of burning
> gas in 1975; and
>
> 4. If the WEPCo rationale is not
> qualified, utilities face substantial
> risks in undertaking a "clean coal"
> demonstration project.

As I mentioned at our meeting, we have asked Administrator Reilly to reconsider the WEPCo interpretations. We know that the EPA staff will oppose our request. This steadfast refusal to back down is best illustrated by a May 5 letter to Detroit Edison where Acting Assistant Administrator Don Clay stated:

> In your March 13 letter, you provided
> data that illustrated large decreases
> in the source's "potential to emit"
> sulfur dioxide, particulate
> matter . . . and NOx as a result of
> the conversion. [Nevertheless,]
> [o]ur review of the available
> information suggests that Region V's
> conclusion that the source appears to
> be subject to PSD review . . . is
> correct.

We hope the Department and others in the Administration will urge Administrator Reilly to overrule his staff on this important issue. I am sending Linda Stuntz, under separate cover, more detailed information on the WEPCo case, including an amici brief supporting Wisconsin Electric in the Seventh Circuit litigation. That brief, joined in by the aluminum, steel, utility, petroleum, and coal industries, underscores the broad and adverse impact WEPCo will have on energy policy and on our economy.

UARG1 0000091

HUNTON & WILLIAMS

Ms. Polly Gault
Department of Energy
June 5, 1989
Page 3

    If I can provide any additional information, please let me know. We would appreciate the opportunity to meet with you and others in the Department within the next few weeks to discuss analyses we are preparing on the impact of <u>WEPCo</u> on the utility industry.

                            Sincerely yours,

                            Henry V. Nickel

Enclosure

cc:     Linda Stuntz, Esquire (w/enclosure)
       Mr. Walker Nolan (w/enclosure)
       Ms. Lynn LeMaster (w/enclosure)

UARG1 0000092

June 5, 1989

## THE WEPCO, DETROIT EDISON, AND OHIO EDISON DECISIONS

In October 1988, Administrator Thomas affirmed a determination of then Acting Assistant Administrator Don Clay finding that new source performance standards (NSPS) (i.e., SO2 scrubbers) and prevention of significant deterioration (PSD) new source permitting requirements would apply if a maintenance, repair, and replacement project (called a "life extension" project) planned at a five unit coal-fired electric generating plant owned by Wisconsin Electric Power Company (WEPCo) went forward. WEPCo was seeking to replace equipment that posed safety concerns at four of the units and required shutdown of one of those units. In addition, replacement of defective equipment was required at two units to allow those units to operate again at design capacity. The remainder of the repairs and replacements in the project were needed to improve efficiency and reliability without having any impact on emission rates.

On February 15, 1989, Acting Assistant Administrator Clay resolved additional issues posed by WEPCo. Among other things, he determined that WEPCo could not avoid NSPS by switching to a lower sulfur coal, but rather would need to install scrubbers or similar controls. He also found that PSD review would be required even though the units were not increasing their emission rate.

In the Detroit Edison case, EPA Region V determined that a project to allow natural gas-firing at an oil-fired plant could not be undertaken without a PSD permit. In a May 5 letter, Don Clay observed that the project would substantially reduce emissions, but he nevertheless tentatively concluded that Region V's PSD determination appears to be "correct."

UARG1 0000093

-2-

In the <u>Ohio Edison</u> case, EPA determined that removing a clean coal technology demonstration project after the demonstration concluded would trigger PSD and NSPS requirements. Although EPA Acting Assistant Administrator Clay promised "no action" in terms of EPA civil enforcement, "clean coal" participants would still potentially face criminal penalties for "knowing" violations of the Clean Air Act and would be subject to citizen suits under the Act. In other words, EPA has made clear that removing a clean coal demonstration project is unlawful (in EPA's view) and has informed those undertaking these demonstration projects that, at most, EPA will not initiate a civil action. Citizens and a local U.S. Attorney can do what they want.

