IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:10-cv-13101-BAF-RSW |
| | ) | |
| and | ) | |
| | ) | Judge Bernard A. Friedman |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, and SIERRA CLUB | ) | Magistrate Judge R. Steven Whalen |
| | ) | |
| Plaintiff-Intervenors | ) | |
| v. | ) | |
| | ) | |
| DTE ENERGY COMPANY, and | ) | |
| DETROIT EDISON COMPANY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO ESTABLISH CORRECT LEGAL STANDARD ON THE ISSUE OF
"ROUTINE MAINTENANCE, REPAIR AND REPLACEMENT"**

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

UNITED STATES OF AMERICA,      )
         Plaintiff,         )
                       )
     vs.                   )     IP 99-1692-C-M/F
                       )
SOUTHERN INDIANA GAS       )
AND ELECTRIC COMPANY ,    )
         Defendant.      )

## ORDER ON SOUTHERN INDIANA GAS AND ELECTRIC COMPANY'S
## MOTION FOR SUMMARY JUDGMENT ON FAIR NOTICE

90-5-2-1-06966

## ORDER ON SOUTHERN INDIANA GAS AND ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT ON FAIR NOTICE

This matter is before the Court on defendant Southern Indiana Gas and Electric Company's ("SIGECO") Motion for Summary Judgment on Fair Notice on the United States' ("the Government") claims that it violated the Clean Air Act ("CAA"), 42 U.S.C. § 7401, *et seq.* The parties have fully briefed their arguments, and the motion is now ripe for ruling.

## I. BACKGROUND

## A. RELEVANT PROVISIONS OF THE CLEAN AIR ACT

This motion does not require the Court to determine if SIGECO's projects actually violated the CAA. The Court need only determine whether SIGECO had fair notice of the Government's interpretation of the routine maintenance exemption. However, some discussion of the CAA provisions at issue in this case is necessary before turning to the substance of the motion.

The purpose of the CAA is "to protect and enhance the quality of Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401 (b) (1994). To accomplish this purpose, Congress required the Administrator of the Environmental Protection Agency (the "EPA") to identify and prepare air quality criteria for air pollutants, and promulgate national primary and secondary ambient air quality standards ("NAAQS") for each pollutant. *Id.* § 7408-09. States were then required to classify areas where the air quality was better or worse than the NAAQS for each pollutant. An area that meets the NAAQS for a particular pollutant is designated an "attainment" area, while areas that do not meet the NAAQS are called "non-attainment" areas. *Id.* § 7407(d). An area that cannot be classified due to insufficient

# TABLE OF CONTENTS

PAGE

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A. RELEVANT PROVISIONS OF CLEAN AIR ACT . . . . . . . . . . . . . . . . . . . . . . . . 1
      1. New Source Performance Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      2. Prevention of Significant Deterioration . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      3. Routine Maintenance Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   B. DISPUTE OVER SCOPE OF ROUTINE MAINTENANCE . . . . . . . . . . . . . . . . . . 5

   C. FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      1. SIGECO's Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          a. The 1991 Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          b. The 1992 Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          c. The 1997 Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      2. Public Statements about Routine Maintenance . . . . . . . . . . . . . . . . . . . . . . 11
      3. Industry Letters from Utility Air Regulatory Group . . . . . . . . . . . . . . . . . . 12
      4. The January 1998 Non-Applicability Determination . . . . . . . . . . . . . . . . . 13
      5. Other Projects Throughout Industry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      6. Depositions from State EPA Officials . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II. SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   A. IS THE EPA'S INTERPRETATION REASONABLE . . . . . . . . . . . . . . . . . . . . . . 19
   B. FAIR NOTICE DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   C. APPLICATION OF FAIR NOTICE DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . 27
      1. Notice Available for All Three Projects . . . . . . . . . . . . . . . . . . . . . . . . . . 29
          a. Notice Provided by the Routine Maintenance Exemption Language . 29
          b. The WEPCO Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
              1. – Comparison of WEPCO to SIGECO'S Projects . . . . . . . . . . 35
              2. – The Clay Memo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      2. Additional Notice After the 1992 Project . . . . . . . . . . . . . . . . . . . . . . . . . 42
          a. Preamble from the Federal Register . . . . . . . . . . . . . . . . . . . . . . . . . 42
          b. IDEM'S 1998 Non-Applicability Determination . . . . . . . . . . . . . . . 43

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

APPENDIX: EVIDENTIARY ISSUES

The Court holds that SIGECO had fair notice of the EPA's interpretation of routine maintenance prior to all of its projects.

