IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:10-cv-13101-BAF-RSW |
| and | ) | |
| | ) | Judge Bernard A. Friedman |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, and SIERRA CLUB | ) | Magistrate Judge R. Steven Whalen |
| | ) | |
| Plaintiff-Intervenors | ) | |
| v. | ) | |
| | ) | |
| DTE ENERGY COMPANY, and | ) | |
| DETROIT EDISON COMPANY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE LEGAL STANDARDS AT ISSUE IN THIS CASE**

**TABLE OF CONTENTS**

ARGUMENT ..........................................................................................................................1

   I.  THE PROPER ROUTINE MAINTENANCE TEST ...........................................................1

   II.  AGGREGATION .................................................................................................6

   III.  THE DEMAND GROWTH EXCEPTION .......................................................................7

CONCLUSION ....................................................................................................................10

# TABLE OF AUTHORITIES

**Federal Cases**

*Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979) ........................................3

*Auer v. Robbins*, 519 U.S. 452 (1997) ...................................................................5

*Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871 (2011) ........................................... 5-6

*New York v. EPA*, 443 F.3d 880 (D.C. Cir. 2006) ................................................ 3-4, 6

*Talk America, Inc. v. Mich. Bell Telephone Co.*, 131 S. Ct. 2254 (2011) .......................5

*United States v. Ala. Power Co.*, 681 F. Supp. 2d 1292 (N.D. Ala. 2008) ................. 4-5

*United States v. Cinergy Corp.*, No. 1:99CV1693LJMVSS, 2005 WL 3018688
(S.D. Ind. Nov. 9, 2005) .............................................................................8

*United States v. Cinergy Corp.*, 495 F. Supp. 2d 909 (S.D. Ind. 2007) ...........................6

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C. 2003) .................4

*United States v. Duke Energy Corp.*, No. 1:00CV1262, 2010 WL 3023517
(M.D.N.C. July 28, 2010) ...........................................................................3

*United States v. Murphy Oil USA, Inc.*, 155 F. Supp. 2d 1117 (W.D. Wis. 2001) .........6

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) .................2, 3

*United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/S, 2002 WL 31427523
(S.D. Ind. Oct. 24, 2002) ...........................................................................8

*United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994 (S.D. Ind. 2003) ...................2, 5, 6

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) .................................2, 3, 5

**Federal Regulations**

40 C.F.R. § 52.21 (r)(6)(i)(c) .........................................................................9-10

57 Fed. Reg. 32,314 (July 21, 1992) ...............................................................6, 8

67 Fed. Reg. 80,186 (Dec. 31, 2002) ................................................................8

68 Fed. Reg. 61,248 (Oct. 27, 2003)..................................................................................4

**State Administrative Code**

MICH. ADMIN. CODE R. 336.2801(ll)(ii)(C) ...................................................................9

MICH. ADMIN. CODE R. 336.2818(3)(a)(iii) ...............................................................10

DTE's various litigation arguments are not only contrary to the Clean Air Act, binding

case law, and longstanding EPA implementation, they are also often inconsistent with the

Company's own documents or contradicted by the Company's previous assertions.  For example,

in an internal company document only recently disclosed to the United States, DTE states

"[r]*outine maintenance are projects with a capitol cost less than $250,000.*"[1]  This cannot be

squared with DTE's litigating position that a $35 million boiler renovation project that replaced

nearly a million pounds of steel can qualify as routine maintenance.   Moreover, in order

downplay the massive scope and cost of the Monroe Unit 2 boiler work, DTE now insists that all

the work should be evaluated piecemeal even though the Company's witnesses have urged at

every opportunity that all of the "boiler tube" work was essentially the same.  Such efforts to so

obscure the legal analyses pertinent to this case should not be credited.

