UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>and<br><br>NATURAL RESOURCES DEFENSE COUNCIL, INC. AND SIERRA CLUB,<br><br>      Intervenor-Plaintiffs,<br><br>      v.<br><br>DTE ENERGY COMPANY AND DETROIT EDISON COMPANY,<br><br>      Defendants. | Civil Action No.<br>2:10-cv-13101-BAF-RSW<br><br>Judge Bernard A. Friedman<br><br>Magistrate Judge R. Steven Whalen |

**DEFENDANTS' REPLY IN RESPONSE TO
INTERVENOR-PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO ESTABLISH CORRECT LEGAL STANDARD ON THE ISSUE
OF "ROUTINE MAINTENANCE, REPAIR AND REPLACEMENT" ("RMRR")**

The arguments in Intervenor-Plaintiffs' opposition to Detroit Edison's RMRR Motion (Doc. No. 125) are not materially different from those rejected by the majority of courts. Those courts have found that the Government's litigation position conflicts with EPA's established interpretation, which judges RMRR by reference to "whether that type of equipment has been repaired or replaced by *sources within the relevant industrial category*." 57 Fed. Reg. 32,314, 32,326 (July 21, 1992) (emphasis added). Like the Government, Intervenor-Plaintiffs ignore the plain language of this official statement—as well as decades of other EPA statements and conduct—and instead primarily rely upon the Seventh Circuit's decision in *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990), and two decisions from the D.C. Circuit to support the argument that RMRR *must* be construed narrowly to cover only "*de minimis*" activities. Doc. No. 125 at 3-6. Detroit Edison has explained the error of these arguments at length, and will not repeat that explanation here. *See, e.g.*, Doc. Nos. 116 and 127. Rather, Detroit Edison submits this reply to respond to Intervenor-Plaintiffs' arguments that (1) Congress intended that all exiting units would eventually trigger New Source Review ("NSR"), and thus Monroe Unit 2's alleged "initial reprieve" from NSR has now expired; and (2) Detroit Edison improperly relies upon *Nat'l Parks Conservation Ass'n, Inc. v. TVA*, No. 3:01-CV-71, 2010 WL 1291335 (E.D. Tenn. Mar. 31, 2010) ("*NPCA v. TVA*") in light of a settlement that was reached in that case. Intervenor-Plaintiffs are mistaken on both counts.

## ARGUMENT

**I.  CONGRESS DID NOT INTEND TO SUBJECT EVERY EXISTING MAJOR SOURCE TO NSR PERMITTING REQUIREMENTS.**

Intervenor-Plaintiffs' claim that Congress intended that "all plants would eventually be subject to NSR" ignores the law, as well as the history and purpose of NSR. Doc. No. 125 at 2-3. As EPA has explained, NSR is not intended as a driver for decreasing emissions from existing sources. 70 Fed. Reg. 61,081, 61,088 (Oct. 20, 2005) ("[T]he primary purpose of the major NSR

1

program is *not* to reduce emissions, but to balance the need for environmental protection and economic growth. *That is, the goal of major NSR is to minimize emissions increases from new source growth.*") (emphasis added). Rather, substantial emission reductions have been and will continue to be achieved by subjecting existing sources (like Detroit Edison's sources) to a host of other *non-NSR* Clean Air Act ("CAA") programs. These include state implementation plans that are specifically designed to meet or exceed federal air quality standards, 42 U.S.C. § 7410; visibility protection programs, *id*. §§ 7491-92; and the Title IV Acid Rain Program, *id*. §§ 7651-7651*o*—all of which are more efficient at reducing emissions and improving air quality than NSR. *See* 70 Fed. Reg. at 61,083 ("the substantial emissions reductions from other CAA requirements that are more efficient than major NSR"). These are the programs that effectively control emissions from existing sources, yet Intervenor-Plaintiffs (and the Government) act as if they do not exist.

The circumstances surrounding Congress' adoption of just one of these non-NSR programs—the Acid Rain Program—confirms that Congress never envisioned NSR as a driver for the kind of significant emissions reductions Intervenor-Plaintiffs say it must produce. The Acid Rain Program was added to the CAA in 1990, more than a decade after Congress passed NSR in 1977. Pub. L. No. 101-549, 104 Stat. 2399, 2584 (1990) (codified at 42 U.S.C. §§ 7651-7651*o*). Congress established in the statute new emissions limits reflecting a fundamental premise that NSR could not be expected to achieve the desired emissions reductions from existing sources. *Id*. In fact, EPA told Congress that new legislation was needed to deal with existing sources:

> Some have suggested that the existing law is adequate to deal with interstate pollution. The most persuasive argument that it is not, is the EPA's own analysis of the options available under existing law.

