UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DISTRICT

UNITED STATES OF AMERICA,

  Plaintiff,

and

NATURAL RESOURCES DEFENSE
COUNCIL, INC. AND SIERRA CLUB

  Intervenor-Plaintiffs,

  v.

DTE ENERGY COMPANY and
DETROIT EDISON COMPANY,

  Defendants.
_____/

Civil Action No. 10-13101

HON. BERNARD A. FRIEDMAN

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**I.**  **Introduction**

This matter is before the Court on Defendants' motion for summary judgment. Plaintiff filed a response, and Defendants filed a reply. Pursuant to E.D. Mich. L.R. 7.1(f)(2), the Court will decide this motion without oral argument.

Plaintiff United States of America ("Plaintiff" or "Government") commenced this action pursuant to Sections 113(b) and 167 of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7413(b) and 7477. The complaint alleges that Defendants Detroit Edison Company and DTE Energy Company (collectively, "Detroit Edison" or "Defendants") have violated the CAA and the State

1

Implementation Plan adopted by the State of Michigan and approved by the Environmental Protection Agency ("EPA").[1]  The pivotal issue in this case is whether Defendants violated the CAA by renovating electric utility steam generating units ("units") at their Monroe, Michigan power plant without first obtaining a New Source Review ("NSR") permit from the Michigan Department of Environmental Quality.[2]  Plaintiff contends that such a permit was required because the renovations constituted a "major modification" of the subject units.  Defendants contend that no such permit was required, and that they are therefore entitled to summary judgment because they abided by their statutory and regulatory obligations.  For the reasons discussed below, the Court shall grant Defendants' motion.

II.     **Standard of Review**

Summary judgment is proper where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. In considering a motion for summary judgment, the Court will construe all facts in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). There are no genuine issues of material fact when "the record taken as a whole could not lead a rational trier of fact to

---

[1] Pursuant to Section 109 of the CAA, 42 U.S.C. § 7409, the EPA must establish national ambient air quality standards that specify the maximum permissible concentration of air pollutants in different areas of the country.  Section 110 of the CAA, 42 U.S.C. § 7410, requires states to meet the EPA's national ambient air quality standards by developing State Implementation Plans, which impose regulatory requirements on individual sources of air pollution, including electric power generating plants.  The State Implementation Plans are subject to EPA approval, and once approved, they are federally enforceable.  *See* 42 U.S.C. § 7413(a), (b).  Michigan has incorporated the federal standards into its State Implementation Plan. *See* Mich. Admin. Code R. 336.2801, *et seq.*

[2] Such renovations are referred to as "projects" throughout the relevant statutes and regulations.  "Pre-construction" work is work done in preparation for the projects at issue.

find for the nonmoving party." Id. If the movant carries its burden of showing an absence of evidence to support a claim, then the nonmovant must demonstrate by affidavits, depositions, answers to interrogatories, and admissions that a genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 324-325 (1986).

### III. The Clean Air Act and New Source Review

Defendants own and/or operate several power plants, including a plant in Monroe, Michigan. The Monroe power plant includes four units. It is a "major emitting facility" under the CAA, 42 U.S.C. § 7479(1), and a "major emitting source" under the CAA and Michigan's State Implementation Plan. As such, the CAA and Michigan's State Implementation Plan regulate most projects undertaken at the Monroe power plant, including the projects at issue in this case.

The CAA was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1); Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth., 480 F.3d 410, 412 (6th Cir. 2007). Section 165 of the CAA states that no unit, or major emitting facility, may be constructed unless, among other requirements, the owner or operator obtains a permit prior to construction. *See* 42 U.S.C. § 7475.

In 1977 Congress amended the CAA and added requirements pertaining to the construction and/or modification of power "sources,"[3] including units such as those at

---

[3] A "source" is any building, structure, facility, or installation which emits or may emit a regulated new source review pollutant. Mich. Admin. Code R. 336.2801(ss). The parties agree that the Monroe units at issue are "sources," as defined at Mich. Admin. Code R. 336.2901(t).

3

Defendants' Monroe power plant. Congress "grandfathered" existing sources, so that they have to comply with the requirements only when "major modifications" to the sources are contemplated. The new rules, known as New Source Review, require an owner or operator of a source ("source operator") to, among other things, obtain a construction permit and install appropriate pollution controls prior to commencing construction of a major modification to a power source.

