**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

UNITED STATES OF AMERICA,

      Plaintiff,

and

NATURAL RESOURCES DEFENSE
COUNCIL, INC. AND SIERRA CLUB,

      Intervenor-Plaintiffs,

      v.

DTE ENERGY COMPANY AND
DETROIT EDISON COMPANY,

      Defendants.

Civil Action No.
2:10-cv-13101-BAF-RSW

Judge Bernard A. Friedman

Magistrate Judge R. Steven Whalen

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**BASED ON COMPLIANCE WITH PRE-CONSTRUCTION**
**PROJECTION REQUIREMENTS**

Pursuant to Fed. R. Civ. P. 56, Defendants DTE Energy Company and Detroit Edison Company, by counsel, hereby move for summary judgment. For the reasons set forth in the accompanying memorandum of law, Defendants are entitled to judgment as a matter of law as to each of EPA's claims in this action.

In accordance with Local Rule 7.1(a)(2), counsel for Defendants conferred with counsel for EPA, and explained the nature of this motion and its legal basis. EPA did not concur in the relief sought.

Respectfully submitted this 22nd day of May 2013.

By: /s/ F. William Brownell

-1-

Matthew J. Lund (P48632)
Pepper Hamilton LLP
100 Renaissance Center, 36th Floor
Detroit, Michigan 48243
lundm@pepperlaw.com
(313) 393-7370

Michael J. Solo (P57092)
Office of the General Counsel
DTE Energy, One Energy Plaza
Detroit, Michigan 48226
solom@dteenergy.com
(313) 235-9512

F. William Brownell
Mark B. Bierbower
Makram B. Jaber
Hunton & Williams LLP
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
bbrownell@hunton.com
mbierbower@hunton.com
mjaber@hunton.com
(202) 955-1500

Brent A. Rosser
Hunton & Williams LLP
Bank of America Plaza,Suite 3500
101 South Tryon Street
Charlotte, North Carolina 28280
brosser@hunton.com
(704) 378-4700

Harry M. Johnson, III
George P. Sibley, III
Hunton & Williams LLP
951 E. Byrd Street
Richmond, Virginia 23219
pjohnson@hunton.com
gsibley@hunton.com
(804) 788-8200

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 22, 2013, the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON COMPLIANCE WITH PRE-CONSTRUCTION PROJECTION REQUIREMENTS** was served electronically only on the following attorneys of record in accordance with an agreement reached among the parties:

Ellen E. Christensen
U.S. Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, MI 48226
313-226-9100
Email: ellen.christensen@usdoj.gov

James A. Lofton
Thomas Benson
Justin A. Savage
Kristin M. Furrie
James W. Beers, Jr.
Elias L. Quinn
U.S. Department of Justice
Environmental and Natural Resource Div.
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044
202-514-5261
Email: thomas.benson@usdoj.gov
        justin.savage@usdoj.gov
        kristin.furrie@usdoj.gov
        jim.lofton@usdoj.gov
        james.beers@usdoj.gov
        elias.quinn@usdoj.gov

Holly Bressett
Sierra Club Environmental Law Program
85 Second St., 2nd Floor
San Francisco, CA 94105
Phone: (415) 977-5646
Email: Holly.Bressett@sierraclub.org

/s/ F. William Brownell

-3-

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| and | Civil Action No. |
| NATURAL RESOURCES DEFENSE COUNCIL, INC. AND SIERRA CLUB, | 2:10-cv-13101-BAF-RSW |
| Intervenor-Plaintiffs, | Judge Bernard A. Friedman |
| v. | Magistrate Judge R. Steven Whalen |
| DTE ENERGY COMPANY AND DETROIT EDISON COMPANY, | |
| Defendants. | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BASED ON COMPLIANCE WITH PRE-CONSTRUCTION PROJECTION REQUIREMENTS

## *ORAL ARGUMENT REQUESTED*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

STATEMENT OF ISSUE PRESENTED ................................................................. v

CONTROLLING OR OTHER APPROPRIATE AUTHORITY ............................... vi

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ...................................... vii

PRELIMINARY STATEMENT ...............................................................................1

LEGAL BACKGROUND ........................................................................................2

I.    The 2002 NSR Reform Rules Create a Project-and-Report System, Not a Prior Approval System..............................................................................................2

    A.    "Baseline Actual Emissions" ...........................................................3

    B.    "Projected Actual Emissions"...........................................................4

    C.    Comparison of "Baseline Actual Emissions" and "Projected Actual Emissions" .....................................................................................5

II.   The 2002 NSR Reform Rules Measure the Validity of the Source's Preconstruction Projection Through Postconstruction Emissions Data.............7

STATEMENT OF THE CASE..................................................................................8

I.    Procedural History ...........................................................................................8

    A.    The Government's Notice of Violation and Subsequent Enforcement Action ............................................................................................8

    B.    The Court Grants Detroit Edison's Motion for Summary Judgment......................8

    C.    The Sixth Circuit Decision................................................................9

        1.    The Sixth Circuit Endorsed Key Premises of This Court's 2011 Decision. ...........................................................................9

        2.    The Sixth Circuit Carves Out a Narrow Category of Claims to Ensure That the System Works.............................................12

II.   Statement of Undisputed Material Facts.........................................................13

ARGUMENT ..........................................................................................................16

CONCLUSION........................................................................................................19

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, No. 3:01-CV-71, 2010 WL 1291335 (E.D. Tenn. Mar. 31, 2010)..................................................................13

*United States v. DTE Energy Co.*, No. 11-2328, (6th Cir. Mar. 28, 2013)............1, 2, 3, 5, 6, 7, 8, ..............................................................................................10, 11, 12, 13, 16, 18

