# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

———————————————————————

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| and | ) | Case No. 2:10-cv-13101-BAF-RSW |
| NATURAL RESOURCES DEFENSE COUNCIL, INC. and SIERRA CLUB | ) | Honorable Bernard A. Friedman |
| Plaintiff-Intervenors, | ) | |
| v. | ) | |
| DTE ENERGY COMPANY, and DETROIT EDISON COMPANY | ) | |
| Defendants. | ) | |

———————————————————————

## SIERRA CLUB OPPOSITION TO DEFENDANTS' MOTION FOR

## SUMMARY JUDGMENT

## STATEMENT OF ISSUE PRESENTED

1. Is DTE entitled to judgment as a matter of law regarding its failure to abide by New Source Review regulations for projecting the emissions increase that would result from the company's $65 million overhaul of its Monroe Unit 2 generating station where the record is bereft of any explanation or documentation of DTE's decision to exclude thousands of tons of projected emissions increases due to purported electric demand growth, and where the company contemporaneously projected that its system electric demand would be declining?

   **Plaintiff-Intervenor's Answer: No**

## **CONTROLLING OR OTHER APPROPRIATE AUTHORITY**

*U.S. v. DTE Energy Co.*, 711 F.3d 643 (6th Cir. 2013)

*New York v. U.S. EPA*, 413 F.3d 3 (D.C. Cir. 2005)

40 C.F.R. § 52.21(b)(41)(ii)(c).

40 C.F.R. § 52.21(r)(6)(i)

## <u>TABLE OF CONTENTS</u>

STATEMENT OF ISSUE PRESENTED .................................................................. II

CONTROLLING OR OTHER APPROPRIATE AUTHORITY ........................... III

TABLE OF AUTHORITIES ................................................................................... V

INTRODUCTION ....................................................................................................1

BACKGROUND ......................................................................................................2

STANDARD OF REVIEW .....................................................................................5

ARGUMENT ...........................................................................................................6

I.     DTE FAILED TO COMPLY WITH NSR REGULATIONS

REQUIRING THAT ANY DEMAND GROWTH EXCLUSION BE

EXPLAINED AND DOCUMENTED .................................................6

II.     THE LACK SO FAR OF A POST-PROJECT EMISSIONS

INCREASE DOES NOT FORECLOSE THIS ENFORCEMENT

ACTION. ...........................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bridgeport Music, Inc. v. WB Music Corp.*,
    508 F.3d 394 (6th Cir. 2007) ...............................................................5

*Celotex Corp v. Catrett*,
    477 U.S. 317 (1986) ............................................................................6

*Matsushita Elec. Indus. Co. v. Zenith Radio Co.*,
    475 U.S. 574 (1986) ............................................................................5

*New York v. U.S. EPA*,
    413 F.3d 3 (D.C. Cir. 2005) .............................................................7, 9

*U.S. v. DTE Energy Co.*,
    711 F.3d 643 (6th Cir. 2013) .....................................................passim

*United States v. Cinergy Corp.*,
    Case No. 199CV1693LJMVSS, 2005 WL 3018688 (S.D. Ind. Nov. 9,
    2005) ...................................................................................................7

