# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:10-cv-13101-BAF-RSW |
| and | ) | |
| | ) | Judge Bernard A. Friedman |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, and SIERRA CLUB | ) | Magistrate Judge R. Steven Whalen |
| | ) | |
| Plaintiff-Intervenors | ) | |
| v. | ) | |
| | ) | |
| DTE ENERGY COMPANY and | ) | |
| DETROIT EDISON COMPANY | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF UNITED STATES' OPPOSITION
TO DTE'S MOTION FOR SUMMARY JUDGMENT
BASED ON COMPLIANCE WITH PRE-CONSTRUCTION
PROJECTION REQUIREMENTS**

**ORAL ARGUMENT REQUESTED**

**FILED UNDER SEAL**

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

## STATEMENT OF ISSUE PRESENTED

DTE performed a $65 million capital improvement at Monroe Unit 2 in 2011. At the time, DTE expected that pollution from the plant would increase as a result of the project by thousands of tons. Did the Sixth Circuit find that EPA and this Court must be allowed to review DTE's claim that the entire expected emissions increase is exempted from regulation?

**Plaintiff's Answer**:  Yes.

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

CONTROLLING OR OTHER APPROPRIATE AUTHORITY ..................................... v

BACKGROUND AND PROCEDURAL HISTORY.................................... 2

STATEMENT OF FACTS .......................................................... 4

    I.     Statement Of Additional Material Facts ........................................ 4

    II.    Response To DTE's Assertions Of Undisputed Material Facts ................................... 8

STANDARD OF REVIEW ........................................................ 9

ARGUMENT ................................................................ 10

    I.     The Sixth Circuit Already Rejected DTE's Argument That Preconstruction Emissions Projection Are Not Subject To Review ........................... 10

    II.    DTE's Argument Is Legally Deficient ........................................ 11

        A.  Applying the Law Requires Articulating the Law ................................. 11

        B.  Evaluating Compliance Requires Evaluating Facts ............................. 13

    III.    DTE's Use Of The Demand Growth Exclusion Violates EPA's Regulations ........... 15

        A.  Legal Standard for the Demand Growth Exclusion ............................. 15

        B.  DTE Failed to Apply the Demand Growth Exclusion in Accordance with the Regulations ................................. 16

        C.  DTE's Own Documents Confirm That It Should Have Projected an Emissions Increase Related to the Project ....................... 18

CONCLUSION ................................................................ 21

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

# TABLE OF AUTHORITIES

## Federal Cases

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................v, 9

*Cit. Awareness Network v. U.S. Nuclear Reg. Comm'n*, 59 F.3d 284 (1st Cir. 1995) .................12

*Decker v. NW Envtl. Def. Center*, 133 S. Ct. 1326 (2013) ............................................................9

*Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007)........................................v, 3, 12, 13, 16, 20

*McPherson v. Kelsey*, 125 F.3d 989 (6th Cir. 1997)........................................................................12

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) ....................................................v, 3, 12, 13, 15, 16

*Puerto Rican Cement Co., Inc. v. EPA*, 889 F.2d 292 (1st Cir. 1989) .............................12, 13, 18

*Scott v. Harris*, 550 U.S. 372 (2007) ........................................................................9

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) ........................................................9

*United States v. Cinergy Corp.*, No. 1:99CV1693LJM-VSS, 2005 WL 3018688
(S.D. Ind. Nov. 9, 2005)........................................................................12, 16

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006) ..................................12, 13, 14, 18

*United States v. Cole*, 359 F.3d 420 (6th Cir. 2004) ........................................................13

*United States v. DTE Energy Co.*, 711 F.3d 643 (6th Cir. 2013) ......................................... *passim*

*United States v. Duke Energy Corp.*, No. 1:00-cv-1262, 2010 WL 3023517
(M.D.N.C. July 28, 2010) ........................................................................14

*United States v. La. Generating, LLC*, No. 09-100-JBB-CN, 2012 WL 1676706
(M.D. La. May 14, 2012) ........................................................................17

*United States v. La. Generating, LLC*, No. 09-100-JBB-CN, 2012 WL 4107129
(M.D. La. Sept. 19, 2012) ........................................................................8, 9

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) ..................................17

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 292 (7th Cir. 1990) ............................................v, 12, 18

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

**Federal Statutes**

42 U.S.C. § 7477 ...................................................................................................11

**Federal Regulations**

40 C.F.R.§ 52.21(b)(41)(ii) ..............................................................................3,13

40 C.F.R. § 52.21(b)(41)(ii))(c) .................................................................3, 9, 15, 18


57 Fed. Reg. 32,314 (July 21, 1992) ............................................v, 12, 13, 18

61 Fed. Reg. 38,250 (July 23, 1996) ......................................................v, 12

67 Fed. Reg. 80,186 (Dec. 31, 2002) .................................................v, 3, 4, 12, 15, 16

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

## CONTROLLING AND APPROPRIATE AUTHORITIES

**Cases**

*Auer v. Robbins*, 591 U.S. 452 (1997)

*Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007)

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005)

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 292 (7th Cir. 1990)

**Preamble to EPA's 1992 NSR Rules Amendments**

57 Fed. Reg. 32,314 (July 21, 1992)

**Notice of Proposed Rule Making re: EPA's NSR Rules**

61 Fed. Reg. 38,250 (July 23, 1996)

**Preamble to EPA's 2002 NSR Rules Amendments**

67 Fed. Reg. 80,186 (Dec. 31, 2002)

**Guidance Documents**

Technical Support Document for the Prevention of Significant Deterioration and Nonattainment Area New Source Review Regulations (November 2002)

April 20, 2010 Letter from Dianne McNally (U.S. EPA) to Mark Wejkszner (Pa. Dep't Envtl. Protection) (Northampton Determination)

May 23, 2000 Letter from Frank Lyons (U.S. EPA) to Henry Nickel (Hunton & Williams) (Detroit Edison Determination)

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

In the years leading up to the Spring 2010 outage, DTE had a problem with one of its "flagship" coal-fired generating units.  Monroe Unit 2 was nearly 40 years old, and was being forced out of service more and more by mechanical breakdowns.  The company had to decide whether to invest in Monroe Unit 2 or let its performance continue to decline.  DTE chose to spend $65 million of ratepayer money to overhaul Monroe Unit 2, expecting that this investment would allow the unit to operate more hours, generate more electricity, and produce more pollution after the project.  The company's own computer modeling predicted that pollution would increase by 3,701 tons of $SO_2$ and 4,096 tons of $NO_X$ after the project.

