# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

      Plaintiff,

and

NATURAL RESOURCES DEFENSE
COUNCIL, INC. AND SIERRA CLUB,

      Intervenor-Plaintiffs,

      v.

DTE ENERGY COMPANY AND
DETROIT EDISON COMPANY,

      Defendants.

Civil Action No.
2:10-cv-13101-BAF-RSW

Judge Bernard A. Friedman

Magistrate Judge R. Steven
Whalen

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT BASED
ON COMPLIANCE WITH PRE-CONSTRUCTION
<u>PROJECTION REQUIREMENTS</u>**

**\*ORAL ARGUMENT REQUESTED\***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

CONTROLLING OR OTHER APPROPRIATE AUTHORITY...............................iv

GLOSSARY OF ACRONYMS AND ABBREVIATIONS............................................v

FACTS MATERIAL TO THIS MOTION ARE NOT IN DISPUTE.........................3

ARGUMENT.........................................................................................................................5

I.      The Sixth Circuit Forbade the Approach EPA Seeks to Apply Here...................5

        A.      Post-Project Data Dictate Whether a Project Was a Modification............6

        B.      EPA's Approach Is Pure Second Guessing....................................................8

II.     EPA Has Not Alleged a Violation of Projection Regulations..............................11

CONCLUSION ..................................................................................................................12

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................4

*Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711 (6th Cir. 2002) ...............................10

*United States v. AM General Corp.*, 808 F. Supp. 1353 (N.D. Ind. 1992)...........................12

*United States v. DTE Energy Co.*, 711 F.3d 643 (6th Cir. 2013) .................. 1, 2, 3, 5, 6, 7, 8

*United States v. LTV Steel Co.*, 116 F. Supp. 2d 624 (W.D. Pa. 2000)...............................11

*United States v. Oklahoma Gas & Elec. Co.*, No. 13-cv-690-D (W.D. Okla.
    filed July 8, 2013) ..........................................................................12

*United States v. Pan Am. Grain Mfg. Co.*, 29 F. Supp. 2d 53 (D.P.R. 1998)........................12

## FEDERAL STATUTE

42 U.S.C. § 7413(b) ......................................................................................3

## FEDERAL REGULATIONS

40 C.F.R. § 19.4...........................................................................................3

40 C.F.R. § 52.21(b)(41)(ii)........................................................................ 11, 12

40 C.F.R. § 52.21(b)(41)(ii)*(a)* .......................................................................10

40 C.F.R. § 52.21(b)(41)(ii)*(c)* .......................................................................10

40 C.F.R. § 52.21(r)(6)(i)*(c)* .........................................................................10

40 C.F.R. § 52.21(r)(6)(ii)..............................................................................5

# CONTROLLING OR OTHER APPROPRIATE AUTHORITY

**Preamble to EPA's 1992 NSR Rules Amendments**

57 Fed. Reg. 32,314 (July 21, 1992)

**Preamble to EPA's 2002 NSR Rules Amendments**

67 Fed. Reg. 80,186 (Dec. 31, 2002)

**Relevant Federal Regulations**

40 C.F.R. § 52.21(a)(2)(iii)
40 C.F.R. § 52.21(a)(2)(iv)
40 C.F.R. § 52.21(b)(2)(iii)
40 C.F.R. § 52.21(b)(20)
40 C.F.R. § 52.21(b)(23)
40 C.F.R. § 52.21(b)(41)(i)
40 C.F.R. § 52.21(b)(41)(ii)
40 C.F.R. § 52.21(b)(48)(i)
40 C.F.R. § 52.21(r)(6)(ii)
40 C.F.R. § 52.21(r)(6)(iii)
40 C.F.R. § 52.21(r)(6)(iv)
40 C.F.R. § 52.21(r)(6)(vi)

