# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

     Plaintiff,

and

SIERRA CLUB,

     Intervenor-Plaintiff,

     v.

DTE ENERGY COMPANY AND
DETROIT EDISON COMPANY,

     Defendants.

Civil Action No.
2:10-cv-13101-BAF-RSW

Judge Bernard A. Friedman

Magistrate Judge R. Steven
Whalen

## DEFENDANTS' RESPONSE TO UNITED STATES' MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

For the past three years, the Government and DTE have fully litigated the Government's claims regarding the 2010 projects at DTE's Monroe Unit 2 power plant. After discovery closed, this Court granted DTE's original motion for summary judgment on those claims; the parties fully briefed and argued their validity in the Court of Appeals; and the Sixth Circuit—in a decision that found this Court's legal premises to be "largely correct"—resolved the appeal in a thorough decision that directed this Court to resolve one narrow question—whether DTE, "at a basic level," complied with the "specific instructions" governing preconstruction projections. *United States v. DTE Energy Co.*, 711 F.3d 643, 649 (6th Cir. 2013). As explained in

DTE's summary judgment briefing, the facts material to that question are not in dispute, and DTE is entitled to judgment as a matter of law.

The Government now seeks to add to the case *seven* additional new source review (NSR) claims—one relating to earlier projects at Monroe Unit 2 (Count 4), two relating to projects at two other Monroe units (Counts 1 and 5), and four relating to projects at three units at two other power plants (Belle River Units 1 and 2 and Trenton Channel Unit 9, Counts 6-9). Proposed First Am. Compl. at 17-19, 22-32, ECF No. 184-2. All of these new claims differ factually from the initial Monroe Unit 2 claims. They involve different units (most at different power plants), different outages, and different routine repair and replacement projects. Litigating those claims—assuming they survive possible motions to dismiss—could require substantial additional discovery. Judicial economy would be ill-served—and DTE substantially prejudiced—if resolution of the Monroe Unit 2 claims is delayed while the parties litigate these unrelated projects.

But if the fully-briefed motion for summary judgment on the Monroe Unit 2 claims is addressed first, these concerns dissipate, and the efficiencies achieved by litigating all of the Government's claims in one case before the same judge counsel in favor of allowing the Government's proposed amendment. Each of the projects the Government seeks to challenge in its proposed amended complaint is governed by the 2002 NSR Rules. As a result, this Court's ruling on DTE's fully-briefed motion for summary judgment will clarify the governing legal standards and thus will materially advance consideration of the proposed new claims. Moreover, this Court is now well-familiar with the governing NSR rules and thus is as well-positioned as any court to resolve disputed legal issues efficiently.

DTE therefore will not oppose the expansion of this case to include the new projects in the Government's proposed amended complaint, provided that joinder of those claims to this case does not delay resolution of the existing claims involving Monroe Unit 2.

## BACKGROUND

### I.    Procedural History

This case originally was filed in August 2010, when the Government made the conscious decision to target the spring 2010 projects at Monroe Unit 2 in a standalone action.  The Government had challenged dozens of other projects in a 2009 Notice of Violation (NOV).[1]  Ex. 1, 2009 NOV.  But the Government did not include claims as to any of these projects in its 2010 lawsuit, instead choosing to focus exclusively on the 2010 Monroe Unit 2 projects and litigating those claims to completion on an expedited schedule.

After the Court denied the Government's motion for a preliminary injunction, the parties commenced extensive discovery focusing exclusively on the 2010 Monroe Unit 2 projects.  Between August 2010 and August 2011, the parties combined to serve 83 document requests and 60 interrogatories, which resulted in the production of more than 5 million pages of documents.

---

[1] Four of the seven new claims the Government now seeks to include in its proposed amended complaint were included in the 2009 NOV.  The other three claims the Government proposes to add to this case involve projects which had been completed well before the 2009 NOV and the 2010 Complaint, and DTE had submitted preconstruction notices to the Michigan Department of Environmental Quality (MDEQ) for these projects as required by the regulations.  These projects were not a secret.

