# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

     Plaintiff,

and

SIERRA CLUB,

     Intervenor-Plaintiff,

     v.

DTE ENERGY COMPANY AND
DETROIT EDISON COMPANY,

     Defendants.

Civil Action No.
2:10-cv-13101-BAF-RSW

Judge Bernard A. Friedman

Magistrate Judge R. Steven
Whalen

## PLAINTIFF UNITED STATES' MOTION
## FOR ENTRY OF PROPOSED CONSENT DECREE

The United States asks this Court to approve the proposed Consent Decree, as revised ("Consent Decree" or "Decree"). The proposed Decree will resolve the United States' claims in this case. Plaintiff-Intervenor Sierra Club and Defendants DTE Energy Company and Detroit Edison Company (collectively "DTE") have agreed to the Consent Decree and support this motion. The Decree is provided at Attachment A.

As described in the accompanying brief, the Consent Decree is fair, reasonable, in the public interest, and consistent with the goals of the Clean Air Act. The settlement will cut tens of thousands of tons of air pollution from DTE's power plants each year as well as require the company to pay a $1.8 million civil penalty. In addition, DTE must perform a $5.5 million environmental mitigation project that will reduce air pollution in Wayne County, to offset some of the harm from the excess pollution alleged to have been emitted from DTE's plants.

The Consent Decree was lodged with the Court on May 14, 2020, to solicit public comments pursuant to 28 C.F.R. § 50.7. *See* Dkt. No. 266. The United States received 348 comments, which are compiled at Attachment B. All but one are form emails supporting the Consent Decree and the separate agreement between DTE and Sierra Club; the remaining comment objects to certain of the Consent Decree's terms. As a result of the comments, the Parties have changed one paragraph of the Decree, as discussed in the brief. Nothing in the remaining comments changes the conclusion that the Decree should be approved by the Court.

The United States respectfully requests that the Court approve the Consent Decree. There is a signature line for the Court on page 62 of the Consent Decree.

Respectfully submitted,

Bruce S. Gelber
Deputy Assistant Attorney General
Environment & Natural Resources Div.

 s/ Thomas A. Benson
Thomas A. Benson
(Mass. Bar # 660308)
Kristin M. Furrie
U.S. Department of Justice
Environment & Natural Resource Div.
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044
202-514-5261
thomas.benson@usdoj.gov

Peter Caplan
U.S. Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, MI 48226

## CERTIFICATE OF SERVICE

I certify that this document was filed through the Court's ECF system, which will cause copies to be sent to all counsel of record.

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| and | Civil Action No. |
| SIERRA CLUB, | 2:10-cv-13101-BAF-RSW |
| Intervenor-Plaintiff, | Judge Bernard A. Friedman |
| v. | Magistrate Judge R. Steven Whalen |
| DTE ENERGY COMPANY AND DETROIT EDISON COMPANY, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF UNITED STATES' MOTION FOR ENTRY OF PROPOSED CONSENT DECREE

The United States asks this Court to approve the proposed Consent Decree, as revised ("Consent Decree" or "Decree"). The proposed Decree will resolve the United States' claims in this case. Plaintiff-Intervenor Sierra Club and Defendants DTE Energy Company and Detroit Edison Company (collectively "DTE") have agreed to the Consent Decree and support this motion. The Decree is provided at Attachment A.

As described below, the Consent Decree is fair, reasonable, in the public interest, and consistent with the goals of the Clean Air Act. The settlement will cut tens of thousands of tons of air pollution from DTE's power plants each year as well as require the company to pay a $1.8 million civil penalty. In addition, DTE must perform a $5.5 million environmental mitigation project that will reduce air pollution in Wayne County, to offset some of the harm from the excess pollution alleged to have been emitted from DTE's plants. The Consent Decree contains strict emission limits on DTE's plants and additional terms that are consistent with similar settlements that the United States has reached with other electric utilities.

The Consent Decree was lodged with the Court on May 14, 2020, to solicit public comments pursuant to 28 C.F.R. § 50.7. *See* Dkt. No. 266. The United States received 348 comments, which are compiled at Attachment B. All but one are form emails supporting the Consent Decree and the separate agreement between DTE and Sierra Club;[1] the remaining comment objects to certain of the Consent Decree's terms. As a result of the comments, the Parties have changed one paragraph of the Decree. As discussed in Section II.D of the

---

[1] Sierra Club and DTE have entered into a separate agreement that would resolve Sierra Club's claims in exchange for certain additional terms of relief. *See* Doc. 267. The United States opposes this agreement and will separately respond to Sierra Club's motion concerning the separate agreement.

argument, nothing in the remaining comments changes the conclusion that the Decree should be approved by the Court.

