# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,
    Plaintiff,

and

SIERRA CLUB,
    Intervenor-Plaintiff,

    v.

DTE ENERGY COMPANY and
DETROIT EDISON COMPANY,
    Defendants.

Civil Action No.
2:10-cv-13101-BAF-RSW

Judge Bernard A. Friedman

Magistrate Judge R. Steven Whalen

## ***ORAL ARGUMENT REQUESTED***

## THE UNITED STATES' RESPONSE TO SIERRA CLUB'S MOTION TO ENTER AGREEMENT BETWEEN SIERRA CLUB AND DTE OR, IN THE ALTERNATIVE, NOTICE OF THAT AGREEMENT

Of Counsel:

SUSAN PARKER BODINE
*Assistant Administrator*
Office of Enforcement and
    Compliance Assurance

U.S. Environmental
Protection Agency

JEFFREY BOSSERT CLARK
*Assistant Attorney General*
BRUCE S. GELBER
*Deputy Assistant Attorney General*
PATRICIA McKENNA
*Assistant Section Chief,*
    *Environmental Enforcement Section*
MICHAEL B. BUSCHBACHER
*Counsel to the Assistant Attorney General*

Environment & Natural Resources Div.
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530
(202) 305-2075
michael.buschbacher@usdoj.gov

i

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES ............................................................. viii

KEY AUTHORITIES.............................................................................ix

LEGAL BACKGROUND......................................................................3

ARGUMENT.........................................................................................5

  I.  Judicial Review of the Terms of Sierra Club's Agreement Is Required....5

  II.  This Court Should Deny Sierra Club's Motion to Enter. .........................8

    a.  Sierra Club May Not Override the Considered Enforcement Discretion of the United States. ..................................................................8

    b.  The "Mitigation" Relief Violates the CAA. .........................................9

    c.  Sierra Club Cannot Be Permitted to Settle for Remedies Beyond Those Congress Authorized in the CAA or Miscellaneous Receipts Act (MRA)— or Those Limits Will Be Eviscerated......................................................11

    d.  Sierra Club's Requested Relief Is Contrary to Sound Environmental Enforcement Policy.................................................................................18

  III.  The Constitutional Standing and Avoidance Doctrines Also Preclude Sierra Club's Added Relief................................................................19

    a.  Sierra Club Lacks Standing to Obtain the Additional Relief............ 20

    b.  This Court Should Avoid Interpreting the CAA in a Way that Would Raise Constitutional Issues.................................................................. 22

CONCLUSION ...................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Farmland Indus., Inc.*,
45 F. Supp. 2d 863 (D. Kan. 1999)...........................................................22

*Binno v. Am. Bar Ass'n*,
826 F.3d 338 (6th Cir. 2016) ..................................................................20

*Buckley v. Valeo*,
424 U.S. 1 (1976) ...................................................................................24

*Cal. Sportfishing Protection Alliance v. Forever Resorts, LLC*, No. 2:16-cv-01595
(E.D. Cal. Aug. 30, 2018) ..........................................................................5

*Cambrians For Thoughtful Dev., U.A. v. Didion Milling, Inc.*,
571 F. Supp. 2d 972 (W.D. Wis. 2008) .....................................................21

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)................................................................................25

*City of Philadelphia v. Stepan Chem. Co.*,
544 F. Supp. 1135 (E.D. Pa. 1982)...............................................16, 17, 18

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008)................................................................................20

*Dep't of Transp. v. Assoc. of Am. R.R.*,
135 S. Ct. 1225 (2015) .......................................................................23, 25

*DuBois v. Thomas*,
820 F.2d 943 (8th Cir. 1987) ................................................................. 1, 9

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004).............................................1, 3, 4, 5, 8, 9, 22

*EPA v. City of Green Forest, Ark.*,
921 F.2d 1394 (8th Cir. 1990) ............................................................1, 8, 9

*Families for Asbestos Compliance Testing & Safety v. City of St. Louis, Mo.*,
638 F. Supp. 2d 1117 (E.D. Mo. 2009).....................................................22

*Firefighters v. City of Cleveland,*
    478 U.S. 501 (1986)...............................................................................10, 12

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
    561 U.S. 477 (2010).................................................................................. 23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 197
    (2000),
     8 U.S. 167, 197...................................................................................23, 24

*Gutierrez v. Mobil Oil Corp.,*
    798 F. Supp. 1280 (W.D. Tex. 1992) .....................................................10, 11

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,*
    484 U.S. 49 (1987).........................................................1, 3, 4, 9, 13, 22

*Hallstrom v. Tillamook County*, 493 U.S. 20 (1989)........................................... 7

*Hallstrom v. Tillamook County,*
    844 F.2d 598 (9th Cir. 1987) ..................................................................... 7

*Heckler v. Chaney,*
    470 U.S. 821 (1985)................................................................................. 24

*Huntington v. Attrill,*
    146 U.S. 657 (1892)................................................................................. 14

*In re Davis,*
    960 F.3d 346 (6th Cir. 2020) ................................................................11, 18

*In re Ferro Corp. Derivative Litig.,*
    511 F.3d 611 (6th Cir. 2008) ..................................................................... 7

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018) ............................................................................22, 25

*Jorge Lopez v. A&S Metals Recycling Inc.*, No. 17-1735-GW-AFMx (C.D. Cal.
    Nov. 2, 2018) ........................................................................................... 5

*Kokesh v. SEC,*
    137 S. Ct. 1635 (2017) ............................................................................. 14

*Lujan v. Defenders of Wildlife,*
      504 U.S. (1992) ................................................................................. 21

*Meghrig v. KFC W., Inc.,*
      516 U.S. 479 (1996) ..................................................................... 13, 14

*Michigan Corr. Org. v. Michigan Dep't of Corr.,*
      774 F.3d 895 (6th Cir. 2014) ............................................................ 11