The Utility Air Regulatory Group[1] has requested that Administrator Reilly reconsider these decisions. Detroit Edison is separately seeking review of the Region V decision concerning its natural gas project.

### EPA's New Interpretation of the NSPS and PSD Requirements

New Source Performance Standards (NSPS) require new sources to meet a 70-90% scrubbing requirement and other stringent emission limitations. The Prevention of Significant Deterioration (PSD) permit program imposes numerous monitoring

---

[1] The Utility Air Regulatory Group (UARG) is a voluntary, nonprofit, unincorporated, ad hoc group of 65 electric utilities, the Edison Electric Institute, the National Rural Electric Cooperative Association, and the American Public Power Association. UARG's purpose is to participate on behalf of its members collectively in federal air pollution control regulatory activities and in related litigation. Since 1977, UARG has been involved in all major Environmental Protection Agency Clean Air Act rulemaking and in numerous judicial proceedings related to these rulemakings.

UARG1 0000094

-3-

and modeling requirements on new sources, as well as technology-based emission limits that are potentially more stringent than NSPS. Existing sources are subject to NSPS and PSD if they are "modified," that is, if they undergo physical or operational changes that increase emissions.

The WEPCo, Detroit Edison, and Ohio Edison decisions substantially expand the previous understanding of what is a "modified" source for NSPS purposes. Under these decisions, if emissions immediately before a "non-routine" (as determined by EPA staff) change are greater than emissions after the change, NSPS is triggered. This is the case notwithstanding the fact that the emissions immediately before the change are not representative of normal source operations.

EPA similarly expanded the "modification" requirements that apply to the PSD program. Under these decisions, if EPA finds a change to be "non-routine," EPA will always conclude that the change causes an emissions increase since EPA compares actual annual emissions before the change with the emissions projected from operating 100 percent of the time, at 100 percent capacity, for 365 days. This approach, which allows projects an emission increase, conflicts with the plain language of EPA's rules.

EPA's decisions acknowledge that "routine" repairs and replacements are not subject to the NSPS and PSD modification rules. However, the Agency has arbitrarily redefined what repair and replacement activities are "routine," such that "routine" activities include only those that (1) are frequently done at that plant, (2) involve no major equipment, (3) are inexpensive, and (4) do not extend the life of a plant. This new interpretation is vastly different from past implementation of the "routine" rule, which included any repair and replacement activity that is normal business practice. It gives EPA staff

UARG1 0000095

-4-

virtually unlimited discretion to find that any major repair or replacement project is "non-routine."

## Direct Impacts of the WEPCo, Detroit Edison, and Ohio Edison Decisions

Under these decisions:

1. A unit that discovers safety problems due to an unanticipated defect in equipment and shuts down pending repairs cannot resume operations without meeting stringent new source standards and receiving a new source prevention of significant deterioration ("PSD") permit. This occurs whenever EPA determines the repair or replacement is not "routine." WEPCo, Port Washington Unit 5, October 14 letter.

2. A unit, under the WEPCo decision, cannot repair or replace deteriorated or defective equipment needed to return to past maximum operating levels, unless the repairs or replacements are "routine." WEPCo.

3. A unit cannot avoid an emissions increase that would trigger new source standards by switching to a lower sulfur coal or oil, or to natural gas. It must install control technology (e.g., scrubbers). WEPCo, February 15 letter.

4. A utility experiencing increased forced outages at its units due to equipment problems cannot undertake repairs needed to avoid serious electric reliability problems without applying for and receiving a PSD permit, even though these repairs will only improve reliability and efficiency and will not increase the emission rate of the

UARG1 0000096

-5-

units. This occurs whenever EPA determines these "emissions neutral" or even "emissions beneficial" repairs or replacements are not "routine." WEPCo, Detroit Edison.

5. A unit that was not able to burn a lower polluting fuel (e.g., natural gas) in the past cannot be converted to burn that fuel without first applying for and receiving a PSD permit. Detroit Edison.