## Summary

SIGECO's most compelling evidence that it was not on notice of the EPA's interpretation of the routine maintenance exemption was the inter-agency confusion illustrated by IDEM's non-applicability determination on the 1997 project. However, SIGECO already had completed its 1997 project by the time it received the determination from IDEM, and the notice that matters for the fair notice doctrine are the statements the defendant receives before the alleged violation begins. Accordingly, SIGECO's arguments that the IDEM determination deprived it of notice of the EPA's interpretation of routine maintenance lose force. The Clay Memo and WEPCO's discussion of routine maintenance made it "ascertainably certain" that the EPA would make a case-by-case determination by weighing the nature, extent, purpose, frequency, cost, and other relevant factors, to make a common-sense finding. Further, it also was "ascertainably certain" that no factor would be elevated above the rest and given dispositive weight, and that how often a project occurred in the life of a unit was a significant factor. The 1989 UARG letter confirms that the regulated community understood how the EPA interpreted routine maintenance in the Clay Memo. Therefore, the Court **DENIES** SIGECO's Motion for Summary Judgment on Fair Notice.

## IV. **CONCLUSION**

For the reasons discussed herein, the Court finds that SIGECO had fair notice of the EPA's interpretation of routine maintenance. Thus, the Court **DENIES** SIGECO's Motion for Summary Judgment.

IT IS SO ORDERED this ___*13*___ day of February, 2003.

_____
LARRY J. MCKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed to:

Steven Ellis
Environmental and Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044

Thomas Kieper
Assistant United States Attorney
United States Attorney's Office
Southern District of Indiana
10 West Market St., Suite 2100
Indianapolis, IN 46204-3048

Kevin A. Gaynor
VINSON & ELKINS, L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

John R. Maley
Barnes & Thornburg
1313 Merchants Bank Building
11 South Meridian Street
Indianapolis, IN 46204

Angila M. Retherford
Vectren Corporation
P. O. Box 209
20 NW Fourth Street
Evansville, IN 47704-0209

-49-

## APPENDIX: EVIDENTIARY ISSUES

At issue in this motion is whether or not SIGECO had fair notice of the EPA's interpretation of the routine maintenance exemption. As stated earlier, that notice can come from the routine maintenance exemption itself, or from public statements by the EPA about the exemption. Many of the documents offered by SIGECO (1) are not public statements by the EPA, or (2) do not construe the routine maintenance exemption. Documents from either category are not relevant to the fair notice inquiry and will not be considered by the Court. The Government also makes a number of other objections to evidence relied upon by SIGECO, and offers evidence to which SIGECO objects. The objections will be ruled upon in turn.

## A. EVIDENCE OFFERED BY SIGECO NOT RELEVANT TO FAIR NOTICE INQUIRY

The Court's review and analysis of the relevant case law has convinced it that the following pieces of evidence offered by SIGECO are not relevant to the fair notice inquiry: various EPA background documents on the NSR program; the 1978 letter from the EPA's Director of the Stationary Source Enforcement Division to the Director of EPA's Region VI Enforcement Division (Def.'s Ex. 6); IDEM's 1986 non-applicability determination; IDEM's 1989 non-applicability determination; a number of other EPA non-applicability determinations that SIGECO finds compelling; and the deposition testimony from former EPA officials.