## ARGUMENT

### I.  THE PROPER ROUTINE MAINTENANCE  TEST

In a Power Point presentation only received in discovery by the United States on August

1, 2011, DTE illustrated what it thought qualified as routine maintenance before it was sued:

"[r]outine maintenance are projects with a capitol cost less than $250,000."  2009 NSR

Presentation (Ex. 1) at DECO000365100.  Indeed, in documents submitted to the State, the

Company acknowledged that unpermitted "boiler tube" work, such as is at issue here, could

result in NSR liability: "[S]everal court cases suggest that boiler tube replacement may not be

routine. . .  Companies like Detroit Edison find that it may be best to secure a[n NSR] permit,

even if this is a conservative approach to [NSR] applicability, rather than rely on use of a permit

exemption."  PSD Permit Application [EP19000000491 at 521] (Excerpted at Ex. 2) at 30 (April,

---

[1] Presentation: 2009 Fuel Blending and NSR 2nd Quarter Update [DECO 000365085] (2009
NSR Presentation) (Excerpted at Ex. 1) at DECO000356100 (emphasis added).

2008) (regarding unrelated activities). Moreover, DTE urges that this Court adopt its broad "routine in the industry" test even though the electric industry understood *by 1989* that industry standards of practice were not the emphasis of the routine maintenance test. *See United States v. S. Ind. Gas & Elec. Co.* ("*SIGECo*"), 245 F. Supp. 2d 994, 1019 (S.D. Ind. 2003); *see also* U.S. Routine Maintenance Opp. (ECF No. 126) at 17-19. DTE asks that this Court apply a regulatory interpretation that not even the Company itself adheres to outside the context of litigation. The regulatory routine maintenance exception should not be allowed to swallow the statutory rule that physical changes trigger NSR requirements. *See Wis. Elec. Power Co. v. Reilly* ("*WEPCo*"), 893 F.2d 901, 909 (7th Cir. 1990); *United States v. Ohio Edison Co.,* 276 F. Supp. 2d 829, 855 (S.D. Ohio 2003); *SIGECo*, 245 F. Supp. 2d at 1014-15, 1021; EAB Final Order, Ex. 6 to U.S. Legal Standards MPSJ (ECF No. 117-19) at 394.

DTE's principal argument that EPA has "zig[ged] and zag[ged]" on the proper routine maintenance test is predicated on the false choice between a "routine in the industry" test and a "routine at the unit" test. DTE's Legal Standards Opp. (ECF No. 127) at 10. The Company paints the world in black and white and then complains about the sharp contrast. In fact, EPA's longstanding approach to routine maintenance claims *does* contemplate industry practices—just not in the way DTE would like. *See* U.S. Routine Maintenance Opp. (ECF No. 126) at 4. EPA's measured approach—which considers *both* the practices of the units at issue *and* those of other individual units in the industry—was implemented in the *WEPCo* matter, it is consistent with the Agency's clarification in the 1992 Preamble, it was reiterated in the 2000 DTE Determination, *see id.* at 2-3, and it is fully consistent with those EPA comments DTE proclaims establish the Agency's allegedly "dizzying" inconsistency. *C.f.* DTE's Legal Standards Opp. (ECF No. 127) at 8–9. DTE's real complaint is that EPA does not consider, and has never considered, the

2

regulatory exception to turn on ever-rising, industry-wide tallies of allegedly similar projects.

Indeed, DTE tried to convince EPA to agree to such a broad interpretation of routine

maintenance in 2000, and EPA rejected it, just as it had in WEPCo, and instead reiterated the

"very narrow" approach to routine maintenance set forth in the Clay Memo.  *See* DTE

Determination, Ex. 4 to U.S. Legal Standards MPSJ (ECF No. 117-17) Encl. at 8-9.  And rightly

so.  The interpretation that DTE asks this court to adopt would (1) let the regulated industry set

its own standard for compliance,[2] (2) grant grandfathered facilities indefinite immunity from

NSR on an installment plan, one retrofit at a time,[3] and (3) lead to the absurd result that the

Clean Air Act's protections would become obsolete while grandfathered plants are renovated

again and again.  *See* U.S. Routine Maintenance Opp. (ECF No. 126) at 5 & n.7.