S. REP. NO. 101-228, at 289-90 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3672-73. Following EPA's advice, Congress enacted Title IV to require electric utility industry-wide emissions

2

reductions—$SO_2$ emissions by 10 million tons per year and $NO_x$ emissions by 2 million tons per year from 1980 levels.  42 U.S.C. § 7651(b).

Remarkably, the Acid Rain Program is the antithesis of the program that would exist if the Intervenor-Plaintiffs were correct in their contention that Congress intended that "all plants would eventually be subject to NSR."  The program imagined by Plaintiff-Intervenors is the ultimate "command-and-control" program—one under which *all* power plant units would have long ago installed extremely costly control equipment, such as scrubbers for $SO_2$ control and selective catalytic reduction for $NO_x$ control, regardless of air quality needs and regardless of cost-effectiveness.  The Acid Rain Program, by contrast, is a *market-based* program, under which Congress established industry-wide reduction goals to achieve air quality goals but left it to the industry to achieve those reductions in the most cost-effective way possible through the use of emissions "allowances."  Under that program, utilities installed expensive controls where it was most cost-effective to install such controls, and otherwise used the market-based allowance trading system to achieve the required industry-wide reductions.  *See, e.g.,* Byron Swift, *Emission Trading and Hot Spots: A Review of the Major Programs,* Daily Env't Rep. (BNA) No. 89 (May 10, 2004), at 3 ("The cap-and-trade approach [of the Acid Rain Program] fundamentally changes the regulatory system away from traditional end-of-pipe rate-based standards and into an overall performance system.  These programs have been shown to reduce the costs of compliance to half or less of the cost of traditional rate-based standards.")  (footnote and citations omitted) (excerpt attached as Ex. 1).  As EPA has touted, the Acid Rain Program was an "innovative, market-based control program" that "air pollution control experts from a wide range of perspectives agree … is one of the most successful environmental programs in U.S. history."  U.S. EPA, ACID RAIN PROGRAM 2004 PROGRESS REPORT: 10 YEARS OF ACHIEVEMENT, at 2 (Oct. 2005) (available at http://epa.gov/airmarkets/progress/docs/2004report.pdf.).

In short, Title IV and other non-NSR programs are working, and neither the Government nor Intervenor-Plaintiffs allege that Detroit Edison has violated any of them.  *See, e.g.*, Doc. No. 46-4 ¶¶ 7-9 (discussing substantial emissions reductions at Monroe and billions of dollars of installed and planned pollution control equipment at the plant).  Rather, under their (and the Government's) current view of NSR, *every* existing unit should have shut down or installed new emissions controls long ago, regardless of whether such controls are even needed to meet or maintain EPA-established air quality standards.  *See, e.g.,* Doc. No. 114 at 1 ("Defendants seek a free pass from the New Source Review program."); Hr'g Tr. (Jan. 19, 2011) at 9:12-14 ("Detroit Edison is asking for a four-year holiday from … New Source Review").  This is not compatible with the policy decisions Congress made for controlling utility industry emissions.  *See, e.g.*, 68 Fed. Reg. 61,248, 61,269, 61,273 (Oct. 27, 2003) ("[N]othing in the legislative history of the 1977 Amendments, which created the NSR program, …suggest[s] that Congress intended to force all then-existing sources to go through NSR.").  Nor is it compatible with the position EPA recently expressed outside of the litigation context:

> An existing source—whether grandfathered or not—triggers NSR only if it makes a physical or operational change that results in an emissions increase.  Thus, a facility can conceivably continue to operate indefinitely without triggering NSR—making as many physical or operational changes as it desires—*as long as the changes do not result in emissions increases.*

68 Fed. Reg. at 61,273 (emphasis added).  Plaintiff-Intevenors' argument should be rejected because—as EPA put it—an interpretation under which "all major facilities eventually trigger NSR … cannot be squared with the plain language of the CAA." *Id.*

## II. TVA'S GLOBAL SETTLEMENT DOES NOT AFFECT THE VALIDITY OF THE DISTRICT COURT'S ORDER DISMISSING THE NSR CASE AGAINST IT.