Whether the NSR rules apply depends on whether the project in question constitutes a "major modification." A major modification is defined as a physical change at a major stationary source or a change in the method of operation that results in a significant net emissions increase.[4]  42 U.S.C. §§ 7470-7492; Mich. Admin. Code R. 336.2801-336.2830. The 2002 NSR rules, as adopted by the EPA in 2002 and incorporated into the Michigan State Implementation Plan, state that a project is a major modification for a regulated pollutant "if it causes both . . . [a] significant emissions increase [and] [a] significant net emissions increase." 40 C.F.R. § 52.21(a)(2)(iv); Mich. Admin. Code R. 336.2802(4)(a). A project "is not a major modification if it does not cause a significant emissions increase." Id.

A utility company contemplating a major modification, and thus bringing the project within NSR governance, must obtain a permit before beginning construction. *See* 40 C.F.R. § 52.21(a)(2)(iii); Mich. Admin. Code R. 336.2802(3). If a project constitutes a major modification, a source operator is required to obtain a permit, install pollution controls, and meet other requirements before beginning the work. *See, e.g.*, 42 U.S.C. §§ 7475(a), 7503(a).

---

[4]Mich. Admin. Code R. 336.2801(ee) provides the standard for calculating whether a "net emissions increase" has occurred.

Accordingly, NSR applicability must be determined before a source operator begins work so that a permit, if needed, may be obtained. *See* United States v. Ohio Edison Co., 276 F. Supp. 2d 829, 881 (S.D. Ohio 2003).

As a result of the 2002 NSR changes, if a source operator determines that its project does not constitute a major modification, it may commence its project without an NSR permit subject to certain post-project emissions monitoring requirements. *See* Mich. Admin. Code R. 336.2902. Source operators that anticipate post-project emissions, but do not anticipate that their project will constitute a major modification, must submit a copy of their projections to the appropriate reviewing authority, which in this matter is the Michigan Department of Environmental Quality. *See* Mich. Admin. Code R. 336.2818. Once the source operator submits such projections, it need not obtain an NSR permit before beginning construction. *See* Mich. Admin. Code R. 336.2902(6)(b).

After the project is completed, the source operator must monitor the emissions that could increase as a result of the project. The source operator must also maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of five years. *See* Mich. Admin. Code R. 336.2902(6)(c).

The source operator's post-project data allows the Michigan Department of Environmental Quality to determine whether a major modification has taken place. "Regardless of any . . . preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase." 40 C.F.R. § 52.21(a)(2)(iv)(b); Mich. Admin. Code R. 336.2802(4)(b). If the post-project data show an emissions increase resulting from the project, then the project is considered to have been a major modification, and

the regulating authorities may pursue a post-project enforcement action. *See* Mich. Admin. Code R. 336.2802(4).

As the EPA has explained, post-project monitoring "provide[s] a reasonable means of determining whether a significant increase . . . resulting from a proposed change . . . occurs within 5 years following the change." 57 Fed. Reg. At 32,325. If the Michigan Department of Environmental Quality "determines that the source's emissions have in fact increased significantly over baseline levels as a result of the change, the source would become subject to NSR requirements at that time," including the requirement of a post-project permit and a possible enforcement action. Id.

Pursuant to the 2002 NSR rules, source operators must abide by specific pre- and post-project obligations, referred to in the energy industry as "source obligations," that prescribe a procedure for complying with the above-described NSR program. A source operator's first "source obligation" regards situations in which there is a reasonable possibility that a project that is not part of a major modification may still result in a significant emissions increase of a regulated pollutant, and the source operator elects to use the method specified in Mich. Admin. Code R. 336.2801(ll)[5] for calculating projected actual emissions. In such a case, the source

---

[5] In determining the projected actual emissions pursuant to Mich. Admin. Code R. 336.2801(ll), before beginning actual construction, the source operator must (a) consider historical operational data including business projections; (b) include emissions, including fugitive emissions and emissions associated with startups, shutdowns and malfunctions; and (c) exclude emissions that are unrelated to the project, that could have been accommodated during the period used to establish baseline actual emissions, and that are due to product demand growth.

operator must gather specifically required information.[6] The source operator must then provide notice of its projection to the regulating authority, which in this matter is the Michigan Department of Environmental Quality. *See* Id. Following such notice, the operator need not wait for additional authorization from the Michigan Department of Environmental Quality, and may commence construction without an NSR permit in full compliance with the CAA. *See* Mich. Admin. Code R. 336.2818(3)(b).