### FEDERAL STATUTE

42 U.S.C. § 7413(b) ...........................................................................................17

### FEDERAL REGULATIONS

40 C.F.R. § 19.4 ................................................................................................17

40 C.F.R. § 52.21(a)(2)(iii) ..................................................................................6

40 C.F.R. § 52.21(a)(2)(iv)(*a*) .............................................................................7

40 C.F.R. § 52.21(a)(2)(iv)(*b*) .............................................................................7

40 C.F.R. § 52.21(a)(2)(iv)(*c*) .......................................................................3, 17

40 C.F.R. § 52.21(b)(2)(iii)(*a*) ..........................................................................13

40 C.F.R. § 52.21(b)(20) ......................................................................................4

40 C.F.R. § 52.21(b)(23) ......................................................................................5

40 C.F.R. § 52.21(b)(41) ......................................................................................3

40 C.F.R. § 52.21(b)(41)(i) ...........................................................................4, 5, 16

40 C.F.R. § 52.21(b)(41)(ii)(*a*) .....................................................................5, 17

40 C.F.R. § 52.21(b)(41)(ii)(*b*) .....................................................................5, 17

40 C.F.R. § 52.21(b)(41)(ii)(*c*) .....................................................................5, 17

40 C.F.R. § 52.21(b)(48)(i) ............................................................................3, 16

40 C.F.R. § 52.21(b)(48)(i)(*a*) ......................................................................4, 16

40 C.F.R. § 52.21(b)(48)(i)(*b*) ........................................................................4, 16

40 C.F.R. § 52.21(b)(48)(i)(*c*) ..............................................................................3

40 C.F.R. § 52.21(b)(48)(i)(*d*) .......................................................................4, 16

40 C.F.R. § 52.21(r)(6) ........................................................................................17

40 C.F.R. § 52.21(r)(6)(i)(*a*) ................................................................................6

40 C.F.R. § 52.21(r)(6)(i)(*b*) ................................................................................6

40 C.F.R. § 52.21(r)(6)(i)(*c*) ................................................................................6

40 C.F.R. § 52.21(r)(6)(ii) ......................................................................................6

40 C.F.R. § 52.21(r)(6)(iii) .....................................................................................7

40 C.F.R. § 52.21(r)(6)(iv) .....................................................................................7

40 C.F.R. § 52.21(r)(6)(vi)(*a*) .......................................................................6, 16

40 C.F.R. § 52.21(r)(6)(vi)(*b*) .......................................................................6, 15

## FEDERAL REGISTER

67 Fed. Reg. 80,186 (Dec. 31, 2002) ...................................................................2, 5

## STATE REGULATION

Mich. Admin. Code R. 336.2818(3)(a) ...................................................................15

## STATEMENT OF ISSUE PRESENTED

1.  In its March 28, 2013, decision, the Sixth Circuit concluded that the legal premises underlying this Court's decision to grant DTE's motion for summary judgment were "largely correct."  The Government is not allowed to second-guess an operator's projection to prove that the operator's projection was faulty, much less to prove that an unpermitted "major modification" has occurred.  But the Sixth Circuit remanded the case to allow the Court to consider whether DTE complied with the objective requirements governing preconstruction projections under the 2002 NSR Reform Rules.

Is DTE entitled to judgment as a matter of law where the undisputed facts establish that DTE has complied with the objective requirements of EPA's regulations governing preconstruction projections and the Government has never contended otherwise?

**Defendants' Answer:  Yes.**

## <u>CONTROLLING OR OTHER APPROPRIATE AUTHORITY</u>

**Preamble to EPA's 1992 NSR Rules Amendments**

57 Fed. Reg. 32,314 (July 21, 1992)

**Preamble to EPA's 2002 NSR Rules Amendments**

67 Fed. Reg. 80,186 (Dec. 31, 2002)

**Relevant Federal Regulations**

40 C.F.R. § 52.21(a)(2)(iii)
40 C.F.R. § 52.21(a)(2)(iv)
40 C.F.R. § 52.21(b)(2)(iii)
40 C.F.R. § 52.21(b)(20)
40 C.F.R. § 52.21(b)(23)
40 C.F.R. § 52.21(b)(41)(i)
40 C.F.R. § 52.21(b)(41)(ii)
40 C.F.R. § 52.21(b)(48)(i)
40 C.F.R. § 52.21(r)(6)(ii)
40 C.F.R. § 52.21(r)(6)(iii)
40 C.F.R. § 52.21(r)(6)(iv)
40 C.F.R. § 52.21(r)(6)(vi)

**GLOSSARY OF ACRONYMS AND ABBREVIATIONS**

| | |
|---|---|
| CAA | Clean Air Act |
| CEMS | Continuous Emissions Monitoring System |
| EPA | United States Environmental Protection Agency |
| MDEQ | Michigan Department of Environmental Quality |
| MPSC | Michigan Public Service Commission |
| NNSR | Nonattainment New Source Review |
| NOx | Nitrogen Oxide |
| NSR | New Source Review |
| PM | Particulate Matter |
| PSCR | Power Supply Cost Recovery |
| PSD | Prevention of Significant Deterioration |
| $SO_2$ | Sulfur Dioxide |
| SSM | Startup, Shutdown and Malfunction |

## PRELIMINARY STATEMENT

Two years ago, Defendants DTE Energy Company and Detroit Edison Company (now called DTE Electric Company) (collectively, DTE) asked the Court to enter summary judgment in favor of DTE in this enforcement case under the Clean Air Act's (CAA) New Source Review (NSR) program.  Under the U.S. Environmental Protection Agency's (EPA's or Agency's) 2002 NSR Reform Rules and consistent with the statutory objective of NSR, construction projects are not "major modifications" unless they cause an increase in emissions.  DTE had concluded before construction that the 2010 routine repair and replacement projects at DTE's Monroe Unit 2 power plant would not cause an increase in emissions, and actual post-project data then available confirmed as much.  The Government could only prove its case by second-guessing DTE's preconstruction emissions projection, and this, DTE argued, was not allowed.  The Court agreed and granted DTE's motion.  *See* Op. & Order Granting Defs.' Mot. for Summ. J. (Summary Judgment Order), Aug. 23, 2011, ECF No. 160.