REGULATIONS

40 C.F.R. § 52.21(a)(2)(iv)(a) ....................................................................13

40 C.F.R. § 52.21(a)(2)(iv)(*b*) ...................................................................14

40 C.F.R. § 52.21(b)(21)(i) .........................................................................13

40 C.F.R § 52.21(b)(23) ................................................................................3

40 C.F.R. § 52.21(b)(41) ..........................................................................3, 13

40 C.F.R. § 52.21(b)(41)(ii)(c) .....................................................................4

40 C.F.R. § 52.21(b)(48) ...............................................................................3

40 C.F.R. § 52.21(r)(6)(i) ............................................................................11

40 C.F.R. § 52.21(r)(6)(1)(c) ............................................................1, 7, 10

v

**FEDERAL REGISTER**

57 Fed Reg. 32,314 (July 21, 1992) .................................................................. 7, 12

67 Fed Reg. 80,186 (Dec. 31, 2002) ................................................................. 7, 9

**INTRODUCTION**

In the spring of 2010, Detroit Edison ("DTE" or "Company") embarked on a nearly three-month long, $65 million overhaul of Unit 2 at its Monroe Generating Station.  Before the overhaul began, DTE carried out computer modeling that projected annual post-construction emission increases of 3,701 tons of nitrogen oxides ("NOx") and 4,096 tons of sulfur dioxide ("SO2").  Such increases far exceed the Clean Air Act's 40-ton threshold for triggering the Act's New Source Review ("NSR") permitting provisions for those pollutants, pursuant to which DTE should have installed modern pollution controls on Monroe Unit 2 in connection with the overhaul project.  The Company did not do so, however. Instead, DTE claimed that all of the projected post-project emission increases were unrelated to the overhaul and could, therefore, be disregarded under the "demand growth exclusion" set forth in U.S. EPA's NSR regulations.  To date, DTE has repeatedly failed to identify any analysis upon which that demand growth claim was purportedly based, much less shown that the Company fulfilled its duty to "document and maintain . . . an explanation for why such amount" of emissions were excluded from the Company's pre-construction projection "before beginning actual construction of the project."  40 C.F.R. § 52.21(r)(6)(1)(c).

In the wake of the ruling from the U.S. Court of Appeals for the Sixth Circuit that an NSR enforcement action can be based on a utility's failure to

1

comply with the regulations that require pre-construction assessment of NSR applicability, DTE now claims in its motion for summary judgment that the Plaintiffs are merely trying to "second guess" its demand growth exclusion analysis. But one cannot second guess an analysis that has never been provided. And that, ultimately, is the shortfall with DTE's approach here. Rather than present an analysis showing that the projected 3,701 tons of NOx and 4,096 tons of SO2 emission increases are entirely due to demand growth, DTE appears to rely solely on unsupported demand growth assumptions to avoid acknowledging that the projected increases should have triggered NSR requirements. In addition to being unsupported, DTE's assumptions are undermined by the Company's own contemporaneous projection to the Michigan Public Service Commission that energy demand in its system is declining. As a result of these material weaknesses in the factual record supporting DTE's contentions here, there is simply no basis on this record to grant summary judgment to DTE.

**<u>BACKGROUND</u>**

In its decision remanding this proceeding, the Sixth Circuit made three holdings that are of particular importance here. First, the court confirmed that U.S. EPA's regulations require a utility that is seeking to modify an electric generating unit to "make a preconstruction projection of whether and to what extent emissions

2

from the source will increase following construction." *U.S. v. DTE Energy Co.*,
711 F.3d 643, 644 (6th Cir. 2013). Second, the Sixth Circuit made clear that such
pre-construction projection "determines whether the project constitutes a 'major
modification' and thus requires a permit" under the Clean Air Act's NSR program.
*Id*. at 644. Third, the court held that given the importance of the pre-construction
projection to the entire NSR program, such projection may be "subject to an
enforcement action by EPA to ensure that the projection is made pursuant to the
requirements of the regulations." *Id*. at 652. It is exactly such an enforcement
action that is now before the Court.

Under the NSR regulations, a utility's pre-construction projection involves
three basic steps: (1) determine baseline actual emissions as defined in 40 C.F.R.
§ 52.21(b)(48); (2) determine projected actual emissions as defined in 40 C.F.R.
§ 52.21(b)(41); and (3) compare the two to determine whether a net emissions
increase exceeding the significance thresholds set forth in 40 C.F.R § 52.21(b)(23)
is projected to occur. If the projected emissions increase exceeds the significance
threshold then the utility "must seek a permit from EPA or the relevant state
agency and install expensive modern pollution-control technology." *DTE Energy*,
711 F.3d at 647. If the significance threshold is not exceeded, then the utility will
likely have to comply with various recordkeeping and reporting requirements so
that the EPA, state environmental agency, and/or interested individuals can

3

evaluate whether the pre-construction projection was accurate or whether an NSR-triggering post-project emissions increase occurs. *Id.*

The NSR regulations include a number of detailed requirements that must be followed in carrying out the pre-construction projection. Only one of those requirements is at issue here: the demand growth exclusion, which provides that a utility should subtract from its projected actual emissions any emissions that "could have been accommodated" during the baseline period and that are "unrelated to the particular project, including any increased utilization due to product demand growth." 40 C.F.R. § 52.21(b)(41)(ii)(c).