At that moment, DTE should have sought New Source Review ("NSR") permits.  Under EPA's NSR regulations, once it projects that an overhaul project will lead to a significant increase in air pollution, an operator's "inquiry is over and it must seek a permit from EPA or the relevant stage agency and install expensive modern pollution-control technology."  *United States v. DTE Energy Co.*, 711 F.3d 643, 647 (6th Cir. 2013).  DTE had other ideas, however.  Rather than obtain the permits that the law required, DTE told the state environmental agency that the pollution increases and the $65 million overhaul were unrelated, despite the fact that the overhaul enabled the unit to run more often.  In doing so, the Company claimed the benefit of a regulatory exclusion known as the demand growth exclusion.

In its new summary judgment motion, DTE argues that the company complied with EPA's preconstruction regulations, and that, in any event, neither EPA nor this Court can evaluate the Company's preconstruction conduct.  *E.g.* DTE Brief, ECF 166 at 7.  But DTE's new motion just repeats the argument that the Sixth Circuit already rejected.  The Court of Appeals has confirmed that EPA "must" be able to bring enforcement actions for preconstruction violations of its NSR requirements.  Moreover, it explicitly held that EPA's enforcement powers

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

include ensuring sources properly employ the so-called demand growth exclusion—the regulatory provision upon which DTE relied when it told the state agency it did not need an NSR permit. *See DTE*, 711 F.3d at 650. As the Sixth Circuit underscored, operators may be "subject to an enforcement action by EPA to ensure that the projection is made pursuant to the requirements of the regulations." *Id.* at 652. When DTE claimed the benefit of the demand growth regulation, it did so without legal authority or factual support. In its latest motion, DTE again skips over the pertinent legal analysis and the relevant facts, asking this Court instead to bless its unsupported "judgment" without question. But DTE's "extreme makeover" of Monroe Unit 2 is precisely the sort of "blatant violation" the Sixth Circuit said EPA must be able to challenge, and DTE has offered neither reason nor record evidence to support its claim of compliance with the demand growth exclusion.

The United States respectfully requests that the Court deny DTE's motion.

## BACKGROUND AND PROCEDURAL HISTORY

This case is back before the Court after the Sixth Circuit overturned the 2011 summary judgment ruling for DTE. The Sixth Circuit held that EPA can bring enforcement actions based on a source's pre-construction analysis, just as EPA did here. In fact, EPA "*must*" be allowed to "ensur[e] that operators follow the requirements in making [emissions] projections." *See DTE*, 711 F.3d at 650 (emphasis added). The Sixth Circuit described PSD as a system that "depends on operators' making accurate projections before embarking on construction projects." *Id.* at 649. If EPA were precluded from enforcement in situations like this, "New Source Review would cease to be a preconstruction review program." *Id.* The Sixth Circuit described the regulations as taking a middle road, in which the operators make projections but must follow the requirements of the regulations. *Id.* Sources that fail to do so are "subject to an enforcement

2

proceeding" in federal court.  *Id.*  Fundamentally, the Sixth Circuit confirmed EPA's ability to enforce based on faulty pre-construction analysis.  *See id.* at 650; *id.* at 653 ("The majority ultimately holds that USEPA must be able to challenge the accuracy of the operator's scientific or technical preconstruction projections and remands the case for renewed (further) proceedings in the district court on that basis.") (Batchelder, J., dissenting).

A critical issue in determining whether DTE followed the regulations here is the application of a regulatory provision known as the "demand growth exclusion."  40 C.F.R. § 52.21(b)(41)(ii)(c).  The Sixth Circuit specifically included the demand growth exclusion as one of the many preconstruction requirements EPA "must" be able to review for compliance. *DTE*, 711 F.3d at 650 (citing § 52.21(b)(41)(ii)); *accord New York v. EPA*, 413 F.3d 3, 35 (D.C. Cir. 2005) ("*New York*") (authorities must be able to evaluate whether a source has "overstat[ed]" the exclusion and improperly avoided NSR review).

The demand growth exclusion allows a source to exclude part of a projected emissions increase if certain requirements are met.  Most important for this case, only emissions increases *unrelated* to the project can be excluded and thus not counted for NSR purposes.  *See* 40 C.F.R. § 52.21(b)(41)(ii)(c); *DTE*, 711 F.3d at 650; *New York*, 413 F.3d at 32-33 (discussing, *inter alia*, 67 Fed. Reg. 80,186, 80,203 (Dec. 31, 2002)).  Where a project will cause or enable emissions increases by allowing a facility to run more in the future, the Supreme Court has recognized that additional pollution *cannot* be excluded.  *See Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 580 (2007) ("*Duke Energy*") (noting EPA's long-held interpretation that "when plans to increase . . . hours of operation are inextricably intertwined with the physical changes planned" at a facility, those plans "should have to undergo PSD review scrutiny").

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

As the Sixth Circuit opined, if an operator makes "no projection, or the projection is made in contravention of the regulations guiding how the projection is to be made, then the system is not working." *DTE*, 711 F.3d at 649.  Thus, where an operator expects a project to result in increased pollution but improperly evades the preconstruction obligations enacted by Congress, it can be "subject to an enforcement action."  *Id.*; *see also* 67 Fed. Reg. at 80,190 ("If you are subsequently determined not to have . . . properly project[ed] emissions . . . you will be subject to any applicable enforcement provisions."); Excerpts of EPA's Technical Support Document for PSD and NNSR Regulations (Nov. 2002), ECF 114-6 at I-4-18 (discussing the possibility of "retroactive determinations" and "retroactive NSR applicability").  This case presents just such an enforcement action.