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| CAA | Clean Air Act |
| DTE | DTE Energy Company and Detroit Edison Company |
| EPA | United States Environmental Protection Agency |
| MDEQ | Michigan Department of Environmental Quality |
| NOV | Notice of Violation |
| NSR | New Source Review |
| PSCR | Power Supply Cost Recovery |
| PSD | Prevention of Significant Deterioration |

Before this case went to the Sixth Circuit, EPA intended to prove that the 2010 projects at Monroe Unit 2 were "major modifications" by second-guessing DTE's preconstruction projection. The fact that emissions had actually decreased following the project was of no moment—EPA argued it could meet its burden by convincing the Court that a "proper" projection would have predicted an increase in emissions caused by the projects. This Court rejected this view of NSR enforcement.

So did the Sixth Circuit. The NSR rules create a "project-and-report" system. *U.S. v. DTE Energy Co.*, 711 F.3d 643, 649 (6th Cir. 2013). EPA cannot "enforce" NSR by second-guessing the operator's projection, because that would create, in effect, a "prior approval" system. *Id.* "If operators had to defend every projection to the agency's satisfaction, companies would hesitate to make any changes, including those that may improve air quality." *Id.* The NSR Rules thus "take a middle road by trusting operators to make projections but giving them specific instructions to follow." *Id.* Accordingly, where the source has projected no increase in emissions due to the project, post-project data will dictate whether a modification has occurred. "If [the] company's projections are later proven incorrect, EPA can bring an enforcement action" alleging a major modification. *Id.* at 651. This system is "entirely compatible with the statute's intent, which … is 'to prevent increases in air pollution.'" *Id.*

The Sixth Circuit thus explained this Court's "premises are largely correct." *Id.* at 649. It ultimately remanded the case, but not so EPA could attempt to prove by second-guessing that the 2010 projects were, in fact, major modifications—the Court squarely rejected that approach and carefully explained its "reversal does not constitute endorsement of EPA's suggestions." *Id.* at 652. Instead, it asked this Court to resolve a different question—whether DTE, "at a basic level … [made] a projection in

-1-

compliance with how the projections are to be made." *Id.* at 649.  But the Court was unambiguous this review could not devolve into "second-guess[ing]" and emphasized the availability of this limited type of enforcement action "does not mean that the agency gets *in effect* to require prior approval of the projections." *Id.* (emphasis added).

EPA makes clear in its response that it intends to ignore the vast majority of the Sixth Circuit's decision.  Focusing solely on the demand growth exclusion, EPA contends that, had DTE conducted a "genuine" projection—i.e., the one concocted after the fact by EPA's litigation experts using methodologies that are not contained in the regulations—DTE would have projected an increase in emissions caused by the projects.  At trial, EPA thus will ask the Court to rule that its experts' post hoc pre-construction projections are better than the one DTE actually conducted.  This is *precisely* the type of enforcement action EPA described at oral argument that led Judge Rogers to observe:  "That sounds like getting a permit to not get a permit.  It sounds like you have to get approval from EPA as to your calculations before you can proceed without a permit."  Oral Arg. at 50:39, Nov. 27, 2012.  It is certainly a far cry from the action the Court envisioned, in which EPA would enforce the objective requirements—the specific "instructions"—in the regulations, such as whether "an operator … uses an improper baseline period or uses the wrong number to determine whether a projected emissions increase is significant." *DTE*, 711 F.3d at 650.

EPA deviates even further by suggesting DTE should be held liable for failing to "demonstrate" that the demand growth exclusion applies.  But EPA does not point to any "instructions" in the rules that require a source to "demonstrate" to EPA's satisfaction the correctness of its engineering judgment or specify how it would even do so.  As the Court made clear, "the agency [does not] get[] in effect to require prior ap-

proval of the projections." *DTE*, 711 F.3d at 649. In some circumstances, the rules require the operator to provide notice of its projection, but this Court already has ruled that DTE complied with those regulations. Op. & Order (Op.) at 10, ECF No. 160. EPA did not challenge that ruling on appeal and cannot do so now.