In June 2011, the case was ripe for summary judgment, so DTE filed its motion. The Court granted that motion in August 2011, and the Government appealed. After full briefing and argument in the Court of Appeals, the Sixth Circuit found this Court's legal premises to be "largely correct," but remanded the case to resolve a very narrow question—whether DTE, "at a basic level," complied with the "specific instructions" governing pre-construction projections under the 2002 NSR Reform Rules. *DTE Energy Co.*, 711 F.3d at 649. The facts material to that question are not in dispute, so DTE filed a second motion for summary judgment. *See* ECF No. 166. That motion is now fully briefed and is ripe for decision.

## II.    The Government's Misinterpretation of the Sixth Circuit's Decision

The Government intends to ignore the vast majority of the Sixth Circuit decision. As DTE explained in its reply in support of its motion for summary judgment, the Government seeks to prove that the 2010 projects at Monroe Unit 2 were, in fact, major modifications, because a "genuine" projection—i.e., one concocted after the fact by EPA's litigation experts using methodologies that are not in the regulations— would have projected an increase in emissions. *See* DTE Reply Br. at 2, 5, ECF No. 183. This is precisely the type of second-guessing the Sixth Circuit rejected. *See id.* at 8-11. The first order of business for this Court on remand should be to resolve the dispute over the meaning of the Sixth Circuit's decision that is reflected in the competing briefs on DTE's renewed motion for summary judgment.

The Government's motion for leave to amend reflects the same fundamental misunderstanding of the Sixth Circuit's decision, only it goes one step further. As in its response to DTE's motion for summary judgment, the Government argues that it

should be allowed to prove that routine maintenance projects were "major modifications" because DTE "should have anticipated" that those projects would cause an increase in emissions. Mem. in Supp. of United States' Mot. for Leave to File First Am. Compl. at 2, ECF No. 184 (EPA Br.). But the Government takes its misunderstanding of NSR to the next level when it argues that a mere increase in actual post-project emissions is sufficient to establish that a project was a major modification. *See, e.g., id.* (suggesting that a mere increase in emissions with no showing of causation would "be the trigger for NSR liability"). While an actual post-project increase in emissions is necessary to a finding that a project was a major modification, the Government cannot meet its burden merely by showing an increase in emissions—it also must show that the increase was *caused by the projects*. The fact that "actual emissions exceed [baseline actual emissions] by more than the significant threshold . . . [does] not automatically constitute a violation of PSD. There are many legitimate circumstances under which this could occur," including greater-than-expected demand. MDEQ, PSD Workbook: A Practical Guide to Prevention of Significant Deterioration at 4-6 to 4-7 (Oct. 2003), attached as Ex. 2; 67 Fed. Reg. 80,186, 80,203 (Dec. 31, 2002) (noting, with respect to the trigger for NSR permitting, that "[b]oth the statute and … regulations indicate that there should be a causal link between the proposed change and any post-change increase in emissions."); *see also DTE*, 711 F.3d at 651 ("If post-construction emissions are higher than preconstruction emissions, *and the increase does not fall under the demand growth exclusion*, the operator faces large fines and will have to undertake another project at the source to install modern pollution-control technology.") (emphasis added).

## III.   Response to Factual Assertions Regarding DTE's NSR Compliance

DTE will fully respond to the allegations in the Government's First Amended Complaint at the appropriate time.  But DTE must address now two of the more egregious statements in the Government's motion.

First, the Government notes that "[w]hile DTE has challenged the United States' allegations, it also obtained NSR permits and has proceeded to construct pollution controls at Monroe Unit 2."  EPA Br. at 1.  The Government thus suggests that DTE sought NSR permits in response to the complaint.