The United States respectfully requests that the Court approve the Consent Decree. There is a signature line for the Court on page 62 of the Consent Decree.

## BACKGROUND

### A.    Procedural History

This case was filed in 2010, and both the United States and Plaintiff-Intervenor Sierra Club amended their complaints in 2014.[2] As amended, the complaints allege claims against several DTE facilities under the New Source Review provisions of the Clean Air Act. The applicable provisions require sources to obtain permits and install pollution controls whenever they "modify" facilities. Whether the facilities at issue were modified has been the central question in the litigation. The original complaints addressed a single project at Monroe Unit 2 in 2010; this Court and the Sixth Circuit have each ruled twice on the proper standard for whether that project was a modification. Since the

---

[2] Both complaints address the same alleged modifications. Sierra Club sought to add claims concerning a different alleged modification in amending its complaint, but the Court limited the Sierra Club complaint to the modifications alleged by the United States. *See* Dkt. 217.

conclusion of the second appeal in January 2018, the case has been stayed to allow for settlement negotiations.

The amended complaints allege New Source Review claims at six of DTE's coal-fired generating units: Belle River Units 1-2; Monroe Units 1-3; and Trenton Channel Unit 9. Plaintiffs allege that DTE violated New Source Review for modifications that increased sulfur dioxide ("$SO_2$") and oxides of nitrogen ("$NO_X$") emissions.

**B.  Consent Decree Terms**

**1.  Plant-Specific Injunctive Relief**

The Consent Decree requires DTE to control emissions from all its coal-fired units, with reductions phasing in between 2022 and 2030.[3] Consent Decree ¶7. All told, DTE has 12 operational coal-fired units: those listed above plus Monroe Unit 4; River Rouge Unit 3; and St. Clair Units 2, 3, 6, and 7. For units at the Belle River, River Rouge, St. Clair, and Trenton Channel plants, DTE must retrofit each unit with stringent pollution controls or convert it to burn

---

[3] After the United States filed its initial complaint, DTE obtained state New Source Review permits for the Monroe units, so no additional controls are needed there.

natural gas.[4] Either option significantly decreases the amount of $SO_2$ and $NO_X$ generated.

The Consent Decree also requires DTE to meet interim limits for $SO_2$ and $NO_X$ at all its coal-fired units within 60 days of the Court's approval of the Consent Decree. Consent Decree ¶9. These interim limits apply until the more stringent steps required by Paragraph 7 are implemented.

### 2.    Overall Emission Reductions and System-wide Tonnage Caps

The Consent Decree imposes declining annual system-wide tonnage limitations on DTE's overall $NO_X$ and $SO_2$ emissions, which reflect the emission reductions from the plant-specific injunctive relief described above. *See* Consent Decree ¶11. EPA estimates that, upon full implementation, the pollution controls required by the Consent Decree will reduce combined annual emissions of $SO_2$ and $NO_X$ by about 138,000 tons per year compared to DTE's emissions when this case was filed.

DTE must also surrender certain $SO_2$ and $NO_X$ "allowances" that may become available through compliance with the Consent Decree that are not

---

[4] The "retrofit" option entails installing pollution controls known as flue gas desulfurization and selective catalytic reduction to meet specified emissions rates. *See* Consent Decree ¶6.ww. DTE may also repower or refuel with natural gas. *See* Consent Decree ¶6.tt, 6.uu. Finally, if DTE chooses to retire a unit, the obligations in Paragraph 7 of the Consent Decree would be extinguished. Consent Decree ¶43.

needed to meet DTE's own requirements. *Id.* ¶¶ 14-22. Such allowances are necessary to comply with independent $SO_2$ and $NO_X$ trading programs established under the Act, and requiring the surrender of any "excess" allowances helps prevent the benefits of emission reductions required by the Consent Decree from being offset by emission increases at other, non-DTE units.

### 3. Civil Penalty

The proposed Consent Decree requires DTE to pay a $1.8 million civil penalty to the United States. *See* Consent Decree ¶39.