*Middlesex County Sewerage Authority v. Nat. Sea Clammers Assn.,*
      453 U.S. 1 (1981) .............................................................................. 14

*Nw. Envtl. Def. Ctr. v. Unified Sewerage Agency of Washington Cty.,*
      1990 WL 191827 (D. Or. July 27, 1990) ........................................... 15

*Oppose Pollution, Inc. v. Heritage Grp.,*
      973 F.2d 1320 (7th Cir. 1992) ............................................................ 9

*Pub.Int. Rsch. Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.,*
      913 F.2d 64, 81 (3d Cir. 1990) ...................................................... 15, 17

*Robertson v. Allied Sols., LLC,*
      902 F.3d 690 (7th Cir. 2018) ............................................................ 20

*Russello v. United States,*
      464 U.S. 16 (1983) ............................................................................ 12

*Schumacher v. SC Data Ctr., Inc.,* 912 F.3d 1104, 1105 (2019),
      912 F.3d 1104 (2019) ........................................................................ 20

*Seila Law LLC v. Consumer Financial Protection Bureau,*
      591 U.S. ___, No. 19-7, 2020 WL 3492641 (2020) ..................... 23, 24

*Sierra Club v. Elec. Controls Design, Inc.,*
      703 F. Supp. 875 (D. Or. 1989) ........................................................ 16

*Sierra Club v. Elec. Controls Design, Inc.,*
      909 F.2d 1350 (9th Cir. 1990) ................................................. 6, 15, 16

*Town of Chester, N.Y. v. Laroe Estates, Inc.,*
      137 S. Ct. 1645 (2017) ...................................................................... 19

v

*U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine, LLC,*
   339 F.3d 23 (1st Cir. 2003) ............................................................ 13

*United States v. Cinergy Corp.,*
   582 F. Supp. 2d 1055 (S.D. Ind. 2008) ........................................ 10, 11, 13

*United States v. D.C.,*
   933 F. Supp. 42 (D.D.C. 1996) ......................................................... 9

*United States v. Hayes,*
   555 U.S. 415 (2009) ........................................................................ 11

*United States v. Lexington-Fayette Urban Cty. Gov't,*
   2007 WL 2020246 (E.D. Ky. July 6, 2007) ..................................... 8

*United States v. Smithfield Foods, Inc.,*
   982 F. Supp. 373 (E.D. Va. 1997) ................................................. 17

*United States v. Yeager,*
   303 F.3d 661 (6th Cir. 2002) .......................................................... 7

*US v. Jones & Laughlin Steel Corp.,*
   804 F.2d 348 (1986) .................................................................. 18, 20

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,*
   529 U.S. 765 (2000) ....................................................................... 23

*WildEarth Guardians v. Pub. Serv. Co. of Colorado,*
   690 F.3d 1174 (10th Cir. 2012) ........................................ 10, 11, 20, 21, 22

**Constitutional Provisions**

U.S. Const. Art. II, § 1, cl. 1 ...................................................................... 23

U.S. Const. Art. II, § 3 ............................................................................. 24

**Statutes & Legislative History**

31 U.S.C. § 3302(c) ................................................................................ 17

33 U.S.C. § 1365(c), (c)(3) ..................................................................... 4, 6

42 U.S.C. § 6972 ..................................................................................... 13

42 U.S.C. § 7413(b) ...................................................................... 12

42 U.S.C. § 7604 (a), (b)(1), (c)(3), (g) .........................4, 7, 9, 10, 12, 14, 16, 17

H.R. Rep. No. 92–911 (1972), 1 Leg. Hist. 820 ................................. 3

S.Rep. No. 92–414 (1971), 2 Leg. Hist ......................................... 3

1 Annals of Cong. (J. Madison) ................................................. 23

131 Cong. Rec. S3645 (daily ed. Mar. 28, 1985)......................... 3, 4

133 Cong. Rec. 737 (daily ed. Jan. 14, 1987)............................. 4, 7

Clean Water Act, Pub. L. 100-4 (Feb. 4, 1987).............................. 3

Clean Air Act, Pub. L. 101-549 (Nov. 15, 1990)........................ 3, 16

**Rules**

Fed. R. Civ. P. 41(a)(2) ............................................................. 5

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ........................................ 6

Memorandum from Jeffrey Bossert Clark, Assistant Att'y Gen. for
    Environment & Natural Resources (Mar. 12, 2020), *available at*
    https://www.justice.gov/enrd/page/file/1257901/download ................. 18

## STATEMENT OF THE ISSUES

For over a decade the United States has been litigating Clean Air Act ("CAA" or "the Act") claims against DTE. After two appeals and an unsuccessful attempt by DTE to obtain certiorari, the U.S., DTE, and Intervenor Sierra Club have negotiated a proposed consent decree, which the U.S. recently moved to have this Court enter. Sierra Club, however, wants more. In a separate proposed settlement it seeks wide-ranging additional relief, including closure of several of DTE's coal-fired units and a requirement that DTE undertake two completely open-ended "mitigation" projects.