6. A unit that has undertaken a "clean coal" demonstration project must meet new source standards and obtain a PSD permit if it wishes to remove the experimental technology at the end of the demonstration period. EPA may issue a "no action" assurance to such a project. Ohio Edison. A "no action" assurance is a promise by the EPA signatory (in the case of Ohio Edison, an Acting Assistant Administrator) that EPA will not bring a civil enforcement action. This does not insulate the company from a "citizen suit" under the Clean Air Act. Also, as the attachment to the EPA Ohio Edison letter makes clear, a U.S. Attorney can still bring a criminal prosecution.

### Broader Consequences of the WEPCo, Detroit Edison, and Ohio Edison Decisions

1. WEPCo will wholly undermine any "acid rain" legislation designed to allow reductions in the most cost-effective way. For example, it subjects many older, smaller units to scrubbers when these units are the logical candidates for fuel switching.

2. WEPCo is presently causing utilities to defer needed major maintenance, repair and replacement projects

UARG1 0000097

-6-

       required for electric system reliability. The consequence of such deferrals is that utilities must risk interruption of service in the very near future or costly expenditures on short-term solutions (e.g., unplanned installation of combustion turbines). Given the time required to obtain a PSD permit to undertake a repair program at an existing unit or to install a new combustion turbine, a substantial deterioration in electric reliability in the near future -- with serious health and environmental consquences -- is likely unless WEPCo is revisited.

3.    For other industries, WEPCo says: you may not undertake major repairs or replacements that restore a plant to its past levels of production unless someone in an EPA region or EPA headquarters finds that the project is "routine." Given EPA's restrictive interpretation of "routine," the WEPCo decision means that such projects cannot be undertaken without assuming substantial risks or seeking a determination from EPA that could take 6 to 12 months.

4.    Even more troublesome is the WEPCo determination that major repairs and replacements that improve "reliability" and "efficiency" but do not increase (and may even reduce) emission rates can require a PSD permit unless EPA determines that the project is "routine." This aspect of the WEPCo decision is hostile to improving the productivity of our basic industries.

5.    Utilities and others that want to reduce emissions by converting to natural gas are barred from doing so without a PSD permit unless they were capable of burning gas in 1975. This will cause companies to abandon such conversions in many cases and delay them (due to PSD

UARG1 0000098


-7-

permitting requirements) whenever a company decides to proceed.

6. If the WEPCo rationale is not qualified, utilities face substantial risks undertaking a "clean coal" demonstration project. If new source requirements apply upon removal of the experimental controls, a unit will have to be shut down or face very costly retrofit controls. The price may be too great for many companies, thereby discouraging participation in the program.

### Adminsitrative Solution to the WEPCo, Detroit Edison, and Ohio Edison Cases

In the WEPCo, Detroit Edison, and Ohio Edison decisions, EPA interpreted its new source performance standards (NSPS) and prevention of significant deterioration (PSD) requirements in an unprecedented manner. While the rules governing these EPA programs are complex, the EPA determinations in these cases could be easily overcome with the following interpretations:

1. For NSPS purposes, EPA can, and should, recognize that, in determining an emissions increase, representative operations of the unit should be used in comparing past emissions to future emissions after a change. Nothing on the face of EPA's regulations or their regulatory history precludes such a declaration by the new EPA Administrator. Such a "clarification" would mean that "clean coal" technologies could be removed at the end of the demonstration period without triggering NSPS. It would also allow utilities and other industries to make necessary repairs to return plants to past maximum production levels.


UARG1 0000099

-8-

2. For PSD purposes, EPA can, and should, recognize that any emission increase predicted to occur as a result of an increase in hours of operation or production rate up to original design capacity (unless limited by a federally enforceable restriction on production or hours) is an exempt emission increase, as § 52.21(b)(2)(iii)(f) of EPA's rules explicitly and unambiguously provides. This reconsideration of the WEPCo, Detroit Edison, and Ohio Edison decisions would allow "clean coal" projects to proceed without having to receive a PSD permit. It would also allow industry to convert to lower-emitting natural gas without a PSD permit.

UARG1 0000100