The background documents and the 1978 letter are not relevant to the fair notice analysis. Most importantly, no evidence has been offered to show that the documents were *public* documents that notified the regulated community of the EPA's *official* position. The 1978 letter was an internal memo from one EPA official to another, and the background documents are unofficial statements

that do not even mention the routine maintenance exemption. SIGECO has offered no evidence that it was aware of these documents prior to this lawsuit (or, more importantly, prior to its projects in 1991, 1992 or 1997). Moreover, as the Fourth Circuit emphasized in *Hoechst Celanese*, the fair warning inquiry centers on the perspective of the defendant, not the agency. *See Hoechst Celanese*, 128 F.3d at 226 ("But in addressing whether a party has received fair notice, we look at the facts as they appear to the party entitled to notice, not the agency."). SIGECO has not drawn the Court's attention to any cases that consider internal, unofficial statements by an agency about its regulations, and the Court's own research has uncovered no such cases. Instead, the fair warning case law focuses on the language of the regulation itself, and public statements made by the agency about its interpretation of the regulation. Consideration of these internal documents would unduly expand the boundaries of the fair warning rule and re-direct the focus of the analysis from the defendant to the agency. Therefore, the documents are excluded.

In 1986, SIGECO contacted IDEM about a project at Culley Station Unit 2 that involved replacing the forced draft system with a balanced draft system. IDEM concluded that the project was not required to obtain a construction permit, which it would have needed if it was subject to NSR. The project cost approximately $8 million and required a six-month outage to be completed. IDEM issued SIGECO a similar non-applicability determination for another balanced draft conversion project in 1989 at Culley Unit 3 – a project that cost over $16 million. SIGECO argues:

> [T]hese projects [the 1986 and 1989 projects] included far more extensive tube replacement than any of the projects at issue in this case. IDEM's determinations are critical to this case because they confirm to SIGECO that repair and replacement projects of this magnitude did not trigger New Source Review. Obviously, when SIGECO undertook later maintenance, repair, and replacement activities that were far less significant than these larger projects, including the Projects at issue in this case, it had absolutely no reason to believe that these later projects triggered New

-2-

Source Review.

Def.'s Memo in Support of Motion for Summary Judgment on Fair Notice at 32.

SIGECO's arguments about the 1986 and 1989 projects are unavailing. Although SIGECO's 1986 "Life Extension Program" cost $8 million and required a six-month outage to complete, SIGECO had no information from IDEM that the routine maintenance exemption played any role in its determination. IDEM sent SIGECO a brief non-applicability letter that stated: "[t]he modifications and replacements . . . listed in your letter as part of a Life Extension Program on Unit 2 will not require a construction permit from the Department of Environmental Management." Def.'s Ex. 33. No mention of routine maintenance was made in the letter. NSR construction permits are not required for projects that do not increase emissions, and Hurst admitted that during SIGECO's discussions with IDEM about the 1986 project, SIGECO represented to IDEM that the project would have no effect on emissions. Pl.'s Ex. 26, Hurst Depo. at 55. Due to this representation about emissions, and due to the fact that the project would require Unit 2 to be shut down for six months, it seems unlikely that SIGECO could have reasonably taken the non-applicability determination as a statement about the scope of routine maintenance. It would have been a very speculative and risky assumption to make, considering that the letter that did not even mention the exemption. The Court concludes that this determination has no bearing on whether or not SIGECO had fair notice about the EPA's interpretation of routine maintenance.

SIGECO also compares the projects at issue to a 1989 project at Culley Station Unit 3. The estimated cost of the 1989 project was $16.5 million. Def.'s Stmt. of Facts ¶ 34. Yet IDEM's non-applicability letter for the 1989 project explicitly cites lack of emissions as the reason it would not require a permit. Def.'s Ex. 34. In the June 1989 letter, IDEM stated, "[n]one of the boiler or

-3-

turbine generator work [involved in the 1989 project] will affect or change emissions from this boiler so they do not require any permitting action. The effect of the ESP modification will be to decrease emissions." *Id.* As with the 1986 project, no mention was made of the routine maintenance exemption by IDEM. Consequently, this non-applicability determination cannot be considered a public statement by EPA about the routine maintenance exemption. *See Gen. Elec.*, 53 F.3d at 1329.