 Further, the Company attempts to evade the D.C. Circuit's rulings in *Alabama Power* and

*New York v. EPA* ("*New York II*"), 443 F.3d 880 (D.C. Cir. 2006), that regulatory exceptions like

the one for routine maintenance are limited to *de minimis* activities.  DTE's effort falls flat.  The

D.C. Circuit held in 1979 that "the term 'modification' is nowhere limited to physical changes

exceeding a certain magnitude," and thus exceptions to the Clean Air Act's "modification"

provision that are not justified "on grounds of *de minimis* or administrative necessity . . . *cannot*

*stand*." *Alabama Power*, 636 F.2d at 400 (italics added).  When EPA later proposed to adopt a

routine maintenance interpretation to expand the exception beyond its authority to exempt *de*

*minimis* activities, the D.C. Circuit stated in no uncertain terms that "EPA for decades has

---

[2] *United States v. Duke Energy Corp.*, 2010 WL 3023517, at *7 (M.D.N.C. July 28, 2010) (to exalt industry practice over individual unit considerations would be to "allow the industry to render the [NSR] program a nullity by making its own practice the sole standard").

[3] *WEPCo*, 893 F.2d at 909 (excluding like-kind replacements from being a "physical change" for NSR purposes would "open vistas of indefinite immunity" from the Act's requirements); *Ala. Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979) (grandfathered facilities were not to receive "perpetual immunity" from NSR); *see also Ohio Edison,* 276 F. Supp. at 850.

interpreted ['any physical change'] to mean 'virtually all changes, even trivial ones, . . . generally interpret[ing] the [routine maintenance] exclusion as being limited to *de minimis* circumstances,'" and *vacated* the rule. *New York II*, 443 F.3d at 889-90 (quoting 68 Fed. Reg. 61,248, 61,272 (Oct. 27, 2003)). DTE's attempt to breathe new life into this argument by quoting the Agency's *denied*[4] petition for rehearing to the D.C. Circuit should be rejected. *See* DTE's Legal Standards Opp. (ECF No. 127) at 4.[5]

DTE also urges that EPA's guidance on the appropriate routine maintenance test such as the DTE Determination and EAB Final Order of 2000 post-date the Agency's enforcement initiative and so should be disregarded as "*potentially* self-serving" litigation positions. *See* DTE's Legal Standards Opp. (ECF No. 127) at 5-6 (quoting *United States v. Duke Energy Corp.* ("*Duke I*"), 278 F. Supp. 2d 619, 630 n.8 (M.D.N.C. 2003)) (emphasis added). The argument defies both logic and law. First, the mere fact that EPA undertook enforcement actions against violators of the NSR program over a decade ago cannot mean that the Agency is foreclosed from continuing to implement its statutory mandate or provide guidance on its nation-wide regulatory program. Based on an expansive reading of the 1992 Preamble, a few courts have erroneously concluded that EPA has been inconsistent in its application of the provisions.[6] However, those courts were confronted with projects that *predated* the allegedly inconsistent guidance, and so were faced with the potential concern for retroactive shifts in policy. *See Duke I*, 278 F. Supp. 2d at 624 (projects from 1988 to 2000); *United States v. Ala. Power Co.*, 681 F. Supp. 2d 1292,

---

[4] *See New York v. EPA*, No. 03-1380, Doc. Nos. 977881 (Ex. 3) and 977876 (Ex.4) (D.C. Cir. June 30, 2006) (denying EPA's petitions for rehearing and rehearing en banc respectively).

[5] *See also* ECF No 127 at 4 n.2 & 9 (citing EPA remarks in 2003 about the *de minimis* rationale that were subsequently contradicted by *New York II*, 443 F.3d at 888-90).

[6] *See, e.g.*, *United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/S, 2002 WL 31427523, at *9-*10 (S.D. Ind. Oct. 24, 2002) (holding the test described in the DTE Determination to be consistent with the analysis set forth prior to the NSR enforcement initiative).

1309 (N.D. Ala. 2008) (projects from 1985 to 1993). This is not the case here, where DTE's projects followed *ten years after* the guidance it argues should be ignored.

Second, as indicated by recent Supreme Court precedent, whether an agency document is "*potentially* self-serving" cannot be sufficient reason to withhold deference to the agency's interpretation outlined therein. *See Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 881-82 (2011) (applying and explaining the "controlling" weight afforded to an agency's reasonable interpretation of its own regulations under *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *see also Talk America, Inc. v. Mich. Bell Telephone Co.*, 131 S. Ct. 2254, 2263-64 (2011) (extending *Auer* deference to an agency's novel interpretation advanced in a litigation brief). EPA's DTE Determination and EAB Final Order reviewed past Agency determinations and exercised careful judgment regarding the projects *then* before it by applying the approach outlined in the *WEPCo* matter, which DTE admits applies here. *See* DTE Determination (ECF No. 117-17) at Encl. 10-11; EAB Final Order (ECF No. 117-19) at 391-411. Other than underscoring the date of their issuance (which remains a decade prior to the work at issue), DTE has provided "no reason to suspect that the interpretation[s do] not reflect the agency's fair and considered judgment on the matter[s] in question," nor any reason why the rule of deference the Supreme Court described in *Auer* should not apply here. *Chase Bank*, 131 S. Ct. at 881 (quoting *Auer*, 519 U.S. at 462).