Intervenor-Plaintiffs also claim that Detroit Edison's reliance on *Nat'l Parks Conservation Ass'n, Inc. v. TVA*, No. 3:01-CV-71, 2010 WL 1291335 (E.D. Tenn. Mar. 31, 2010), as sup-

4

port for the majority view on RMRR is "especially spurious" in light of a settlement that was reached after they and another plaintiff lost the case at the district court and appealed it to the Sixth Circuit. Doc. No. 125 at 9 n.6. Not so.[1] The decision in *NPCA v. TVA* has not been vacated, and the subsequent settlement does nothing to undercut the validity or reasoning of that order, which found after a bench trial that the replacement of tube components (there, an economizer and a superheater) qualified as RMRR. *See Matter of Mem'l Hosp. of Iowa Cnty., Inc.*, 862 F.2d 1299, 1300 (7th Cir. 1988) ("[A]n opinion is a public act of the government, which may not be expunged by private agreement. History cannot be rewritten. There is no common law writ of erasure."); *McIntyre v. Aetna Life Ins. Co.*, No. 3:08-cv-00029, 2009 U.S. Dist. LEXIS 36163, *8 (W.D. Va. Apr. 29, 2009) ("The settlement the parties have reached in this matter does not change the factual allegations that were presented to the Court or the legal reasoning and analysis supporting the opinions and orders ….").

## CONCLUSION

Detroit Edison's RMRR Motion (Doc. No. 116) should be granted.

Respectfully submitted, this 10th day of August 2011.

> By: /s/ F. William Brownell
> F. William Brownell (bbrownell@hunton.com)
> Hunton & Williams LLP | 2200 Pennsylvania Ave., N.W.
> Washington, D.C. 20037-1701 | (202) 955-1500

---

[1] What is spurious is Intervenor-Plaintiffs' claim that the TVA settlement somehow undercuts the court's decision, and the apparent suggestion that the Eastern District of Tennessee case that they had lost in the district court somehow played a substantial role in the TVA settlement. *NCPA v. TVA* involved one unit at one plant—the Bull Run power plant in Tennessee. TVA chose to enter into a "global" settlement—one that covers TVA's *entire system*, 59 units at 11 power plants—with EPA, the States of Alabama, Kentucky, North Carolina, Tennessee, as well as the environmental groups that brought the unsuccessful *NCPA v. TVA* case. Jumping to the conclusion that the TVA global settlement undercuts a district court's reasoned opinion in *NCPA v. TVA* is not warranted.

5

| | |
|---|---|
| Matthew J. Lund (P48632)<br>Pepper Hamilton LLP<br>100 Renaissance Center, 36th Floor<br>Detroit, Michigan 48243<br>lundm@pepperlaw.com<br>(313) 393-7370<br><br>Michael J. Solo (P57092)<br>Office of the General Counsel<br>DTE Energy, One Energy Plaza<br>Detroit, Michigan<br>solom@dteenergy.com<br>(313) 235-9512 | F. William Brownell<br>Mark B. Bierbower<br>Makram B. Jaber<br>Hunton & Williams LLP<br>2200 Pennsylvania Ave., N.W.<br>Washington, D.C. 20037-1701<br>bbrownell@hunton.com<br>mbierbower@hunton.com<br>mjaber@hunton.com<br>(202) 955-1500<br><br>Brent A. Rosser<br>Hunton & Williams LLP<br>Bank of America Plaza, Suite 3500<br>101 South Tryon Street<br>Charlotte, North Carolina 28280<br>brosser@hunton.com<br>(704) 378-4700<br><br>Harry M. Johnson, III<br>George P. Sibley, III<br>Hunton & Williams LLP<br>951 E. Byrd Street<br>Richmond, Virginia 23219<br>pjohnson@hunton.com<br>gsibley@hunton.com<br>(804) 788-8200<br><br>*Counsel for Defendants* |

6

## CERTIFICATE OF SERVICE

 I hereby certify that on August 10, 2011, the foregoing **DEFENDANTS' REPLY IN RESPONSE TO INTERVENOR-PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO ESTABLISH CORRECT LEGAL STANDARD ON THE ISSUE OF "ROUTINE MAINTENANCE, REPAIR AND REPLACEMENT" ("RMRR")** was served electronically only on the following attorneys of record in accordance with an agreement reached among the parties:

 Ellen E. Christensen
 U.S. Attorney's Office
 211 W. Fort Street
 Suite 2001
 Detroit, MI  48226
 313-226-9100
 Email:  ellen.christensen@usdoj.gov

 James A. Lofton
 Thomas Benson
 Justin A. Savage
 Kristin M. Furrie
 James Beers, Jr.
 Elias Quinn
 U.S. Department of Justice
 Environmental and Natural Resource Div.
 Ben Franklin Station
 P.O. Box 7611
 Washington, DC  20044
 202-514-5261
 Email:  thomas.benson@usdoj.gov
  justin.savage@usdoj.gov
  kristin.furrie@usdoj.gov
  jim.lofton@usdoj.gov
  james.beers@usdoj.gov
  elias.quinn@usdoj.gov

 Holly Bressett
 Sierra Club Environmental Law Program
 85 Second St., 2nd Floor
 San Francisco, CA  94105
 Phone: (415) 977-5646
 Email:  Holly.Bressett@sierraclub.org

        /s/ F. William Brownell