The second "source obligation" is a post-project matter. When construction of the project is completed and regular plant operations resume, the source operator must monitor the emissions of any regulated pollutant that could increase as a result of the project for five to ten years.[7] *See* Mich. Admin. Code R. 336.2818(3). For the type of units at issue in the instant matter, the source operator must submit a report to the Michigan Department of Environmental Quality within 60 days after the end of each calendar year following the project's completion, setting out each unit's annual emissions during the previous calendar year. *See* Mich. Admin. Code R. 336.2818(3). If the emissions increase, then the project is evaluated to see if a "major modification" and possible NSR violation has occurred. *See* Mich. Admin. Code R. 336.2818(3).

---

[6]Such information includes (1) a description of the project; (2) identification of the emissions unit or units whose emissions of a regulated new major source review pollutant may be affected by the project; and (3) a description of the applicability test used to determine that the project is not a major modification for any regulated new source review pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded, an explanation for why such amount was excluded, and any netting calculations, if applicable. Mich. Admin. Code R. 336.2818(3).

[7]The operator must measure the annual emissions for five years following resumption of regular operations after the change, or for ten years following resumption of regular operations after the change if the project increases the design capacity or potential to emit the regulated pollutant(s). Mich. Admin. Code R. 336.2818(3).

**IV.    Facts**

In March 2010, Defendants halted operations at some of their Monroe, Michigan power plant units to perform work that Defendants contend was maintenance work. On March 12, 2010, Defendants mailed a "pre-project notification" letter, also referred to as a "Notice Letter," to the Michigan Department of Environmental Quality, informing the agency of the projects at issue. The Notice Letter predicted an annual post-project emissions increase, but asserted that the emissions increase was unrelated to the projects. The Michigan Department of Environmental Quality did not question Defendants' notification.

The power-plant outages necessary to commence the projects began at 1:30 a.m. on March 13, 2010. The projects concluded on June 20, 2010, and the affected units resumed regular operations later that summer.

Following completion of the projects, Defendants began ongoing post-construction emissions monitoring.

**V.    Analysis**

Plaintiff argues that NSR is meant to serve as a pre-construction review program. Plaintiff contends that Defendants were required to obtain a permit from the Michigan Department of Environmental Quality prior to construction, because their projects constituted a major modification to the units at issue. In addition, Plaintiff argues that Defendants' Notice Letter was untimely and that its content was insufficient.

Defendants acknowledge that they did not obtain a pre-construction permit. They argue that they were not required to do so because they satisfied their obligations by projecting their post-construction emissions, determining that those projections did not indicate a major

8

modification, reporting these projections to the Michigan Department of Environmental Quality through the submission of a "Notice Letter," and monitoring their emissions post-project. Defendants further argue that so long as certain pre-project requirements are met, NSR is triggered only if the project in question *causes* an emissions increase, which then demonstrates that the project is *per se* a "major modification." They acknowledge that based on emissions measurements which they have been taking since the project was completed, their project may eventually prove to be a "major modification." That determination, however, cannot be made until the completion of the first year for which such measurements are required. For this reason, Defendants argue that Plaintiff's only remedy, i.e. a post-construction enforcement action, is premature.

      The Court agrees with Defendants' analysis. While Plaintiff focuses largely on the text of the CAA, Plaintiff does not recognize the function of the 2002 NSR rules and Michigan's State Implementation Plan, which lessens the pre-construction burden on existing facilities so long as certain requirements are met. The 2002 NSR rules provide source operators such as Defendants with the option of either getting a permit before commencing their projects, or measuring their emissions afterward and running the risk of the Government bringing an enforcement action.