On appeal, the Sixth Circuit endorsed the central premises of this Court's decision, explaining that "the district court's premises are largely correct."  *United States v. DTE Energy Co.*, No. 11-2328  (Sixth Cir. Op.), slip op. at 9 (6th Cir. Mar. 28, 2013).  The 2002 NSR Reform Rules create a "project-and-report" system for determining NSR applicability.  *Id.* at 10.  Those rules do not allow the Government to second-guess the operator's determination, because that would create, in effect, a "prior approval" system.  *Id.*  Instead, the operator's judgment will be judged by whether emissions at the unit increase after the project.  *Id.* at 12.  And the source can manage its emissions to ensure that they do not increase.  *Id.*

But the Sixth Circuit panel majority concluded that this Court's decision may have gone too far in one limited respect—it seemed to preclude *any* challenge to the operator's preconstruction projection "before there is post-construction data to prove or disprove it."  *Id.* at

-1-

2.  In other words, the Sixth Circuit panel majority believed that this Court's decision, if applied to its broadest extent, would preclude not only impermissible second-guessing, but also more basic actions to ensure that the operator complied with the "specific instructions" governing preconstruction projections.  *Id.* at 9.  "[The Government] is not categorically prevented from challenging even blatant violations of its [projection] regulations. . . ."  *Id.* at 2.  So the Sixth Circuit reversed and remanded.

The narrow question remaining for this Court to answer on remand is straightforward: Did DTE comply, "at a basic level," *id.* at 10, with the regulations' "specific instructions" for conducting preconstruction projections?  The answer is "yes."  The Government has never contended otherwise.

## LEGAL BACKGROUND

I.    **The 2002 NSR Reform Rules Create a Project-and-Report System, Not a Prior Approval System.**

As with previous iterations of EPA's NSR regulations, the 2002 NSR Reform Rules[1] require operators to determine, before commencing construction, whether a construction project is projected to cause a significant increase in emissions and thus trigger CAA permitting requirements.  *Id.* at 4-6.  For projects like those at issue here that only involve existing emissions units, the rules require the operator to project its future emissions and compare those emissions to baseline actual emissions:

> [a] significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the **projected actual emissions** … and the **baseline actual emissions** … for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

---

[1] *See* 67 Fed. Reg. 80,186 (Dec. 31, 2002).

40 C.F.R. § 52.21(a)(2)(iv)(*c*) (emphases added). If projected actual emissions[2] in any one of the five years after the project exceed baseline actual emissions by greater than the significance threshold for any regulated pollutant, the operator must get a permit. And even if the calculation does not show a significant increase, the operator nonetheless may be required to comply with certain recordkeeping and reporting requirements.

These rules therefore prescribe three basic steps: (1) determine "baseline actual emissions"; (2) determine "projected actual emissions"; and (3) compare the two. Sixth Cir. Op. at 6.

A.      **"Baseline Actual Emissions"**

"Baseline actual emissions" is defined as "the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 5-year period immediately preceding when the owner or operator begins actual construction of the project." 40 C.F.R. § 52.21(b)(48)(i). The regulations specifically require the operator to do four things when determining baseline actual emissions.

First, and most obviously, the operator must pick the 24-month baseline period. That consecutive 24-month period must occur within the five years immediately preceding actual construction of the project, unless the operator requests the use of another period that is deemed "more representative." *Id.* And the operator can select a different consecutive 24-month period for each regulated pollutant. *Id.* § 52.21(b)(48)(i)(*c*). The operator then calculates the average

---

[2] As discussed more fully below, the term "projected actual emissions" under the regulations incorporates causation by excluding emissions increases unrelated to the project at issue. *See infra* at 4-5 (discussing 40 C.F.R. § 52.21(b)(41)).

annual rate based on that 24-month period. (The math is easy—simply divide the total emissions for that period by two.)

Second, the regulations tell the operator to include both fugitive emissions, to the extent quantifiable, and emissions associated with startup, shutdown and malfunction (SSM) in calculating average emissions rate. *Id.* § 52.21(b)(48)(i)(*a*). "Fugitive emissions" are "those emissions which could not reasonably pass through a stack, chimney, vent or other functionally equivalent opening." *Id.* § 52.21(b)(20). SSM emissions are the (sometimes, for some pollutants) higher rates of emission that occur during startup, shutdown and malfunction.

Third, the operator must adjust baseline emissions downward to subtract non-compliant emissions. *Id.* § 52.21(b)(48)(i)(*b*). These are emissions "that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24-month period." *Id.*

Finally, the regulations instruct the operator to make sure there is adequate data for the 24-month period selected. "The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year …." *Id.* § 52.21(b)(48)(i)(*d*).

### B.    "Projected Actual Emissions"

"Projected actual emissions" is defined as the "maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit" a regulated PSD pollutant "in any one of the 5 years (12-month period) following the date the unit resumes regular operation after the project. . . ." *Id.* § 52.21(b)(41)(i). The regulations direct operators to do four things in making this projection.