DTE cites the demand growth exclusion as its basis for concluding that the $65 million Monroe Unit 2 overhaul would not trigger NSR requirements. (DTE SJ Br. at Ex. 4, ¶5.e). In a planned outage notification sent to the Michigan Department of Environmental Quality ("MDEQ") just before the overhaul project commenced, DTE projected that the Monroe Unit 2 $SO_2$ emissions would increase from a baseline amount of 30,115 tons per year to a post-project level of 33,816 tons in 2013, for a total increase of 3,701 tons. (DTE SJ Br. at Ex. 3 Table 1). The Company further projected that $NO_x$ emissions from Monroe Unit 2 would increase from a baseline amount of 10,398 tons to a post-project level of 14,494 tons, for a total increase of 4,096 tons. (*Id.*). DTE then excluded the exact amounts of the projected $SO_2$ and $NO_x$ emission increases from its analysis, thereby

4

enabling the Company to project zero change in emissions as a result of the $65 million overhaul. (*Id*.). In the notification, DTE simply quoted the regulatory provision setting forth the demand growth exclusion without presenting any explanation for why the projected emissions increase were purportedly the result of demand growth, or any analysis showing how those specific increases were determined to all be due to demand growth. (*Id*. at p. 3). The present enforcement action followed.

## STANDARD OF REVIEW

Summary judgment is proper only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. In considering a motion for summary judgment, a court will construe all facts in a light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Co*., 475 U.S. 574 (1986); *Bridgeport Music, Inc. v. WB Music Corp*., 508 F.3d 394, 397 (6th Cir. 2007) ("The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the non-moving party."). There are no genuine issues of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id*. If the movant carries its burden of showing an absence of evidence to support a claim, then the non-movant must

demonstrate by affidavits, depositions, answers to interrogatories, and admissions that a genuine issue of material fact exists.  *See Celotex Corp v. Catrett*, 477 U.S. 317, 324-25 (1986).

## ARGUMENT

## I.     DTE FAILED TO COMPLY WITH NSR REGULATIONS REQUIRING THAT ANY DEMAND GROWTH EXCLUSION BE EXPLAINED AND DOCUMENTED

In its summary judgment motion, DTE presents as an "undisputed material fact" the contention that the Company "followed the NSR regulations' specific instructions for determining whether the projects would trigger CAA permitting requirements."  (DTE SJ Br. at p. 13).  This contention, however, is neither a fact nor undisputed.  Instead, on the core issue regarding DTE's pre-construction projection – the exclusion of thousands of tons of projected emissions increases as purportedly caused by demand growth – the record reveals no analysis upon which such exclusion was purportedly based.  Instead, DTE just repeatedly offers the mantra that the thousands of tons of projected emissions increases are due to demand growth as if repeating the claim enough times will make it true.  Such unsupported assumptions, however, are not enough to demonstrate compliance with the NSR regulations, much less to obtain summary judgment on the issue.

The law here is clear.  Under the NSR regulations, DTE was required "before beginning actual construction of the project" to "document and maintain a

6

record of . . . the amount of emissions excluded under paragraph (b)(41)(ii)(c) of this section and an explanation for why such amount was excluded." 40 C.F.R. § 52.21(r)(6)(i)(c). In addition, such explanation must go beyond the mere claim that all emission increases are due to demand growth because the NSR regulations do not create a "per se exclusion for demand growth." *New York v. U.S. EPA*, 413 F.3d 3, 33 (D.C. Cir. 2005). Instead, "demand growth can only be excluded to the extent it—and not the physical or operational change—is the cause of the emissions increase." 57 Fed Reg. 32,314, 32,327 (July 21, 1992); *see also United States v. Cinergy Corp.*, Case No. 199CV1693LJMVSS, 2005 WL 3018688, at *3 (S.D. Ind. Nov. 9, 2005) (agreeing with argument "that to exclude an increase, it must be completely unrelated to the physical change and entirely caused by independent factors"). As U.S. EPA explained in promulgating the 2002 NSR rules that DTE purports to rely on:

> demand growth can only be excluded to the extent that the physical or operational change is not related to the emissions increase. Thus, even if the operation of an emissions unit to meet a particular level of demand could have been accomplished during the representative baseline period, but the increase is related to the changes made to the unit, then the emissions increases resulting from the increased operation must be attributed to the project, and cannot be subtracted from the projection of projected actual emissions.