STATEMENT OF FACTS

**I.      Statement Of Additional Material Facts**

1.       DTE renovated Monroe 2 in 2010.  The work included the replacement of several major parts of the boiler such as the unit's economizer, high temperature reheater, and waterwalls.  *See* Project Authorization Papers (attached hereto as Ex. A).  The $65 million project was unprecedented in the unit's history.  *See* Inspection Notes, ECF 8-4 at 3 (economizer and reheater pendants had never before been replaced in their entirety); Apr. 27, 2010 Fessler Email, ECF 114-3 at DECO 27772 (describing Monroe 2 overhaul as the "largest outage I can remember").

2.       The Monroe 2 overhaul was performed to eliminate problems that were causing the unit to break down repeatedly in the years before the project (these breakdowns are referred to as "forced outages" in the industry).  *See* Project Authorization Papers (Ex. A) at 000006-8. The largest source of forced outages prior to the project was the economizer that was replaced as

4

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

part of the project. *See* 2010 Capital Plan Summary (attached as Ex. B) at 5 (economizer was the "[g]reatest contributor to Monroe Unit 2 ROF since 2006"). By replacing the worn-out and failing boiler components with new ones, DTE expected Monroe 2 to be able to operate more hours and generate more electricity in the years after the project. *See* Economizer Replacement, Utility Capital Committee Review, ECF 58 Ex. 13E (Filed Under Seal, ECF 60) at 8 (describing "recovered" operating time in the future); Reheater Replacement, Utility Capital Committee Review, ECF 58 Ex. 13F (Filed Under Seal, ECF 61) at 6 (same); *see also* Project Authorization Papers, Ex. A at 000006-8.

3.      To perform the preconstruction emissions analysis in its Notice Letter, DTE used a "sophisticated" computer model known as PROMOD that simulated the operation of Monroe 2 after the project. *See* DTE Brief, ECF 166 at 14. DTE admits that the PROMOD projections relied upon in the Notice Letter "reflect the Company's best estimate." *Id.* The PROMOD run that the company used in the Notice Letter was part of a submission to the state Public Service Commission to seek cost recovery from ratepayers. *See* DTE Resp. to U.S. Requests for Admission ("RFAs") No. 29 (RFA responses attached as Ex. C).

4.      DTE's computer modeling makes clear that DTE expected Monroe 2 to operate for many more hours after the unit was rehabilitated. Biewald Declaration, ECF 8-19 ¶ 7; Biewald Second Declaration, ECF 58-11 ¶¶ 7–10. The increase in operating hours projected in the model was enabled by a large expected decrease in the outage rate of Monroe 2 (*i.e.*, fewer breakdowns) in the years after the project when compared to the recent past. Biewald Declaration, ECF 8-19 ¶ 21. The outage rates the unit experienced in the years before the project are sharply higher than what DTE expected in the years after the project as shown in the graph below.

5



*See* DTE Resp. to U.S. RFA Nos. 32 & 33 (Ex. C) (Unit 2 outage rates for 2011-2014); "Final

ROR inputs for 2011 PSCR" (DECO 5994) (Ex. D) (Unit 2 outage rates for 2005-2009); *see also*

Email from Ken White (DECO 17728) (Ex. E) (noting a precipitous decline in projected outage

rate "if we get the projects that we are asking for"); Monroe Reliability Improvement Study (Ex.

F) at DECO 160805 (showing chart with same projected decrease in outage rate).

     5.     Not surprisingly, given the projected increase in operations, DTE's computer

model also projected that Monroe 2 would substantially increase its pollution after the renovation

was completed.  *See* Notice Letter, ECF 8-6 at 5.

     6.     DTE does not (and cannot) dispute that it projected increased operating hours and

increased $SO_2$ and $NO_X$ emissions after the project.  In fact, DTE admits that its model projected

increases of 3,701 tons of $SO_2$ and 4,096 tons of $NO_X$ after the project compared to the baseline

period chosen by the company its Notice Letter.  *See* Notice Letter, ECF 8-6 at 5.

     7.     Nevertheless, DTE made only conclusory statements in its Notice Letter asserting

that none of these increases were due to the project, thus claiming the benefit of EPA's demand

growth exclusion regulation.  Notice Letter, ECF 8-6 at 2.

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

8.      Based on DTE's own computer model, the predicted emissions increase specifically *related to the overhaul* was at least several hundred tons per year:

| EMISSIONS INCREASES RELATED TO MONROE 2 OVERHAUL BASED ON DTE PROMOD MODELING | | |
|---|---|---|
| Year | SO$_2$ Increase Related to the Project | NO$_X$ Increase Related to the Project |
| 2011 | 1,373 | 980 |
| 2012 | 289 | 864 |
| 2013 | 1,302 | 946 |

Expert Report of Philip Hayet (Ex. G) at 14.  By contrast, DTE contends that the emissions increase related to the project is zero tons of SO$_2$ (out of a projected increase of 3,701 tons) and zero tons of NO$_X$ (out of a projected increase of 4,096 tons).  *See* Notice Letter, ECF 8-6 at 5; DTE Brief, ECF 166 at 15.

9.      DTE claimed (and still claims) that *all* its projected future emissions increases were excludable from review under the regulatory provision known as the demand growth exclusion.  *See* Notice Letter, ECF 8-6 at 5; DTE Brief, ECF 166 at 15.  DTE made this claim even though the company was in fact projecting system-wide electricity demand to *decline* in the years following the renovation work.  *See* Biewald Declaration, ECF 8-19 ¶¶ 7, 20–21.