Finally, and most fundamentally, the enforcement case EPA intends to pursue on remand is very different from the action the Sixth Circuit would allow. The Sixth Circuit authorized an action to determine, at a basic level, whether DTE complied with the "specific instructions" in the regulations governing projections. A finding of liability would justify, at most, a one-time civil penalty for a violation of the projection regulations, *see* 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4, not a finding that projects that have not caused emissions to increase were, in fact, major modifications.

In short, EPA's view of NSR enforcement is at odds with the regulations and cannot be reconciled with the Sixth Circuit's decision. The material facts are undisputed, and they demonstrate that DTE complied with the specific instructions governing projections. That EPA's experts would reach a different conclusion based on different judgments is immaterial and cannot justify the denial of summary judgment.

## FACTS MATERIAL TO THIS MOTION ARE NOT IN DISPUTE

EPA attempts to manufacture a dispute of material fact that would preclude the entry of summary judgment. EPA Br. at 4-9, ECF No. 178. But EPA's supposed factual disputes are immaterial to the question at hand and, indeed, highlight what EPA is trying to do here: second-guess DTE's projection. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unneces-

sary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Sixth Circuit established the governing law in its decision by carefully de-lineating the question this Court would be asked to answer—did DTE, "at a basic lev-el," comply with the "specific instructions" governing preconstruction projections? The facts material to that question are set forth in DTE's opening brief, and they are undisputed.  Specifically, DTE:

**(1)** Properly calculated baseline actual emissions.

**(2)** Considered "all relevant information"  and projected its actual emissions for the 5 years following the project, identifying the "maximum annual rate … at which [the unit] is projected to emit a regulated NSR pollutant in any one of [those] 5 years."

**(3)** Excluded emissions that, based on the company's business and engineering judgment and its understanding of the inputs used as part of its projection modeling, were unrelated to the project and could have been accommodated during the base-line period.

**(4)** Properly determined that projected actual emissions would not exceed baseline actual emissions.

*See* Defs.' MSJ Br. at 13-17, ECF No. 166.   And significantly, emissions at Monroe 2 have decreased since the project.  *Id.* at 18.  If one were to turn back the clock and re-do DTE's preconstruction projection today, the only "correct" projection would be one that shows a decrease in emissions.

These facts, which EPA does not dispute, fully resolve the question the Sixth Circuit asked this Court to answer.  EPA instead focuses on facts—some of which are disputed, others of which are not—that are immaterial.  For example, EPA chides DTE for replacing broken parts and components on Monroe 2, asserting that projects were "performed to eliminate problems that were causing the unit to break down re-peatedly in the years before the project."  EPA Br. at 4.  But as the Sixth Circuit ob-

-4-

served, "the statute and regulations allow sources to replace parts indefinitely … so long as none of those changes cause an emissions increase." *DTE*, 711 F.3d at 651.

EPA also notes that its expert Philip Hayet would have concluded that a significant portion of a projected increase in emissions was related to the project. But what some litigation expert might conclude based on different judgments and methodology is immaterial. It is just the type of "second-guess[ing]" the Sixth Circuit put off-limits.

EPA also asserts that "[t]o date, DTE has never offered a *genuine* explanation for how the increased operating hours projected by its PROMOD model could be unrelated to the project." EPA Br. at 8 (emphasis added). But EPA identifies no specific regulatory "instruction" that imposes such a requirement, much less one that instructs DTE on what EPA might deem "genuine." The regulations do not require DTE to "defend every projection to the agency's satisfaction." *DTE*, 711 F.3d at 649. The regulations instead require sources to provide notice to the relevant authority where there is a "reasonable possibility" of an increase in emissions, and even then, the source is not "require[d] … to obtain any determination from [EPA] before beginning actual construction." 40 C.F.R. § 52.21(r)(6)(ii). And this Court specifically held that DTE's notice fully complied with the rules, and EPA did not challenge that ruling. In all events, the Sixth Circuit squarely rejected the suggestion that operators like DTE need buy-in from EPA before commencing construction.