But as the Government knows—indeed, as DTE told the Government when it issued an NOV to DTE for the Monroe Unit 2 projects in June 2010—DTE had already planned and started installing state-of-the-art controls on the Monroe units at that time.  Ex. 3, June 23, 2010, Letter to Mark Palermo at 1.  In fact, DTE had submitted an application for an NSR Prevention of Significant Deterioration ("PSD") permit for a fuel optimization and air quality improvement project at Monroe Units 3 and 4 in April 2009, and that permit was issued by MDEQ on August 2, 2010.  Declaration of Skiles Boyd (Nov. 2010) at ¶ 11 (originally filed at ECF No. 46-4).  And DTE was already preparing and would file in the very near future a similar application for Monroe Units 1 and 2.  These applications and the control equipment that has already been constructed or that is currently nearing completion were part and parcel of DTE's $2 billion control project at the Monroe plant and were well under way before the Government accused DTE of violating the law by conducting maintenance at Monroe Unit 2.  They are completely unrelated to the filing of this case.[2]

---

[2] Indeed, if anything DTE's actions demonstrate that DTE will obtain permits where it believes the law requires it to do so.

Second, the Government suggests that DTE sought to "obscure" emissions increases at Belle River Unit 2 and Trenton Channel Unit 9 from regulators by using incorrect baseline periods. *See* EPA Br. at 5-7. Not so. As an initial matter, it is hard to understand how DTE can "obscure" anything by laying the data out in notices and annual reports to the permitting authority—MDEQ.[3] With respect to the Fall 2007 projects at Belle River Unit 2, the Government concedes in a footnote, EPA Br. at 6 n.3, that the State regulatory authority may allow a source to use a period outside the preceding five years that is "more representative of normal source operation." *See* 40 C.F.R. § 52.21(b)(48)(i). And that is exactly what DTE did with respect to the pre-construction projection for the 2007 Belle River Unit 2 projects. Moreover, DTE was fully transparent, explaining in its preconstruction notice that it was using an alternative baseline period. EPA Br., Att. 3 at 1-2, ECF No. 184-4. MDEQ did not question DTE's determination that the baseline it used was more representative of actual operations.

Nor is the Government correct that DTE sought to "obscure" emission increases at Trenton Channel Unit 9 following 2007 projects at that unit. With respect

---

[3] As DTE explained to EPA almost three years ago, "Detroit Edison regularly communicates with the [MDEQ]," the relevant permitting authority here. Ex. 4 at ¶ 15. Indeed, "[t]he information included in [DTE's] notifications is based on meetings with [MDEQ]." *Id.* Two such meetings took place in 2007 and 2008, in the same period during which DTE submitted the notice letters and annual reports cited by the Government in its brief. *See* Exs. 5, 6, DTE Presentations to MDEQ: New Source Review Update for Detroit Edison Units (July 23, 2007 and Apr. 30, 2008, respectively). In these meetings, DTE discussed with the permitting authority all aspects of its NSR notification and annual reporting practices, including selection of baselines. *See* Ex. 5 at EPA5-24-10 Q11000867-68; Ex. 6 at EPA5-24-10 Q11000828, -832, -844, -847-49.

to those projects, the Government does not allege—nor could it—that DTE used an incorrect baseline in conducting its preconstruction projection. Instead, the Government complains that DTE included a different baseline in its annual postconstruction emissions report for 2009. *See* EPA Br. at 7. But the rules governing these reports require only that the report contain actual post-project emissions data; they do not address baselines. *See* 40 C.F.R. § 52.21(r)(6)(iv). DTE provides updated baseline information for its plants voluntarily as part of its NSR compliance program. Again, and as reflected in the report cited by the Government, DTE was fully transparent in identifying to MDEQ the "current" as well as the changed baseline it was using and why it was using it.[4] EPA Br., Att. 5 at 2-3, ECF No. 184-6. And significantly, actual emissions for NOx and $SO_2$ for Trenton Channel Unit 9 were lower than what DTE had projected in 2007. *Compare* EPA Br., Att. 4 at 5, ECF No. 184-5 (projecting emissions of 18,654 tons of $SO_2$ and 2,665 tons of NOx for 2009) *with* EPA Att. 5 at 5 (reporting actual emissions of 17,926 tons of $SO_2$ and 2,636 tons of NOx).[5]