### 4. Environmental Mitigation Project

To partially redress the alleged harm from the plants' excess emissions, the Consent Decree requires DTE to implement a bus replacement project that will reduce air pollution in Wayne County. *See generally* Consent Decree ¶¶30-38 and Appendix A. DTE will be required to spend $5.5 million to replace old transit and/or school buses operating within the DTE service areas with new buses that will pollute less. *See* Consent Decree Appendix A. Once the Court approves the Consent Decree, DTE will have 180 days to submit a plan for bus replacements to EPA for the agency's approval. *Id*. The replacements must be completed within six years of the Court's approval. *Id*.

### 5. Resolution of Claims and Other Terms

Section VIII of the proposed Consent Decree provides a resolution of the United States' past claims at DTE's five coal-fired power plants. Consent Decree ¶43. The past resolution of claims applies to all NSR violations for all pollutants regulated as of the date of lodging, and factually related violations under other provisions of the Clean Air Act (*i.e.*, Title V and New Source Performance Standards) at DTE's plants before lodging the Decree. *Id.* In addition, Section VIII provides a conditional resolution of certain potential future New Source Review claims that could arise from "modifications." Under these provisions, DTE will be protected – subject to defined "reopener" conditions[5] – against any future NSR claims arising before December 31, 2030. *Id.* ¶44. This resolution of potential future claims is consistent with resolutions provided in similar system-wide settlements that the United States has reached with electric utilities for alleged NSR violations. It is justified by the large percentage of the system that will be controlled, the associated environmental benefits, the certainty that

---

[5] The limits on the resolution of future New Source Review claims are set forth in Paragraphs 44-47.

emission reductions will be realized, and the declining tonnage caps. *See United States v. Wis. Elec. Power Co.*, 522 F. Supp. 2d 1107 (E.D. Wis. 2007).

While the Decree resolves all the United States' claims in the litigation, it states that none of the relief in the Decree is attributable to the 2010 claim at Monroe Unit 2. As described further in Paragraph C of the Decree preamble, the United States made this determination as an exercise of its prosecutorial discretion in light of the litigation history and EPA's guidance on NSR enforcement. *See* EPA Administrator, Memorandum Regarding New Source Review Preconstruction Permitting Requirements (Dec. 7, 2017).

## C.    Public Comments and Change to Decree

The United States lodged the proposed Consent Decree with this Court on May 14, 2020. EPA issued a press release the next day. The United States then published a notice in the Federal Register describing the Decree and announcing a 30-day public comment period (through June 18, 2020). 85 Fed. Reg. 29,979 (May 19, 2020). Beginning on May 14, and throughout the 30-day public comment period, the Decree was available for public review on the U.S. Department of Justice website.

The comment period ended June 18, 2020. Through July 6, the United States received 348 comments, which are compiled at Attachment B (in order of receipt). All but one are form emails. These form emails each state that they are

on behalf of "an individual associated with Sierra Club" and that the writer voices "support for the consent decree and even stronger support for the separate agreement between DTE and Sierra Club." Some of the emails include personal details about the writer's background, views on the importance of environmental issues, complaints about pollution levels, or other unique statements, but all support the Decree and are similar in substance. For the Court's convenience, Attachment C compiles just the unique statements from those form comments that have additional statements.

The remaining comment criticized the Consent Decree and requested four changes: increased civil penalty and environmental mitigation, extended record-keeping, and more frequent reporting. This comment came from a student attorney and director of the Environmental Law Clinic at Detroit Mercy Law School ("Law Clinic Comment"). For convenience, it is separately included as Attachment D.

The United States has reviewed all the comments carefully, and concluded that one aspect of the Law Clinic Comment warranted a change to the Decree. The Law Clinic Comment proposes extending record-keeping under Section XV of the decree "to cover the full timeline of DTE's obligations" under the agreement. *See* p. 3. Paragraph 96 of the original agreement required DTE to retain Decree-related documents through 2021 or 2023, depending on the nature

of the document. *See* Dkt. XX at ¶96. We understand the point of the Law Clinic Comment to be that certain Decree obligations extend beyond these two deadlines. In response, the United States worked with the Parties to change the document retention deadline, so the Decree now requires the company to hold Decree-related documents for five years after termination. Consent Decree ¶96. This meets the commenters' request to "cover the full timeline of DTE's obligations under the consent decree." Law Clinic Comment at 3.

No other changes were made to the consent decree as originally lodged at Dkt. 266-1.

## ARGUMENT

## I.    Standard for Judicial Review and Approval of Consent Decrees

Approval of a consent decree is within the informed discretion of the Court. *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991). That discretion generally should be exercised in favor of settlement, as "[p]ublic policy strongly favors settlement of disputes without litigation." *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976); *see Donovan v. Robbins*, 752 F.2d 1170, 1177 (7th Cir. 1984).