The questions presented here are:

1. Whether Sierra Club can escape judicial review of its agreement by labelling it a "private settlement";

2. Whether a citizen group appearing as a plaintiff-intervenor can override the considered enforcement decision of the United States not to seek further relief;

3. Whether the open-ended "community projects" sought by Sierra Club violate the Act and sound environmental policy;

4. Whether Sierra Club has standing to seek independent relief; and

5. Whether this Court should avoid the "[d]ifficult and fundamental questions" under the Constitution that would arise if it were to grant Sierra Club's request.

viii

# KEY AUTHORITIES

1.  *Ellis v. Gallatin Steel Co.*, 390 F.3d 461 (6th Cir. 2004)

2.  *EPA v. City of Green Forest, Ark.*, 921 F.2d 1394 (8th Cir. 1990)

3.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring)

4.  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49 (1987)

5.  *Meghrig v. KFC W., Inc.*, 516 U.S. 479 (1996)

6.  *Seila Law LLC v. CFPB*, 591 U.S. __, No. 19-7, 2020 WL 3492641 (2020)

7.  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017)

8.  *United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055 (S.D. Ind. 2008)

9.  *WildEarth Guardians v. Public Service Co. of Colorado*, 690 F.3d 1174 (10th Cir. 2012)

## INTRODUCTION

Since 1970, the CAA has empowered citizens with standing to act as "private attorneys general," who may both bring suit on their own and, in some cases, intervene in civil enforcement actions brought by the government. The role of such citizen suits is narrow by design. As the Sixth Circuit held, "Congress has authorized citizen suits [under the CAA] only when environmental officials '*fail* to exercise their enforcement responsibility' and has provided [only] an 'interstitial' role for private parties in enforcing the statute." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 475 (6th Cir. 2004) (Sutton, J.) (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 60-61 (1987)).

Crucially, the Act "does *not* permit citizen suits to seek types of relief 'that the [government] chose to forgo.'" *Id.* (emphasis added). Nor may citizen intervenors "compel a consent decree on their own terms," since doing so would "'enable citizens to commandeer the federal enforcement machinery.'" *EPA v. City of Green Forest, Ark.*, 921 F.2d 1394, 1402 (8th Cir. 1990) (quoting *DuBois v. Thomas,* 820 F.2d 943, 949 (8th Cir. 1987)).

The dispute now before the Court involves precisely these limitations designed to ensure government enforcement primacy. After lengthy negotiations, the U.S., DTE, and Sierra Club signed a proposed consent decree. If entered, it would require DTE to limit pollution from all of its coal-fired units by certain

1

deadlines, pay a $1.8 million civil penalty to the U.S. Treasury, and perform a $5.5 million mitigation project, replacing old municipal or school buses in Wayne County with lower-emitting vehicles, thereby offsetting some of DTE's alleged excess emissions. As the United States has explained in its motion to enter, Dkt. No. 278, this relief is fair, just, reasonable, and consistent with the Act. The injunctive relief will improve regional air quality for many Michiganders and others in the airshed while also protecting the natural beauty of the Great Lakes region. The substantial penalty will deter DTE and others from committing CAA violations in the future.

But Sierra Club wants more. The side deal it negotiated with DTE would release Sierra Club's actual and potential federal citizen suit claims in exchange for DTE shuttering all but its largest units, pledging to use Sierra Club's preferred types of buses for the government's air-quality mitigation project, and funding two additional "mitigation" projects. The first project would require DTE to spend at least $2 million on unspecified environmental projects in southwest Detroit to be proposed by a five-member committee comprising a representative of DTE, an academic, and three members of the community selected with input from Sierra Club. The second project would require DTE to perform an unspecified energy efficiency project or projects at a Detroit community center.

The United States remains unwilling to include this relief in its consent decree, as it is inconsistent with sound environmental enforcement policy and perverts litigation claims meant to help the general public, just to benefit a select few. Sierra Club simply cannot obtain separate relief the U.S. "chose to forgo."

## LEGAL BACKGROUND

Citizen suits have been termed "private attorney general" actions. "[A]s the phrase implies," they are designed primarily to serve "society as a whole" rather than individual or factional interests. *Ellis*, 390 F.3d at 477. Despite this purpose, early versions of both the CAA and the Clean Water Act ("CWA") did little to prevent citizen plaintiffs from using the threat of potentially crippling civil penalties to extract settlements that included improper forms of relief.

Congress took note of these issues in the 1980s, observing that citizen suits were prone to "certain abuses . . . , including attempt[s] [by plaintiffs] to settle penalty claims through payments to private parties rather than to the United States Treasury." 131 Cong. Rec. S3645 (daily ed. Mar. 28, 1985).[1] After lengthy deliberation, Congress amended the citizen suit provisions in both the CWA, Pub. L. 100-4 (Feb. 4, 1987), and the CAA, Pub. L. 101-549 (Nov. 15, 1990).

---

[1] Though this legislative history is tied to the development of the CWA's citizen suit provision, it also applies to the nearly identical provisions of the CAA. *See* S.Rep. No. 92–414 (1971), 2 Leg. Hist. 1497; H.R. Rep. No. 92–911 at 133 (1972), 1 Leg. Hist. 820; *Gwaltney*, 484 U.S. at 62 (1987).

These amendments were aimed at preventing "abusive, collusive, or inadequate settlements," 133 Cong. Rec. 737 (daily ed. Jan. 14, 1987), as well as relief "inconsistent with the government's enforcement program or interpretation of the law," 131 Cong. Rec. S3645 (daily ed. Mar. 28, 1985).

As amended, both statutes now require citizen groups to give 60 days' notice to the government before filing suit, allowing the government to bring its own action during this window, precluding most citizen enforcement (though a citizen may still appear as an intervenor). 33 U.S.C. § 1365(c)(3) (CWA); 42 U.S.C. § 7604(b)(1) (CAA). Both statutes also provide that "[n]o consent judgment shall be entered in an action brought under [citizen suit provisions] in which the United States is not a party" unless the United States has been afforded 45 days to review the proposed consent judgment. 33 U.S.C. § 1365(c)(3); 42 U.S.C. § 7604(c)(3). The CAA adds that, during this review period, "the Government may submit its comments on the proposed consent judgment to the court and parties or may intervene as a matter of right." 42 U.S.C. § 7604(c)(3).