SIGECO's attempts to compare its projects to other utility companies' projects suffer from similar deficiencies. The massive project in Illinois by Com Ed in 1997[1] was allowed to proceed by the state permitting agency subject to the explicit condition that it would not increase emissions. Def.'s Ex. 38.[2] Com Ed argued to the Illinois EPA prior to the determination that NSR would not be triggered because emissions would not increase, and also because it constituted routine maintenance. While the Illinois EPA explicitly cited a lack of emissions increase as a reason for its determination, it did not refer to routine maintenance as a basis for the non-applicability

---

[1]Obviously, even if this project was exempt as routine maintenance, it would have no bearing on the 1991 and 1992 projects because the determination was in 1997.

[2]SIGECO offers testimony from the deposition of Shashikant Shah ("Shah"), an Illinois EPA permit reviewer involved in the 1997 Com Ed project non-applicability determination, to show that the basis for the non-applicability determination was that the project was routine. Although Shah does state that the Illinois EPA considered some of the work to be routine, he said that part of the reason it was routine maintenance was that the project would not increase emissions. Def.'s Ex. 40. This appears to be a misunderstanding of the routine maintenance exemption because whether or not emissions increase has no bearing on whether a project constitutes routine maintenance. If emissions will not increase due to proposed construction, that alone suffices to exempt a project from NSPS and PSD. The routine maintenance inquiry is a separate issue that also can, standing alone, exempt a project from NSPS or PSD requirements. In any event, the focus of the fair notice inquiry is on *public statements* made by the agency. Thus, a statement by a permit reviewer in 2002 purporting to explain why the Illinois EPA decided NSPS and PSD did not apply to a 1997 project that was not included in the Illinois EPA's letter to Com Ed in 1997 has little relevance to the fair notice inquiry.

-4-

determination.[3] Nor has SIGECO offered evidence that the EPA's non-applicability determination

for the project at Cincinnati Gas and Electric's Beckjord Station involved the routine maintenance

exemption. Def.'s Ex. 29. Accordingly, none of these determinations are public statements by the

EPA about its interpretation of the routine maintenance exemption. *See Gen. Elec.*, 53 F.3d at 1329.

SIGECO also filed a Supplemental Statement of Material Facts and Evidentiary Material

("Supplemental Statement") in Support of this Motion for Summary Judgment on Fair Notice. This

Supplemental Statement consists of deposition testimony from numerous environmental officials,

including former EPA officials, current EPA officials, and state environmental officials. The Court

allowed SIGECO to file the Supplemental Statement because it appeared that the testimony could

assist the Court in deciding the instant motion. However, a closer review of the substance of the

deposition testimony has convinced the Court that the testimony is not relevant to the fair notice

inquiry.

Because most of the deponent's statements are similar, a few quotations will suffice to

illustrate the substance of their testimony. Richard Mays, who held several different positions at the

EPA in the 1980s, testified: "there was no discussion, to my recollection, of any enforcement action

or any violations being based upon the repair and maintenance rule at the time I was there." Mays

Depo. at 52. Mays also stated that he attended periodic docket reviews in which pending

enforcement matters were discussed, and "whether the repair and maintenance of an existing piece

of – part of a plant would have triggered the NSR, NSPS requirements was never discussed during

---

[3]The 1999 Detroit Edison non-applicability determination was also based on the company's assertion that emissions would not increase due to the construction activity. Regardless, that determination has little relevance because it took place after all of SIGECO's projects in the instant case.

these docket reviews." *Id.* at 126-28. Joseph Cannon, another highly-placed EPA official in the 1980s, also testified that this "new" view of routine maintenance (and more generally, the "new" view of the applicability of NSR to existing sources in the utility industry) was not discussed while he was at the EPA: "the dog didn't bark . . . even when we were scratching our heads and trying to figure out ways that you could get emission reductions from major sources, including particularly power plants." Cannon Depo. at 72-73. Cannon continued, "If that had been the position or the policy of the agency I would have known if at that time and it would have been widely discussed." *Id.* at 78, 82. Other former EPA officials testified that the "focus of NSR programs was to regulate emissions from new plants, not existing plants," Schweers Depo. at 104, and that they are surprised by the current enforcement initiative. *See, e.g.*, Barber Depo. at 171. Other former officials provided similar observations.