Ultimately, the D.C. Circuit, the majority of the district courts that have considered the issue, and EPA agree that the routine maintenance exemption must be a narrow one. For its contrary position, DTE relies on a stew of vague statements by EPA that did not construe the regulatory exception at all,[7] do not have the force of law,[8] or "largely replicate[d] the ambiguity

---

[7] *See* DTE's Legal Standards Opp. (ECF No. 127) at 7-8 (describing the "Dingell inquiry"); *c.f. SIGECo*, 245 F. Supp. 2d at 1020 (holding that EPA's "statement [to Congressman Dingell] does not construe routine maintenance").

5

present in the regulatory text."[9]  *Chase Bank*, 131 S. Ct. at 882.  This Court should not be "persuaded by [DTE's] attempt to obfuscate the multi-factor analysis for the [routine maintenance] exclusion."  *United States v. Cinergy Corp.*, 495 F. Supp. 2d 909, 932 (S.D. Ind. 2007).

## II. AGGREGATION

There is no question that DTE's work on the economizer, reheater, and waterwalls at Monroe Unit 2 was done on the same boiler, at the same time, by the same work force, and for the same purpose.  *See, e.g.*, Sealed Ex. 1 to U.S. Opp. to DTE's 2002 NSR Reform MSJ (ECF No. 115-1) at 11, 14, 15; *C.f. United States v. Murphy Oil USA, Inc*, 155 F. Supp. 2d 1117, 1141 (W.D. Wis. 2001) ("In light of the evidence that the two projects were planned and implemented almost simultaneously and modified the same process unit, I will treat them as one."); 3M Maplewood Determination (ECF No. 117-20) at 4 (considering, *inter alia*, coordinated planning and execution of work, the physical proximity of the work, and whether the work effected the same stages of the production process).  DTE's designated 30(b)(6) witness indicated in an exhibit to his testimony that the same individuals "planned, managed, and supervised" each of the component replacements.  *See* (ECF No. 115-1) at 14.  Indeed, DTE's own purported routine maintenance expert indicated that the boiler components at issue had the same "failure mechanisms," *see* Declaration of Jerry Golden (ECF No. 46-10) at 16–17, and that their

---

[8] *See* DTE's Legal Standards Opp. (ECF No. 127) at 9 (citing the transcript of ABA Update re Clean Air Act (ECF No. 15-12)); *id.* at 4 (relying on EPA's *denied* petition for rehearing *en banc* in *New York II*).

[9] *Compare* DTE's Legal Standards Opp. (ECF No. 127) at 3, 9 (citing 1992 preamble language in 57 Fed. Reg. 32,314, 32,326 (July 21, 1992)) *with SIGECo*, 245 F. Supp. 2d at1019, 1021 (1992 preamble language "does not clarify much" about the routine maintenance test, nor did it mark a shift from EPA's approach in the 1988 Clay Memo which "put the regulated community on notice that how frequently projects occur in a unit's expected life cycle was a very significant factor in the routine maintenance inquiry").

replacements shared a common purpose: "to avoid future forced or maintenance outages." *Compared id.* at 60 *with id.* at 66.