      These rules, while still following the directives and intent of the CAA, provide source operators with greater flexibility by giving them a post-construction opportunity to fulfill their obligations under the CAA. They allow source operators to pursue necessary maintenance work without the expensive, burdensome and potentially unnecessary permitting requirements, while ensuring that Plaintiff will maintain its opportunity to pursue an enforcement action if post-construction monitoring detects an increase in emissions of regulated pollutants that are a result

of such projects.

At the time of filing of this complaint, less than one year post-project, a determination of whether the projects at issue constitute a major modification is premature. "If [Defendant is] subsequently determined not to have . . . properly project[ed] emissions . . . [it] will be subject to any applicable enforcement provisions." 67 Fed. Reg. at 80,190.  Plaintiff may pursue NSR enforcement if and when post-construction monitoring shows a need to do so.  Therefore, the Court finds that the instant action is premature, and that summary judgment for Defendants is appropriate.

Further, the Court rejects Plaintiff's argument that Defendants' Notice Letter was untimely.  The Court notes that Defendants' notice was sent to the Michigan Department of Environmental Quality the day before construction on the project commenced.  While the Court finds such timing to be minimally sufficient, Plaintiff cites no authority suggesting that notice must be given further in advance of the project's commencement date.  As the Michigan rules have no requirement regarding how far in advance notice must be submitted, and Defendants were not required to obtain any determination from the Michigan Department of Environmental Quality before beginning construction, Defendants' notice was timely.

As to Plaintiff's argument that the language in Defendants' Notice Letter contains boilerplate language from prior outage notifications at other power plants, the Court looks to Michigan's State Implementation Plan for direction.  As detailed above, Michigan's State Implementation Plan requires a pre-construction Notice Letter to include (1) a description of the project; (2) identification of the emissions unit or units whose emissions of a regulated new major source review pollutant may be affected by the project; and (3) a description of the test used to

determine that the project is not a major modification, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded, and an explanation for why such amount was excluded, and any netting calculations, if applicable.  *See* Mich. Admin. Code. R. 336.2818(3).

Plaintiff argues that the text of the Notice Letter provides no analysis specific to the project and no explanation of why any emissions were excluded.  Plaintiff contends that while under the rules Defendants may exclude a portion of the projected emissions increase from the calculation, Mich. Admin. Code R. 336.2801(ll), it must then provide the "reason for excluding that amount."  *See* Mich. Admin. Code R. 336.2818(3)(a)(iii).  Plaintiff argues that while Defendants projected a large emissions increase, they failed to provide any explanation of their basis for excluding emissions in their final calculation.

In response, Defendants assert that the Michigan Department of Environmental Quality, the appropriate reviewing authority for these sorts of projects, *see* Mich. Admin. Code R. 336.2818, did not question Defendants' notification, either upon submission or since that time. Accordingly, Defendants argue, they have not violated any requirement of the CAA, and this enforcement action should be dismissed.  Further, Defendants argue that their Notice Letter contained all of the required information, as it described the projects; identified the emissions unit that would be affected by the projects; provided their calculations of baseline and actual emissions, projected annual emissions and the amount of any increase in emissions over baseline levels that could be excluded as unrelated to the projects; and explained why Detroit Edison was excluding emissions based on market demand and other factors unrelated to the project. Defendants' letter stated that "[a]s required under the new rules we then excluded from the . . .

11

projections '. . . that portion of the unit's emissions following the project that an existing unit could have accommodated . . . and that are also unrelated to the particular project,' including increases due to demand and market conditions or fuel quality." D.E. 107 Exh. 2.  In addition, Defendants' Notice Letter provided a table with all relevant calculations.

While the explanation of the emissions exclusion in the Notice Letter is not very specific, and the accompanying table shows the results of the calculations without their back-up data, Plaintiff does not point to any provision in Michigan's rules requiring specificity beyond that which was provided, and the Court has not found such provision on its own accord.  Further, Plaintiff did not allege any insufficiency of the Notice Letter in its Notice of Violation.  As the Court ruled in its Order Granting Defendants' Motion for Protective Order, Plaintiff is barred from pursuing claims not specified in its Notice of Violation.  D.E. 104.

**VI.  Order**

Accordingly,

IT IS ORDERED that Defendants' motion for summary judgment is GRANTED.



Date:  August 23, 2011

S/Bernard A. Friedman_____
BERNARD A. FRIEDMAN
UNITED STATES DISTRICT JUDGE