First, the operator must project emissions for the 5 years following the project and identify the "maximum annual rate … at which [the unit] is projected to emit a regulated NSR

pollutant in any one of the 5 years (12-month period) following the date the unit resumes regular operation after the project. . . ." *Id.*; Sixth Cir. Op. at 5.

Second, "the owner or operator … [s]hall consider all relevant information," including the "company's own representations," its "expected business activity," and its "filings with the State or Federal regulatory authorities." 40 C.F.R. § 52.21(b)(41)(ii)(*a*). But critically, the rules do not provide an exhaustive list of relevant factors or tell the operator what weight to apply to any one of them. That is left to the operator's business and engineering judgment.

Third, as with its calculation of baseline actual emissions, the operator must include SSM emissions and fugitive emissions (to the extent quantifiable). *Id.* § 52.21(b)(41)(ii)(*b*).

Finally, reflecting the causation requirement of the statute and regulations,[3] the owner/operator "[s]hall exclude, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project" that the unit "could have accommodated during the consecutive 24-month period used to establish the baseline actual emissions … and that are also unrelated to the particular project, including any increased utilization due to product demand growth." *Id.* § 52.21(b)(41)(ii)(*c*).

### C.    Comparison of "Baseline Actual Emissions" and "Projected Actual Emissions"

After the operator has calculated baseline actual emissions and projected actual emissions, it must compare the two numbers and determine whether a "significant" increase in emissions is projected to occur. A table in the regulations defines what constitutes "significant" for each regulated pollutant. *Id.* § 52.21(b)(23). If the projects are projected to cause a

---

[3] 67 Fed. Reg. at 80,203 ("Both the statute and … regulations indicate that there should be a causal link between the proposed change and any post-change increase in emissions.").

-5-

significant net emissions increase, the operator must get a permit. *See* 40 C.F.R.

§ 52.21(a)(2)(iii).

  If the comparison shows no significant increase, but still a "reasonable possibility" that

emissions could increase—as defined by § 52.21(r)(6)(vi)(*b*) or § 52.21(r)(6)(vi)(*a*)—the

operator must comply with one of two sets of notification requirements. For all such projects,

"[b]efore beginning actual construction …, the owner or operator shall document and maintain a

record" that contains the "projected actual emissions, the amount of emissions excluded under

paragraph (b)(41)(ii)(*c*) … and an explanation for why such amount was excluded," as well as a

"description of the project" and an "[i]dentification of the emissions unit(s) whose emissions of a

regulated NSR pollutant could be affected by the project." *Id*. § 52.21(r)(6)(i)(*a*)-(*c*). Additional

obligations apply to projects that fall into the "reasonable possibility" category based on

§ 52.21(r)(6)(vi)(*a*)—i.e., projects that show an increase of greater than 50% of the significant

amount even after excluding emissions increases that are unrelated to the projects. As to those

projects, "before beginning actual construction, the owner or operator" must also provide its

preconstruction analysis to the permitting authority. *Id*. § 52.21(r)(6)(ii). The source is not

"require[d] … to obtain any determination from the Administrator before beginning actual

construction." *Id*.; *see also* Sixth Cir. Op. at 10 (explaining that the regulations do not require

approval of projections). Rather, once pre-project analysis and recordkeeping requirements are

met (i.e., notification is sent to the permitting authority or records are maintained, as applicable

under the rules), the 2002 NSR Reform Rules provide that construction may begin in full

compliance with the CAA. And after construction is complete, the operator must calculate and

maintain a record of emissions in tons per year of any NSR-regulated pollutant and (for electric

generating units) report those emissions to the relevant regulatory authority annually.  40 C.F.R.

§ 52.21(r)(6)(iii)-(iv).

## II.    The 2002 NSR Reform Rules Measure the Validity of the Source's Preconstruction Projection Through Postconstruction Emissions Data.

The 2002 NSR Reform Rules make clear that the Agency may not second-guess the

operator's business and engineering judgment in making a projection that emissions will not

increase due to a project by clarifying that the validity of the projection will be judged by actual

post-project emissions data.  Consistent with the statute, which defines "modification" as a

change that "increases the amount" of an emitted air pollutant, the revised rules state

unequivocally that a "project is a major modification for a regulated NSR pollutant if it causes …

a significant emissions increase … and a significant net emissions increase."  *Id.*

§ 52.21(a)(2)(iv)(*a*).  And in the very next sentence, the rules make clear that a project "is ***not*** a

major modification ***if it does not cause a significant emissions increase***."  *Id.* (emphases added).

So in the absence of evidence showing an actual increase in emissions caused by the project, a

source operator cannot be held liable for constructing a major modification without a permit.

The rules reinforce the primacy of postconstruction real emissions data in judging

whether a major modification has occurred by clarifying that such data either confirm or trump

preconstruction projections.  After describing how an operator should project post-project

emissions, EPA makes clear that, "[r]egardless of ***any such*** preconstruction projections, a major

modification" depends on whether "the project ***causes a significant emissions increase*** …."  *Id.*

§ 52.21(a)(2)(iv)(*b*) (emphases added).  This provision applies expansively to "any such"

projection, whether it is the actual projection performed by the operator or a projection intended

to "second-guess" the operator's projection after the fact.  This Court held as much in its

summary judgment decision, and the Sixth Circuit agreed.  Sixth Cir. Op. at 9 ("[T]he district

-7-

court's premises are largely correct."); *id.* at 11 ("[It] is entirely consistent with the statute and regulations" for a source "to keep its post-construction emissions down in order to avoid the significant increases that would require a permit.").