67 Fed Reg. 80,186, 80,203 (Dec. 31, 2002). In short, demand growth is not simply a talisman that staves off any need to comply with NSR requirements.

7

Instead, a utility seeking that exclusion must demonstrate that its projected

emissions increase is due to growth in demand and is also unrelated to the changes

being made to the emission unit.

The record is bereft of evidence that DTE even attempted to make such a

showing.  For example, the only "explanation" in support of the demand growth

exclusion that DTE offered in its 2010 outage notification to MDEQ was to quote

the applicable regulation.  (DTE SJ Br. at Ex. 3 p. 3).  In the brief accompanying

its summary judgment motion, DTE devotes a single sentence to the demand

growth issue, claiming that:

> Based on the company's business and engineering judgment and its
> understanding of the inputs used as part of its PSCR submission for
> 2010, DTE concluded that any increase in emissions over baseline
> actual emissions would be attributable to factors other than the
> project, in particular the company's belief in mid-2009 that there
> would be substantial demand for power from all of the units in DTE's
> portfolio.

(DTE SJ Br. at p. 15).  The brief does not point to any evidence in the record

explaining such "business and engineering judgment" or documenting how DTE

"concluded that any increase in emissions" would be due to demand growth and

not the $65 million overhaul.  Instead, DTE cites to a declaration from Skiles W.

Boyd, a Company Vice President, who offers a single sentence contending that

DTE "specifically determined that any increase in emissions" would be due to

"substantial demand for electricity generated at DTE's coal-fired power plants in

8

2013. . . ".  (DTE SJ Br. at Ex. 4 ¶5.e).  As with DTE's summary judgment brief,

however, Mr. Boyd's declaration fails to point to any evidence in the record that

the Company explained or documented the conclusion that the thousands of tons of

projected emission increases are purportedly all due to demand growth and

unrelated to the $65 million overhaul.  Instead, the record suggests that DTE

engaged in nothing more than the type of per se demand growth exclusion that is

specifically foreclosed under the NSR regulations.  *New York*, 413 F.3d at 33; 67

Fed Reg. at 80,203.

In his declaration, Mr. Boyd noted that DTE "relied primarily" on the

Company's projections in its 2010 Power Supply Cost Recovery ("PSCR") filing

with the Michigan Public Service Commission in assessing the projected actual

emissions from Monroe Unit 2 after the $65 million overhaul.  (DTE SJ Br.

at Ex. 4 ¶5).  But the modeling included in the 2010 PSCR filing simply identifies

the projected increased utilization of, and hence emissions from, Monroe Unit 2.

DTE has pointed to nothing in that filing that evaluates or explains whether such

increased emissions are due to demand growth and unrelated to the overhaul.

On the contrary, the 2010 PSCR filing actually runs counter to DTE's

demand growth claim.  In that filing, DTE projected lower annual system energy

demand in each of the five years after the overhaul than in each of the five years

before the overhaul.  (Decl. of Bruce Biewald, ECF 8-19, Ex. 8 at p. 9; Decl. of

Matthew Kahal, ECF 8-22, Ex. 11 at pp. 5-7).  DTE's claim of demand growth for

Monroe Unit 2 at the same time that it projected declining demand in its overall

system adds extra importance to the regulatory requirement that DTE explain and

document why DTE's projected increased utilization of Monroe Unit 2 is unrelated

to the boiler overhaul project.  Yet, as noted above, no such explanation or

documentation was provided.