10.     During the ***twenty-five years*** preceding the overhaul, DTE operated Monroe Unit 2 ***every hour*** the unit was available.  DTE Resp. to U.S. RFA No. 36 (Ex. C).  DTE's computer model projected that Monroe 2 would continue to operate every hour it was available in the years following the project.  *Id.* at RFA No. 38.  Just 17 additional hours of operation are enough to trigger NSR because of the unit's high hourly pollution rate compared to other sources.  Sahu Declaration, ECF 8-13 ¶ 13.  Without the including the improvement in outage rate that DTE

7

expected to result from the project, the DTE could not have projected its future operations as high as it did for the post-project period.  Koppe Declaration, ECF 8-16 ¶ 89.

11.     To date, DTE has never offered a genuine explanation for how the increased operating hours projected by its PROMOD model could be unrelated to the project that was expected to eliminate the largest source of breakdowns.

12.     Since the United States sued DTE, the Company has obtained NSR permits and begun installation of pollution controls on Monroe Unit 2.

## II.     Response To DTE's Assertions Of Undisputed Material Facts

DTE's brief sets forth a number of "facts" that are disputed and in some cases flatly contradicted by record evidence or entirely immaterial to the motion.

1.      *Routine Maintenance.*  DTE asserts that the $65 million "extreme makeover" done at Monroe Unit 2 over three months in 2010 was simply a collection of "routine maintenance" projects.  DTE Brief, ECF 166 at 13.  This contention is both immaterial to the present motion and disputed.  As the Sixth Circuit described it, the replacement of waterwall tubing, the economizer, the reheater, the exciter were all part of a single "construction project . . . that included replacing approximately 2,000 square feet of tubing, the economizer, and large sections of reheater piping; installing a new nine-ton exciter … and refurbishing boiler feedwater pumps [and that] required approximately 83 days, 600 construction workers, and $65 million." *DTE*, 711 F.3d at 648.  None of this work can be seen as routine under the narrow exception to NSR provided by the regulations for mere "routine maintenance, repair, and replacement."  *See* Hekking Declaration, ECF 8-17 ¶¶ 38–45; *accord United States v. La. Generating, LLC*, No. 09-100-JJB-CN,  2012 WL 4107129, at *9 (M.D. La. Sept. 9, 2012) ("[N]o reasonable jury could find that the reheater replacement projects qualify for the [routine maintenance] exception.

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

Common sense dictates that when a generating facility takes 25 days and spends $4.5 million—
the largest amount ever spent on the unit—with the intent to decrease forced outages and
therefore increase future generation, this work cannot in any way be considered routine.").  In
any event, whether the work qualifies as routine maintenance is immaterial to DTE's motion.

   2. *Emissions Projection.*  DTE asserts as an "undisputed material fact" that the
Company followed EPA's requirements for performing emissions projections.  DTE Brief, ECF
166 at 13.  This legal conclusion is the subject of DTE's entire motion for summary judgment,
and this response brief.  The United States disputes that DTE followed the regulations in
predicting the emissions increase for NSR purposes.  For instance, DTE improperly excluded
projected emissions increases that were related to the Monroe 2 overhaul. *Contra* 40 C.F.R.
§ 52.21(b)(41)(ii)(c).

## STANDARD OF REVIEW

   At the summary judgment stage, "courts are required to view the facts and draw
reasonable inferences in the light most favorable to the party opposing the summary judgment
motion."  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations omitted).  Where there
remains a genuine issue of material fact as to the issue presented, summary judgment is
inappropriate.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

   EPA's interpretation of its own rules is entitled to even further deference: it is considered
"controlling" as long as it is not "plainly erroneous or inconsistent" with the regulatory language.
*Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal citations omitted).  Indeed, "[i]t is well
established that an agency's interpretation need not be the only possible reading of a
regulation—or even the best one—to prevail."  *Decker v. NW Envtl. Def. Center*, 133 S. Ct.
1326, 1337 (2013).

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

**ARGUMENT**

The Sixth Circuit has made clear that EPA can bring cases in federal court where sources fail to follow the NSR regulations—including where sources incorrectly apply the demand growth exclusion at issue in this case. *DTE*, 711 F.3d at 649-50.  Here DTE embarked on a $65 million overhaul of Monroe Unit 2 that was designed to improve the aging unit and allow it to run more often.  It fed those expectations into its "sophisticated" computer model and predicted huge electricity generation and pollution increases.  Yet when it came to its correspondence with environmental regulators, DTE represented that *none* of those increases counted for NSR purposes.  In other words, in deciding whether to perform the project, DTE expected that the unit would run more as a result of the $65 million overhaul.  When it came time to evaluate the project for NSR purposes, it was as if the $65 million project never existed.

How did the company reach such an incredible conclusion for its NSR projection when it had concluded the exact opposite as part of its business projection?  As described below, DTE misapplied the law of the demand growth exclusion, and misconstrued its own documents to reach its pre-determined conclusion that NSR simply should not—and never could—apply to boiler replacement projects.

**I.    The Sixth Circuit Already Rejected DTE's Argument That Preconstruction Emissions Projection Are Not Subject To Review**

As a threshold matter, DTE suggests that EPA cannot inquire as to what the Company *did* or *should have* predicted about its future emissions.  In fact, DTE claims—just as it did to the Sixth Circuit—that this Court cannot evaluate the Company's pre-construction conduct without considering post-construction emissions data.  DTE Brief, ECF 166 at 7 ("[I]n the absence of evidence showing an actual [post-construction] increase in emissions caused by the project, a source operator *cannot* be held liable for constructing a major modification without a permit."