## ARGUMENT

### I.   The Sixth Circuit Forbade the Approach EPA Seeks to Apply Here.

EPA argues that summary judgment is not appropriate, because it could show at trial, through a team of experts, that the 2010 projects were major modifications

because DTE *should have* projected they would cause an increase in emissions.  This is enforcement through second-guessing that the Sixth Circuit's decision forbids.

### A.   Post-Project Data Dictate Whether a Project Was a Modification.

EPA begins by eliding a key distinction drawn by the Sixth Circuit.  Specifically, EPA asserts the Court held that "[t]he fact that emissions have (so far) gone down in the years after the overhaul does not shed any light on whether DTE followed the regulations in predicting emissions before the project."  EPA Br. at 11.  EPA goes on to suggest the Court held that the preconstruction projection "determines whether the project constitutes a 'major modification' and thus requires a permit."  *Id.*

This is a blatant mischaracterization of the majority decision.  In describing the "project-and-report" system created by the regulations, the Court explained that it is the "owners and operators" of major sources who must do a projection, and it is "*[t]hat* projection" that determines whether a pre-construction permit is needed. *DTE*, 711 F.3d at 644 (emphasis added).  The Court then went on to emphasize that the validity of *that* preconstruction projection showing no increase in emissions caused by the project would be measured by *actual* post-project emissions:

> If a company's projections are later proven incorrect, EPA can bring an enforcement action.  …  If post-construction emissions are higher than preconstruction emissions, and the increase does not fall under the demand growth exclusion, the operator faces large fines and will have to undertake another project at the source to install modern pollution-control technology.

*Id.* at 651.  At no point does the Court suggest that operators will be deterred from under-projecting because a team of litigation experts retained by EPA will prove to a factfinder that their projection showing an increase in emissions is "better."  And, if

-6-

the Court had accepted EPA's position, it would not have explicitly held that an oper-

ator may "keep its post-construction emissions down *in order to avoid* the significant

increases *that would require a permit*."  *Id.* at 650 (emphases added).[1]

In fact, the Sixth Circuit majority specifically rejected EPA's position, both at

oral argument and in its opinion.  The exchange at oral argument is revealing:

> **JUDGE ROGERS**:  [You] would have to say there's some Regulation
> which [DTE] interpreted incorrectly in making these projections.  Is that
> correct?
>
> **MR. BENSON**:  Well, I think what the District Court would find is
> that one side or the other's projection was inaccurate based on the facts.
> It is really a factual question, and then there is a legal question.
>
> **JUDGE ROGERS**:  Alright.  That puzzles me entirely.
>
> \*     \*     \*
>
> **MR. BENSON**:  [I]f there is a projection that complies with the regula-
> tions, there may be two different projections that both sort of on a su-
> perficial level meet the requirements of the regulations.  But they would
> rely on different facts that would be found by the district court. … And
> that is the type of analysis that EPA and the Company is going to do and
> in a court below *the court would have to decide whose analysis makes sense.*
>
> **JUDGE ROGERS**:  Well here's the problem I have with that.  *That
> sounds like getting a permit to not get a permit.  It sounds like you have to get ap-
> proval from EPA as to your calculations before you can proceed without a permit.*

Oral Arg. at 50:39, Nov. 27, 2012 (emphases added).  The majority thus unsurprisingly

made clear that the rules do not tolerate second-guessing:

> [I]f the agency can second-guess the making of the projections, then a pro-
> ject-and-report scheme would be transformed into a prior approval scheme.

---

[1] The Court explained that this "is entirely consistent with the statute and regula-
tions."  *DTE,* 711 F.3d at 650.  Indeed, DTE's practice of "purposely manag[ing] the
cost of electricity from Monroe Unit #2 to keep its emissions from increasing … fur-
ther[s] the goal of the statute."  *Id.* at 651.