---

[4] EPA is wrong to suggest that DTE provided additional baseline information in bad faith, to avoid having to acknowledge increased emissions above baseline. To the contrary, DTE has acknowledged such increases on many occasions in its annual reports and indeed has discussed the issue at length with MDEQ. *See* Exs. 5, 6. Indeed, the 2008 Trenton Channel annual report, which the Government chose not to cite, is one of those reports. *See* Ex. 7, DTE, 2008 NSR Emissions Report for Trenton Channel Power Plant, at 2-3 (Feb. 21, 2009) (acknowledging and explaining apparent increase in $SO_2$ emissions).

[5] The Government's assertions here are reminiscent of earlier claims of bad faith for actions taken in good faith to comply with the law. *Cf. DTE*, 711 F.3d at 650 ("EPA also repeatedly suggests bad faith on the part of an operator that intends to keep its post-construction emissions down in order to avoid the significant increases that would require a permit. *See* EPA Br. at 32-35, Reply Br. at 33-34. However, this is entirely consistent with the statute and regulations.").

# ARGUMENT

## I.     Standard for Granting Leave to Amend

Leave to amend should be "freely give[n] ... when justice so requires," Fed. R. Civ. P. 15(a)(2), but leave may properly be denied when there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment [or] futility of amendment...." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Delay alone does not justify denying leave to amend.  But delay coupled with prejudice to opposing parties does justify doing so.  *See, e.g., Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999).  Where a plaintiff knows about a claim but waits years after filing the initial complaint to seek leave to amend, the delay is "inexcusable" and prejudicial to the defendant.  *See, e.g., Springs v. Mayer Brown LLP*, No. 11-CV-13518, 2013 WL 656494, at *1 (E.D. Mich. Feb. 22, 2013) (Friedman, J.).  And allowing amendment after the close of discovery creates significant prejudice to the defendant.  *Duggins*, 195 F.3d at 834 (collecting cases).

## II.    The Court Should Address the Fully-Briefed Motion for Summary Judgment on the Monroe Unit 2 Claims First.

The Government's argument does not stop at why it makes sense for this Court to allow amendment of the Complaint.  As it did in opposing DTE's motion for leave to file a summary judgment motion after remand, *see* ECF No. 168 ¶ 2, the Government goes further and asks the Court to delay resolution of DTE's motion for summary judgment until discovery has ended on the new claims and a trial is held for those claims.  EPA Br. at 8.  The Government says this would avoid "piecemeal litiga-

tion." *Id.* at 1, 8; *see also id.* at 9 ("There is no reason here to separate the new claims from the existing Monroe Unit 2 claims."). This is a rather audacious assertion, given that it was the Government that filed the complaint focused solely on Monroe Unit 2 in August 2010, even though it had an NOV pending for projects at 35 outages since July 2009. And it is the Government that comes now, more than 3 years later, to file additional claims. The Government deliberately sought piecemeal litigation, apparently when it saw an advantage in challenging the Monroe Unit 2 project first, and now it decries piecemeal litigation after its tactical choice backfired.

The issues on Monroe Unit 2 are ready to be decided. Fact discovery has been complete for years, and DTE's renewed motion for summary judgment is now fully briefed. More critically, DTE would be prejudiced if the Monroe Unit 2 claims are not resolved first. "[A]llowing amendment after the close of discovery creates significant prejudice. . . ." *Duggins*, 195 F.3d at 834. Among other reasons, it would compel reopening discovery and thus "would deprive the defendants of their anticipated closure." *Id.* (internal quotation marks omitted). Discovery on the Monroe Unit 2 claims has been closed for years. Moreover, the new claims are separate and independent of the Monroe Unit 2 claims, which means substantial additional discovery.