The "presumption in favor of voluntary settlement . . . is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial

expertise in the environmental field." *Akzo Coatings*, 949 F.2d at 1436; *see also United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) (stating that favoritism towards these types of settlements "has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement").

In reviewing a proposed consent decree, the district court is to satisfy itself that the settlement is fair, adequate, and reasonable, as well as consistent with the public interest. *United States v. Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010); *see Wis. Elec. Power Co.*, 522 F. Supp. 2d at 1111-12 (entering and approving a similar New Source Review settlement with an electric utility because the decree secured environmental benefits and was "reasonable, fair, and consistent with the statutory purposes of the Clean Air Act").

A court may only accept or reject the settlement agreed upon by the parties and may not modify a consent decree before entry. *Akzo Coatings*, 949 F.2d at 1435; *United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348, 351–52 (6th Cir. 1986); *Wis. Elec. Power Co.*, 522 F. Supp. 2d at 1110, 1112.

## II.   The Consent Decree Is Fair, Adequate, Reasonable, and Consistent with the Public Interest and the Goals of the Clean Air Act

### A.   The Consent Decree Is Fair

In determining whether a settlement is fair, courts consider factors such as the strength of the plaintiff's case, the complexity and length of the litigation, the amount of opposition to the settlement, the good-faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation. *See Akzo Coatings*, 949 F.2d at 1435; *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).

A consent decree must be both procedurally and substantively fair. *See Wis. Elec. Power Co.*, 522 F. Supp. 2d at 1112 (citing *Cannons*, 899 F.2d at 86); *United States v. Davis*, 261 F.3d 1, 20 (1st Cir. 2001). A court's review for procedural fairness will consider the negotiation process and whether it was open and at arm's length. *See Wis. Elec. Power Co.*, 522 F. Supp. 2d at 1112 (citing *Cannons*, 899 F.2d at 86). A court's review for substantive fairness will consider concepts of corrective justice and accountability. *See id.* (citing *Cannons*, 899 F.2d at 87). Because these concepts do not lend themselves to "verifiable precision[,] [i]n environmental cases, EPA's expertise must be given 'the benefit of the doubt when weighing substantive fairness.'" *United States v. Comunidades Unidas Contra*

*La Contaminacion*, 204 F.3d 275, 281 (1st Cir 2000) (quoting *Cannons*, 899 F.2d at 88).

The Consent Decree is procedurally fair. The settlement is the product of arm's-length negotiating sessions between the United States, DTE, and Sierra Club over more than two years. All three Parties were represented by experienced counsel and technical staff. The United States also provided the public at large with an opportunity to comment on the proposed settlement. *See* 85 Fed. Reg. 29,979 (May 19, 2020).

The Consent Decree is also substantively fair. As discussed above, the Consent Decree requires DTE to install and operate pollution controls that will secure substantial reductions in $SO_2$ and $NO_X$, and pay a civil penalty of $1.8 million. In addition, DTE must perform an environmental mitigation project (valued at $5.5 million), which will ameliorate some of the harm from its alleged historic excess emissions. The relief in the Consent Decree reflects the Parties' careful and informed assessment of the claims, while considering the costs and risks associated with further litigation. In particular, while the United States has extensive authority to seek permanent injunctive relief to remedy and mitigate CAA violations, obtaining more injunctive relief in litigation would require both a finding of liability and a further judicial assessment of the necessary relief. Despite 10 years of pitched litigation, no final liability determinations have been

made, and the Parties would all face litigation risk on liability and the appropriate relief.

The time necessary to reach a judgment through litigation further supports the fairness of the Consent Decree, which will achieve results much more quickly. After 10 years of litigation, discovery has not yet begun on six of the seven claims in the amended complaints. By contrast, the interim emissions rates in the Consent Decree take effect within two months of Court approval and the final control requirements for most units apply by the end of 2022. This injunctive relief will significantly reduce the amount of harmful air pollution emitted each year. Finally, the fact that the United States, DTE, and Sierra Club – representing a spectrum of interests – all agreed to the terms confirms that it is fair.

In short, the Consent Decree is procedurally and substantively fair given the risks and expense of continuing litigation, the arm's-length negotiations that led to the settlement, and the substantial benefit to the public from the emissions reductions.