As the Sixth Circuit observed in *Ellis*, such "notice provisions demonstrate that Congress has authorized citizen suits only when environmental officials '*fail* to exercise their enforcement responsibility' and has provided an 'interstitial' role for private parties in enforcing the statute." 390 F.3d at 475 (quoting *Gwaltney,* 484 U.S. at 60-61). The Act "does not permit citizen suits to seek types

4

of relief 'that the [U.S.] chose to forgo'; otherwise, administrative 'discretion to enforce the [Act] in the public interest would be curtailed considerably' and the 'nature of the citizens' role' would become 'potentially intrusive.'" *Id.* In short, the separation of powers would suffer a grave blow.

**ARGUMENT**

**I.      Judicial Review of the Terms of Sierra Club's Agreement Is Required.**

Sierra Club audaciously argues that it can leverage its claims against DTE to extract relief that the U.S. "chose to forgo" here. It claims that cloaking DTE's concession as "a private settlement agreement," rather than a consent decree, hides its approach from judicial oversight. *See* Motion for Entry at 5, 10. That is incorrect. Regardless of how Sierra Club labels its document, without agreement by all parties, an "action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). And there is nothing "proper" about Sierra Club's request.

To the best of the United States' knowledge, every court that has considered the question has held that citizen groups cannot evade judicial review by labelling an agreement a private settlement rather than a consent decree. *See Cal. Sportfishing Protection Alliance v. Forever Resorts, LLC*, No. 2:16-cv-01595, at *3 (E.D. Cal. Aug. 30, 2018) (Ex. 1); *Jorge Lopez v. A&S Metals Recycling Inc.*, No. 17-1735-GW-AFMx (C.D. Cal. Nov. 2, 2018) (Ex. 2) (The settlement agreement

5

"is a consent judgment within the scope of 33 U.S.C. § 1365(c), subject to federal review and judicial approval."); *see also Sierra Club v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1352 n.2 (9th Cir. 1990) ("if it finds that the proposed judgment is not in accordance with the [statute], the United States can object").

This conclusion flows from the text of the Act. "Consent judgment" is a term of art that covers *any* agreed settlement "that becomes a court judgment when the judge sanctions it." *Judgment* (2), Black's Law Dictionary (11th ed. 2019).[2] It "is merely a contract acknowledged in open court and ordered to be recorded, but it binds the parties as fully as other judgments." *Id.*

An order granting Sierra Club's request that this Court "dismiss this case[,] having taken notice of the Separate Agreement but without incorporating the terms of that agreement into the dismissal" fits comfortably within this definition. Its so-called private agreement (1) is based on a contract of settlement between Sierra Club and DTE resolving claims in *public litigation* brought by the United States and (2) qualifies as a Rule 54(a) "judgment" in this case because,

---

[2] It is significant that Congress selected the phrase "consent judgment" instead of "consent decree." Traditionally, a "decree" was a judicial decision by "a court of equity, admiralty, divorce, or probate," while a "judgment" was a final decision "of a court of law." *Decree (1)*, Black's Law Dictionary (11th ed. 2019). Today, "consent decree" continues to connote a measure of ongoing equitable supervision. Congress's decision to instead use the phrase "consent judgment" indicates that supervision is not necessary in order to trigger governmental review.

"as a practical matter, [it would] prevent the parties from further litigating the merits of the case in federal court." *United States v. Yeager*, 303 F.3d 661, 665 (6th Cir. 2002); *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 617 (6th Cir. 2008). This is how Congress itself understood the phrase, since the legislative history indicates that the notice provisions were intended to prevent "abusive, collusive, or inadequate *settlements*." 133 Cong. Rec. 737 (daily ed. Jan. 14, 1987) (emphasis added).

Any other approach would conflict with the statutory scheme, creating a loophole that would allow private parties to evade the United States' and the courts' ability to serve as Congress's check on abusive settlements. As the Ninth Circuit has noted, courts should not "attribute to Congress an intent to enact a provision after hours of debate that could be evaded by every potential plaintiff, thus rendering it meaningless." *Hallstrom v. Tillamook County*, 844 F.2d 598, 601 (9th Cir. 1987), *aff'd* 493 U.S. 20 (1989).

This conclusion applies regardless of whether the United States is a party or not. Indeed, Congress gave the United States authority to oppose improper consent judgments by intervening to raise an objection. *See* 42 U.S.C. § 7604(c)(3). It would make no sense to read Congress's reforms to allow parties to easily dodge review simply by terming the settlement a "private agreement" following intervention by the United States.

7

Case 2:10-cv-13101-BAF-RSW ECF No. 279, PageID.8882 Filed 07/08/20 Page 17 of 35

## II.   This Court Should Deny Sierra Club's Motion to Enter.

### a. Sierra Club May Not Override the Considered Enforcement Discretion of the United States.

Sierra Club's "second-guessing of the [United States'] assessment of an appropriate remedy . . . fails to respect the statute's careful distribution of enforcement authority among the federal [government], the States and private citizens" and should therefore be rejected. *Ellis*, 390 F.3d at 477. As the Sixth Circuit explained, the Act gives the U.S. broad discretion to decide what relief is appropriate—this preserves the United States' discretion and ensures that citizen suits supplement, but do not supplant, federal enforcement policy. *See id.*

When—as here—the citizen group participates as a mere plaintiff-intervenor, the need for courts to police and bar such second-guessing is even greater. "[P]rivate parties should not be allowed to hijack, via intervention—even intervention by right, a government [enforcement] suit . . . ." *United States v. Lexington-Fayette Urban Cty. Gov't*, 2007 WL 2020246, at *4 (E.D. Ky. July 6, 2007). Further, "[s]ince citizens [plaintiffs] . . . are cast in the role of private attorneys general, as a practical matter there [i]s little left to be done after the EPA step[s] in and negotiate[s] a consent decree." *Green Forest, Ark.*, 921 F.2d at 1404.