According to SIGECO, the testimony of these individuals "confirms that EPA's current interpretation of the Clean Air Act's New Source Review regulations radically departs from EPA's historical interpretation and establishes beyond doubt that EPA failed to make the rules 'ascertainably certain' as required by the fair notice doctrine." *See* Def.'s Motion for Leave to File Supplemental Statement at 1. However, these depositions only establish that the routine maintenance exemption was not talked about very much while these individuals were at the EPA, or at least that these former officials do not remember the exemption being talked about very much. The Court fails to see how this testimony has anything to do with whether the defendant in this case had fair notice of the EPA's interpretation of the routine maintenance exemption. An agency has fairly notified a regulated party of its interpretation of a regulation, "[i]f, by reviewing the regulations and other *public* statements issued by the agency, a regulated party acting in good faith would be able

-6-

to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform." *Gen. Elec. Co.*, 53 F.3d at 1329 (citations omitted) (emphasis added). The deposition testimony does not come from any *public* statements by the EPA about how to interpret routine maintenance or the NSR programs; rather, it arises from the distant memory of former EPA officials and establishes a lack of *internal* discussions about these issues. Confusion within an agency about how to interpret a provision does suggest that a defendant may not be fairly notified, *see Gen. Elec. Co.*, 53 F.3d at 1332, but none of this testimony establishes confusion at EPA about this exemption – the officials merely opine that there was no discussion about it. Accordingly, the Court will not consider the deposition testimony offered in SIGECO's Supplemental Statement of Material Facts.

## B. REMAINING EVIDENTIARY ISSUES

### 1. Statement from EPA Contractor

SIGECO submits a statement made in 1986 by an EPA contractor listing a number of common repair/replacement jobs for a boiler. Def.'s Ex. 9. The contractor contacted seven companies by telephone for reports of projects at their facilities, and produced a survey based on those calls. The Court excludes this statement as hearsay because it is being offered for its truth. Even if it were not hearsay, it has scant relevance to the fair notice inquiry. The survey says nothing at all about the routine maintenance exemption. Nor would an outside contractor be able to speak for the EPA on what constitutes routine maintenance. Moreover, courts only consider the language of the regulations at issue and any public statements by the agency about the regulations when analyzing fair notice, and SIGECO offers no evidence that this was a public statement that may have given it notice of the EPA's interpretation of routine maintenance. *See Gen. Elec.* 53 F.3d at 1329

(company is fairly notified if agency's interpretation of its regulations is ascertainably certain from regulation itself or *public statements* by the agency). Accordingly, the Court excludes the letter from the contractor[4]. Def.'s Ex. 9.

## 2. 1990 Report by EPA Consultant

SIGECO also offers a 1990 report prepared by an EPA consultant analyzing the issue of utility "life extension" practices. Pl.'s Stmt. of Facts ¶ 17. The Government objects to this report as hearsay, and SIGECO argues that (1) the report is not hearsay because it is a party-opponent admission under 801(d)(2), and (2) it is a public record under 803(8), and consequently admissible even if it is hearsay.

Though SIGECO does not specify which type of admission this report is under FED.R.EVID. 802(d)(2), the only category that it could arguably fit under is the "agency admission" exemption in 802(d)(2)(D), which exempts "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." The language of the rule requires that the author of the statement be an agent or servant of the party it is being offered against, and it appears that this report, Def.'s Ex. 17, was prepared by an outside, independent contractor. Under rudimentary agency law, an independent contractor is not an agent or employee of the principal, and SIGECO has provided the Court with no evidence that the company that prepared the report was anything other than an independent contractor. *See*

---

[4]SIGECO also submits a 1991 report from another EPA contractor about life extension projects. See SIGECO Supp. Brief in Support of its Motion for Summary Judgment on Fair Notice. The 1991 report is inadmissible hearsay. Even if it were not hearsay, the Court agrees with the Government that this *internal* memo written by an *outside contractor* has no relevance to the fair notice issue. *See General Electric*, 53 F.3d 1324.