Additionally, DTE's current assertion that its Monroe 2 boiler work should not be aggregated for NSR purposes cannot be squared with the Company's own representations in this case which have, time and again, asserted that boiler tubes should be treated alike no matter what component they comprise. *See*, *e.g.*, 30(b)(6) Deposition of Skiles Boyd (June 29, 2001) (Excerpted at Ex. 5) at 174-75 ("Whether it's an economizer, reheater or boiler tube walls, they're all boiler tube projects").[10] Moreover, DTE has continually treated *the very work at issue* as a single project. *See* DTE Notification Letter, Ex. 5 to U.S. Opp. to DTE NSR Reform MSJ (ECF No. 114-4) (consolidating the work when projecting post-project emissions); *see also* Letter from M. Solo (DTE) to S. Argentieri (EPA) (Ex. 1 to U.S. Opp. to DTE's Motion for a Protective Order, ECF No. 85-2) at 2 ("As set forth in DTE's March 12, 2010 planned outage notification letter to the [state] permitting authority . . . *this project* does not require a permit." (emphasis added)). DTE cannot have it both ways, insisting throughout this litigation that *this* work—indeed all boiler tube work—is all essentially the same while arguing on the other hand that the individual component work should be considered separately for NSR purposes.

## III. THE DEMAND GROWTH EXCEPTION

DTE's arguments with regard to the demand growth exception deal with numerous aspects of the Company's liability—but few of them have anything to do with the application of the demand growth exception. First, DTE restates its summary judgment argument that only

---

[10] *See also* Deposition of Leonard Ernest Kantola (June 7, 2011) (Excerpted as Ex. 6) at 203-204 ("They're just tubes. The boiler is full of tubes. In some cases, you'll replace a bunch of different tubes all over the place and in some cases, you replace a bunch of tubes in one area, and it's all tubes. . . In outages that I personally managed, we replaced reheat pendants, super heat pendants, economizers, waterwall. It's just tubes.").

actually observed emissions increases can form the basis of liability under the NSR program.
*See* DTE's Legal Standards Opp. (ECF No. 127) at14.  However, the Company makes no
attempt to explain how such *post*-project observations can form the sole basis for liability under
a statutorily mandated *pre*construction program.  *C.f.* U.S. Opp. (ECF No. 114) at 5-6.[11]

DTE also confuses the issues, arguing at length that about the requisite causal link
between the projects at issue and reasonably expected emissions increases.  *See* DTE's Legal
Standards Opp. (ECF No. 127) at 15-19.  However, the demand growth exception imposes
distinct (though related) burdens on a utility that seeks to exclude a portion of its anticipated
emissions increases from the NSR calculus.  In fact, the very court DTE cites to underscore the
causation requirement placed the burden of proving exclusions under the demand growth
exception squarely on the utility.  *See id.* at 19 (citing *United States v. Cinergy Corp.*, 2005 WL
3018688, at *3 (S.D. Ind. Nov. 9, 2005)); *United States v. Cinergy Corp.*, Final Jury Instructions,
Ex. 1 to U.S. Legal Standards MPSJ (ECF No. 117-2) at Instruction 23 ("The burden is on
Defendants to prove by a preponderance of the evidence that the demand growth exclusion
applies to an emissions increase.").

---

[11] DTE also attempts to avoid the clear implications of EPA's Columbia Generating decision
(Ex. 13 to U.S. Opp. to DTE NSR Reform MSJ (ECF. No. 114-8).  However, DTE's misleading
use of EPA's footnote in the 2002 rules entirely ignores the context of EPA's comment.  *See*
DTE's Legal Standards Opp. (ECF No. 127) at 15 n.9 (quoting 67 Fed. Reg. 80,186, 80,194
(Dec. 31, 2002).  The footnote quoted by DTE addresses the "normal operations" language as it
related to a test for calculating emissions increases at sources *other than electricity generating
units*, a test neither at issue in EPA's Columbia Generating decision, nor in this case.  *See* 67
Fed. Reg. at 80,194. The logic of EPA's decision in Columbia Generating remains fully
applicable to the instant matter, DTE's diversion notwithstanding.  Of course, this is not the only
instance that DTE has selectively omitted important context from its citation to an EPA
Preamble: DTE claimed that EPA's clarifying statement in the 1992 preamble "codified" the
Company's desired approach to the routine maintenance test even though EPA stated, in the
same paragraph, that neither the proposed nor final rule changes "deal[t] with this aspect of the
regulations."  *See* ECF No. 127 at 8 n.5; 57 Fed. Reg. at 32,326.