## STATEMENT OF THE CASE

### I.     Procedural History

#### A.     The Government's Notice of Violation and Subsequent Enforcement Action

In June 2010, the Government issued DTE a "Notice and Finding of Violation" (NOV) that accused DTE of violating the NSR regulations. Ex. 1, NOV. Specifically, the Government alleged that routine boiler tube replacement projects that DTE commenced at Monroe Unit 2 in March 2010 were "major modifications." *Id.* at 4. The Government did not allege that DTE failed to follow the specific instructions for determining NSR applicability. Rather, the Government contended that DTE should have reached a different conclusion—i.e., that the projects would cause a significant increase in emissions. The Government and DTE were unable to resolve the matter, so the Government filed this lawsuit in August 2010, shortly after Monroe Unit 2 resumed operations and well before annual data were available to show whether Monroe Unit 2 had emitted any regulated pollutant at greater-than-baseline levels, much less whether the projects had ***caused*** emissions to increase. In its Complaint, the Government asserted two essentially identical claims—that DTE violated the Prevention of Significant Deterioration (PSD) (Count One) and Nonattainment New Source Review (NNSR) (Count Two) programs by constructing a major modification at Monroe Unit 2 without a permit.

#### B.     The Court Grants Detroit Edison's Motion for Summary Judgment.

DTE moved for summary judgment, because the Government had no evidence showing that emissions at Monroe Unit 2 increased after the 2010 projects. The Government's case instead was built on exactly the type of second-guessing that the 2002 NSR Reform Rules do not

tolerate.  Specifically, the Government intended to prove its case by showing, through expert testimony, that Detroit Edison ***should have projected*** that the projects ***would cause*** an increase in emissions, regardless of DTE's projection that no increase would result from the project and regardless of whether actual post-project emissions ever increased above baseline levels (and, indeed, regardless of whether emissions actually decreased, as they did since Monroe Unit 2 returned to operation after the projects, almost three years ago).

This Court agreed with DTE that the 2002 NSR Reform Rules do not allow the type of second-guessing that was the cornerstone of the Government's liability proof.  *See* Summary Judgment Order, ECF No. 160.  DTE had complied with the rules' pre-construction source obligations governing notice requirements, and actual post-project emissions data did not show an actual significant increase in emissions. *Id.* at 3-6.  Any contention that the 2010 projects were, in fact, major modifications was premature.  *Id.* at 9.  This Court also rejected the Government's belated claim that DTE's preconstruction notice to the Michigan Department of Environmental Quality (MDEQ) was deficient, both because the notice met all of the regulatory requirements and because the Government failed to allege in its NOV that DTE's notice was deficient.  *Id.* at 12.

The Government appealed.

### C.      The Sixth Circuit Decision

#### 1.      The Sixth Circuit Endorsed Key Premises of This Court's 2011 Decision.

On appeal, the Government pursued the same enforcement theory it had pursued unsuccessfully in this Court.  The Government argued that it should be able to prove that a major modification has occurred by second-guessing the operator's projection:  "[The Government] can … enforce PSD requirements by demonstrating that the operator ***should have*** projected that

emissions would increase." Br. for the United States as Appellant at 29 (emphasis in original);

*see also* Reply Br. for the United States as Appellant at 5 (claiming that "the statute itself, the …

regulation, case law, and decades of NSR practice … all … make clear that EPA can enforce

NSR based on the pollution an operator should have expected to result from construction").   The

Government contended that it need not adduce evidence of an actual increase in emissions after

the project to meet its burden.  Br. for the United States as Appellant at 31.  It would suffice,

argued the Government, to show that a "projection" made after the fact in the context of an

enforcement case would have shown an increase.  *Id.*

     The Sixth Circuit issued its decision on March 28, 2013.  In that decision, the Sixth

Circuit did not question the basic premises of this Court's summary judgment decision or

disagree with this Court's conclusion that there can be no modification where there is no actual

emissions increase due to the project.  "[T]he district court's premises are largely correct," the

Court observed.  Sixth Cir. Op. at 9.  The 2002 NSR Reform Rules "do[] not contemplate

approval of the projection prior to construction."  *Id.* at 10.  The regulations, therefore, "allow

operators to undertake projects without having EPA second-guess their projections."  *Id.* at 2.

Were EPA allowed to "second-guess the making of the projections, then a project-and-report

scheme would be transformed into a prior approval scheme."  *Id.* at 10.[4]  Thus, the Sixth Circuit

---

[4] The Court explored this topic at length with the Government's counsel at oral argument:

> **JUDGE ROGERS**:   [You] would have to say there's some Regulation which [DTE] interpreted incorrectly in making these projections.  Is that correct?

> **MR. BENSON**:        Well, I think what the District Court would find is that one side or the other's projection was inaccurate based on the facts.  It is really a factual question, and then there is a legal question.

> **JUDGE ROGERS**:   Alright.  That puzzles me entirely.

> *        *        *

(Continued . . . .)

-10-

observed, "submitting [the] ... projection one day before construction began … is fully consistent with a project-and-report scheme." *Id.* at 11.  And "keep[ing] ... post-construction emissions down in order to avoid the significant increases that would require a permit … is entirely consistent with the statute and regulations." *Id.*  Indeed, "purposely manag[ing] the cost of electricity from Monroe Unit #2 to keep its emissions from increasing….further[s] the goal of the statute." *Id.* at 13.

The Sixth Circuit also agreed with this Court on the role of post-project data—they dictate whether or not a modification has occurred, where the operator has projected no increase in emissions due to the project.  "If [the] company's projections are later proven incorrect,  EPA can bring an enforcement action" alleging a major modification.  *Id.* at 12.  This reflects the nature of the statutory and regulatory modification program:  "As EPA conceded at oral argument,  the statute and regulations allow sources to replace parts indefinitely without losing their grandfathered status so long as none of those changes cause an emissions increase." *Id.* at 12.