DTE attempts to shift the focus away from its failure to provide a

contemporaneous explanation and documentation of its demand growth exclusion

claim by arguing that the Plaintiffs are improperly trying to "second guess" the

Company's pre-construction projection.  (DTE SJ Br. at 18).  But the Court need

not parse the line drawn by the Sixth Circuit between improper "second guessing"

and a proper challenge to DTE's failure to follow the regulations in making its pre-

construction projections, *DTE Energy*, 711 F.3d at 644, as no such second guessing

is occurring here.  The Company is correct that the United States has offered a

series of expert reports regarding projected emissions impacts of the $65 million

overhaul.  But none of those analyses are needed to conclude that DTE failed to

provide the requisite explanation and documentation of its claimed demand growth

exclusion, as is required by 40 C.F.R. § 52.21(r)(6)(i)(c).  In short, one cannot

second guess an analysis that has never been provided.  In addition, it is important

to note that a large focus of the expert reports submitted by the United States is on

10

the fact that DTE's own economic analyses suggest that the Company expected the overhaul to lead to increased generation at Monroe Unit 2 that would inherently mean increased emissions.  (*See, e.g.*, Decl. of Myron Adams, ECF 8-21, Ex. 10 at p. 5; Reply Decl. of Matthew Kahal, ECF 58-13, Ex. 18 at p. 4; Reply Decl. of Robert Koppe, ECF 58-10, Ex. 15 at p. 2; Reply Decl. of Myron Adams, ECF 58-12, Ex. 17 at p. 2).  Certainly identifying portions of DTE's own analyses that are inconsistent with the Company's contention that all emission increases at Monroe Unit 2 are attributable to demand growth cannot be considered second guessing what the Company did.

Finally, while not cited in DTE's summary judgment briefing, the Company did present, in response to the U.S.'s motion for a preliminary injunction, a new analysis from an outside consultant named Michael King purporting to show that "several assumptions unrelated to the project are the likely explanation for the projected changes in generation" at Monroe Unit 2.  (Decl. of Michael King, ECF 46-11, Ex. 10 at p. 37).  The NSR regulations, however, require documentation and explanation of a demand growth exclusion "before beginning actual construction of the project," 40 C.F.R. § 52.21(r)(6)(i), not as a *post hoc* rationalization.  In addition, Mr. King's analysis studiously avoided any consideration of whether the $65 million overhaul, and the resulting decreases in forced outages and increases in availability, played a role in causing the emissions increases that DTE projected.

11

(Reply Decl. of Bruce Biewald, ECF 58-11, Ex. 16 at pp. 1-4, 6).  Finally,

Mr. King's analysis, at most, creates an issue of disputed fact regarding whether

DTE followed the applicable regulations in claiming the demand growth exclusion.

*Cf.* 57 Fed Reg. 32,314, 32,327 (July 21, 1992) (noting that the demand growth

exclusion "is a fact-dependent determination that must be resolved on a case-by-

case basis.").

## II.    THE LACK SO FAR OF A POST-PROJECT EMISSIONS INCREASE DOES NOT FORECLOSE THIS ENFORCEMENT ACTION.

In an effort to relitigate an issue that it already lost at the Sixth Circuit, DTE

contends that Plaintiffs are foreclosed from basing this enforcement action on the

Company's pre-construction projections because no post-project emissions

increase has occurred so far.  (DTE SJ Br. at 7-8, 18-19).  But such argument

ignores the fact that it is the pre-construction projection "that determines whether

the project constitutes a 'major modification' and thus requires a permit."  *DTE

Energy*, 711 F.3d at 644.  As such, the Sixth Circuit made clear that:

> The operator has to make projections according to the requirements
> for such projections contained in the regulations.  If the operator does
> not do so, and proceeds to construction, it is <u>subject to an enforcement
> proceeding</u>.

*Id.* at 649 (emphasis added).  While the dissenting Judge on appeal accepted the

argument that a lack of a post-project emissions increase would moot the case, *id.*

at 652-53, the majority did not adopt that position.  Instead, the Sixth Circuit

12

majority remanded specifically to allow the enforcement action regarding the pre-construction projection to proceed. *Id*. at 652. DTE's attempt to short-circuit the pre-construction based enforcement action that the Sixth Circuit specifically allowed to proceed should be rejected.