10

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

(emphasis added)).  But the Sixth Circuit already ruled that the language of the statute is clear, and that EPA *must* be allowed to enforce violations of the PSD program before construction begins and before increased pollution harms the public.  *See DTE*, 711 F.3d at 650 (discussing 42 U.S.C. § 7477 and EPA's regulatory requirements).  Directly contrary to the regulatory interpretation DTE exhumes from its loss at the Court of Appeals, "EPA's enforcement powers must . . . extend to ensuring that operators follow the requirements in making those [required preconstruction] projections." *Id.*  Moreover, "[t]hat projection determines whether the project constitutes a 'major modification' and thus requires a permit." *Id.* at 644.

DTE's strained reading of EPA's regulations was addressed in briefing to this Court and the Sixth Circuit, and it was plainly rejected by the Appellate court.  The fact that emissions have (so far) gone down in the years after the overhaul does not shed any light on whether DTE followed the regulations in predicting emissions before the project.[1]  And as DTE admits, the Sixth Circuit remanded this case to answer that very question.  DTE Brief, ECF 166 at 2.

## II.   DTE's Argument Is Legally Deficient

DTE claims that it followed EPA's regulations when it performed its emission projection for the Monroe 2 overhaul project.  To evaluate this claim of compliance, this Court must apply the law to the facts of the case.  DTE's Motion fails to discuss the applicable law, and it ignored the pertinent facts long-established in the record.  As such, DTE's Motion cannot succeed.

### A.   Applying the Law Requires Articulating the Law

DTE claims in its brief that it complied with the demand growth exclusion when it performed its emissions projection.  DTE Brief, ECF 166 at 15, 17.  As the Company knows full

---

[1]   Moreover, DTE fails to mention that *this Court* ordered DTE to keep emissions to below baseline levels.  *See* ECF No. 29.

11

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

well,[2] the demand growth provision and its predecessors have been interpreted in the Federal

Register,[3] described in guidance documents,[4] applied in permitting documents and applicability

determinations,[5] and discussed (both directly and indirectly) by courts.[6]  But DTE's new motion

fails to discuss—or even cite—any source of law that illustrates EPA's "controlling"

interpretation of the regulations; it never analyzes its claim for compliance under the applicable

body of regulatory law; and the Company never gives any reason why EPA's interpretation of its

own regulations should be entirely ignored.[7]

   EPA's interpretation has been consistent and clear: where an operator's modification

project enables a facility to operate more hours, and those hours are projected to contribute to an

increase in pollution, that excess pollution *cannot* be excluded from PSD review.  *See*, *e.g.*, 57

Fed. Reg. at 32,328 ("[A]n increase in emissions attributable to an increase in hours of operation

. . . which is the result of a construction-related activity is not excluded from review." (citing

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 916 n.11 (7th Cir. 1990) (*WEPCO*); *Puerto Rican*

---

[2]   ECF 127 at 16-18 (prior DTE brief citing regulatory guidance documents and discussing differing regulatory interpretations).

[3]   *E.g.*, 67 Fed. Reg. 80,186, 80,202-203 (Dec. 31, 2002); 61 Fed. Reg. 38,250, 38,268 (July 23, 1996); 57 Fed. Reg. 32,314, 32,327-328 (July 21, 1992).

[4]   *E.g.*, Technical Support Document for PSD & NNSR, ECF 114-6 at I-4-37.

[5]   *E.g.* Letter from Dianne McNally (EPA Region III) to Mark Wejkszner (Pa. Dep't Envtl. Protection) ("Northampton Determination") (Apr. 20, 2010), ECF 114-7 at 3; Letter from Frank Lyons (U.S. EPA) to Henry Nickel (Hunton & Williams) (May 23, 2000), ECF 8-15 at Encl. pp. 20–21.

[6]   *See*, *e.g.*, *Duke Energy*, 549 U.S. at 577-78; *United States v. Cinergy Corp.*, 458 F.3d 705, 708 (7th Cir. 2006); *New York*, 413 F.3d at 33; *United States v. Cinergy Corp.*, No. 1:99CV1693LJM-VSS, 2005 WL 3018688, at *3 (S.D. Ind. Nov. 9, 2005).

[7]   *Cf. McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to… put flesh on its bones." (citing *Cit. Awareness Network v. U.S. Nuclear Reg. Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995)).

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

*Cement Co., Inc. v. EPA*, 889 F.2d 292, 298 (1st Cir. 1989)); *see also United States v. Cinergy Corp.*, 458 F.3d 705, 709 (7th Cir. 2006) (explaining that revitalizing a plant to operate more hours may trigger PSD obligations).  This is not news; as the Supreme Court noted, this has been EPA's interpretation for *decades*.  *See Duke Energy*, 549 U.S. at 579-80 & n.7 (discussing EPA guidance from 1988 and 1992).  DTE expected Monroe 2 to operate more hours because of the project and to emit more pollution during those hours, but the Company excluded those emissions from PSD review anyway.  SOF ¶¶ 7–8.  DTE offers no explanation for its contra-legal determination; indeed, it "neglect[s] to cite even one authority supporting" it.  *United States v. Cole*, 359 F.3d 420, 428 n.13 (6th Cir. 2004) (deeming party's unsupported argument waived).

## B.    Evaluating Compliance Requires Evaluating Facts

As the Sixth Circuit confirmed, EPA "must" be able to enforce compliance with the emissions projection regulations—including application of the demand growth exclusion.  *See DTE*, 711 F.3d at 650 (*citing* 40 C.F.R. § 52.21(b)(41)(ii)); *accord New York*, 413 F.3d at 35) (noting importance of enforcement authorities' ability to ensure operators do not "overstat[e] the demand growth exclusion" in order to evade permitting requirements).  Whether the demand growth exclusion applies "is a fact-dependant determination that must be resolved on a case-by-case basis."  *DTE*, 711 F.3d at 646 (quoting 57 Fed. Reg. at 32,327).