> … [A]t a basic level the operator has to make a projection in compliance with how the projections are to be made.  But this does not mean that the agency gets *in effect* to require prior approval of the projections.

*DTE*, 711 F.3d at 649 (emphasis added).

The Court also specifically rejected EPA's conception of NSR enforcement through projection as a means of forcing sources to adopt modern emissions control technology.  At oral argument, Judge Rogers observed in questioning EPA's counsel: "The only way you can really use a lever to force them to get a permit which would put them to a lower level than they now have is to second guess their projection in a way that projects it *higher than what even turns out to be reality*."  Oral Arg. at 46:20, Nov. 27, 2012 (emphasis added).  And after endorsing the propriety of sources managing emissions to avoid emissions increases and NSR enforcement, the majority held that the definitions of "major modification" are

> incompatible with EPA's argument that [NSR] is a program designed to force every source to eventually adopt modern emissions control technology.  … As EPA conceded at oral argument, the statute and regulations allow sources to replace parts indefinitely without losing their grandfathered status so long as none of those changes cause an emissions increase.

*DTE*, 711 F.3d at 650-51.  EPA ignores all of this in its response brief.

## B.   EPA's Approach Is Pure Second Guessing.

The Sixth Circuit remanded this case so that the Court could determine whether, at a basic level, DTE complied with the instructions for conducting projections—not to determine through second-guessing whether a major modification has occurred.  EPA nonetheless tries to fit its Orwellian view of enforcement into the narrow window the Sixth Circuit allowed.  Specifically, EPA argues that the ultimate question is whether DTE "should … have projected an increase had it followed the

regulations." EPA Br. at 14. Unsurprisingly, EPA says that DTE should have ex-
pected an increase, relying on the same expert analysis it contends shows that DTE
did not comply with the regulations. The reasoning is circular, and it allows for pre-
cisely the type of second-guessing the Sixth Circuit prohibited.

For example, EPA points to analyses by Mr. Hayat and Mr. Biewald, both of
whom would opine that the projects should have been expected to cause an increase.
*Id.* at 7. EPA also points to DTE's documents, which it (without irony) accuses DTE
of "misconstru[ing]." *Id.* at 10. Both types of proof effectively transform NSR into a
prior approval system, one where DTE's judgment is irrelevant, while the conclusions
of outside litigation experts are deemed conclusive, and where DTE's understanding
of its own documents and past practices is secondary to that of EPA's hired experts.
This is the epitome of second-guessing.[2]

EPA also derides DTE's analysis as "conclusory," "incredible" and without
"explanation." *Id.* at 10, 13, 18. In EPA's view, DTE was required somehow to
"demonstrate" to EPA's satisfaction that the demand growth exclusion was applica-
ble. *Id.* at 15. But EPA points to no "instruction" in the regulation that imposes such
a requirement or to any provision that instructs operators how to make such a
demonstration. To the contrary, the projection regulations direct only that the source

---

[2] EPA concedes DTE's projection considered not only "reduced outage rates" and
"expected changes in demand," but also "numerous other[]" factors, EPA Br. at 19—
factors DTE told EPA it considered. *See* March 12, 2010 DTE Notification Letter, at
2, ECF No. 166-3; June 1, 2010 DTE Letter in Response to § 114 Request, at 3-4, Ex.
3 to ECF No. 166-2; June 23, 2010 DTE Response to NOV, at 2-3, Ex. 4 to ECF
No. 166-2. EPA's litigation expert would base his judgment on reduced outage rates
alone, EPA Br. at 5, while ignoring other factors—quintessential second-guessing.

"[s]hall," after considering "all relevant information," exclude emissions that are "un-related to the particular project" that it "could have accommodated"—an instruction that DTE indisputably satisfied. *See* Defs.' MSJ Br. at 15-16.