The Government suggests that this prejudice can be excused because the new claims were "not contemplated by the original complaint." EPA Br. at 10. But this is simply incorrect—all of the new projects in the Government's proposed amended complaint had occurred by the time this lawsuit was filed, and four of the seven new claims were specifically identified in the 2009 NOV. The Government made the tactical decision to push its claims as to Monroe Unit 2 to the head of the line. Now that the Sixth Circuit has squarely rejected its enforcement-by-second-guessing approach,

the Government should not be allowed to forestall a final decision on the Monroe Unit 2 claims by adding seven new claims.

**III.  So Long As the Motion for Summary Judgment as to the Monroe Unit 2 Claims Is Addressed Promptly, Granting the Government's Motion to Amend Would Be Within the Court's Discretion.**

Delaying resolution of Monroe Unit 2 for years would unduly prejudice DTE by depriving it of closure on thoroughly-litigated claims.  But if the now-ripe motion for summary judgment is promptly resolved, that prejudice dissipates, and the potential efficiencies to be gained by having all of the Government's claims litigated in this Court before the same judge counsel in favor of granting the amendment.  To begin, all of the claims are governed by the 2002 rules, so this Court's ruling on the pending motion for summary judgment will help focus the litigation of the remaining claims. And this Court is uniquely qualified to resolve legal challenges involving the new claims—no other district court has engaged the 2002 rules in the way this Court has.[6]

## CONCLUSION

For the foregoing reasons, the Government's motion should be granted only if the Court first resolves the pending motion for summary judgment relating to Monroe Unit 2.  Delaying resolution of those claims would prejudice DTE significantly and deprive it of closure on a claim that is ripe for decision.

---

[6] DTE's agreement not to oppose the amendment so long as the Monroe Unit 2 claims are resolved first should not be construed as a concession that the Government's new claims would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6).

Respectfully submitted this 20th day of September, 2013.

By: /s/ F. William Brownell

Matthew J. Lund (P48632)
Pepper Hamilton LLP
Suite 1800
4000 Town Center
Southfield, Michigan 48075-1505
lundm@pepperlaw.com
(313) 393-7370

Michael J. Solo (P57092)
Office of the General Counsel
DTE Energy, One Energy Plaza
Detroit, Michigan  48226
solom@dteenergy.com
(313) 235-9512

F. William Brownell
Mark B. Bierbower
Makram B. Jaber
Hunton & Williams LLP
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
bbrownell@hunton.com
mbierbower@hunton.com
mjaber@hunton.com
(202) 955-1500

Brent A. Rosser
Hunton & Williams LLP
Bank of America Plaza, Suite 3500
101 South Tryon Street
Charlotte, North Carolina 28280
brosser@hunton.com
(704) 378-4700

Harry M. Johnson, III
George P. Sibley, III
Hunton & Williams LLP
951 E. Byrd Street
Richmond, Virginia 23219
pjohnson@hunton.com
gsibley@hunton.com
(804) 788-8200

*Counsel for Defendants*

-12-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 20, 2013, the foregoing **DEFENDANTS' RESPONSE TO UNITED STATES' MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT** was served electronically only on the following attorneys of record in accordance with an agreement reached among the parties:

Ellen E. Christensen
U.S. Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, MI  48226
313-226-9100
Email:  ellen.christensen@usdoj.gov

James A. Lofton
Thomas Benson
Justin A. Savage
Kristin M. Furrie
James W. Beers, Jr.
Elias L. Quinn
U.S. Department of Justice
Environmental and Natural Resource Div.
Ben Franklin Station
P.O. Box 7611
Washington, DC  20044
202-514-5261
Email: thomas.benson@usdoj.gov
        justin.savage@usdoj.gov
        kristin.furrie@usdoj.gov
        jim.lofton@usdoj.gov
        james.beers@usdoj.gov
        elias.quinn@usdoj.gov

Holly Bressett
Sierra Club Environmental Law Program
85 Second St., 2nd Floor
San Francisco, CA  94105
Phone: (415) 977-5646
Email:  Holly.Bressett@sierraclub.org

/s/ F. William Brownell

-13-