### B.   The Consent Decree Is Adequate and Reasonable

The reasonableness of a consent decree is determined by considering "the nature/extent of hazards; the degree to which the remedy will adequately address the hazards; possible alternatives for remedying hazards; and the extent

to which the decree furthers the goals of the statute." *Akzo Coatings*, 949 F.2d at 1436 (citing *Cannons*, 720 F. Supp. at 1038); *Wis. Elec. Power Co.*, 522 F. Supp. 2d at 1118. In environmental cases, one of the more important factors "when evaluating whether a proposed consent decree is reasonable is 'the decree's likely effectiveness as a vehicle for cleansing' the environment." *Lexington-Fayette Urban County Gov't,* 591 F.3d at 489 (quoting *Akzo Coatings*, 949 F.2d at 1437).

The Consent Decree is adequate and reasonable because it addresses the harm to the environment from the alleged violations. When emitted into the air, $SO_2$ and $NO_X$ react with other substances to form various acidic compounds, fine particulates known as $PM_{2.5}$, and ozone. Such compounds harm human health and the environment. *See, e.g.*, *United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 771-74 (E.D. Mo. 2019); *United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 949–54 (S.D. Ind. 2009), *rev'd on other grounds*, 623 F.3d. 455 (7th Cir. 2010). The Consent Decree requires DTE to reduce air emissions, thereby enhancing the environment and serving as an effective remedy for the environmental harm caused by DTE's alleged failure to comply with PSD requirements.

As noted above, the pollution controls required by the proposed Consent Decree will reduce annual combined emissions of $SO_2$ and $NO_X$ by about 138,000 tons compared to emissions at the beginning of the litigation. Such

reductions will help improve air quality, and reduce sulfates, smog, and fine PM in the atmosphere – all leading to improvements in public health. The proposed Consent Decree also requires DTE to spend at least $5.5 million on a bus replacement project that will result in further emissions reductions in the area, thus offsetting some of the harm alleged from DTE's violations. Finally, the settlement includes a civil penalty designed to deter DTE and other similarly situated parties from violating the law in the future. The Consent Decree is thus reasonable given the remedy secured and the goal of the Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

### C. The Consent Decree Is Consistent with Applicable Law and in the Public Interest

To evaluate the public interest, "the district court must consider whether the decree is 'consistent with the public objectives sought to be attained by Congress.'" *Lexington-Fayette Urban County Gov't*, 591 F.3d at 490 (quoting *Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir. 1983); *see also Lexington-Fayette Urban County Gov't,* 591 F.3d at 489-90 (consistency with the public interest means "consistency with the statute" and "consisten[cy] with the public objectives sought to be attained by Congress").

16

The New Source Review program is designed to consistently improve public health and welfare by limiting air pollution while accounting for energy, environmental, and economic impacts and other costs. *See, e.g.*, 42 U.S.C. §7475. As discussed above, this settlement comports with these purposes by reducing harmful air emissions over a ten-year span through pollution controls and an environmental mitigation project. While the time frames and other terms may differ somewhat from the relief that the United States might seek – or the Court could award – after trial, further litigation would drain the time and resources of all Parties and further delay compliance. *See Akzo Coatings*, 949 F.2d at 1436 n.25. Voluntary settlement conserves the time and resources of the parties and the courts, and furthers the public interest by achieving a cleaner and healthier environment without the burdens and uncertainties of trial.

### D.   The Comments Do Not Provide a Basis for Rejecting the Consent Decree

As noted above, the United States made the Consent Decree available for public comment and received 348 comments. Of those, 347 supported the Decree and voiced support for the separate agreement between DTE and Sierra Club. In supporting the Decree, these 347 commenters noted that the Decree's projects are crucial to "improving public health and delivering cleaner air for Michiganders."

The remaining comment, from two individuals at the Detroit Mercy Environmental Law Clinic, criticized the Decree and requested four changes: increased civil penalty and environmental mitigation, extended record-keeping, and more frequent reporting. *See* Attachment D at p. 3. As noted above, the United States did extend the record-keeping requirement as requested by the comment. The United States responds to the remaining three items in the Law Clinic Comment below.

As an initial matter, the Court's inquiry "is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed Decree is fair, reasonable, and faithful to the objectives of the governing statute." *Cannons*, 899 F.2d at 84. The Court's role is limited to only accepting or rejecting the settlement agreed upon by the parties; it may not modify a consent decree before entry. *Akzo Coatings*, 949 F.2d at 1435; *United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348, 351–52 (6th Cir. 1986).