Thus, while citizen intervenors like Sierra Club may generally participate in settlement negotiations and comment on a proposed consent judgment, they

8

do not have a veto power. *E.g., United States v. D.C.*, 933 F. Supp. 42, 47 (D.D.C. 1996). Nor—on the same logic—can they demand additional relief "that the [government] chose to forgo,'" *Ellis*, 390 F.3d at 475 (quoting *Gwaltney,* 484 U.S. at 60-61), or "compel a consent decree on their own terms," *Green Forest, Ark.*, 921 F.2d at 1402. Permitting this would turn the statutory structure on its head, "enabl[ing] citizens to commandeer the federal enforcement machinery," *id.* (quoting *DuBois,* 820 F.2d at 949), by promoting "[a] private plaintiff waiting in the wings [to] the captain of the litigation," *Oppose Pollution, Inc. v. Heritage Grp.*, 973 F.2d 1320, 1324 (7th Cir. 1992).

**b. The "Mitigation" Relief Violates the CAA.**

The relief Sierra Club seeks here is not legally permissible in any event. The section of the CAA governing citizen suits provides that "[t]he district courts shall have jurisdiction . . . to enforce [any CAA] emission standard or limitation . . . and to apply any appropriate civil penalties." 42 U.S.C. § 7604(a). These penalties generally must be "deposited in a special fund in the United States Treasury . . . for use by the Administrator [of EPA] to finance air compliance and enforcement activities." *Id.* § 7604(g)(1). Congress created a limited exception, however, allowing courts to redirect up to $100,000 in penalties to "be used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment." *Id.* § 7604(g)(2). Before

9

choosing such projects, "[t]he court shall obtain the view of the Administrator [of EPA]." *Id.*

Section 304(g) is the *only* mechanism for a citizen plaintiff to obtain mitigation relief under the Act. As the Tenth Circuit recently explained, the injunctive relief available to citizen plaintiffs under the CAA is limited to compelling the defendant to come into "compliance with the applicable emissions standards and limitations." *WildEarth Guardians v. Pub. Serv. Co. of Colorado*, 690 F.3d 1174, 1190 (10th Cir. 2012). "Insofar as the Act contemplates further relief, it is *only* in the form of a [beneficial mitigation project] stemming from any civil penalties recovered." *Id.* (emphasis added); *see also United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1063 (S.D. Ind. 2008); *Gutierrez v. Mobil Oil Corp.*, 798 F. Supp. 1280, 1284-85 (W.D. Tex. 1992).

The Supreme Court has held that the district courts are not generally barred from entering a consent decree merely because "the decree provides broader relief than the court could have awarded after a trial." *Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986). But this does not give plaintiffs free rein to obtain any relief that they can persuade a defendant to offer them, where a specific statute provides to the contrary. Rather, the Court held that the relief must "spring" from the statute and may not "conflict[] with or violate[] [the statutory provisions] upon which the complaint was based." *Id.* at 525-26; *see also*

10

*Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 903 (6th Cir. 2014) ("legal remedies to enforce federal statutes must stem from the legislatively en-acted statute, not from court-created equitable enforcement doctrines").

The "mitigation" relief sought by Sierra Club here squarely conflicts with Congress's statutory scheme. It is more than *twenty times* larger than the statutory cap and far exceeds any reasonable play in the joints.

### c. Sierra Club Cannot Be Permitted to Settle for Remedies Beyond Those Congress Authorized in the CAA or Miscellaneous Receipts Act (MRA)—or Those Limits Will Be Eviscerated.

The United States anticipates that Sierra Club will respond that its side deal does not violate the CAA because it has not labeled the mitigation fund a "penalty," but rather "mitigation," and that courts interpreting other statutes have said that mitigation relief can be obtained in equity. These arguments miss the mark for several reasons.

As noted, Section 304(g)(2) is the *only* avenue by which a citizen plaintiff can seek mitigation relief in a CAA case. *See WildEarth Guardians*, 690 F.3d at 1190; *Cinergy*, 582 F. Supp. 2d at 1063; *Gutierrez*, 798 F. Supp. at 1284-85. Al-lowing Sierra Club to obtain this relief here would wrongly "render [Section 304(g)] a 'dead letter' . . . . deprive[d] of any meaningful effect," as its strictures could be avoided simply by changing how the relief is labeled. *In re Davis*, 960 F.3d 346, 354 (6th Cir. 2020) (quoting *United States v. Hayes*, 555 U.S. 415, 427

11

(2009)). Again, as the Supreme Court held in *Firefighters*, court-approved settlements may not award relief that does not "spring" from the statute or that conflicts with the law's text, structure, or purpose. 478 U.S. at 525-26.

The implausibility of such an easy end run around Section 304(g) is further demonstrated by comparing that provision with the relief Congress authorized the government to seek in Section 113. The former allows courts in citizen suits only to "enforce [any CAA] emission standard or limitation . . . and to apply any appropriate civil penalties." 42 U.S.C. § 7604(a). The latter is much broader, authorizing courts to grant well-taken government requests "to restrain [CAA] violation[s], to require compliance, to assess . . . civil penalt[ies] [and related fees], and to [obtain] any other appropriate relief." 42 U.S.C. § 7413(b)). Crucially, unlike Section 304, Section 113 does not place any Section 304(g)-style limitations on the government's ability to obtain mitigation relief.

These differences matter: "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Thus, while the government may seek equitable mitigation relief under Section 113 "insofar as the court is remedying harm caused by their past violations," the narrower authority set forth in Section 304(a), coupled with the limitations in

12

Section 304(g), demonstrate that mitigation relief exceeding the $100,000 cap is unavailable to citizen plaintiffs. *Cinergy*, 582 F. Supp. 2d at 1063 (quoting *U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine, LLC*, 339 F.3d 23, 31 (1st Cir. 2003)) (emphasis omitted). As *Cinergy* explained, "there are good reasons why Congress would allow the government a greater array of remedies in an enforce-ment action than it would give to private citizens," including that (1) the federal government has "primary enforcement authority under the CAA" and (2) that "'the citizen suit is meant to supplement rather than to supplant governmental action.'" *Id.* (quoting *Gwaltney,* 484 U.S. at 60).