-8-

CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, EVIDENCE PRACTICE UNDER THE RULES § 8.32 at 1128 (2d ed. 1999) [hereinafter MUELLER & KIRKPATRICK] ("[P]robably the framers [of the Federal Rules of Evidence] meant to exclude most statements by most independent contractors."). The Court concludes that the report is not an admission.

SIGECO also claims that the report is not hearsay because it is within the ambit of the public records exception. However, the exception requires that a report be authored by a "public office or agency," and this report was compiled by a private company. FED.R.EVID. 803(8); *see also* MUELLER & KIRKPATRICK, § 8.50 at 1231 ("By its terms, the public records exception does not embrace records prepared by private entities or people who are not public officials, even when filed with public agencies as required."). Private reports like this one do not have the indicia of reliability that justify the public records exception to the hearsay rule. Because the report is being offered for its truth, and because it is not an admission or a public record, it is excluded.

### 3. **Department of Energy Report**

SIGECO quotes from a Department of Energy ("DOE") report on life extension projects that describes certain specific projects in the utility industry and makes some observations about NSPS. Def.'s Ex. 18. The Government objects to the document as hearsay, and SIGECO claims that it is admissible because (1) it is an admission, and (2) it is a public record.

The Court need not address whether the report is an admission because it is admissible under the public records exception to the hearsay rule. FED.R.EVID. 803 provides in relevant part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . .

-9-

> (8) Public records and reports.  Records, reports, statements, or data compilations,
> in any form, of public offices or agencies, setting forth . . . (C) . . . factual findings
> resulting from an investigation made pursuant by authority granted by law.

The DOE is a public office or agency, and the preface of the report, Def.'s Ex. 18 at SIG 342408,

explains that the DOE is required by law to provide this kind of analysis.  Although there are some

observations and conclusions in the report, most of the report is factual in nature.  Courts have had

difficulty separating facts from conclusions when making evidentiary determinations under this

exception, but the Supreme Court settled this issue in *Beech Aircraft Corp. v. Rainey* by broadly

construing the exception and admitting the conclusions if they had sufficient indicia of reliability.

*See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439 (1988) (in view of difficulty of

distinguishing facts from conclusions, concern over applying public records exception should be

answered by examining trustworthiness).  This report was prepared by the  Energy Information

Administration ("EIA"), an independent statistical branch of the DOE, and the special skill,

experience, and independence of the EIA furnish sufficient indicia of reliability and trustworthiness

to admit this report under the public records exception.  *See* Advisory Committee Notes to

FED.R.EVID. 803(8) (the special skill and experience of the official is a factor that assists courts in

passing on the admissibility of evaluative reports).  This seems to be the type of report the public

records and reports exemption was designed to exempt from the hearsay rule, and the Court

concludes that it is admissible.


### 4. General Accounting Office Report

The Government makes a hearsay objection to SIGECO's use of a statement made in a

General Accounting Office ("GAO") report.  Def.'s Ex. 20.  The report is entitled: "Electricity

-10-

Supply: Older Plants' Impact on Reliability and Air Quality." *Id.* In the relevant language of the report, GAO paraphrases what it had been told by EPA policy officials[5] about the impact of the WEPCO decision. SIGECO claims that the GAO is part of the United States government, and that the statement should consequently be considered an admission in this case, and also that the report is a public record.

The Court admits the GAO under the public records exception to the hearsay rule. Fed.R.Evid. 803(8). First, the GAO – the nonpartisan, investigative arm of Congress – is a public agency. Second, the GAO is charged with the duty to prepare investigative reports for Congress, and this report was completed as a result of a request by Senator Dingell, then Chairman of the Subcommittee on Oversight and Investigation for the Committee on Energy and Commerce. Moreover, the GAO has skill and experience in studying and evaluating the nation's environmental needs and goals, and the Government has not offered any evidence that would undermine the trustworthiness of the report. Accordingly, the GAO report is admitted.