Further, DTE admits that utilities are required to "document their preconstruction determinations" with regard to projected, post-project emissions, *see* DTE's Legal Standards Opp. (ECF No. 127) at 15, but fails to understand is that merely *invoking* the demand growth exception in their emissions calculations is a far cry from *substantiating* it.  *C.f.* DTE "Notification Letter" (March 12, 2010), Ex. 5 to U.S. Opp. to DTE NSR Reform MSJ (ECF No. 114-4); (ECF No. 114) at 19 ("[T]he text of [DTE's] Notice Letter provided no analysis specific to the project and no explanation of *why* any emissions were excluded.").  Moreover, DTE overlooks the requirement's relationship to the demand growth exception.  DTE concedes that the Northampton Determination (ECF No. 117-21) articulated "fairly unexceptional principles relating to the 'capable of accommodating' analysis."  DTE's Legal Standards Opp. (ECF No. 127) at 16.  In Northampton, EPA stepped through the process a utility should follow when calculating its post-project emissions: after calculating its baseline and its maximum annual emissions rate in the five years following the project, a company should

> Step 3. Examine the portion of post-change emissions and determine if any of such emissions above the baseline are not related to the project.  If any of the emissions are [1] not related, and [2] the emissions unit(s) could have emitted at this level before the change if operated as projected, then those emissions may be removed from the [projected actual emissions] calculation.

Northampton Determination (ECF No. 117-21) at 4; *see also* MICH. ADMIN. CODE R. 336.2801(ll)(ii)(C) (setting forth the two-pronged demand growth exception).  Thus, the demand growth exception allows utilities to subtract some increases that are unrelated to the project from its projection of total future emissions.  A utility's entirely unsubstantiated claim that *all* projected increases are excludable—like the one DTE provided MDEQ in this case[12]—does not suffice to "document" the Company's preconstruction determination under the D.C. Circuit's

---

[12] *See* U.S. Opp. to DTE's 2002 NSR Reform MSJ (ECF No. 114) at 18-19.

decision in *New York I*, *see* U.S. Legal Standards MPSJ (ECF No. 117) at 19, nor does it pass

muster under applicable regulations. *See* 40 C.F.R. § 52.21(r)(6)(i)(c) & MICH. ADMIN. CODE R.

336.2818(3)(a)(iii) (requiring that a source explain why a certain amount was excluded under the

exception). DTE may not simply wave away the entire projected emissions increase. If the

Company wanted to rely on the demand growth exception, it needed to substantiate which

portion of the increase was unrelated to the project.

Finally, DTE objects to its own version of the United States' position on the demand

growth exception, once again mischaracterizing EPA's interpretation in order to cast it as absurd

or contrary to past comments. *See* DTE's Legal Standards Opp. (ECF No. 127) at 17. Contrary

to DTE's assertion, the United States' point is the same made by EPA in the Northampton

Determination: in addition to excluding only "unrelated" emissions increases, "a facility can only

subtract that portion of the projected actual emissions that the unit(s) could have *already*

physically and legally emitted during the baseline period." (ECF No. 117-21) at 4 (emphasis

added). If Monroe 2 could not have realistically "operated as projected" during its baseline

period, *see id.*, the portion of its post-project emissions increases that were enabled by the work

at issue cannot be excluded from its NSR assessment.

## CONCLUSION

For the foregoing reasons, this court should grant the United States motion for partial

summary judgment on the legal standards at issue in this case.

Respectfully Submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

Dated: August 10, 2011                    *s/ Elias L. Quinn*_____

10

OF COUNSEL:
SABRINA ARGENTIERI
MARK PALERMO
SUSAN PROUT
Associate Regional Counsel
U.S. EPA Region 5
Chicago, IL
77 W. Jackson Blvd.

APPLE CHAPMAN
Associate Director
Air Enforcement Division
U.S. EPA
1200 Pennsylvania Ave. NW
Washington D.C. 20460

JAMES A. LOFTON
JUSTIN A. SAVAGE
JAMES W. BEERS, JR.
THOMAS A. BENSON (MA Bar # 660308)
KRISTIN M. FURRIE
ELIAS L. QUINN (CO Bar # 42159)
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
 (202) 514-5261
thomas.benson@usdoj.gov


BARBARA McQUADE
United States Attorney
Eastern District of Michigan

ELLEN CHRISTENSEN
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226

11

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2011, the foregoing reply brief and associated exhibits were served via ECF on counsel of record, and exhibits filed under seal were served on counsel of record via email.


*s/ Elias L. Quinn*
Counsel for the United States

12