---

**MR. BENSON**:      I mean you have to comply with the regulations and . . . if there is a projection that complies with the regulations, there may be two different projections that both sort of on a superficial level meet the requirements of the regulations.  But they would rely on different facts that would be found by the district court. … And that is the type of analysis that EPA and the Company is going to do and in a court below the court would have to decide whose analysis makes sense.

**JUDGE ROGERS**:   Well here's the problem I have with that.  That sounds like getting a permit to not get a permit.  It sounds like you have to get approval from EPA as to your calculations before you can proceed without a permit.

Oral Arg. at 50:39, Nov. 27, 2012.

## 2. The Sixth Circuit Carves Out a Narrow Category of Claims to Ensure That the System Works.

But the Sixth Circuit also concluded that this Court's legal holding might have been stated too broadly in one limited respect. According to the panel majority, "This appeal raises a single question: can EPA challenge that projection before there is post-construction data to prove or disprove it?" *Id.* at 1. The panel answered this question in the affirmative: even though an operator's projections are not subject to second-guessing by EPA, "[t]he operator has to make projections according to the requirements for such projections contained in the regulations. If the operator does not do so, and proceeds to construction, it is subject to an enforcement proceeding." *Id.* at 10. Stated differently, "If there is no projection, or the projection is made in contravention of the regulations guiding how the projection is to be made, then the system is not working." *Id.* "[A]t a ***basic level*** the operator has to make a projection in compliance with how the projections are to be made." *Id.* (emphasis added).

The category of enforcement actions contemplated by the Sixth Circuit's decision is narrow. EPA is authorized to bring an enforcement action if it believes the operator has not conducted a projection at all or if the operator has not complied with the "requirements for such projections contained in the regulations." *Id.* at 15. As the Court of Appeals explained by way of example, "EPA must be able to prevent construction if an operator … uses an improper baseline period or uses the wrong number to determine whether a projected emissions increase is significant." *Id.* at 11. But that authorization is limited by the Sixth Circuit's clear prohibition against second-guessing. For example, EPA cannot substitute its judgment for that of the operator as to the likely demand for the unit in the projected years or with respect to the weight given to each of the relevant factors the operator must consider. The object of such an action, rather, is to ensure "at a basic level" that "the operator has … [made] a projection in compliance

-12-

with how the projections are to be made." *Id.* at 10. But critically, "this does not mean that the agency gets *in effect* to require prior approval of the projections." *Id.* (emphasis added).

## II.    Statement of Undisputed Material Facts

From March to June 2010, Detroit Edison removed Monroe Unit 2 from service to perform a number of routine maintenance projects, including the replacement of three boiler tube components—the economizer, the pendant reheater, and a portion of the waterwall.[5] Ex. 2, Declaration of Skiles W. Boyd (Boyd Decl.) ¶ 17.

Before commencing construction, DTE followed the NSR regulations' specific instructions for determining whether the projects would trigger CAA permitting requirements. With respect to calculating baseline actual emissions, DTE first selected consecutive 24-month periods within the five years immediately preceding construction for each pollutant: (a) October 2006 through September 2008 for nitrogen oxide (NOx); (b) July 2006 through June 2008 for sulfur dioxide ($SO_2$); and (c) January 2008 through December 2009 for particulate matter (PM). Ex. 3, Letter from Kelly L. Guertin, DTE, to William Presson, MDEQ at 3 (Mar. 12, 2010); Ex. 4, Supplemental Declaration of Skiles W. Boyd (Supp. Boyd Decl.) ¶ 4.a. DTE then tabulated total emissions for these periods, including any emissions associated with startup, shutdown or malfunction. Supp. Boyd Decl. ¶¶ 4.a, 4.c. Fugitive emissions were not included because they were not quantifiable. *Id.* ¶ 4.d. DTE did not need to adjust any of these emissions downward,

---

[5] These types of boiler tube component replacements are common in the utility industry, due to the harsh conditions that exist in the combustion chamber of such boilers. Every utility in the country must do them to maintain the efficiency, reliability, and safety of the nation's electric generating system. *See* Declaration of Jerry L. Golden, ECF No. 46-10. For this reason, Detroit Edison contends that these projects are routine maintenance, repair, and replacement under NSR, 40 C.F.R. § 52.21(b)(2)(iii)(*a*). *See Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, No. 3:01-CV-71, 2010 WL 1291335, *27-34 (E.D. Tenn. Mar. 31, 2010) (finding similar boiler tube component replacements "routine"). This is an independent reason why these projects did not trigger NSR that was not at issue in the appeal.

because none of the emissions exceeded any enforceable limitation, *id.* ¶ 4.e., and the data for each of these periods was recorded by the continuous emissions monitoring system (CEMS) for Monroe Unit 2 and thus was more than adequate, *id.* ¶ 4.b.

With respect to projected actual emissions, DTE relied heavily on the projections it made in the company's 2010 Power Supply Cost Recovery (PSCR) filing submitted in September 2009 to the Michigan Public Service Commission (MPSC). *Id.* ¶ 5. These annual PSCR submissions are intended to reflect the Company's best estimate, considering all relevant information, as to the demand for its power generation units during the coming year and its cost to deliver power to its customers. Ex. 5, Tr. of Gordon P. Usitalo 30(b)(6) Dep. at 76-79, June 9, 2011. To make this submission, DTE used a sophisticated "production cost model" called PROMOD to simulate the dispatch of each of its power plants, including Monroe Unit 2, five years into the future. Supp. Boyd Decl. ¶ 5. The inputs for this PROMOD model are exhaustive, including among other things the estimated demand profile, estimated coal prices, estimated natural gas prices, the cost of emission "allowances" that must be purchased to comply with other CAA regulations, planned outages at various units, and estimates of random outages. *Id.* ¶ 5.b. This analysis indicated that Monroe Unit 2 would experience its highest utilization during calendar year 2013, *id.* ¶ 5.a., and that emissions during that year (before accounting for causation) would be higher than baseline actual emissions. *See* Boyd Decl. ¶ 17.