Despite the rejection of its position by the Sixth Circuit, DTE points to two regulatory provisions in support of its post-project emissions argument, but neither provision supports the Company's position. First, Detroit Edison cites 40 C.F.R. § 52.21(a)(2)(iv)(a), which states that a "project is not a major modification if it does not cause a significant emissions increase," as purportedly foreclosing any finding of a NSR violation in the absence of a post-project increase in actual emissions. (DTE SJ Br. at 7). But the regulations also make clear that "[a]ctual emissions means the actual rate of emissions of a regulated NSR pollutant from an emissions unit, . . . except that ***this definition shall not apply for calculating whether a significant emissions increase has occurred***." 40 C.F.R. § 52.21(b)(21)(i) (emphasis added). Instead, whether a significant emissions increase triggering NSR will occur is to be based on a pre-construction analysis that projects emissions on the basis of the baseline and projected actual emissions tests set forth at 40 C.F.R. §§ 52.21(b)(41), (48). *Id*.; *DTE Energy*, 711 F.3d at 644. In other words, EPA's rules prohibit a utility from using its actual post-project emissions to evade NSR pre-construction permitting requirements.

13

DTE's post-project emissions argument is also based on the following misleading paraphrasing of a relevant regulation:

> EPA makes clear that, '[r]egardless of ***any such*** preconstruction projections, a major modification' depends on whether "the project ***causes a significant emissions increase*** …." 40 C.F.R. § 52.21(a)(2)(iv)(*b*) (emphases added).

(DTE SJ Br. at 7). Such phrasing suggests that EPA's regulations provide that post-project emissions always trump the pre-construction projections regardless of whether those post-project emissions show an increase. But the full regulatory language shows that the cited provision is more limited. The complete sentence paraphrased by DTE is:

> Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

40 C.F.R. § 52.21(a)(2)(iv)(b). In other words, the regulatory language provides only that NSR is triggered by a qualifying post-project emission increase even if the utility had not projected such an increase. Nothing in that language excuses a utility's failure to comply with the pre-construction rules on the ground that a post-project emission increase has yet to occur. DTE's contention to the contrary is based on a misreading of the applicable regulations and should be rejected.

DTE's post-project emissions argument also falters because only two years of post-construction data has been collected. EPA regulations provide for five

14

years of post-construction monitoring and reporting of emissions to assess whether an NSR-triggering emissions increase has occurred, and even then there is no time barrier to contending that an emissions increase was related to a particular major modification. *DTE Energy*, 711 F.3d at 651-52. The pre-construction reporting requirement is intended to "facilitate the agency's ability to ensure that emissions do not increase" over that five-plus year post-project time frame. *Id.* at 649. But it cannot do so if a utility can evade any assessment of its pre-construction projections by simply waiting for a year or two of data without NSR-triggering emissions increases to trump any action targeting the projection. As such, it makes no sense to claim that the pre-construction based enforcement action endorsed by the Sixth Circuit is foreclosed by only two years of post-project emissions data, when future data could still confirm the post-project emissions increase that DTE projected here.

## **CONCLUSION**

For the foregoing reasons, Plaintiff-Intervenor Sierra Club respectfully urges the Court to deny DTE's motion for summary judgment.

Respectfully submitted,

/s/ Shannon W. Fisk
Shannon W. Fisk
(IL Bar No. 6269746)

15

Earthjustice
1617 John F. Kennedy Boulevard
Suite 1675
Philadelphia, PA 19103
Phone: (215) 717-4522
sfisk@earthjustice.org


Nicholas J. Schroeck
(MI Bar No. P70888)
Great Lakes Environmental Law
Center
440 Burroughs St. Box 70
Detroit, MI 48202
Phone: (313)820-7797
nschroeck@wayne.edu

*Attorneys for
Plaintiff-Intervenor Sierra Club*


August 2, 2013

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 2, 2013, I electronically filed the foregoing **SIERRA CLUB'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this matter.

<u>/s/ Shannon W. Fisk</u>

*Attorney for*
*Plaintiff-Intervenor Sierra Club*

17