Because it cannot explain how the facts of this case justify its application of the demand growth exclusion, DTE simply asks the Court to trust its "business and engineering judgment."  DTE Brief, ECF 166 at 15.  And although the law clearly imposes prerequisites on any application of the demand growth exclusion, *see*, *e.g.*, *New York*, 413 F.3d at 33 (discussing EPA guidance documents), DTE ignores the operation of these requirements and instead presents its

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

one-sentence legal argument: "The undisputed facts demonstrate that DTE complied with [listed regulatory] requirements."  DTE Brief, ECF 166 at 17.

But citing a regulation is not the same as following it.  DTE's brief makes no attempt to address the facts of the case as the United States has long alleged and documented them:

> (1) DTE performed the "extreme makeover" so Monroe Unit 2 *could* operate more hours, SOF ¶ 2;
>
> (2) DTE expected Monroe Unit 2 *would* operate more hours, SOF ¶¶ 4, 10;
>
> (3) DTE projected a massive increase in emissions in the years following the project, SOF ¶¶ 5–6, 8; and
>
> (4) the extra pollution expected to result from those extra operating hours was enough to require DTE to obtain a preconstruction permit, SOF ¶ 8.

These facts make the demand growth exclusion *legally unavailable* to DTE for at least some of its massive, expected emissions increase.

Like EPA, this Court "must" be able to evaluate whether DTE properly applied the demand growth exclusion when the Company assessed its Monroe Unit 2 overhaul.  This does not mean "second-guessing" the Company's proper projection, it means evaluating whether DTE properly followed EPA's regulations when it performed that projection—just as the Sixth Circuit directed.  *DTE*, 711 F.3d at 650.  If DTE failed to follow the regulations when it performed its analysis, the question becomes: should the defendant have projected an increase had it followed the regulations.  *See*, *e.g*., *United States v. Duke Energy Corp.*, No. 1:00-cv-1262, 2010 WL 3023517, at *6 (M.D.N.C. July 28, 2010) ("this Court need only determine whether Duke Energy reasonably should have projected a significant increase in emissions") (citing *Cinergy*, 458 F.3d at 707-08).  The PSD regulations impose substantive requirements crafted to protect the public health; establishing a source's compliance takes more than an operator's "say-so."  *Cf.* Supp. Boyd Decl., ECF 166-5 ¶ 5.e (stating DTE "determined" the increase was attributable to "other

14

factors" without presenting any support for that determination or considering whether even portions of the increase would be enabled by or related to the Monroe 2 overhaul project).

## III.     DTE's Use Of The Demand Growth Exclusion Violates EPA's Regulations

DTE claims it followed EPA's regulations when it assessed its $65 million "extreme makeover" of Monroe Unit 2. The critical regulation for this motion is the demand growth exclusion, 40 C.F.R. § 52.21(b)(41)(ii)(c). Whether DTE properly applied this provision is critical because, though it expected pollution from Monroe Unit 2 to go up by thousands of tons each year after the overhaul, "DTE determined that the *entire* emissions increase fell under the demand growth exclusion." *DTE*, 711 F.3d at 648 (emphasis added).[8] Ultimately, DTE's attempt to exclude its expected emissions increase under EPA's demand growth provision fails both as a matter of law and as a matter of fact.

### A.     Legal Standard for the Demand Growth Exclusion

The demand growth provision was created by EPA to exclude certain types of emissions increases from triggering NSR. To exclude *any* portion of its projected emissions increase from NSR consideration, a source must demonstrate both that (1) it could have operated at that level in the past and (2) the increase is "not related" to the project. *New York*, 413 F.3d at 33 (citing 67 Fed. Reg. at 80,203); 40 C.F.R. § 52.21(b)(41)(ii)(c). In other words, emissions can only be excluded if they would have occurred even without the project. As the D.C. Circuit explained, an increase cannot be excluded from the NSR analysis if it was caused or enabled by, *i.e.*, related

---

[8]     The emission projection analysis requires several steps. It begins with the selection of a 24-month baseline period from the five years preceding the project. The pollution from that baseline period must be compared to a projection of future emissions. If that comparison shows an increase, some of that increase can be excluded if the requirements of the demand growth exclusion are met. *See DTE*, 711 F.3d at 647. The Parties have focused on the demand growth exclusion throughout this lawsuit. *See, e.g.*, ECF 8 at 22–24; ECF 46 at 17–18; ECF 58 at 6; ECF 117 at 14–20.

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

to, the project.  *See New York*, 413 F.3d at 32-33 (quoting 67 Fed. Reg. at 80,203); *see also*

*Cinergy*, 2005 WL 3018688 at *3 (confirming EPA's reading of the demand growth exclusion in

an NSR enforcement action).  That other factors may also contribute to an increase is immaterial:

if the project plays *any* role in the increase, that increase counts for NSR purposes.  As EPA has

explained, a "facility must be able to demonstrate that excluded emissions are *completely*

*unrelated* to the project."  Northampton Determination, ECF 114-7 at 4 (emphasis added).  The

Supreme Court has made the same point: "when plans to increase production rate or hours of

operation are inextricably intertwined with the physical changes planned, they . . . should have to

undergo PSD review scrutiny."  *Duke Energy*, 549 U.S. at 580 (citing a 1988 EPA guidance

document) (internal quotation marks omitted).

### B.   DTE Failed to Apply the Demand Growth Exclusion in Accordance with the Regulations

DTE's preconstruction analysis fails as a matter of law.  Instead of attempting to exclude

the portion of the company's project increase that is *unrelated* to the Monroe Unit 2 overhaul,

the company admitted that it simply excluded the *entire* increase.  DTE Brief, ECF 166 at 15;

*DTE*, 711 F.3d at 648.  A review of the record reveals that DTE's purported application of the

demand growth exclusion was not based on any reading of the language of EPA's regulations or

guidance.  Rather, DTE simply declared that the boiler component replacements like the

economizer and reheater replacements at issue here *can never result in emissions increases*.

Based on that belief, DTE simply pronounced with no analysis or support that any emissions

increase would be caused by an increase in demand.  This bare conclusion does not meet the

requirements of the NSR rules.