Intervenors at least attempt to try to find a hook in the regulations—they accuse DTE of "fail[ing] to provide the requisite explanation and documentation of its demand growth exclusion, as is required by 40 C.F.R. § 52.21(r)(6)(i)(c)." Intv'rs' Br. at 10, ECF No. 179.  But the Intervenors ignore that this Court already held that the notice DTE submitted to the MDEQ fully complied with the regulations, Op. at 10, and that the Sixth Circuit agreed. *DTE*, 711 F.3d at 650.  That claim cannot be resurrected now.  *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002).  More importantly, this Court's holding was not only correct (and unchallenged on appeal); its reasoning is directly applicable here and compels rejection of EPA's argument:

> While the explanation of the emissions exclusion in the Notice Letter is not very specific, and the accompanying table shows the results of the calculations without their back-up data, *Plaintiff does not point to any provision in Michigan's rules requiring specificity beyond that which was provided* ….

Op. at 12 (emphasis added).  The same is true here: Plaintiffs point to no provision in the regulations that requires DTE to justify its projection with any more specificity beyond that which DTE provided.

In all events, the propriety of DTE's reliance on the demand growth exclusion is staring EPA right in the face—DTE performed the projects, but Monroe Unit 2's emissions have actually decreased, because low natural gas prices and the poor economy, among other factors, have depressed demand for coal-fired electricity.  These data prove that DTE was right—the projected increase in emissions in DTE's projection was due to factors unrelated to the 2010 projects and thus was properly exclud-

-10-

ed.[3]  EPA nonetheless asks the Court to hold that DTE should have (a) projected that emissions would increase (even though they have decreased); and (b) concluded that the increase was caused by the projects.   This is "reality control" at its finest.

These "facts" are not offered to dispute EPA's assertions, but rather to demonstrate the obvious.  If EPA is right, the trial would involve a battle of experts over whether DTE did a "proper" projection or provided a "genuine" explanation for its conclusions.  If that's not second-guessing, it is hard to imagine what is.

## II.   EPA Has Not Alleged a Violation of Projection Regulations.

EPA cannot contend DTE undertook a "major modification."  DTE projected that the 2010 projects at Monroe 2 would not cause an increase in emissions.  Construction is now complete, so whether the projects were "major modifications" will be determined by actual emissions data, which show decreased emissions.  *See supra* at 6-8.  EPA instead must contend that DTE violated the projection regulations set forth in 40 C.F.R. § 52.21(b)(41)(ii).  But EPA faces an insurmountable jurisdictional problem—it failed to allege any violation of the projection regulations in its NOV.

The authority to bring a claim—and this Court's jurisdiction to hear it—are premised on EPA's providing the required pre-suit notice.  *See U.S. v. LTV Steel Co.*, 116 F.Supp 2d 624, 632 (W.D. Pa. 2000). EPA is only authorized to bring civil actions

---

[3] DTE's 2009 and 2011 Power Supply Cost Recovery (PSCR) filings confirm the validity of DTE's projection.  Like the 2010 PSCR filing, which formed the basis for the projection for the 2010 projects, the 2009 and 2011 PSCR filings accounted for the projects.  As DTE told EPA, both of those filings indicated emissions would decrease at Monroe Unit 2, thus confirming the increase projected in the 2010 projection was due to factors unrelated to the projects.  *See* June 23, 2010 DTE Response to NOV, at 3, Ex. 4 to ECF No. 166-2; King Expert Report, ECF No. 46-11.

under 42 U.S.C. § 7413(b) based on the "specific violation[s] alleged in the NOV."
*U.S. v. AM General Corp.*, 808 F.Supp. 1353, 1362 (N.D. Ind. 1992). EPA's NOV thus
defines the permissible scope of its complaint, and this Court has already held that
EPA "is barred from pursuing claims not specified in its [NOV]." Op. at 12. Failure
to comply with the notice requirements warrants dismissal for lack of subject matter
jurisdiction. *U.S. v. Pan Am. Grain Mfg. Co.*, 29 F.Supp.2d 53, 56 (D.P.R. 1998).