Nothing in the Law Clinic Comment suggests that the Consent Decree should be rejected. The Consent Decree is a package, agreed to by the United States, Sierra Club, and DTE. The Law Clinic Comment identifies a handful of elements of that package that it wishes could be enhanced. Notably, the Law Clinic Comment does *not* raise any objection to the injunctive relief, the cornerstone of the Decree. The overall package is appropriate, in light of the

18

costs and chance of obtaining lesser relief through litigation. Indeed, 347 members of the public wrote in to support the Consent Decree.

### *Increased Civil Penalty and Environmental Mitigation*

The Consent Decree requires DTE to pay a civil penalty of $1.8 million and perform an environmental mitigation project at a cost of at least $5.5 million. The Law Clinic Comment contends that these provisions are inadequate in light of DTE's financial resources and the relief the United States could have secured had it prevailed at trial. The comment also suggests that the mitigation should be augmented so that it "fully and properly compensate[s] specific Michigan communities that were most affected by DTE's coal-fired facilities." Law Clinic Comment at p. 3. But the comment does not suggest additional mitigation projects or identify specific communities that it maintains were disproportionately affected.

After reviewing the comment, the United States continues to believe that the penalty and mitigation amounts obtained in the Consent Decree are appropriate. The comment does not provide any reasoned basis for a particular amount of penalty or mitigation relief that would be appropriate given the facts of this case, nor comparisons from prior settlements or judicial orders that it would consider appropriate here. Instead it simply provides a penalty calculation based on the statutory maximum, and makes no effort at all to

quantify the appropriate amount of mitigation relief. But determining the appropriate penalty after trial is a task involving considerable judicial discretion;[6] one cannot assume the statutory maximum would result if the Parties litigated to judgment. So too whether to order environmental mitigation and the amount of such mitigation is within the Court's discretion.

Here, the Parties have litigated for ten years, but (after the appeals) the Court has made no finding on liability, and discovery has not yet begun on six of the seven projects at issue. The Law Clinic is correct that litigating to judgment *could* result in larger penalty and more extensive mitigation of the harm from any proven excess pollution emitted by DTE. But litigation could also result in less or no relief at all, while taking years longer than the Decree for relief to occur. A consent decree is "a compromise" in which "in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *Local No. 93, Int'l Association of Firefighters v. City of Cleveland,* 478 U.S. 501, 522 (1986) (internal

---

[6] The Act lays out the factors a court must consider in determining a penalty: the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation, payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation, along with "such other factors as justice may require." 42 U.S.C. § 7413(e)(1).

citation omitted). The considered judgment of the United States is that the relief obtained in the Consent Decree is appropriate.

### *Increased Reporting*

The Consent Decree requires DTE to submit reports to the United States and Sierra Club every six months that substantiate its compliance with Decree obligations and provide information on various activities under the agreement. Consent Decree ¶ 48. In addition to the periodic reports, if DTE violates any provision of the Decree, it must submit a separate report describing the violation and its cause within 10 days. *See id*. ¶ 50.

The Law Clinic Comment proposes requiring the periodic reports every three months instead of six. Six months is a typical time for periodic reports in similar decrees, as well as reporting for permitted sources in Michigan, and is appropriate under the circumstances of this case. In addition, DTE must separately notify the United States and Sierra Club of any Decree violation. Thus making the comprehensive periodic reports more frequent is not necessary to provide notice of violations, nor would it enhance DTE's compliance with the Consent Decree.

## CONCLUSION

The Consent Decree substantially reduces air pollutants, requires payment of a civil penalty, secures environmental mitigation, and resolves a complex

matter in this Court without further litigation and delay. The Consent Decree is fair, reasonable, and consistent with applicable law and the public interest. The Decree has been agreed to by the United States, DTE, and Sierra Club. The United States, therefore, respectfully requests that this Court approve and enter the proposed Consent Decree as a final judgment.

Respectfully submitted,

Bruce S. Gelber
Deputy Assistant Attorney General
Environment & Natural Resources Div.

 *s/Thomas A. Benson*
Thomas A. Benson
(Mass. Bar # 660308)
Kristin M. Furrie
U.S. Department of Justice
Environment & Natural Resource Div.
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044
202-514-5261
thomas.benson@usdoj.gov

Peter Caplan
U.S. Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, MI 48226

## CERTIFICATE OF SERVICE

I certify that this document was filed through the Court's ECF system, which will cause copies to be sent to all counsel of record.