This is underscored by the Supreme Court's decision in *Meghrig v. KFC W., Inc.*, 516 U.S. 479 (1996), which held unanimously that RCRA's citizen suit provision, 42 U.S.C. § 6972, does not permit citizen plaintiffs to recover cleanup costs from a responsible party. Unlike CERCLA, RCRA was "not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." *Id.* at 483. And the remedies available under RCRA are likewise oriented towards the pre-sent and future, not the past. *Id.* This structure "amply demonstrate[d] that Con-gress did not intend for a private citizen to be able to undertake a cleanup and then proceed to recover its costs under RCRA." *Id.* at 487. Concluding otherwise would be inconsistent with the "'elemental canon of statutory construction that

where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.'" *Id.* at 488 (brackets omitted) (quoting *Middlesex County Sewerage Authority v. Nat. Sea Clammers Assn.*, 453 U.S. 1, 14 (1981)).

Sierra Club cannot skirt the limitations of Section 304(g) simply by labeling the relief "mitigation" instead of a "penalty." Indeed, Section 304(g) itself rejects any sort of "magic words" distinction between (1) penalties and (2) money to be paid to private parties in lieu of penalties. Both the money to be deposited in the Treasury and the money designated for "beneficial mitigation projects" get the same description: "civil penalties." 42 U.S.C. § 7604(g).

This is supported by over a century of Supreme Court precedent that has adopted a functional definition of "penalty" as any "'punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offen[s]e against its laws.'" *Kokesh v. SEC*, 137 S. Ct. 1635, 1642 (2017) (quoting *Huntington v. Attrill,* 146 U.S. 657, 667 (1892)). Like the civil "disgorgement" relief at issue in *Kokesh*, and unlike the government's bus-replacement project, the money to be spent on vague and open-ended mitigation projects is not carefully tailored to remedying the specific harms caused by the defendants in seeking to "redress[] a wrong to the public, [rather than] a wrong to the individual," and, it is designed, at least in part, to punish the wrongdoer and deter future violations because its origin lies in the penalty authority of Section 304(g). *Id.* at 1642, 1645;

14

*see also Nw. Envtl. Def. Ctr. v. Unified Sewerage Agency of Washington Cty.*, 1990 WL 191827, at *1 (D. Or. July 27, 1990) (concluding that open-ended "mitigation" fund created in excess of statutory authority was a penalty).

To be sure, some courts interpreting different statutes have focused almost entirely on how the relief is labeled. For example, in *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, the Third Circuit held that "Congress intended that any penalties assessed in a [CWA] citizen suit be treated as 'miscellaneous receipts'" that must be paid to the U.S. Treasury under Miscellaneous Receipts Act. 913 F.2d 64, 81 (3d Cir. 1990). But it said that this duty applied only "once the court labeled the money as civil penalties." *Id.* at 82. The Ninth Circuit similarly recognized that civil penalties "may be paid only to the U.S. treasury," but nevertheless concluded that money payments to be made to a variety of private environmental groups under a proposed consent decree were not civil penalties. *Electronic Controls Design*, 909 F.2d at 1354. These decisions make little sense.

*First,* they cannot be squared with the functional definition of "penalty" articulated in *Kokesh*. The fruits of deterrence from Congress's severe penalties must flow to the Treasury or to properly chosen "beneficial mitigation projects," not to private coffers sealed off in side deals. Thus, such side deals cannot be permitted to obscure visibility, defeat accountability, and skirt statutory law.

15

*Second*, Section 304(g) was passed *after* both of these cases were decided, Pub. L. 101-549 (Nov. 15, 1990). And, as noted above, Congress described both the money to be paid to the Treasury and the money to be used to fund a "beneficial mitigation project" as "penalties." 42 U.S.C. § 7604(g). Thus, at the very least, the empty formalist approach of *Powell Duffryn Terminals* and *Electronic Controls Design*, which hands the keys of the kingdom to groups wielding mere labels, has been superseded by statute in the CAA citizen-suit context.

*Third*, as the district court in *Electronic Controls Design* correctly noted, "if the money to be paid under the settlement is not a penalty or fine, it must be some form of damages." 703 F. Supp. 875, 877 (D. Or. 1989), *rev'd,* 909 F.2d 1350 (9th Cir. 1990). Such private damages are not available under this Act. Here, Sierra Club candidly admits that the money for its "mitigation" projects is functionally indistinguishable from monetary damages. Those funds are for "provid[ing] millions of dollars of funding for mitigation projects in economically struggling communities" that were "especially hard hit by air pollution from DTE's power plants and other industrial sources for decades." Mot. to Enter at 12. *Cf. City of Philadelphia v. Stepan Chem. Co.*, 544 F. Supp. 1135, 1146 (E.D. Pa. 1982) ("[L]abelling the monetary relief . . . as 'costs of removal'" did not change the fact that the plaintiff was seeking improper money damages). Whatever one thinks of the side deal as a policy matter, and it has serious flaws

16

(*see infra* at 18-19), Congress controls the purse strings, and Section 304(g) permits those strings to open only so far—to the extent of a maximum $100,000 diversion out of the Treasury and no more.