### 5. Industry Letters

The Government relies on three industry letters sent to the EPA asking the agency to reconsider its interpretation of routine maintenance. Pl.'s Ex 21, 23, 73. SIGECO contends that the letters are hearsay, and that they are also irrelevant. The Government claims that the letters are only offered to show that industry had knowledge of the EPA's interpretation of routine maintenance.

---

[5]The particular quotation that SIGECO uses from this report has two layers of admissibility because the report paraphrases a statement made by an EPA official. First, the statement itself is admissible as a party-opponent admission because it was made by EPA. FED.R.EVID. 801(d)(2). Second, the report is admissible because the Court ultimately concludes that it is a public record.

After reviewing the letters and considering that for which they are being offered, the Court agrees with the Government and will consider the documents.

The 1989 industry letter claimed that the EPA had arbitrarily redefined routine maintenance. Pl.'s Ex. 73. The January 1990 letter focuses on the policy implications of the EPA's WEPCO decision, and a few other decisions involving NSR. Pl.'s Ex. 21. The February 1990 letter[6], sent subsequent to the Seventh Circuit's issuance of the WEPCO decision, contains industry's legal analysis of the WEPCO decision and its recommendations for EPA action. Pl.'s Ex. 23. The Government offers them to show that the utility industry had notice of how the EPA interpreted routine maintenance as early as 1989. It does not actually matter if the analysis in these letters is true or correct – in fact, the Government would probably dispute much of the substance of the letters. As the Government asserts, the relevance of the letters comes from SIGECO's knowledge or notice of the interpretation of routine maintenance expressed in the letters. Thus, the industry letters are not hearsay because they are not offered for their truth.

### 6. WEPCO's Seventh Circuit Brief

The Government also offers excerpts from the brief filed by Wisconsin Electric Company on its appeal to the Seventh Circuit in WEPCO. The Government offers this document to show that the Seventh Circuit already considered and rejected the arguments that SIGECO is making in this case. SIGECO objects to Wisconsin Electric's brief as hearsay and irrelevant. The Court agrees

---

[6]The Court has insufficient information to know if SIGECO was one of the sixty-five utility companies who authored the February 1990 letter. SIGECO expressly disavows the January 1990 letter because it was not one of the companies that authored the letter, but it does not make the same claim about the February 1990 letter. If SIGECO was one of the utilities that wrote the February 1990 letter, then the letter is clearly non-hearsay as a party-opponent admission.

-12-

with SIGECO and will not consider the brief. Even if it is not offered for its truth, the brief is not sufficiently relevant to the resolution of the current motion to be admissible. The Government offers the document to provide context for the Seventh Circuit's ruling, and to show that "the Seventh Circuit [has] already considered and rejected the interpretation that SIGECO is expected to make in this case." United States' Memo in Support at 12.

The brief does, as the Government maintains, have some limited probative value, but that value is substantially outweighed by the danger of unfair prejudice and confusion of the issues. *See* FED.R.EVID. 403. In WEPCO, the Seventh Circuit concluded that the EPA's consideration of the cost, nature, extent, and frequency of the repairs to determine the applicability of the routine maintenance exemption was not arbitrary or capricious. This does mean, however, that the Seventh Circuit made a wholesale rejection of every argument that Wisconsin Electric made in its brief, or every argument that Wisconsin Electric made to the EPA in its 1988 Memo. Parties often make numerous arguments in motions and briefs, and this Court considers it unwise to assume that the Seventh Circuit's silence on an issue or subissue means that the argument was rejected. Moreover, SIGECO was not a party to those memos, and is not bound by the arguments Wisconsin Electric did or did not make in prior litigation, unless of course the Seventh Circuit explicitly or implicitly rejected an identical argument in the text of its opinion. The Court also has an alternative source of proof to show which arguments the Seventh Circuit rejected in WEPCO that avoids this danger of prejudice to SIGECO: the WEPCO decision itself. *See* FED.R.EVID. 403, ACN ("The availability of other means of proof may also be an appropriate factor."). Accordingly, the Court excludes WEPCO's Seventh Circuit brief under Rule 403 of the Federal Rules of Evidence.