As required by the regulations, the company accounted for SSM emissions in the projection. Specifically, DTE calculated average emission rates for use in the projection based on total emissions and other data reported in CEMS before the projects, including the baseline periods, which would include the impacts of start-up, shutdown and malfunction on average emission rates. Supp. Boyd Decl. ¶ 5.c. "Fugitive" emissions were not included because the

company concluded they were not quantifiable and, in any event, would be no greater than fugitive emissions during the baseline period.  *Id.* ¶ 5.d.

The company then excluded emissions caused by independent factors that the unit was capable of accommodating during the baseline period.  Based on the company's business and engineering judgment and its understanding of the inputs used as part of its PSCR submission for 2010, DTE concluded that any increase in emissions over baseline actual emissions would be attributable to factors other than the project, in particular the company's belief in mid-2009 that there would be substantial demand for power from all of the units in DTE's portfolio.  *Id.* ¶ 5.e.  Finally, the Company concluded that the emissions it sought to exclude could have been accommodated during the baseline period, because the unit had greater availability during the baseline period than the highest expected utilization of the unit after the project.  *Id.*

Consistent with the Company's practice for almost a decade, Detroit Edison then submitted a planned outage notification to MDEQ on March 12, 2010, before commencing work on the projects.  *See* Ex. 3.  That notice (i) addressed each of the information requirements of the Michigan NSR rules, *see* Mich. Admin. Code R. 336.2818(3)(a); (ii) explained why the repairs were projects within the NSR "routine maintenance, repair, and replacement" exclusion; and (iii) explained why, in any event, the projects would not result in any "significant emissions increase."  *Id.*[6]  MDEQ did not question Detroit Edison's analysis, either then or since.  Boyd Decl. ¶ 17.  The projects started on March 13, 2010, and concluded on June 20, 2010.  *Id.* ¶ 18.

---

[6] The 2010 projects on Monroe Unit 2 triggered the "reasonable possibility" requirements of 40 C.F.R. § 52.21(r)(6)(vi)(*b*) because, before accounting for causation, Detroit Edison's projection showed an increase in emissions of more than 50% of the significance threshold.  But after accounting for causation by excluding factors unrelated to the project, the projects were not projected to cause any increase in emissions and therefore were not subject to the more stringent reporting requirements applicable to projects that trigger "reasonable possibility" under

(Continued . . . .)

-15-

In the nearly three years since the 2010 projects were completed, Monroe Unit 2 has not exceeded pre-project emissions on an annualized basis.  Supp. Boyd Decl. ¶ 7.  In fact, the unit's actual emissions have been substantially less than baseline emissions for each of 2011 and 2012.  *Id.*  And they will decrease further with the completion of the major air pollution control retrofit project at Monroe Unit 2 in 2014.  Boyd Decl. ¶¶ 8-9.

## ARGUMENT

DTE complied with the 2002 NSR Reform Rules' objective requirements for conducting preconstruction projections.  As explained above, there are nine such requirements:

| With respect to the requirements for calculating "baseline actual emissions," the operator must: | |
|---|---|
| 1.  Select a consecutive 24-month period within the five years preceding construction for each regulated pollutant and calculate average annual emissions for that pollutant | § 52.21(b)(48)(i) |
| 2.  Include SSM emissions and fugitive emissions (to the extent quantifiable). | § 52.21(b)(48)(i)(*a*) |
| 3.  Adjust emissions downward to account for any emissions above any legally enforceable limit. | § 52.21(b)(48)(i)(*b*) |
| 4.  Ensure adequacy of data for the 24-month period selected. | § 52.21(b)(48)(i)(*d*) |
| With respect to the requirements for calculating "projected actual emissions," the operator must: | |
| 5.  Project emissions for the 5 years following the project and identify the "maximum annual rate … at which [the unit] is projected to emit a regulated NSR pollutant in any one of the 5 | § 52.21(b)(41)(i) |

---

§ 52.21(r)(6)(vi)(*a*).  *See* Boyd Decl. ¶ 15.  Nonetheless, consistent with company practice, Detroit Edison treated the projects as if they did trigger the additional reporting requirements and submitted a notice of these projects and its emissions projection analysis to its permitting authority, MDEQ.  This Court ruled in its Summary Judgment Order that DTE's notice was timely and consistent with the regulatory requirements.  Summary Judgment Order at 10, ECF No. 160. On appeal, the Government abandoned its challenge to the timeliness or content of DTE's notice, but still suggested vaguely that DTE's filing of the notice shortly before the project started was somehow improper.  The Sixth Circuit rejected that suggestion.  Sixth Cir. Op. at 11.

| | years (12-month period) following the date the unit resumes regular operation after the project." | |
|---|---|---|
| 6. | "[C]onsider all relevant information, including . . . the company's own representations," its "expected business activity," and its "filings with the State or Federal regulatory authorities." | § 52.21(b)(41)(ii)(*a*) |
| 7. | Include SSM emissions and fugitive emissions (to the extent quantifiable). | § 52.21(b)(41)(ii)(*b*) |
| 8. | "[E]xclude … that portion of the unit's emissions following the project" that the unit "could have accommodated" during the baseline period "and that are also unrelated to the particular project, including any increased utilization due to product demand growth." | § 52.21(b)(41)(ii)(*c*) |
| **After baseline actual emissions and projected actual emissions have been calculated, the operator must:** | | |
| 9. | Determine whether, for any pollutant, projected actual emissions exceed baseline actual emissions by the significant amount specified in § 52.21(b)(23), and if not, whether any of the "reasonable possibility" notice and recordkeeping requirements have been triggered. | § 52.21(a)(2)(iv)(*c*)<br><br>§ 52.21(r)(6) |