DTE's Principal Environmental Engineer claimed as a matter of principle that boiler

component replacements *can never* trigger PSD obligations:

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

Q:  I take it from the discussion that we've had that you -- that the company would not consider a boiler tube component replacement to trigger [PSD]?

A:  No, we don't.

* * *

Q:  I'm just trying to find out could an economizer replacement have an emissions increase related to it?

A:  We don't believe that it does.

Deposition of W. Rugenstein, ECF 114 Ex. 7 (Filed Under Seal, ECF 115) at 111:19-112:1; 167:16-19.  In other words, DTE's "determination" that its projects are excluded from review was not based on any analysis—demand growth or otherwise.  Rather, DTE simply concluded that boiler component replacements cannot trigger PSD.  That self-serving belief is contrary to the NSR rules as written and as interpreted by EPA, the Supreme Court, and the D.C. Circuit.[9]

This categorical claim that replacing even massive parts of the boiler can never result in emissions increases is all that DTE relied upon in claiming that its projected emissions increases was immune from PSD.   In other words, DTE did no analysis of any kind to apply the demand growth exclusion—much less one in accordance with the NSR rules.  In its latest brief, DTE states that, "Based on the company's business and engineering judgment . . . DTE concluded that any increase in emissions over baseline actual emissions would be attributable to factors other than the project."  DTE Brief, ECF 166 at 15.  The testimony from Mr. Rugenstein makes clear that what the company's brief calls "business and engineering judgment" is not a fact-specific

---

[9]    That belief is also contrary to decades of EPA's enforcement efforts under the PSD program.  *See, e.g.*, *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 876 (S.D. Ohio 2003) (where boiler component replacement aimed to increase availability, "the increased hours of operation were not independent of physical changes which caused an increase in emissions"); *United States v. La. Generating, LLC*, No. 09-100-JJB-CN, 2012 WL 1676706, at *2-3 (M.D. La. May 14, 2012) (noting "[t]he [company's] documents clearly show outages were a problem and the company planned to work on the reheaters in order to fix those problems," and concluding that documents projecting hours of operations that would be recovered were proper "evidence of what [the company] expected or reasonably should have expected in terms of increased emissions").

17

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

analysis, but a belief that applies equally to every boiler component replacement project, contrary to EPA regulations, guidance, and case law.  *See, e.g.*, 57 Fed. Reg. at 32,328 (citing *WEPCO*, 893 F.2d at 916 n.11; *Puerto Rican Cement*, 889 F.2d at 298)); 40 C.F.R. § 52.21(b)(41)(ii)(c); *Cinergy*, 458 F.3d 709 (explaining that revitalizing a plant to operate more hours may trigger PSD obligations).

DTE never says—because it cannot say—that the predicted emissions increase was unrelated to the project.  Instead, DTE relies solely on a declaration from company Vice President Skiles Boyd to substantiate its claim that all emissions should be excluded based on the demand growth exclusion.  *See* DTE Brief, ECF 166 at 15 (citing Boyd Declaration, ECF 166-5 ¶ 5.e).  In both Mr. Boyd's declaration and DTE's brief, however, the company fails to establish the proper factual predicate for applying the demand growth exclusion.  Mr. Boyd states that any emissions increases were "attributable to demand growth," language that the DTE brief echoes.  *Id.*  But a conclusory statement that the emissions were attributable to demand is insufficient.  Plants only ever run as a result of economic demand.  The question here is whether the project allowed the plant to meet more of that demand.  DTE's own PROMOD runs show that it did.  What a source needs to demonstrate to invoke the demand growth exclusion—and what DTE has not and cannot demonstrate in this case in light of its own project justifications and PROMOD modeling run—is that the increases were completely *unrelated* to the project.  This failure of proof means DTE's motion must fail as a matter of law.

### C.    DTE's Own Documents Confirm That It Should Have Projected an Emissions Increase Related to the Project

DTE's own documents—from the analyses it used to justify the project to the computer model it relied on in making its prediction—show that the company itself expected an emissions increase related to the project.  At the very least, there is a critical factual dispute: whether the

18

increase that DTE itself predicted was related to the improved unit performance that DTE expected.

First, the rationale for the Monroe Unit 2 overhaul was to allow the unit to operate more hours. SOF ¶ 2. DTE wanted to run the unit more—those extra hours of generation were how DTE could justify the massive capital investment. The Company expected it would be able to make that money back through extended operations. SOF ¶¶ 2. Historically, DTE operated Monroe Unit 2 every hour that the unit was available (that is, it ran whenever it was not shut down due to equipment problems or work being performed on it). SOF ¶ 10. Thus, as DTE's own Rule 30(b)(6) company witness explained, if the unit was available more in the future, it would run more. *See* S. Boyd 30(b)(6) Deposition Vol. 1, ECF 114 Ex. 11 (Filed Under Seal, ECF 115) at 48:9-13. No one disputes that the more hours a coal-fired unit like Monroe Unit 2 runs, the more pollution it will emit. *See* Fessler Deposition (Ex. H) at 93:14-18. DTE expected to run more and thus to generate more pollution, triggering NSR.

Second, the very computer model that DTE relied on for the emissions analysis in its Notice Letter demonstrates that a significant portion of the predicted emissions increase *is* related to the project. As DTE states in its brief, PROMOD is a "sophisticated production cost model" with "exhaustive" inputs that include market demand and outage rates. DTE Brief, ECF 166 at 14. Thus the market demand that DTE expects is incorporated within its computer model. The company's own documents make clear that DTE expected that performing the project would dramatically reduce outage rates at Monroe Unit 2. SOF ¶ 4. The model took *both* of those factors into account (reduced outage rates and any expected changes in demand)—along with numerous others—to predict future emissions. Thus, the model's projection already accounts for demand on the unit, and calculated how much *more* Monroe 2 would operate following its

19

renovation.  DTE then chose to use that estimate as its NSR emissions prediction.  Looking at the model inputs, one can tell how much of the expected emissions increase resulted from the improvement in the Monroe Unit 2 outage rate.  When DTE makes the unsupported claim that the pollution increase related to the project is zero, it is contradicted by the very model that it relied on before the state and told this Court was its "best estimate" of expected generation following the project.