In a footnote, EPA suggests that it *did* allege a violation of § 52.21(b)(41)(ii) on
page 4 of its NOV. EPA Br. at 20-21 n.10. But nowhere on page 4 (or anywhere
else) does EPA allege a violation of the projection regulations, much less the specific
provisions of § 52.21(b)(41)(ii). Rather, the NOV relates *solely* to the allegation that
DTE undertook a "major modification" at Monroe Unit 2, a contention that the Sixth
Circuit ruled would be judged by post-project emissions data. *See, e.g.*, NOV at ¶ 25,
ECF No. 8-8, ("DTE is in violation of PSD requirements … for constructing a major
modification."). That is very different from any claim based on a "specific" alleged
violation of § 52.21(b)(41)(ii).[4] Because EPA failed to assert that claim in its NOV,
this Court lacks jurisdiction to hear it.

## CONCLUSION

For these reasons, DTE's motion for summary judgment should be granted.
Respectfully submitted, this 23rd day of August, 2013.

By: /s/ F. William Brownell

---

[4] EPA knows how to assert an alleged violation of the projection rules. In *U.S. v. Okla. Gas & Elec. Co.*, EPA recently alleged *not* that the utility undertook a "major modification," but that it "failed to include [in its notice to the state] a projection of post-project emissions as required by … regulations." Compl. ¶ 44, No. 13-cv-690-D (W.D. Okla. filed July 8, 2013) (Ex. 1). There are no similar allegations here.

Matthew J. Lund (P48632)
Pepper Hamilton LLP
100 Renaissance Center, 36th Floor
Detroit, Michigan 48243
lundm@pepperlaw.com
(313) 393-7370

Michael J. Solo (P57092)
Office of the General Counsel
DTE Energy, One Energy Plaza
Detroit, Michigan  48226
solom@dteenergy.com
(313) 235-9512

F. William Brownell
Mark B. Bierbower
Makram B. Jaber
Hunton & Williams LLP
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
bbrownell@hunton.com
mbierbower@hunton.com
mjaber@hunton.com
(202) 955-1500

Brent A. Rosser
Hunton & Williams LLP
Bank of America Plaza,Suite 3500
101 South Tryon Street
Charlotte, North Carolina 28280
brosser@hunton.com
(704) 378-4700

Harry M. Johnson, III
George P. Sibley, III
Hunton & Williams LLP
951 E. Byrd Street
Richmond, Virginia 23219
pjohnson@hunton.com
gsibley@hunton.com
(804) 788-8200

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2013, the foregoing **DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BASED ON COMPLIANCE WITH PRE-CONSTRUCTION PROJECTION REQUIREMENTS** was served electronically only on the following attorneys of record in accordance with an agreement reached among the parties:

> Ellen E. Christensen
> U.S. Attorney's Office
> 211 W. Fort Street
> Suite 2001
> Detroit, MI  48226
> 313-226-9100
> Email:  ellen.christensen@usdoj.gov
>
> James A. Lofton
> Thomas Benson
> Justin A. Savage
> Kristin M. Furrie
> James W. Beers, Jr.
> Elias L. Quinn
> U.S. Department of Justice
> Environmental and Natural Resource Div.
> Ben Franklin Station
> P.O. Box 7611
> Washington, DC  20044
> 202-514-5261
> Email: thomas.benson@usdoj.gov
>         justin.savage@usdoj.gov
>         kristin.furrie@usdoj.gov
>         jim.lofton@usdoj.gov
>         james.beers@usdoj.gov
>         elias.quinn@usdoj.gov
>
> Holly Bressett
> Sierra Club Environmental Law Program
> 85 Second St., 2nd Floor
> San Francisco, CA  94105
> Phone: (415) 977-5646
> Email:  Holly.Bressett@sierraclub.org

/s/ F. William Brownell

-14-