*Fourth*, Sierra Club's claimed "mitigation" relief violates the Miscellaneous Receipt Act ("MRA"), one of the main purse-string safeguards Congress has put into place to defend its spending powers. The MRA requires that any "person having custody or possession of public money . . . shall deposit the money without delay in the Treasury." 31 U.S.C. § 3302(c). As *Powell Duffryn* recognized, the MRA requires citizen plaintiffs to deposit all penalties directly into the Treasury. 913 F.2d at 81; *see also United States v. Smithfield Foods, Inc.*, 982 F. Supp. 373, 374 & n.1 (E.D. Va. 1997); 42 U.S.C. § 7604(g). But, contrary to that case, though consistent with Congress's direction in CAA Section 304(g), money obtained in exchange for dropping federal penalty claims does not become "public money" only when a party decides to affix that label to it. *Cf. Stepan Chem. Co.*, 544 F. Supp. at 1146. Such a transparently easy end run around Congressional limits should not be permitted. *See In re Davis*, 960 F.3d at 355.[3]

Sierra Club cannot have it both ways. Either the mitigation fund is public money subject to the requirements of 304(g) and the MRA or it is a form of

---

[3] The MRA similarly prohibits the U.S. from entering settlements with private parties that require the defendant to expend funds to provide money to third

17

private damages prohibited by the Act. In neither case are the "mitigation" projects lawful. *See US v. Jones & Laughlin Steel Corp.*, 804 F.2d 348, 351 (1986) (city appearing as a plaintiff-intervenor cannot obtain monetary relief in a consent decree to redress CAA violations); *Stepan Chem. Co.*, 544 F. Supp. at 1146.

### d. Sierra Club's Requested Relief Is Contrary to Sound Environmental Enforcement Policy.

Environmental policy involves complicated trade-offs and cost-benefit analyses that the federal government is better suited to perform than democratically unaccountable citizen groups, which are more likely to harbor conflicts of interests, pursue their own parochial views, and act outside of their expertise.

Here, the United States is concerned that the agreement's vague and open-ended "mitigation" relief does little to ensure that money is not spent on wasteful or inefficient projects designed more to generate good will than to achieve meaningful improvements in human health or environmental quality. In particular, the U.S. is troubled by the total absence of specificity or substantive criteria for the "mitigation" projects, an absence that stands in stark contrast to the detailed terms and requirements set forth in the government's bus-replacement project.

---

parties in lieu of penalties. *See* Memo. of Jeffrey B. Clark, Assistant Att'y Gen. for DOJ Env't & Nat. Res. Div. (Mar. 12, 2020), *available at* https://www.justice.gov/enrd/page/file/1257901/download. Because citizen suits are mere supplemental and secondary shadows of the Executive Branch's primary enforcement power, they cannot be used to do what primary enforcers may not do.

18

Further, the United States is concerned that requiring DTE to close many of its units elevates outcomes sought by a special interest group over sound environmental policy. While closure is sometimes appropriate, it is the exception, not the rule. Generally, the United States works with the defendant to select fair but aggressive compliance requirements, while leaving the implementation to the defendant (subject to proper federal oversight). This ensures that environmental standards are maintained while also minimizing costs. This is especially important with public utilities, as compliance costs will be passed on to consumers through higher rates. Additionally, unlike the Sierra Club, *see* https://coal.sierraclub.org, the United States has not opted to pursue an anti-coal policy approach as part of an ill-advised effort to pick marketplace winners and losers.

## III.   The Constitutional Standing and Avoidance Doctrines Also Preclude Sierra Club's Added Relief.

### a.   Sierra Club Lacks Standing to Obtain the Additional Relief.

"[A]n intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). And, like all plaintiffs, intervenors must have standing for each unique form of relief sought. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

"An approved settlement takes the form of a judgment of the court, and without both Article III power and proper subject-matter jurisdiction, the court

19

cannot act." *Robertson v. Allied Sols., LLC*, 902 F.3d 690, 698 (7th Cir. 2018); *accord Schumacher v. SC Data Ctr., Inc.*, 912 F.3d 1104, 1105 (2019) (same). Further, in order for Sierra Club to prevail, it must show that it has standing to obtain *all* forms of relief sought in its proposed agreement. *See Jones & Laughlin Steel*, 804 F.2d at 351-52 (courts may not modify proposed consent decrees).

Sierra Club alleges only that an unspecified number of its members "live, work, and recreate near the [relevant] plants" and have suffered unspecified injuries to their "health, recreational, and aesthetic interests" because of DTE's air pollution. Sierra Club's First Amended Comp. ¶ 16, Dkt. No. 214 (May 22, 2014). But allegations of injury must be "both 'specific' and 'concrete' [in order to] satisfy the requirements of Article III." *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016). Amorphously "alleg[ing] that [a group's] 'members live, work, and engage in outdoor recreation in areas that were affected by [Hazardous Air Pollutants] emitted during [defendant's] noncompliance" with the CAA is not enough. *WildEarth Guardians*, 690 F.3d at 1189. And, without a defined injury, there is no way to determine whether the alleged harms are "fairly traceable" to DTE's conduct, and Sierra Club therefore also fails the second prong of the standing inquiry. *Lujan v. Defenders of Wildlife*, 504 U.S. at 555, 560-61 (1992).

But even if Sierra Club were to produce at this late date the necessary specifics on the first and second prongs, it has a much more fundamental problem,

20

namely, that there is simply no way for the Court to determine whether it is "'likely,' as opposed to merely 'speculative, that [any] injury will be 'redressed by a favorable decision'" authorizing the creation of a $2 million fund to pay for vague and as-yet undetermined environmentally beneficial projects in Southwest Detroit. *Id.* Such open-ended relief is speculative almost by definition. Such a grab bag of potential relief may—or may not—overlap with the alleged injuries of Sierra Club members put forward to support its standing claim.