-13-

### 7. <u>Letter from Commonwealth Edison to Illinois EPA</u>

SIGECO compares its projects to a number of other projects undertaken in the utility industry. One of those projects was a 1997 project by Commonwealth Edison ("Com Ed") in Illinois. To establish the substance of the project at Com Ed, SIGECO offers a letter Com Ed wrote to the Illinois EPA about the project. The Government objects to this letter as hearsay, and SIGECO responds the letter is not hearsay because it is not offered for its truth, and even if it is, it is admissible under 803(6) as a business record and 803(8) as a public record.

The Court agrees with SIGECO that the letter need not be offered for its truth to be relevant in this case. Com Ed sent this letter describing its project to the Illinois EPA in an ultimately successful attempt to receive a non-applicability determination. The relevance of the letter in this case is how Com Ed characterized the project to SIGECO – specifically how Com Ed described the nature, extent, purpose and cost of the work. It does not matter if this was an accurate description or if the actual project proceeded according to these specifications. This letter was a basis for the EPA's non-applicability determination, and the Court will consider the letter for this limited purpose.

### 8. <u>Indiana Department of Environmental Management's</u><br><u>1997 Non-Applicability Determination</u>

In January 1998, the Indiana Department of Environmental Management ("IDEM") informed SIGECO that neither NSPS nor PSD would apply to its 1997 Unit 3 project. In this motion and other pending motions, the Government attacks how IDEM arrived at this non-applicability decision, and also accuses SIGECO's lawyers of misrepresenting the holding of the WEPCO case in a letter that SIGECO sent to IDEM prior to its determination. On the first issue, IDEM's internal review of

-14-

SIGECO's 1997 project is irrelevant to the Court's resolution of this motion. As stated earlier, the focus of the fair notice inquiry is on the notice that the defendant had as a result of an agency's public statements (in addition to the notice provided by the regulation itself), not how the agency arrived at its decision. Regardless of how IDEM reached the decision, the end result was a non-applicability determination and this was the actual notice that SIGECO received, and the Court will not consider any evidence of IDEM's internal review process for purposes of this motion.

SIGECO initially sent a letter to IDEM that briefly described the project, and requested a non-applicability determination. The Government maintains that SIGECO's lawyers misrepresented the holding of WEPCO in that letter, and argues that these misrepresentations tainted the subsequent non-applicability determination because IDEM relied on them. The letter states in part, "The WEPCO court determined that 'like-kind replacements' constitute 'routine maintenance, repair, and replacement' and clearly SIGECO's proposed changes constitute 'like-kind' replacements." Pl.'s Ex. 20. SIGECO then quoted from an EPA letter about the scope and meaning of "like-kind," and argued that its 1997 repairs were covered by that definition. *See id.* The Court agrees with the Government that this is a misstatement of the holding in WEPCO – in fact, the Seventh Circuit considered the WEPCO project to be a "like-kind" project, and still affirmed the Clay Memo's conclusion that the project was not routine maintenance. Although the parties acrimoniously contest the meaning of WEPCO in the instant case, nowhere in briefs to this Court does SIGECO contend that the WEPCO court held that like-kind replacements constituted routine maintenance. However, the letter to IDEM was clearly not an objective memo analyzing the 1997 project and the import of relevant case law. Instead, it contained subjective legal arguments made by an interested party, and was sent to IDEM in an effort to persuade it that PSD and NSPS would not apply to the project. It

-15-

was IDEM's responsibility to investigate the project, and make the applicability determination on its own, which would surely include a legal analysis of the WEPCO decision. WEPCO was a landmark CAA case in the Seventh Circuit and IDEM's lawyers were undoubtedly familiar with it long before SIGECO described it in that letter. Regardless of any inadequacies in IDEM's internal review process or how SIGECO described the WEPCO case to IDEM, IDEM ultimately sent SIGECO a non-applicability determination, and the notice contained in that letter is what the Court finds relevant for this motion. Thus, the Court will not consider any evidence about how IDEM reached that decision.