The undisputed facts demonstrate that DTE complied with each of these requirements. *Supra* at 13-16.[7]

Significantly, the Government has never contended otherwise. In its NOV, the Government alleged that the three boiler tube replacement projects were "major modifications" constructed with an NSR permit. Ex. 1 ¶¶ 21-26. The Government did not, however, contend that DTE had failed to comply with any of the explicit instructions governing preconstruction

---

[7] Should this Court conclude that DTE failed to comply with one of these requirements, the conclusion is ***not*** a finding that the 2010 Monroe Unit 2 projects were major modifications. The actual post-project data confirm that these projects were anything but. Instead, the result is a finding of a one-time violation of the regulations governing projections, justifying, at most, a one-time civil penalty for the violation. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

-17-

projections.[8]  The Government's Complaint was similar—DTE constructed a major modification

without a permit.  Compl. ¶¶ 50-51, 55-56, ECF No. 1.   Again, there is no mention of any failure

by DTE to comply with the regulations' specific instructions governing projections.

As both the NOV and the Complaint make clear, the Government's contention always

has been that the 2010 projects were, in fact, major modifications.  And the Government has

sought to prove its case by second-guessing DTE's projection based on the Government's own

post hoc preconstruction projection.  As its counsel made clear at oral argument in the Court of

Appeals, the Government intends to ask the Court to look at two preconstruction projections—

the actual analysis performed by DTE before construction and the Government's made-for-

litigation analysis—and then decide which one is "better."  If the Court likes the Government's

analysis better, the Government argues, then DTE can be held liable—not for violating the rules

governing projections, but rather for constructing a major modification without a permit.  The

Sixth Circuit explicitly rejected this "gotcha" view of NSR enforcement.  Sixth Cir. Op. at 10.[9]

Reality also forecloses the Government's theory.  Any attempt to second-guess Detroit

Edison's projections at this stage would run into a clear problem—emissions at Monroe Unit 2

have decreased since the projects.  The only "correct" projection anyone could make at this point

would be one that shows a decrease in emissions.  So even if this Court were to indulge the

---

[8] The absence of any allegation in the NOV that DTE failed to comply with the regulations' specific instructions governing preconstruction projections means the Court lacks jurisdiction to consider the question.  *See* Order Granting Defs.' Mot. for a Protective Order, May 3, 2011, ECF No. 104.

[9] *See also,* Oral Arg. at 46:20, Nov. 27, 2012 (Judge Rogers: "The only way you can really use a lever to force them to get a permit which would put them to a lower level than they now have is to second guess their projection in a way that projects it higher than what even turns out to be reality.").

Government's Orwellian view of NSR enforcement, it could never prove what it intends to prove.

## **CONCLUSION**

For these reasons, Detroit Edison's motion for summary judgment should be granted.

Respectfully submitted, this 22nd day of May, 2013.

By: /s/ F. William Brownell

Matthew J. Lund (P48632)
Pepper Hamilton LLP
100 Renaissance Center, 36th Floor
Detroit, Michigan 48243
lundm@pepperlaw.com
(313) 393-7370

Michael J. Solo (P57092)
Office of the General Counsel
DTE Energy, One Energy Plaza
Detroit, Michigan  48226
solom@dteenergy.com
(313) 235-9512

F. William Brownell
Mark B. Bierbower
Makram B. Jaber
Hunton & Williams LLP
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
bbrownell@hunton.com
mbierbower@hunton.com
mjaber@hunton.com
(202) 955-1500

Brent A. Rosser
Hunton & Williams LLP
Bank of America Plaza,Suite 3500
101 South Tryon Street
Charlotte, North Carolina 28280
brosser@hunton.com
(704) 378-4700

Harry M. Johnson, III
George P. Sibley, III
Hunton & Williams LLP
951 E. Byrd Street
Richmond, Virginia 23219
pjohnson@hunton.com
gsibley@hunton.com
(804) 788-8200

*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 22, 2013, the foregoing **DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BASED ON COMPLIANCE WITH PRE-CONSTRUCTION PROJECTION REQUIREMENTS** was served electronically only on the following attorneys of record in accordance with an agreement reached among the parties:

> Ellen E. Christensen
> U.S. Attorney's Office
> 211 W. Fort Street
> Suite 2001
> Detroit, MI 48226
> 313-226-9100
> Email: ellen.christensen@usdoj.gov
>
> James A. Lofton
> Thomas Benson
> Justin A. Savage
> Kristin M. Furrie
> James W. Beers, Jr.
> Elias L. Quinn
> U.S. Department of Justice
> Environmental and Natural Resource Div.
> Ben Franklin Station
> P.O. Box 7611
> Washington, DC 20044
> 202-514-5261
> Email: thomas.benson@usdoj.gov
>     justin.savage@usdoj.gov
>     kristin.furrie@usdoj.gov
>     jim.lofton@usdoj.gov
>     james.beers@usdoj.gov
>     elias.quinn@usdoj.gov
>
> Holly Bressett
> Sierra Club Environmental Law Program
> 85 Second St., 2nd Floor
> San Francisco, CA 94105
> Phone: (415) 977-5646
> Email: Holly.Bressett@sierraclub.org

/s/ F. William Brownell

-20-