In the final analysis, DTE's claim that the demand growth exclusion can be used as cover to support its claim that no boiler project ever results in an emissions increase is wrong on the law, and its clearly wrong on the facts—its own facts.  DTE's own project documents show the Company overhauled Monroe 2 to increase its availability so that the unit *could* operate more hours, and its filings with the state show that DTE expected the unit *would* operate more hours.  Since Monroe 2 operated every hour it was available before it was renovated, the only way the unit could operate more hours is if it operated during the hours made available *by the renovation project*.  Thus DTE's own documents conflict with the company's statements to this Court that its anticipate emissions increase was excludable—and so unrelated—to the project.  In other words, the company's plans to generate more from Monroe Unit 2 were "inextricably intertwined with the physical changes planned" and NSR applies.  *Duke Energy*, 549 U.S. at 580.

DTE interprets the Sixth Circuit decision as barring EPA from ever holding a source accountable for misapplying a requirement like the demand growth exclusion—no matter how farfetched.  DTE Brief, ECF 166 at 12.[10]  DTE's use of a far-fetched legal interpretation to

---

[10]   DTE appears to suggest that the United States' claims cannot proceed because the government has not previously argued that DTE failed to comply with the applicable rules.  *See* DTE Brief, ECF 166 at 2, 17-18.  DTE's premise is simply not true.  For example, the complaint states that DTE "did not comply with the applicable [NSR] requirements under the Act and the implementing regulations with respect to the major modification at Monroe Unit 2."  ECF 1 ¶ 56;

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

transform a $65 million, pollution-increasing overhaul into an NSR non-event perfectly illustrates why EPA must be allowed to monitor compliance with NSR preconstruction provisions such as the one in this case.  Indeed, this is why the Sixth Circuit explicitly included the demand growth exclusion as one of the requirements that sources must follow and EPA can enforce.  *DTE,* 711 F.3d at 649–50.

## CONCLUSION

After four decades of operation, DTE invested $65 million in overhauling Monroe Unit 2.  DTE did so expecting that the work would allow the unit to run more—and pollute more—in the years to come.  Under the law, the company was required to seek NSR permits at that moment.  Instead, DTE attempted to take refuge in an incorrect, far-fetched reading of the demand growth exclusion.  DTE's interpretation is incorrect as a matter of law.  No matter what the standard, the company's expectations of increased operations and pollution means that it cannot exclude the entire pollution increase, as it has attempted to do here.

DTE chose to overhaul Monroe Unit 2.  That decision triggered the requirement to "seek a permit from EPA or the relevant stage agency and install expensive modern pollution-control technology."  *Id.* at 647.  DTE's motion for summary judgment should be denied.

Respectfully Submitted,

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

Dated: August 2, 2013                          *s/ Elias L. Quinn*

_____

*see also* Notice of Violation, ECF 8-8 at 4.  The preliminary injunction brief filed the next day provides further detail: DTE failed to comply with the demand growth exclusion (among other aspects of the rules) by failing to properly account for the emissions increase related to the project.  ECF 8 at 23-24.

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

JAMES A. LOFTON
JUSTIN A. SAVAGE
OF COUNSEL:                           JAMES W. BEERS, JR.
SABRINA ARGENTIERI               THOMAS A. BENSON (MA Bar # 660308)
MARK PALERMO                        KRISTIN M. FURRIE
SUSAN PROUT                           ELIAS L. QUINN (CO Bar # 42159)
Associate Regional Counsel        Environmental Enforcement Section
U.S. EPA Region 5                     U.S. Department of Justice
Chicago, IL                             P.O. Box 7611
77 W. Jackson Blvd.                  Washington, D.C. 20044-7611
                                        (202) 514-5261
APPLE CHAPMAN                     thomas.benson@usdoj.gov
Associate Director
Air Enforcement Division
U.S. EPA
1200 Pennsylvania Ave. NW        BARBARA McQUADE
Washington D.C. 20460             United States Attorney
                                       Eastern District of Michigan

                                       ELLEN CHRISTENSEN
                                       Assistant United States Attorney
                                       211 W. Fort St., Suite 2001
                                       Detroit, MI 48226

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2013, the foregoing memorandum and supporting materials were filed UNDER SEAL with the Clerk of the Court via ECF.  In addition, on August 2, 2013, I transmitted a copy of these documents to counsel for all parties at the email addresses below.

**Mark B Bierbower**
Hunton & Williams LLP
mbierbower@hunton.com

**F. William Brownell**
Hunton & Williams LLP
bbrownell@hunton.com

**Makram B Jaber**
Hunton & Williams LLP
mjaber@hunton.com

**Harry M. Johnson**
Hunton & Williams
pjohnson@hunton.com

**Lucinda M. Langworthy**
Hunton & Williams LLP
clangworthy@hunton.com

**Brent A. Rosser**
Hunton & Williams LLP
brosser@hunton.com

**George P. Sibley**
Hunton & Williams
gsibley@hunton.com

**Michael J. Solo**
DTE Energy Company
solom@dteenergy.com

**Matthew J. Lund**
Pepper Hamilton LLP
lundm@pepperlaw.com

**Holly D. Bressett**
Sierra Club Environmental Law Program
holly.bressett@sierraclub.org

**Shannon W. Fisk**
Earthjustice
sfisk@earthjustice.org


*s/ Elias L. Quinn*
Counsel for the United States

FILED UNDER SEAL - Case No. 10-cv-13101-BAF-RSW - PURSUANT TO PROTECTIVE ORDER - ECF NO. 39