Similarly, it is unclear how obliging DTE to fund vague and open-ended energy-efficiency projects at a Detroit community center will remedy any harms caused by DTE's air pollution to any Sierra Club member's health, recreational, or aesthetic interests. *See WildEarth Guardians*, 690 F.3d at 1190 n.11 ("We do not see how solar panels could redress injuries caused by PSCo's past mercury emissions—let alone any injuries suffered by WildEarth specifically.").[4]

As in *WildEarth Guardians*, Sierra Club has "not plausibly explain[ed] how a[n] [unspecified environmentally beneficial project] would redress its ill-defined

---

[4] *See also Cambrians For Thoughtful Dev., U.A. v. Didion Milling, Inc.*, 571 F. Supp. 2d 972, 981 (W.D. Wis. 2008) ("A project that generally enhances the public health or environment is no more redress for plaintiffs' particular claims than a fine that generally encourages future compliance with the [CAA] and benefits the undifferentiated public interest."); *Anderson v. Farmland Indus., Inc.*, 45 F. Supp. 2d 863, 871 (D. Kan. 1999); *Families for Asbestos Compliance Testing & Safety v. City of St. Louis, Mo.*, 638 F. Supp. 2d 1117, 1124 (E.D. Mo. 2009).

injuries, as opposed to merely advancing generalized environmental interests," and it therefore lacks standing. 690 F.3d at 1190.

> **b.      This Court Should Avoid Interpreting the CAA in a Way That Would Raise Constitutional Issues.**

The views of the United States are entitled to special deference here. Again, the Act "does not permit citizen suits to seek types of relief 'that the [government] chose to forgo . . . . [O]therwise administrative 'discretion to enforce the [statute] in the public interest would be curtailed considerably' and the 'nature of the citizens' role' would become 'potentially intrusive.'" *Ellis*, 390 F.3d at 475 (quoting *Gwaltney,* 484 U.S. at 60-61). Allowing such an intrusion here would not only violate the CAA, but would also raise serious constitutional questions that this Court should avoid. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) ("a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems").

For years, members of the Supreme Court have recognized the "[d]ifficult and fundamental questions" that arise when private citizen groups exercise a power that the Constitution commits to the Executive alone. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring); *see also id.* at 209 (Scalia, J., joined by Thomas, J., dissenting) (noting that the CWA "turns over to private citizens the function of enforcing the

22

law"); *Dep't of Transp. v. Assoc. of Am. R.R.*, 135 S. Ct. 1225, 1237 (2015) (Alito, J., concurring) (restating Justice Kennedy's concerns in *Laidlaw*). *Cf. Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 778 n.8 (2000) (recognizing the issue). The intrusion here is far more significant than in a typical citizen suit and raises at least two "difficult and fundamental questions" of constitutional law.

1.      ***The Vesting and "Take Care" Clauses***. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. __ , No. 19-7, 2020 WL 3492641, at *4 (2020) (quoting U.S. Const. Art. II, § 1, cl. 1). The Constitution therefore gives the President plenary authority both to direct his subordinates and, in nearly all cases, to remove them from office if he deems it necessary. *Id.* This ensures that "'the chain of dependence [is] preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.'" *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 498 (2010) (quoting 1 Annals of Cong., at 499 (J. Madison)).

Citizen plaintiffs, however, are not federal officers and are not subject to direct Presidential control or removal, yet they nevertheless wield the authority to enforce important federal laws as "private attorneys general," including through "the quintessentially executive power" of being able "to seek daunting

23

monetary penalties against private parties on behalf of the United States in federal court." *Seila*, *supra*, at *12. Permitting a mere plaintiff-intervenor to override the Executive Branch by settling "private attorney general" claims on terms that the Attorney General objects to is very difficult to square with the font of our law. And it "clashes with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control," *id.* at *5, and is tantamount to anointing Sierra Club as a "self-appointed mini-EPA," *Laidlaw*, 528 U.S. at 209 (Scalia, J., dissenting); *see also Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (quoting U.S. Const. Art. II, § 3); *Heckler v. Chaney*, 470 U.S. 821, 832 (1985).

2.      ***The Appropriations Clause and Private Non-Delegation Doctrine***. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Settlements providing for payments to third parties in lieu of penalties owed to the U.S. Treasury in substance, if perhaps not in form, are an appropriation of government money in a manner that was never authorized by Congress—indeed, in a manner Congress expressly forbidden by Section 304(g)(2) and the MRA. *See supra* 9-18.

"[H]anding off [this appropriations] power to a private entity is 'legislative delegation in its most obnoxious form.'" *Assoc. of Am. R.R.* 135 S. Ct. at 1238 (Alito, J., concurring) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)). "When it comes to private entities, . . . there is not even a fig leaf of

24

constitutional justification. Private entities are not vested with 'legislative Powers.' Nor are they vested with the 'executive Power,' which belongs to the President." *Id.* at 1237 (Alito, J., concurring) (citations omitted).

*   *   *

This Court should avoid interpreting the CAA in such a way as to raise these serious constitutional questions. *See, e.g.*, *Jennings*, 138 S. Ct. at 836. If the Court determines that the questions cannot be avoided, the United States respectfully requests the opportunity to submit additional briefing on these issues.

## CONCLUSION

The United States respectfully asks that this Court deny Sierra Club's Motion for Entry.

Respectfully submitted,

s/ Michael B. Buschbacher

| Of Counsel: | JEFFREY BOSSERT CLARK |
| | *Assistant Attorney General* |
| SUSAN PARKER BODINE | BRUCE S. GELBER |
| *Assistant Administrator* | *Deputy Assistant Attorney General* |
| Office of Enforcement and | PATRICIA McKENNA |
|    Compliance Assurance | *Assistant Section Chief,* |
| |    *Environmental Enforcement Section* |
| U.S. Environmental | MICHAEL B. BUSCHBACHER |
| Protection Agency | *Counsel to the Assistant Attorney General* |

Environment & Natural Resources Div.
U.S. Department of Justice

25

## CERTIFICATE OF SERVICE

I certify that this document was filed through the Court's ECF system, which will cause copies to be sent to all counsel of record.

*s/ Michael B. Buschbacher*