# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| and | Civil Action No. |
| SIERRA CLUB, | 2:10-cv-13101 |
| Intervenor-Plaintiff, | Judge Bernard A. Friedman |
| v. | Magistrate Judge R. Steven Whalen |
| DTE ENERGY COMPANY AND DETROIT EDISON COMPANY, | |
| Defendants. | |

**CONSENT DECREE**

i

## TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ..................................................................3

II.     APPLICABILITY ................................................................................... 3

III.    DEFINITIONS ....................................................................................... 4

IV.    COMPLIANCE REQUIREMENTS...................................................... 14

V.     PROHIBITION ON NETTING CREDITS OR OFFSETS .......................... 25

VI.    ENVIRONMENTAL MITIGATION PROJECT ........................................ 25

VII.   CIVIL PENALTY .................................................................................. 27

VIII.  RESOLUTION OF CIVIL CLAIMS ..................................................... 28

IX.    PERIODIC REPORTING...................................................................... 31

X.     REVIEW AND APPROVAL OF SUBMITTALS ...................................... 33

XI.    STIPULATED PENALTIES ................................................................. 34

XII.   FORCE MAJEURE .............................................................................. 42

XIII.  DISPUTE RESOLUTION ................................................................... 46

XIV.  PERMITS............................................................................................ 48

XV.   INFORMATION COLLECTION AND RETENTION................................. 50

XVI.  NOTICES ........................................................................................... 51

XVII.  SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS ...... 54

XVIII. EFFECTIVE DATE .............................................................................. 54

XIX.  RETENTION OF JURISDICTION ...................................................... 55

XX.   MODIFICATION ................................................................................. 55

XXI.  GENERAL PROVISIONS .................................................................. 55

XXII.  SIGNATORIES AND SERVICE ......................................................... 58

XXIII. PUBLIC COMMENT/AGENCY REVIEW .............................................. 58

XXIV. TERMINATION .................................................................................. 59

XXV.  26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION ........................... 61

XXVI. FINAL JUDGMENT ........................................................................... 62

APPENDIX A -- ENVIRONMENTAL MITIGATION PROJECT

A.      Plaintiff, the United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), filed a complaint in this action on August 5, 2010.  The Court granted Plaintiff-Intervenor Sierra Club's motion to intervene on November 23, 2010.  The United States and Sierra Club (collectively "Plaintiffs") later amended their complaints, and the Court granted leave to file the amended complaints ("Complaints") on April 9, 2014.  The Complaints allege violations of the Clean Air Act ("CAA" or "the Act") against DTE Energy and Detroit Edison Company ("Defendants").

B.      The Complaints sought injunctive relief and civil penalties pursuant to Sections 113(b) and 167 of the Act 42, U.S.C. §§ 7413(b) and 7477, alleging that Defendants violated: (a) the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-7492; (b) the nonattainment New Source Review ("Nonattainment NSR") provisions of the Act, 42 U.S.C. §§ 7501-7515; (c) applicable federal PSD and Nonattainment NSR regulations; and (d) the State Implementation Plan adopted by the State of Michigan and approved by EPA pursuant to Section 110 of the Act, 42 U.S.C. § 7410 ("Michigan SIP").  The Complaints allege that, *inter alia,* Defendants made major modifications to major emitting facilities, and failed to obtain the necessary permits and install and operate the controls necessary under the Act to reduce sulfur dioxide ("$SO_2$") and/or oxides of nitrogen ("$NO_x$"), at certain electricity generating stations located in Michigan, and that such emissions damage human health and the environment.

C.      Statement of the United States: The Complaints alleged major modifications at several of Defendants' units, including a major modification at Monroe Unit 2 in 2010.  While the Consent Decree resolves that claim and releases Defendants from any liability for it, none of

1

the relief in this Consent Decree is attributable to the United States' Monroe Unit 2 2010 claim. It is the position of the United States that this is an appropriate exercise of its prosecutorial discretion in light of the specific circumstances of this case.  In 2017, EPA issued a policy memorandum noting that the 2013 and 2017 appellate decisions in this case "have created uncertainty regarding the applicability of NSR permitting requirements in circumstances where the owner or operator of an existing major stationary source projects that proposed construction will not cause an increase in actual emissions that triggers NSR requirements" and concluding that it would therefore no longer pursue cases factually similar to the 2010 Monroe Unit 2 claim. *See* EPA Administrator, *Memorandum Regarding New Source Review Preconstruction Permitting Requirements* (Dec. 7, 2017).  The Department in its independent judgment as a matter of prosecutorial discretion, has decided to apply EPA's rationale to the 2010 Monroe Unit 2 claim as well as take to heart the litigation history, which may implicate cases such as *General Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Circ. 1995).  The specific circumstances described above are not raised by the other claims in the Complaints.

D.      Defendants opted to retire St. Clair Unit 1 and have permanently ceased operation of that unit as of March 31, 2019.

E.      Defendants do not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the Complaints.

F.      The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid further litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, with the consent of the Parties, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and pursuant to Sections 113, 167, and 304 of the Act, 42 U.S.C. §§ 7413, 7477, and 7604.  Venue is proper in this District pursuant to Sections 113(b) and 304(c) of the Act, 42 U.S.C. §§ 7413(b) and 7604(c), and 28 U.S.C. §§ 1391(b) and (c).  For purposes of this Decree, or any action to enforce this Decree, Defendants consent to (i) the Court's jurisdiction over this Decree and any such action and over Defendants and (ii) venue in in this judicial district.  Except as expressly provided for herein, this Consent Decree shall not create any rights in or obligations of any party other than the Parties to this Consent Decree.  Except as provided in Section XXIII (Public Comment) of this Consent Decree, the Parties consent to entry of this Consent Decree without further notice.  Notwithstanding the foregoing, should this Consent Decree not be entered by this Court, then the waivers and consents set forth in this Section I (Jurisdiction and Venue) shall be null and void and of no effect.

## II.  APPLICABILITY

2.      Upon entry, the provisions of this Consent Decree shall apply to and be binding upon the United States, Sierra Club, and Defendants and their respective successors, assigns, or other entities or persons otherwise bound by law.

3.      Defendants shall provide a copy of this Consent Decree to all vendors, suppliers, consultants, contractors, agents, and other entities retained to perform any of the work required by this Consent Decree.  Notwithstanding any retention of contractors, subcontractors, or agents to perform any work required under this Consent Decree, Defendants shall ensure that all work they are required to undertake is performed in accordance with the requirements of this Consent Decree.  In any action to enforce this Consent Decree, except as expressly provided herein (*e.g.*, Section XII (Force Majeure)), Defendants shall not assert as a defense the failure of their officers, directors, employees, servants, agents, or contractors to take actions necessary to comply with this Consent Decree.

## III. <u>DEFINITIONS</u>

4.      Every term expressly defined by this Section shall have the meaning given that term herein.  Every other term used in this Consent Decree that is also a term used under the Act or in a regulation implementing the Act, including regulations approved as part of the Michigan SIP, shall mean in this Consent Decree what such term means under the Act or those regulations.

a.      A "30-Day Rolling Average Emission Rate" for a Unit shall be expressed as lbs/mmBTU and calculated in accordance with the following procedure:  first, sum the total pounds of the pollutant in question emitted from the Unit during an Operating Day and the previous 29 Operating Days; second, sum the total heat input to the Unit in mmBTU during the Operating Day and the previous 29 Operating Days; and third, divide the total number of pounds of the pollutant emitted during the 30 Operating Days by the total heat input during the 30 Operating Days.  A new 30-Day Rolling Average Emission Rate shall be calculated for each new

4

Operating Day.  Each 30-Day Rolling Average Emission Rate shall include all emissions of the applicable pollutant that occur during all periods within any Operating Day, including emissions from startup, shutdown, and Malfunction.

        b.      A "24-Hour Rolling Average Emission Rate" for a Unit shall be expressed as lbs/mmBTU and calculated in accordance with the following procedure:  first, sum the total pounds of the pollutant emitted from the Unit during an operating hour and the previous 23 operating hours; second, sum the total heat input to the Unit in mmBTU during the operating hour and the previous 23 operating hours; and third, divide the total number of pounds of the pollutant emitted during the 24 operating hours by the total heat input during the 24 operating hours.  A new 24-Hour Rolling Average Emission Rate shall be calculated for each new operating hour.

        c.      "Baghouse" means a full stream (fabric filter or membrane) particulate emissions control device.  In this context, full stream means that it captures the entire stream of exhaust gas with no concurrent bypass.

        d.      "Belle River" means DTE's Belle River Power Plant consisting of two electric utility steam-generating units designated as Unit 1 (638 MW) and Unit 2 (602 MW) and related equipment, located in East China Township, Michigan.

        e.      "Boiler Island" means a Unit's (a) fuel combustion system (including bunker, coal pulverizers, crusher, stoker, and fuel burners); (b) combustion air system; (c) steam generating system (firebox, boiler tubes, and walls); and (d) draft system (excluding the stack), all as further described in "Interpretation of Reconstruction," by John B. Rasnic, U.S. EPA (November 25, 1986) and attachments thereto.

f.     "Capital Expenditures" means all capital expenditures, as defined by Generally Accepted Accounting Principles ("GAAP"), as those principles exist at the Date of Entry of this Consent Decree, excluding the cost of installing or upgrading pollution control devices.

g.     "CEMS" or "Continuous Emission Monitoring System," means, for obligations involving the monitoring of $NO_x$, $SO_2$, and PM emissions under this Consent Decree, the devices defined in 40 C.F.R. § 72.2 and installed and maintained as required by 40 C.F.R. Part 75.

h.     "Clean Air Act," "CAA," or "Act" means the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

i.     "Complaints" shall mean the amended complaints filed by the United States and Sierra Club in this case on April 9, 2014, and May 22, 2014, respectively.

j.     "Consent Decree" means this Consent Decree, including Appendix A, which is hereto incorporated into this Consent Decree.

k.     "Continuously Operate" or "Continuous Operation" means that when a pollution control technology or combustion control is required to be continuously used at a Unit pursuant to this Consent Decree (including, but not limited to, SCR, FGD, ESP, Baghouse, or Low $NO_x$ Combustion System), it shall be operated at all times such Unit is in operation (except as otherwise provided by Section XII (Force Majeure)), consistent with the technological limitations, manufacturers' specifications, good engineering and maintenance practices, and good air pollution control practices for minimizing emissions (as defined in 40 C.F.R. § 60.11(d)) for such equipment and the Unit.

l.      "Date of Entry" means the date this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

m.      "Date of Lodging" means the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Eastern District of Michigan.

n.      "Day" means calendar day unless otherwise specified in this Consent Decree.

o.      "Defendants" or "DTE" mean DTE Energy and Detroit Edison Company.

p.      "Electrostatic Precipitator" or "ESP" means a device for removing particulate matter from combustion gases by imparting an electric charge to the particles and then attracting them to a metal plate or screen of opposite charge before the combustion gases are exhausted to the atmosphere.

q.      "Emission Rate" for a given pollutant means the number of pounds of that pollutant emitted per million British thermal units of heat input (lb/mmBTU), measured in accordance with this Consent Decree.

r.      "Environmental Mitigation Project" or "Project" means the project set forth in Section VI (Environmental Mitigation Project) and Appendix A of this Consent Decree, and any other project undertaken for the purpose of fulfilling Defendants' obligations under Section VI and Appendix A and approved for that purpose by EPA pursuant to Section X (Review and Approval of Submittals).

s.      "EPA" means the United States Environmental Protection Agency.

7

t.     "Flue Gas Desulfurization System" or "FGD" means a pollution control device that removes sulfur compounds from a flue gas stream, including an absorber or absorbers utilizing lime or limestone, or a sodium based material, for the reduction of $SO_2$ emissions.

u.     "Fossil Fuel" means any hydrocarbon fuel, including but not limited to coal, metallurgical coke, petroleum coke, petroleum oil, natural gas, or any other fuel made or derived from the foregoing.

v.     "Greenhouse Gases" means the air pollutant defined at 40 C.F.R. § 86.1818-12(a) as of the Date of Lodging of this Consent Decree as the aggregate group of six greenhouse gases: carbon dioxide, nitrous oxide, methane, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride.  This definition continues to apply even if 40 C.F.R. § 86.1818-12(a) is subsequently revised, stayed, vacated or otherwise modified.

w.     "KW" means Kilowatt or one thousand watts net.

x.     "lb/mmBTU" means pounds of a pollutant per million British thermal units of heat input.

y.     "Low $NO_x$ Combustion System" means burners and associated combustion air control equipment, including Overfire Air (if installed at the Unit), which control mixing characteristics of Fossil Fuel and oxygen, thus restraining the formation of $NO_x$ during combustion of fuel in the boiler.

z.     "Malfunction" means any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner.  Failures that are caused in part by poor maintenance or careless operation are not Malfunctions.

aa.     "MW" means a megawatt or one million watts.

bb.     "Michigan SIP" means the Michigan State Implementation Plan, and any amendments thereto, as approved by EPA pursuant to Section 110 of the Act, 42 U.S.C. § 7410.

cc.     "Monroe" means DTE's Monroe Power Plant consisting of four electric utility steam-generating units designated as Unit 1 (764 MW), Unit 2 (772 MW), Unit 3 (773 MW), and Unit 4 (765 MW) and related equipment, located in Monroe, Michigan.  Consistent with the preamble to this agreement, all relief granted herein with respect to Monroe Unit 2 is not attributable to the United States' 2010 claim relating to Monroe Unit 2.

dd.     "Natural Gas" means natural gas received directly or indirectly through a connection to an interstate pipeline transporting natural gas governed by a tariff approved by the Federal Energy Regulatory Commission.  The Parties recognize that Natural Gas is expected to contain no more than 0.5 grains of sulfur per 100 standard cubic feet of Natural Gas.

ee.     "Netting" shall mean the process of determining whether a particular physical change or change in the method of operation of a major stationary source results in a "net emissions increase" or "net significant emissions increase" as those terms are defined at 40 C.F.R. § 52.21(b)(3)(i) and (ii) and in the Michigan SIP.

ff.     "$NO_X$" means oxides of nitrogen.

gg.     "$NO_X$ Allowance" means an authorization to emit a specified amount of $NO_x$ that is allocated or issued under an emissions trading or marketable permit program of any kind established under the Clean Air Act or the Michigan SIP; provided, however, that with respect to any such program that first applies to emissions occurring after December 31, 2018, a "$NO_x$ Allowance" shall include an allowance created and allocated under such program only for

control periods starting on or after the first anniversary of the Date of Entry of this Consent Decree.

hh.    "Nonattainment NSR" means the new source review program within the meaning of Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515 and 40 C.F.R. Part 51, and corresponding provisions of the federally enforceable Michigan SIP.

ii.    "Operating Day" or "Operating Days" means any calendar day(s) during which a Unit fires any fuel.

jj.    "Operating Hour" or "Operating Hours" means any clock hour during which a Unit fires any fuel.

kk.    "Operational or Ownership Interest" means part or all of DTE's legal or equitable operational or ownership interest in any operating, non-Retired Unit.  The Parties recognize that under this definition, Section XVII (Sales or Transfers of Operational or Ownership Interests) of this Consent Decree does not apply to salvage, scrap, or demolition of a Retired Unit.

ll.    "Over-Fire Air" or "OFA" means an in-furnace staged combustion control to reduce $NO_x$ emissions.

mm.    "Parties" means the United States of America, the Sierra Club, and Defendants.  "Party" means one of the named "Parties."

nn.    "PM" means total filterable particulate matter.

oo.    "PM CEMS" or "PM Continuous Emission Monitoring System" means the equipment that samples, analyzes, measures, and provides, by readings taken at frequent intervals, an electronic or paper record of PM emissions.

10

pp.    "PM Control Device" means any device, including an ESP or Baghouse, which reduces emissions of PM.

qq.    "PM Emission Rate" means the number of pounds of PM emitted per million BTU of heat input (lb/mmBTU).

rr.    "Prevention of Significant Deterioration" or "PSD" means the new source review program within the meaning of Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492 and 40 C.F.R. Part 52, and corresponding provisions of the federally enforceable Michigan SIP.

ss.    "Project Dollars" means Defendants' expenditures and payments incurred or made in carrying out the Environmental Mitigation Project identified in Section VI (Environmental Mitigation Project) of this Consent Decree to the extent that such expenditures or payments both: (a) comply with the requirements set forth in Section VI (Environmental Mitigation Project) and Appendix A of this Consent Decree, and (b) constitute Defendants' direct payments for such project or Defendants' external costs for contractors, vendors, and equipment.

tt.    "Refuel" or "Refueled" means the modification of a Unit such that the modified unit generates electricity solely through the combustion of Natural Gas.  Nothing herein shall prevent the reuse of any equipment at any existing Unit provided that the unit owner applies for, and obtains, all required permits, including, if applicable, a PSD or Nonattainment NSR permit.

uu.    "Repower" or "Repowered" means the removal and replacement of the Unit components such that the replaced unit generates electricity solely through the combustion

of Natural Gas through the use of a combined cycle combustion turbine technology.  Nothing herein shall prevent the reuse of any equipment at any existing unit or new emissions unit, provided that the Unit owner(s) applies for, and obtains, all required permits, including, if applicable, a PSD or Nonattainment NSR permit.

vv.     "Retire," "Retired," or "Retirement" means to permanently shut down and cease to operate the Unit, and to comply with applicable state and federal requirements for permanently ceasing operation of the Unit, including removing the Unit from Michigan's air emissions inventory, and amending all applicable permits so as to reflect the permanent shutdown status of such Unit.  The terms "Retire," "Retired," or "Retirement" shall not be construed to apply to electric synchronization motors, capacitors, switch gears, transformers, interconnection equipment and other non-combustion equipment and activities at the sites of System Units, regardless of whether such equipment was part of the System Units.

ww.     "Retrofit" means that the Unit must install and Continuously Operate both an FGD and an SCR, or equivalent pollution control technologies approved by EPA, and achieve and maintain the following 30-Day Rolling Average Emission Rates:

- $NO_x$: 0.080 lb/mmBTU

- $SO_2$: 0.060 lb/mmBTU

xx.     "River Rouge" means Defendants' River Rouge Power Plant consisting of one electric utility steam-generating unit designated as Unit 3 (276 MW) and related equipment, located in River Rouge, Michigan.

yy.     "SCR" or "Selective Catalytic Reduction" means an air pollution control device for reducing $NO_x$ emissions in which ammonia ("$NH_3$") is added to the flue gas and then

12

passed through layers of a catalyst material.  The ammonia and $NO_x$ in the flue gas stream react on the surface of the catalyst, forming nitrogen ("$N_2$") and water vapor.

zz.    "$SO_2$" means sulfur dioxide.

aaa.    "$SO_2$ Allowance" means an authorization to emit a specified amount of $SO_2$ that is allocated or issued under an emissions trading or marketable permit program of any kind established under the Clean Air Act or the Michigan SIP; provided, however, that with respect to any such program that first applies to emissions occurring after December 31, 2018, an "$SO_2$ Allowance" shall include an allowance created and allocated under such program only for control periods starting on or after the first anniversary of the Date of Entry of this Consent Decree.

bbb.    "State" means the State of Michigan.

ccc.    "St. Clair" means, for purposes of this Consent Decree, Defendants' St. Clair Power Plant consisting of five electric utility steam-generating units designated as Unit 1 (152 MW), Unit 2 (160 MW), Unit 3 (165 MW), Unit 6 (319 MW), and Unit 7 (452 MW) and related equipment, located in East China Township, Michigan.

ddd.    "Surrender" or "Surrender of Allowances" means, for purposes of $SO_2$ or $NO_x$ Allowances, permanently surrendering allowances from the accounts administered by EPA and the State of Michigan, if applicable, so that such allowances can never be used thereafter to meet any compliance requirements under the CAA, a state implementation plan, or this Consent Decree.

eee.    "System" means the Belle River, Monroe, River Rouge, St. Clair, and Trenton Channel facilities as defined herein.

13

fff. "System-Wide Annual Tonnage Limitation" for a pollutant means the sum of the tons of the pollutant emitted from all the Units in Defendants' System including, without limitations, all tons of that pollutant emitted during periods of startup, shutdown, and Malfunction, in the designated year.

ggg. "Title V Permit" means the permit required of major sources pursuant to Subchapter V of the Act, 42 U.S.C. §§ 7661-7661e.

hhh. "Trenton Channel" means Defendants' Trenton Channel Power Plant consisting of one electric utility steam-generating unit designated as Unit 9 (536 MW) and related equipment, located in Trenton, Michigan.

iii. "Unit" means collectively, the coal pulverizer, stationary equipment that feeds coal to the boiler, the boiler that produces steam for the steam turbine, the steam turbine, the generator, the equipment necessary to operate the generator, steam turbine, and boiler, and all ancillary equipment, including pollution control equipment and systems necessary for production of electricity. An electric steam generating station may be comprised of one or more Units.

## IV. COMPLIANCE REQUIREMENTS

### A. Unit $NO_x$ and $SO_2$ Requirements

7. <u>Retrofit/Refuel/Repower Deadlines.</u> By no later than the specific dates set forth below, Defendants shall Retrofit, Refuel, or Repower the following Units:

| Unit Name | Compliance Deadline (For Each Individual Unit) |
|---|---|
| Belle River Units 1-2 | December 31, 2030 |
| River Rouge Unit 3 | December 31, 2022 |

| St. Clair Units 2-3 and 6-7 and Trenton Channel Unit 9 | December 31, 2022 |
|---|---|

Notwithstanding the deadlines in the chart in this Paragraph, if the Midcontinent Independent System Operator ("MISO") designates Trenton Channel 9 as a System Support Resource in order to address reliability issues in the area, the compliance deadline for Trenton Channel 9 shall be December 31, 2023. In addition, if MISO notifies DTE in writing that DTE is constrained from injecting and delivering the full generation output of the Blue Water Energy Center to the grid, and this would cause DTE to be short of meeting its Planning Reserve Margin Requirement or cause grid reliability problems, the compliance deadline for St Clair Units 2-3 and 6-7 and Trenton Channel 9 shall be December 31, 2023.

8.      Notification.  For each Unit listed above, Defendants shall notify Plaintiffs in writing which option they elect to use for that unit.  This notice shall be made at least 365 days before the compliance deadline listed above or within 30 Days of the Effective Date, whichever is later.

9.      Emissions Rates.  Commencing no later than 60 Operating Days after the Effective Date, and continuing until the Unit is Retrofit, Refueled, or Repowered, Defendants shall achieve and maintain the following 30-Day Rolling Average Emission Rates for $NO_x$ and $SO_2$ at each Unit individually:

| Unit Name | $NO_X$ 30-Day Rolling Average Emission Rate (For Each Individual Unit) | $SO_2$ 30-Day Rolling Average Emission Rate (For Each Individual Unit) |
|---|---|---|
| Belle River Units 1-2 | 0.290 | 0.680 |
| Monroe Units 1-4 | 0.090 | 0.100 |

15

| | | |
|---|---|---|
| River Rouge Unit 3 | 0.400 | 0.700 |
| St. Clair Unit 2 | 0.470 | 1.000 |
| St. Clair Unit 3 | 0.470 | 1.000 |
| St. Clair Unit 6 | 0.350 | 1.200 |
| St. Clair Unit 7 | 0.250 | 1.200 |
| Trenton Channel Unit 9 | 0.200 | 1.000 |

10.     Commencing on the Effective Date, Defendants shall Continuously Operate the following pollution controls and any additional controls installed to comply with Paragraph 7:

| Unit Name | NO$_X$ Pollution Controls | SO$_2$ Pollution Controls |
|---|---|---|
| Belle River Units 1-2 | Low NO$_X$ Combustion System (including Overfire Air) | |
| Monroe Units 1-4 | SCR | FGD |
| River Rouge Unit 3 | Low NO$_X$ Combustion System (including Overfire Air) | |
| St. Clair Units 2-3 | Low NO$_X$ Combustion System (including Overfire Air) | |
| St. Clair Units 6-7 | Low NO$_X$ Combustion System (including Overfire Air) | |
| Trenton Channel Unit 9 | Low NO$_X$ Combustion System (including Overfire Air) | |

### B.  System NO$_x$ and SO$_2$ Requirements

11.     For each calendar year as specified below, Defendants' System shall not exceed the corresponding System-Wide Annual Tonnage Limitation for NO$_x$ and SO$_2$ specified below:

| Calendar Year | System-Wide Annual Tonnage Limitation for NO$_x$ | System-Wide Annual Tonnage Limitation for SO$_2$ |
|---|---|---|
| 2020-2022 | 23,850 | 54,400 |
| 2023-2030 | 15,400 | 31,800 |
| 2031 and later years | 6,400 | 4,650 |

### C.  Monitoring of NO$_x$ and SO$_2$ Emissions

12.     In determining a 30-Day Rolling Average Emission Rate for NO$_x$ or SO$_2$, Defendants shall use emission data obtained from a CEMS in accordance with the procedures of 40 C.F.R. Part 75, except that emissions data need not be bias adjusted and the missing data substitution procedures of 40 C.F.R. Part 75 shall not apply to such determinations.  Diluent capping (*i.e.*, 5% CO$_2$) will be applied to the emission rate for any hours where the measured CO$_2$ concentration is less than 5% following the procedures in 40 C.F.R. Part 75, Appendix F, Section 3.3.4.1.

13.     For purposes of determining compliance with any System-Wide Annual Tonnage Limitation, Defendants shall use NO$_x$ and SO$_2$ emission data obtained from a CEMS in accordance with the procedures specified in 40 C.F.R. Part 75.  If a Unit is Refueled, SO$_2$ emissions shall be calculated using methods set forth in EPA document AP-42 or by use of a stack test emission factor.

### D.  Use and Surrender of $NO_x$ and $SO_2$ Allowances

14.     Except as may be necessary to comply with Section XI (Stipulated Penalties), Defendants shall not use $NO_x$ or $SO_2$ Allowances to comply with any requirement of this Consent Decree, including by claiming compliance with any emission limitation required by this Consent Decree by using, tendering, or otherwise applying $NO_x$ or $SO_2$ Allowances to offset any excess emissions.

15.     Except as provided in this Consent Decree, Defendants shall not sell, bank, trade, or transfer their interest in any $NO_x$ or $SO_2$ Allowances allocated to Units in the System. Nothing in this Consent Decree shall restrict Defendants' ability to transfer $NO_x$ or $SO_2$ Allowances among their own facility or general accounts.

16.     Beginning in the first full calendar year after the Effective Date, and continuing each calendar year thereafter, Defendants shall Surrender all $NO_x$ and $SO_2$ Allowances allocated to the Units in the System for that calendar year that Defendants do not need to meet federal and/or state CAA regulatory requirements for the System Units.  However, $NO_x$ and $SO_2$ Allowances allocated to the System may be used by Defendants to meet their own federal and/or state CAA regulatory requirements for such Units.

17.     Nothing in this Consent Decree shall prevent Defendants from purchasing or otherwise obtaining $NO_x$ or $SO_2$ Allowances from another source for purposes of complying with federal and/or state CAA regulatory requirements to the extent otherwise allowed by law.

18.     The requirements of this Consent Decree pertaining to Defendants' use and Surrender of $NO_x$ and $SO_2$ Allowances are permanent and are not subject to any termination provision of this Consent Decree.

### E.  Super-Compliant $NO_x$ and $SO_2$ Allowances

19.     Notwithstanding Subsection IV.D, in each calendar year beginning with the first full calendar year after the Effective Date, and continuing thereafter, Defendants may sell, bank, use, trade, or transfer $NO_x$ or $SO_2$ Allowances allocated to the Units in the System that are made available in that calendar year solely as a result of:

a.     achievement and maintenance of an Emission Rate below an applicable 30-Day Rolling Average Emission Rate; or

b.     compliance with Paragraph 7 before the deadline set forth in Paragraph 7 provided that Defendants are also in compliance for that calendar year with all emission limitations for $NO_x$ or $SO_2$ set forth in this Consent Decree.  Defendants shall timely report the generation of such Super-Compliant Allowances in accordance with Section IX (Periodic Reporting) of this Consent Decree.

### F.  Method for Surrender of $NO_x$ and $SO_2$ Allowances

20.     Defendants shall Surrender, or transfer to a non-profit third-party selected by Defendants for Surrender, all $NO_x$ and $SO_2$ Allowances required to be Surrendered pursuant to Subsection IV.D by June 30 of the immediately following calendar year.  Such Surrender need not include the specific Allowances that were allocated to System Units, so long as Defendants Surrender Allowances that are from the same year or an earlier year and that are equal to the number required to be Surrendered under this Consent Decree.

21.     If any $NO_x$ or $SO_2$ Allowances required to be Surrendered under this Consent Decree are transferred directly to a non-profit third-party, Defendants shall include a description of such transfer in the next report submitted to EPA pursuant to Section IX (Periodic Reporting)

of this Consent Decree.  Such report shall: (a) identify the non-profit third-party recipient(s) of the Allowances and list the serial numbers of the transferred Allowances; and (b) include a certification by the third-party recipient(s) stating that the recipient(s) will not sell, trade, or otherwise exchange any of the Allowances and will not use any of the Allowances to meet any obligation imposed by any environmental law.  No later than the third periodic report due after the transfer of any Allowances, Defendants shall include a statement that the third-party recipient(s) Surrendered the Allowances for permanent Surrender to EPA in accordance with the provisions of the next Paragraph within one year after Defendants transferred the Allowances to them.  Defendants shall not have complied with the Allowance Surrender requirements of this Paragraph until all third-party recipient(s) have actually Surrendered the transferred Allowances to EPA.

22.     For all Allowances required to be Surrendered, Defendants or the third party recipient(s) (as the case may be) shall, with respect to the Allowances that Defendants are to Surrender, ensure that an Allowance transfer request form is first submitted to EPA's Office of Air and Radiation's Clean Air Markets Division directing the transfer of such Allowances to the EPA Enforcement Surrender Account or to any other EPA account that EPA may direct in writing.  Such Allowance transfer requests may be made in an electronic manner using the EPA's Clean Air Markets Division Business System, or similar system provided by EPA.  As part of submitting these transfer requests, Defendants shall ensure that the transfer of their Allowances are irrevocably authorized and that the source and location of the Allowances being Surrendered are identified by name of account and any applicable serial or other identification numbers or station names.

### G.  PM Emissions Reductions and Controls

#### 1.  Optimization of ESPs and Baghouses

23.     By no later than 60 Operating Days from the Effective Date, and continuing thereafter, Defendants shall Continuously Operate each PM Control Device on each Unit in the System and use good air pollution control practices to maximize PM emission reductions at all times each Unit is in operation.  Defendants shall:

a.      at a minimum, to the extent practicable: (i) fully energize each section of the ESP for each Unit, where applicable; (ii) operate automatic control systems on each ESP to maximize PM collection efficiency, where applicable; (iii) maintain power levels delivered to the ESPs, consistent with manufacturers' specifications, the operational design of the Unit, and good engineering practices; and (iv) evaluate and restore the plate-cleaning and discharge-electrode-cleaning systems for the ESPs at each Unit by varying the cycle time, cycle frequency, rapper-vibrator intensity, and number of strikes per cleaning event; and

b.      during the next planned Unit outage (or unplanned outage of sufficient length), optimize the PM controls on that Unit by inspecting for and repairing any failed ESP section and any openings in ESP casings, ductwork, and expansion joints to minimize air leakage.

#### 2.  PM Emissions Rates

24.     Commencing no later than 60 Operating Days after the Effective Date, Defendants shall achieve and maintain the following PM Emissions Rates:

a.      Monroe Units 1 through 4: Defendants shall achieve and maintain a 24-Hour Rolling Average Emission Rate for PM of no greater than 0.011 lb/mmBTU for each Unit.

21

Each 24-Hour Rolling Average Emission Rate shall include all emissions that occur during all periods of operation, including startup, shutdown, and Malfunction.

       b.     Belle River Units 1 and 2: Defendants shall achieve and maintain a 24-Hour Rolling Average Emission Rate for PM of no greater than 0.030 lb/mmBTU for each Unit for all periods of operation, including shutdown and Malfunction, other than periods of Startup, as defined at 40 C.F.R. § 63.10042.  In calculating each 24-Hour Rolling Average Emission Rate for PM, any hour that includes periods of Startup, as defined at 40 C.F.R. § 63.10042, shall not be considered an Operating Hour for purposes of that calculation.  During periods of Startup, Defendants shall comply with the work practice standards at Table 3 of 40 C.F.R. Subpart UUUUU for the applicable PM pollution control devices.

       c.     River Rouge Unit 3, St. Clair Units 2, 3, 6, and 7, and Trenton Channel 9: Defendants shall achieve and maintain a 30-Day Rolling Average Emission Rate for PM of no greater than 0.030 lb/mmBTU for each Unit.

### 3.   PM CEMS

25.    In determining the PM Emissions Rates, Defendants shall use the PM CEMS installed at each unit.  The PM CEMS shall be comprised of a continuous particle mass monitor measuring filterable particulate matter concentration, directly or indirectly, on an hourly average basis and a diluent monitor used to convert the concentration to units expressed in lb/mmBTU. The PM CEMS installed at each Unit must be appropriate for the anticipated stack conditions and capable of measuring filterable PM concentrations on an hourly average basis.  Defendants shall maintain, in an electronic database, the hourly average emission values of all PM CEMS in

lb/mmBTU.  Except for periods of monitor Malfunction, maintenance, or repair, Defendants shall operate the PM CEMS at all times when the Unit it serves is operating.

26.      In maintaining and operating the PM CEMS required under this Consent Decree, Defendants shall use the criteria set forth in 40 C.F.R. Part 60, Appendix B, Performance Specification 11, and 40 C.F.R. Part 60, Appendix F, Procedure 2.  With respect to relative correlation audits, Defendants must conduct such audits no less frequently than once every 12 operating quarters[1], or earlier if the characteristics of the PM or gas change such that the PM CEMS measurement technology is no longer valid.  For each Unit at which Defendants install, certify, operate, and maintain a PM CEMS, Defendants may use the procedures specified in 40 C.F.R. § 63.10010(i)(1)-(3) (including the specified temperature) for purposes of correlating the PM CEMS under this Consent Decree.  Diluent capping (*i.e.,* 5% $CO_2$) will be applied to the PM rate data for any hours where the measured $CO_2$ concentration is less than 5% following the procedures in 40 C.F.R. Part 75, Appendix F, Section 3.3.4.1.  Defendants shall operate the PM CEMS in accordance with all EPA reviewed QA/QC protocols.  Compliance with the PM CEMS correlation and quality assurance procedures in 40 C.F.R. Part 63, Subpart UUUUU constitutes compliance with this Paragraph.

---

[1] An "operating quarter," for the purpose of this Paragraph, is any calendar quarter during which a boiler operates 168 hours or more.

## V. <u>PROHIBITION ON NETTING CREDITS OR OFFSETS</u>

27.     Emission reductions that result from actions to be taken by Defendants after the Date of Entry to comply with the requirements of this Consent Decree shall not be considered as a creditable contemporaneous emission decrease for the purpose of obtaining a Netting credit or offset under the CAA's Nonattainment NSR and PSD programs, and shall not be used in any way to determine whether or not a project would result in either a "significant emissions increase" or a "significant net emissions increase" under the Nonattainment NSR and PSD programs.

28.     The limitations on the generation and use of Netting credits and offsets set forth in the previous Paragraph do not apply to emission reductions achieved by a particular System Unit that are greater than those required under this Consent Decree for that particular System Unit. For purposes of this Paragraph, emission reductions from a System Unit are greater than those required under this Consent Decree if they result from such Unit's compliance with federally-enforceable emission limits that are more stringent than those limits imposed on the Unit under this Consent Decree and under applicable provisions of the CAA or the Michigan SIP.

29.     Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by the applicable state regulatory agency or EPA for the purpose of attainment demonstrations submitted pursuant to § 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on National Ambient Air Quality Standards, PSD increment, or air quality related values, including visibility, in a Class I area.

## VI.  ENVIRONMENTAL MITIGATION PROJECT

30.    Defendants shall implement the Environmental Mitigation Project ("Project") described in Appendix A to this Consent Decree in compliance with the approved plans and schedules for the Project and other terms of this Consent Decree.

31.    Defendants shall maintain, and present to Plaintiffs upon request, documents to substantiate the completion of the Project described in Appendix A, and shall provide these documents to Plaintiffs within 30 Days following such request.

32.    All plans and reports prepared by Defendants pursuant to the requirements of this Section of the Consent Decree and required to be submitted to Plaintiffs shall be publicly available from Defendants without charge in paper or electronic format.

33.    With respect to the Project, Defendants certify the truth and accuracy of each of the following:

a.    That, as of the date of executing this Decree, Defendants are not required to perform or develop the Project by any federal, state, or local law or regulation and are not required to perform or develop the Project by agreement, grant, or as injunctive relief awarded in any other action in any forum;

b.    That, as of the date of executing this Decree, the Project is not a Project that Defendants were planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Decree;

c.    That Defendants have not received and will not receive credit for the Project in any other enforcement action; and

d.      That Defendants shall neither generate nor use any pollutant reductions from the Project as netting reductions, pollutant offsets, or to apply for, obtain, trade, or sell any pollutant reduction credits.

34.      Defendants shall use good faith efforts to secure as much environmental benefit as possible for the Project, consistent with the applicable requirements and limits of this Consent Decree.

35.      Defendants shall comply with the reporting requirements described in Appendix A.

36.      In connection with any communication to the public or to shareholders regarding Defendants' actions or expenditures relating in any way to the Environmental Mitigation Project in this Consent Decree, Defendants shall include prominently in the communication the information that the actions and expenditures were required by this Consent Decree.

37.      Beginning with the first Periodic Report under this Consent Decree, and continuing until completion of each Project, Defendants shall provide Plaintiffs with updates concerning the progress of the Project.

38.      Within 60 Days following the completion of the Project required under this Consent Decree (including any applicable periods of demonstration or testing), Defendants shall submit to Plaintiffs a report that documents the date that the Project was completed, Defendants' results of implementing the Project, including the emission reductions or other environmental benefits achieved, and the Project Dollars expended by Defendants in implementing the Project.

## VII.  CIVIL PENALTY

39.      Within 30 Days of the Effective Date, Defendants shall pay to the United States a civil penalty in the amount of $1,800,000.

40.      Defendants shall pay the civil penalty by Fedwire Electronic Funds Transfer ("EFT") to the United States Department of Justice account, in accordance with written instructions provided to Defendants by the Financial Litigation Unit ("FLU") of the U.S. Attorney's Office for the Eastern District of Michigan.  The costs of such EFT shall be Defendants' responsibility.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree.  The FLU will provide the payment instructions to:

> Peter Rynearson
> DTE Electric Controller
> 1 Energy Plaza, 950WCB
> Detroit, MI 48226

on behalf of Defendants.  Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States and EPA in accordance with Section XVI (Notices).  At the time of payment, Defendants shall send notice that payment has been made to (i) EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) the United States via email or regular mail in accordance with Section XVI; and (iii) EPA in accordance with Section XVI.  Such notice shall state that the payment is for the

27

civil penalty owed pursuant to the Consent Decree in *United States v. DTE Energy Co.* and shall reference the civil action number, CDCS Number, and DOJ case number 90-5-2-1-09949.

41.     Failure to timely pay the civil penalty shall subject Defendants to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render Defendants liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

42.     Defendant shall not deduct any penalties paid under this Decree pursuant to this Section or Section XI (Stipulated Penalties) in calculating its federal income tax.

## VIII.  RESOLUTION OF CIVIL CLAIMS

### A.  Claims of the United States

43.     <u>Claims of the United States Based on Modifications Occurring Before the Date of Lodging of this Consent Decree.</u>  Entry of this Consent Decree shall resolve all civil claims of the United States against Defendants that arose from any modifications commenced at any System Unit prior to the Date of Lodging of this Consent Decree, including but not limited to those modifications alleged in the Complaints filed in this civil action and the NOVs issued by EPA to DTE on July 24, 2009, June 4, 2010, and March 13, 2013, under any or all of: (a) Part C or D of Subchapter I of the CAA, 42 U.S.C. §§ 7470-7492, 7501-7515, and the implementing PSD and Nonattainment NSR provisions of the Michigan SIP; (b) Section 111 of the CAA, 42 U.S.C. § 7411, and 40 C.F.R. § 60.14; and (c) Title V of the CAA, 42 U.S.C. §§ 7661-7661f, but only to the extent that such Title V claims are based on Defendants' failure to obtain an operating permit that reflects applicable requirements imposed under Part C or D of Subchapter I

28

of the CAA.  For each of the Units addressed in Paragraph 7, the United States agrees that Defendants' Paragraph 7 obligations with respect to a particular Unit would be satisfied if Defendants Retrofit, Refuel, or Repower that Unit by the date set forth in Paragraph 7.  In the event that Defendants Retire a Unit by the date set forth in Paragraph 7 for that Unit, Defendants shall have no further obligations under this Consent Decree with respect to that unit.

44.   <u>Claims of the United States Based on Modifications after the Date of Lodging of this Consent Decree</u>.  Except as provided in Subsection VIII.B below, entry of this Consent Decree also shall resolve all civil claims of the United States that arise from a modification commenced before December 31, 2030, for pollutants regulated under Parts C or D of Subchapter I of the Act and under regulations promulgated thereunder as of the Date of Lodging where:

a.   such modification is commenced at any System Unit after the Date of Lodging of this Consent Decree, or

b.   such modification is one this Consent Decree expressly directs DTE to undertake.

The term "modification" as used in this Paragraph shall have the meaning that term is given under the CAA and under the regulations in effect as of the Date of Lodging of this Consent Decree.  The claims resolved by this Paragraph shall not include claims based upon Greenhouse Gases and sulfuric acid mist.

45.   <u>Reopener</u>.  The resolution of the United States' civil claims against DTE, as provided by this Subsection VIII.A (Claims of the United States), is subject to the provisions of Subsection VIII.B (Pursuit of Civil Claims Otherwise Resolved by Subsection VIII.A).

**B.  Pursuit of Civil Claims Otherwise Resolved by Subsection VIII.A**

46.     <u>Bases for Pursuing Resolved Claims for the DTE System</u>.  If DTE violates a System-Wide Annual $NO_x$ Tonnage Limitation or System-Wide Annual $SO_2$ Tonnage Limitation; or fails by more than 90 Days to Refuel, Repower, or Retrofit any Unit as required by this Consent Decree; or fails by more than 90 Days to install, upgrade, or commence Continuous Operation of any emission control device or achieve any Emission Rate or limitation required pursuant to this Consent Decree, then the United States may pursue any claim at any DTE System Unit that is otherwise resolved under Subsection VIII.A (Claims of the United States), where the modification(s) on which such claim is based was commenced: (1) after the Date of Lodging of this Consent Decree, and (2) within the five years preceding the violation or failure specified in this Paragraph.

47.     <u>Additional Bases for Pursuing Resolved Claims for Modifications at an Improved Unit</u>.  The United States may also pursue claims arising from a modification (or collection of modifications) at a System Unit that have otherwise been resolved under Subsection VIII.A (Claims of the United States), if the modification (or collection of modifications) at the System Unit on which such claim is based (a) was commenced after the Date of Lodging, and (b) individually (or collectively) increased the maximum hourly emission rate of that Unit for $NO_x$ or $SO_2$ (as measured by 40 C.F.R. § 60.14(b) and (h)) by more than 10%.

## IX.  PERIODIC REPORTING

48.     After entry of this Consent Decree, Defendants shall submit to Plaintiffs a periodic report, within 60 Days after the end of each half of the calendar year (January through June and July through December).  The report shall include the following information:

a.      all information necessary to determine compliance during the reporting period with the requirements of Section IV concerning emissions and monitoring and surrender of Allowances.  Such information includes but it not limited to (1) spreadsheets of all 30-Day Rolling Average Emission Rates and 24-Hour Rolling Average Emission Rates for all Units, (2) a list of any notifications in accordance with Paragraph 8, (3) total System-Wide Annual $NO_x$ and $SO_2$ tonnages for the calendar year, and (4) specific calculations demonstrating the basis and specific amounts of $NO_x$ and $SO_2$ Allowances to be Surrendered;

b.      all periods of monitor Malfunction, maintenance, and/or repair as provided in Paragraph 25;

c.      all information relating to super-compliant $NO_x$ and $SO_2$ Allowances that Defendants claim to have generated in accordance with Subsection IV.E (Super-Compliant $NO_x$ and $SO_2$ Allowances) through compliance beyond the requirements of this Consent Decree, including a detailed description of the basis for such claim and the specific amount of super-compliant $NO_x$ and $SO_2$ Allowances claimed at each Unit;

d.      all information indicating that the installation or upgrade and commencement of operation of a new or upgraded pollution control device may be delayed, including the nature and cause of the delay, and any steps taken by Defendants to mitigate such delay;

31

e.      all affirmative defenses asserted pursuant to Paragraph 64 during the period covered by the progress report;

f.      an identification of all periods when any pollution control device required by this Consent Decree was not Continuously Operated, the reason(s) for the equipment not being Continuously Operated, and the basis for Defendants' compliance or non-compliance with the Continuous Operation requirements of this Consent Decree; and

g.      a summary of Defendants' actions implemented and expenditures (cumulative and in the current reporting period) made pursuant to implementation of the Environmental Mitigation Project required pursuant to Section VI.

49.      In any periodic report submitted pursuant to this Section, Defendants may incorporate by reference information previously submitted under their Title V permitting requirements, provided that Defendants attach the Title V Permit report (or the pertinent portions of such report) and provide a specific reference to the provisions of the Title V Permit report that are responsive to the information required in the periodic report.

50.      In addition to the reports required pursuant to this Section

a.      If Defendants violate or deviate from any provision of this Consent Decree, Defendants shall submit to Plaintiffs a report of any violation or deviation from any provision of this Consent Decree within 10 business days after Defendants knew or should have known of the event.  In the report, Defendants shall explain the cause or causes of the violation or deviation and all measures taken or to be taken by Defendants to cure the reported violation or deviation or to prevent such violations or deviations in the future.  If at any time the provisions of this Consent Decree are included in Title V Permits, consistent with the requirements for such

inclusion in this Consent Decree, then the deviation reports required under applicable Title V

regulations shall be deemed to satisfy all the requirements of this Paragraph.

      b.    If Defendants receive a notice from MISO as described in Paragraph 7,

Defendants shall submit a copy of the MISO document along with a description of how it affects

the Paragraph 7 compliance deadlines within 60 days of Defendants' receipt of the MISO

document.

      51.    Each report required by this Consent Decree shall be signed by the Responsible

Official as defined in Title V of the Clean Air Act for the appropriate System Unit(s), and shall

contain the following certification:

> *This information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my evaluation, or the direction and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete. I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.*

## X.  REVIEW AND APPROVAL OF SUBMITTALS

      52.    Defendants shall submit each plan, report, or other submission required by this

Consent Decree to Plaintiffs whenever and in the manner such a document is required to be

submitted for review or approval pursuant to this Consent Decree. EPA (after consultation with

Sierra Club) may approve the submission or decline to approve it and provide written comments

explaining the bases for declining such approval as soon as reasonably practicable. Within 60

Days of receiving written comments from EPA, Defendants shall either: (a) revise the

submission consistent with the written comments and provide the revised submission to EPA; or

(b) submit the matter for dispute resolution, including the period of informal negotiations, under Section XIII (Dispute Resolution) of this Consent Decree.

53.     Upon receipt of EPA's final approval of the submission, or upon completion of the submission pursuant to dispute resolution, Defendants shall implement the approved submission in accordance with the schedule specified therein or another EPA-approved schedule.

## XI.  STIPULATED PENALTIES

54.     For any failure by Defendants to comply with the terms of this Consent Decree, and subject to the provisions of Sections XII (Force Majeure) and XIII (Dispute Resolution) and the other Paragraphs in this Section of the Consent Decree, Defendants shall pay, within 30 Days after receipt of written demand by the United States, the following stipulated penalties:

| Consent Decree Violation | Stipulated Penalty |
| --- | --- |
| a.  Failure to pay the civil penalty as specified in Section VII (Civil Penalty) of this Consent Decree | $10,000 per Day |
| b.  Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $NO_x$ or $SO_2$ | $2,500 per Day per violation where the violation is less than 5% in excess of the lb/mmBTU limits<br><br>$5,000 per Day per violation where the violation is equal to or greater than 5% but less than 10% in excess of the lb/mmBTU limits<br><br>$10,000 per Day per violation where the violation is equal to or greater than 10% in excess of the lb/mmBTU limits |

| c.  Failure to comply with any applicable System-Wide Annual Tonnage Limitations established by this Consent Decree | (1) $5,000 per ton for first 100 tons, $10,000 per ton for each additional ton above 100 tons, plus (2) Surrender of Allowances in an amount equal to two times the number of tons emitted that exceeded the System-Wide Annual Tonnage Limitation |
| e.  Failure to comply with any applicable 24-Hour Rolling Average Emission Rate or 30-Day Rolling Average Emission Rate for PM[2] | $2,500 per Day per violation where the violation is less than 5% in excess of the lb/mmBTU limits<br><br>$5,000 per Day per violation where the violation is equal to or greater than 5% but less than 10% in excess of the lb/mmBTU limits<br><br>$10,000 per Day per violation where the violation is equal to or greater than 10% in excess of the lb/mmBTU limits |
| f.  Failure to install, commence Continuous Operation, or Continuously Operate a $NO_x$, $SO_2$, or PM control device as required under this Consent Decree | $10,000 per Day per violation during the first 30 Days; $37,500 per Day per violation thereafter |
| g.  Failure to Retrofit, Refuel, or Repower as required under this Consent Decree | $10,000 per Day per violation during the first 30 Days; $37,500 per Day per violation thereafter |
| h.  Failure to conduct a stack test for PM as required by Subsection IV.G of this Consent Decree | $5,000 per Day per violation |
| i.  Failure to apply for any permit required by Section XIV (Permits) | $1,000 per Day per violation |

---

[2] Violations of the Monroe 24-Hour Rolling Average Emission Rate for PM are also subject to stipulated penalties under a separate administrative consent order (No. AQD No. 26-2015) between Defendants and the State of Michigan. In the event of any violation of that Emissions Rate, the United States will consult with the State of Michigan before making a stipulated penalty demand, and the United States and Michigan will agree to split the applicable stipulated penalty such that the total stipulated penalties paid for the violation do not exceed the amounts set forth here.

| | |
|---|---|
| j.  Failure to timely submit or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required by this Consent Decree | $750 per Day per violation during the first 10 Days; $1,000 per Day per violation thereafter |
| k.  Failure to Surrender $SO_2$ Allowances as required under this Consent Decree | $37,500 per Day.  In addition, $1,000 per $SO_2$ Allowance not Surrendered |
| l.  Failure to Surrender $NO_x$ Allowances as required under this Consent Decree | $37,500 per Day.  In addition, $1,000 per $NO_x$ Allowance not Surrendered |
| m.  Using, selling, banking, trading, or transferring $NO_x$ Allowances or $SO_2$ Allowances except as permitted under this Consent Decree | At the option of Defendants either the Surrender of Allowances in an amount equal to four times the number of Allowances used, sold, banked, traded, or transferred in violation of this Consent Decree, or the payment of $2,500 per ton for an amount of tons equal to four times the number of Allowances used, sold, banked, traded, or transferred in violation of this Consent Decree |
| n.  Failure to demonstrate the third-party Surrender of a $NO_x$ or  $SO_2$ Allowance in accordance with Paragraphs 21 | $1,000 per Day per violation |
| o.  Failure to optimize ESPs (or Baghouses) as required by Paragraph 23 | $1,000 per Day per violation |
| p.  Failure to undertake and complete as described in Appendix A the Environmental Mitigation Project in compliance with Section VI (Environmental Mitigation Project) of this Consent Decree | $1,000 per Day per violation during the first 30 Days; $5,000 per Day per violation thereafter |
| q.  Any other violation of this Consent Decree | $1,000 per Day per violation |

55.     Violations of any limit based on a 30-Day Rolling Average Emission Rate constitutes 30 Days of violation, provided, however, that where such a violation (for the same pollutant and from the same Unit) recurs within periods less than 30 Days, Defendants shall not

be obligated to pay a daily stipulated penalty for any Day of the recurrence for which a stipulated penalty has already been paid.

56.     All stipulated penalties shall begin to accrue on the Day after the performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases, whichever is applicable. Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

57.     For purposes of the stipulated penalty for failure to make any Allowance Surrender required pursuant to Paragraph 54, Defendants shall make the required Surrender of any Allowances by June 30 of the immediately following calendar year.

58.     All stipulated penalties shall be paid within 30 Days of receipt of written demand to Defendants from the United States, and Defendants shall continue to make such payments every 30 Days thereafter until the violation(s) no longer continues, unless Defendants elect within 20 Days of receipt of written demand to dispute the imposition or accrual of stipulated penalties in accordance with the provisions in Section XII (Dispute Resolution) of this Consent Decree.

59.     Stipulated penalties shall continue to accrue as provided in accordance with Paragraph 56 during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.      If the dispute is resolved by agreement, or by a decision of the United States pursuant to Section XII (Dispute Resolution) of this Consent Decree that is not appealed

37

to the Court, accrued stipulated penalties agreed or determined to be owing, together with accrued interest, shall be paid within 30 Days of the effective date of the agreement or of the receipt of the United States' decision;

       b.      If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendants shall, within 30 Days of receipt of the Court's decision or order, pay all accrued stipulated penalties determined by the Court to be owing, together with interest accrued on such penalties determined by the Court to be owing, except as provided in Subparagraph c, below;

       c.      If the Court's decision is appealed by either Party, Defendants shall, within 15 Days of receipt of the final appellate court decision, pay all accrued stipulated penalties determined to be owed, together with interest accrued on such stipulated penalties determined to be owed by the appellate court.

60.      Notwithstanding any other provision of this Consent Decree, the accrued stipulated penalties agreed to by the United States and Defendants, or determined by the United States through Dispute Resolution to be owed, may be less than the stipulated penalty amounts set forth in Paragraph 54.

61.      All monetary stipulated penalties shall be paid in the manner set forth in Section VII (Civil Penalty) of this Consent Decree and all Allowance Surrender stipulated penalties shall comply with the Allowance Surrender procedures of Paragraphs 20-22.

62.      Should Defendants fail to pay stipulated penalties in compliance with the terms of this Consent Decree, the United States shall be entitled to collect interest on such penalties, as provided for in 28 U.S.C. § 1961.

63.     The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to Plaintiffs by reason of Defendants' failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of the Act for which this Consent Decree provides for payment of a stipulated penalty, Defendants shall be allowed a credit for stipulated penalties paid against any statutory penalties also imposed for such violation.

64.     <u>Affirmative Defense as to Stipulated Penalties for Excess Emissions Occurring During Malfunctions</u>.  If any of the Units in the System exceed an applicable 24-Hour or 30-Day Rolling Average Emission Rate set forth in this Consent Decree due to Malfunction, Defendants, bearing the burden of proof by a preponderance of the evidence, have an affirmative defense to a claim for stipulated penalties under this Consent Decree if Defendants have complied with the reporting requirements of Paragraphs 65-67 and demonstrate all of the following:

a.     the excess emissions were caused by a sudden, unavoidable breakdown of technology, beyond the control of Defendants;

b.     the excess emissions (1) did not stem from any activity or event that could have been foreseen and avoided, or planned for, and (2) could not have been avoided by better operation and maintenance practices;

c.     to the maximum extent practicable, the air pollution control equipment and processes were maintained and operated in a manner consistent with good practice for minimizing emissions;

d.     repairs were made in an expeditious fashion when Defendants knew or should have known that an applicable 24-Hour or 30-Day Rolling Average Emission Rate was

being or would be exceeded.  Off-shift labor and overtime must have been utilized, to the extent practicable, to ensure that such repairs were made as expeditiously as practicable;

e.      the amount and duration of the excess emissions (including any bypass) were minimized to the maximum extent practicable during periods of such emissions;

f.      all possible steps were taken to minimize the impact of the excess emissions on ambient air quality;

g.      all emission monitoring systems were kept in operation if at all possible;

h.      Defendants' actions in response to the excess emissions were documented by validated, contemporaneous operating logs, or other relevant evidence;

i.      the excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance; and

j.      Defendants properly and promptly notified EPA as required by this Consent Decree.

65.     To assert an affirmative defense for exceedance of an applicable 24-Hour Rolling Emission Rate due to Malfunction under Paragraph 64, Defendants shall submit all data demonstrating the actual emissions for any 24-hour period during which the excess emissions from the Malfunction occurs.  To assert an affirmative defense for exceedance of an applicable 30-Day Rolling Emission Rate due to Malfunction under Paragraph 64, Defendants shall submit all data demonstrating the actual emissions for the Day the Malfunction occurs and the 29-Unit Operating Day period following the Day the Malfunction occurs.  Defendants may, if they elect, submit emissions data for the same 24-Hour or 30-Unit Operating Day period, as applicable, but that excludes the excess emissions.

66. For an affirmative defense under Paragraph 64, Defendants, bearing the burden of proof by a preponderance of the evidence, shall demonstrate, through submission of the data and information under the reporting provisions of this Section, that all reasonable and practicable measures within Defendants' control were implemented to prevent the occurrence of the excess emissions.

67. Defendants shall provide notice to Plaintiffs in writing of Defendants' intent to assert an affirmative defense for Malfunction under Paragraph 64 in Defendants' semi-annual progress reports as required by Paragraph 48. This notice shall be submitted pursuant to the provisions of Section XVI (Notices). The notice shall contain:

a. The identity of each stack or other emission point where the excess emissions occurred;

b. The magnitude of the excess emissions expressed in lb/mmBTU and the operating data and calculations used in determining the magnitude of the excess emissions;

c. The time and duration or expected duration of the excess emissions;

d. The identity of the equipment causing the excess emissions;

e. The nature and suspected cause of the excess emissions;

f. The steps taken, if the excess emissions were the result of a Malfunction, to remedy the Malfunction and the steps taken or planned to prevent the recurrence of the Malfunction;

g. The steps that were or are being taken to limit the excess emissions; and

h. If applicable, a list of the steps taken to comply with permit conditions governing Unit operation during periods of Malfunction.

41

68.     A Malfunction shall not constitute a Force Majeure Event unless the Malfunction also meets the definition of a Force Majeure Event, as provided in Section XII (Force Majeure).

69.     The affirmative defense provided herein is only an affirmative defense to stipulated penalties for violations of this Consent Decree, and not a defense to any civil or administrative action for injunctive relief.

## XII.  FORCE MAJEURE

70.     For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of Defendants, their contractors, or any entity controlled by Defendants that delays or prevents the performance of any obligation under this Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite Defendants' best efforts to fulfill the obligation.  "Best efforts to fulfill the obligation" include using best efforts to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it is occurring and (b) after it has occurred, such that the delay and/or violation are minimized to the greatest extent possible and the emissions during such event are minimized to the greatest extent possible.

71.     Notice of Force Majeure Events.  If any event occurs or has occurred that may delay or prevent compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which Defendants intend to assert a claim of Force Majeure, then Defendants shall notify Plaintiffs in writing as soon as practicable, but in no event later than 21 days following the date Defendants first knew, or by the exercise of due diligence should have known, that the event caused or may cause such delay or violation.  In this notice, Defendants shall reference this Paragraph of this Consent Decree and describe the anticipated length of time

that the delay or violation may persist, the cause or causes of the Force Majeure Event, all measures taken or to be taken by Defendants to prevent or minimize the delay or violation, the schedule by which Defendants propose to implement those measures, and Defendants' rationale for attributing the failure, delay, or violation to a Force Majeure Event. A copy of this Notice shall be sent electronically, as soon as practicable, to Plaintiffs. Defendants shall adopt all reasonable measures to avoid or minimize such failures, delays, or violations. Defendants shall be deemed to know of any circumstance which they, their contractors, or any entity controlled by them, knew or should have known.

72.     <u>Failure to Give Notice</u>.  If Defendants fail to comply with the notice requirements of this Section, the United States (after consultation with Sierra Club) may void Defendants' claim for Force Majeure as to the specific event for which Defendants have failed to comply with such notice requirement.

73.     <u>United States' Response</u>.  The United States shall notify Defendants in writing regarding Defendants' claim of Force Majeure as soon as reasonably practicable. If the United States (after consultation with Sierra Club) agrees that a delay in performance has been or will be caused by a Force Majeure Event, the Parties shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement(s) by a period equal to the delay actually caused by the event, or as otherwise agreed to by the United States (after consultation with the Sierra Club) and Defendants, in which case the delay at issue shall be deemed not to be a violation of the affected requirement(s) of this Consent Decree. In such circumstances, an appropriate modification shall be made pursuant to Section XX (Modification) of this Consent Decree.

74.     <u>Disagreement</u>.  If the United States (after consultation with the Sierra Club) does not agree with Defendants' claim of Force Majeure, or if the United States (after consultation with the Sierra Club) and Defendants cannot agree on the length of the delay actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Section XIII (Dispute Resolution) of this Consent Decree.

75.     <u>Burden of Proof</u>.  In any dispute regarding Force Majeure, Defendants shall bear the burden of proving that any delay in performance, or any other violation of any requirement of this Consent Decree, was caused by or will be caused by a Force Majeure Event.  Defendants shall also bear the burden of proving that Defendants gave the notice required by this Section and the anticipated duration and extent of any failure, delay, or violation(s) attributable to a Force Majeure Event.  An extension of one compliance date may, but will not necessarily, result in an extension of a subsequent compliance date.

76.     <u>Events Excluded</u>.  Unanticipated or increased costs or expenses associated with the performance of Defendants' obligations under this Consent Decree shall not constitute a Force Majeure Event.

77.     <u>Potential Force Majeure Events</u>.  The Parties agree that, depending upon the circumstances related to an event and Defendants' response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; Malfunction of a Unit or emission control device; unanticipated coal supply or pollution control reagent delivery interruptions; acts of God; acts of war or terrorism; and orders by a government official, government agency, other regulatory authority, or a regional transmission organization (e.g., the

44

Midcontinent Independent System Operator, Inc.), acting under and authorized by applicable law or tariff as accepted by the Federal Energy Regulatory Commission, that directs Defendants to supply electricity to avoid loss of customer load or unserved customer load or as necessary to preserve the reliability of the bulk power system.  Depending upon the circumstances and Defendants' response to such circumstances, failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where the failure of the permitting authority to act is beyond the control of Defendants and Defendants have taken all steps available to it to obtain the necessary permit, including, but not limited to: submitting a complete permit application; responding to requests for additional information by the permitting authority in a timely fashion; and accepting lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal terms and conditions imposed by the permitting authority.

78.   <u>Extended Schedule</u>.  As part of the resolution of any matter submitted to this Court under Section XIII (Dispute Resolution) of this Consent Decree regarding a claim of Force Majeure, the United States and Defendants by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work and/or obligations under this Consent Decree to account for the delay in the work and/or obligations that occurred as a result of any delay agreed to by the United States or approved by the Court. Defendants shall be liable for stipulated penalties pursuant to Section XI (Stipulated Penalties) for their failure thereafter to complete the work and/or obligations in accordance with the extended or modified schedule (provided that Defendants shall not be precluded from asserting

that a further Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule).

## XIII.  DISPUTE RESOLUTION

79.    The dispute resolution procedure provided by this Section shall be available to resolve all disputes arising under this Consent Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Parties.  The provisions of this Section shall be the sole and exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.

80.    The dispute resolution procedure required herein shall be invoked by one Party giving written notice to the other Parties advising of a dispute pursuant to this Section.  The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute.  The Party receiving such a notice shall acknowledge receipt of the notice, and the Parties in dispute shall expeditiously schedule a meeting to discuss the dispute informally not later than 14 Days following receipt of such notice.

81.    Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of informal negotiations between the Parties.  Such period of informal negotiations shall not extend beyond 30 Days from the date of the first meeting between the Parties' representatives unless they agree in writing to shorten or extend this period.

82.    If the Parties are unable to reach agreement during the informal negotiation period, the United States shall provide Defendants and Sierra Club with a written summary of its position regarding the dispute.  The written position provided by the United States shall be considered binding unless, within 45 Days thereafter, Defendants seek judicial resolution of the

46

dispute by filing a petition with this Court.  Any Party opposing such petition may submit a response to the petition within 45 Days of filing.

83.     The time periods set out in this Section may be shortened or lengthened upon motion to the Court of one of the Parties to the dispute, explaining the Party's basis for seeking such a scheduling modification.

84.     This Court shall not draw any inferences nor establish any presumptions adverse to any Party as a result of invocation of this Section or the Parties' inability to reach agreement.

85.     As part of the resolution of any dispute under this Section, in appropriate circumstances the Parties may agree, or this Court may order, an extension or modification of the schedule for the completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution.  Defendants shall be liable for stipulated penalties pursuant to Section XI (Stipulated Penalties) for their failure thereafter to complete the work in accordance with the extended or modified schedule, provided that Defendants shall not be precluded from asserting that a Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule.

86.     The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.  In their filings with the Court under Paragraph 82, the Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

## XIV.  <u>PERMITS</u>

87.     Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires Defendants to secure a permit to authorize construction or operation of any device, including all preconstruction, construction, and operating permits required under State law, Defendants shall make such application in a timely manner.  EPA will use best efforts to review expeditiously, to the extent applicable, all permit applications submitted by Defendants to meet the requirements of this Consent Decree.

88.     Notwithstanding the previous Paragraph, nothing in this Consent Decree shall be construed to require Defendants to apply for, amend, or obtain a PSD or Nonattainment NSR permit or permit modification for any physical change in, or any change in the method of operation of, any System Unit that would give rise to claims resolved by Section VIII (Resolution of Claims) of this Consent Decree.

89.     When permits are required, Defendants shall complete and submit applications for such permits to the applicable State or local agency to allow sufficient time for all legally required processing and review of the permit request, including requests for additional information by the applicable State or local agency.  Any failure by Defendants to submit a timely permit application for a System Unit, as required by permitting requirements under state, local, and/or federal regulations, shall bar any use of Section XII (Force Majeure) of this Consent Decree where a Force Majeure claim is based on permitting delays.

90.     Notwithstanding the reference to the Title V Permits for the System Units in this Consent Decree, the enforcement of such permits shall be in accordance with their own terms and the CAA and its implementing regulations.  Such Title V Permits shall not be enforceable

48

under this Consent Decree, although any term or limit established by or under this Consent Decree shall be enforceable under this Consent Decree regardless of whether such term has or will become part of a Title V Permit, subject to the terms of Section XXIV (Termination) of this Consent Decree.

91.     Within 180 Days after the Date of Entry of this Consent Decree, Defendants shall amend any applicable Title V Permit application(s), or apply for amendments of their Title V Permits, to include a schedule for all Unit-specific, plant-specific, and System-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree: (a) all applicable definitions from Section III and (b) all Compliance Requirements contained in Section IV.

92.     Within one year from the Date of Entry of this Consent Decree, Defendants shall apply to permanently include the requirements and limitations enumerated in the previous Paragraph into a federally enforceable non-Title V permit or request a site-specific revision to the Michigan SIP to include such requirements and limitations.

93.      Defendants shall provide Plaintiffs with a copy of each application for a federally enforceable permit or Michigan SIP amendment, as well as a copy of any permit proposed as a result of such application, to allow for timely participation in any public comment opportunity.

94.      Prior to termination of this Consent Decree, Defendants shall obtain enforceable provisions in their Title V Permits that incorporate all applicable Unit-specific, plant-specific, and System-specific performance, operational, maintenance, and control technology requirements (including the requirement to operate PM CEMS) enumerated in Paragraph 91.  For

49

avoidance of doubt, the provisions of this Consent Decree in Section XII (Force Majeure) and Paragraph 64 (Affirmative Defenses to Certain Stipulated Penalties) are applicable to compliance with this Consent Decree only and shall not be incorporated into any permits or approvals obtained in compliance with this Consent Decree.

## XV.  INFORMATION COLLECTION AND RETENTION

95.     Any authorized representative of the United States, including its attorneys, contractors, and consultants, upon presentation of credentials, shall have a right of entry upon the premises of a Unit at any reasonable time for the purpose of:

a.      monitoring the progress of activities required under this Consent Decree;

b.      verifying any data or information submitted to Plaintiffs in accordance with the terms of this Consent Decree;

c.      obtaining samples and, upon request, splits of any samples taken by Defendants or their representatives, contractors, or consultants; and

d.      assessing Defendants' compliance with this Consent Decree.

96.     Defendants shall retain, and instruct their contractors and agents to preserve, all non-identical copies of all records and documents (including records and documents in electronic form) in their or their contractors' or agents' possession or control, and that directly relate to Defendants' performance of their obligations under this Consent Decree until five years after the termination of the Consent Decree.   This record retention requirement shall apply regardless of any corporate document retention policy to the contrary.

97.     All information and documents submitted by Defendants pursuant to this Consent Decree shall be subject to any requests under applicable law providing public disclosure of documents unless (a) the information and documents are subject to legal privileges or protection or (b) Defendants claim and substantiate in accordance with 40 C.F.R. Part 2 that the information and documents contain confidential business information.

98.     Nothing in this Consent Decree shall limit the authority of EPA to conduct tests and inspections at Defendants' facilities under Section 114 of the Act, 42 U.S.C. § 7414, or any other applicable federal laws, regulations, or permits.


## XVI.  <u>NOTICES</u>

99.     Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in both paper and electronic format to the following addresses.  Electronic submittals shall not be the only form of notification, submission, or communication unless agreed upon by both the submitting and receiving Parties.


**<u>As to the United States of America:</u>**

To one of the addresses below and to U.S. EPA

By email:     eescdcopy.enrd@usdoj.gov
                  Re: DJ # 90-5-2-1-09949

By mail:      Chief, Environmental Enforcement Section
                  Environment and Natural Resources Division

U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC  20044-7611
Re: DJ # 90-5-2-1-09949

By commercial delivery service:
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
150 M St. NE
Room 2.900
Washington, DC 20002
Re: DJ # 90-5-2-1-09949


**As to U.S. EPA:**

To one of the Headquarters addresses and both Region 5 addresses

*EPA Headquarters*
By mail:          Director
Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency Mail Code 2242A
1200 Pennsylvania Avenue, NW
Washington, DC 20460

By commercial delivery service:
Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios South Building, Room 1119
1200 Pennsylvania Avenue, NW
Washington, DC 20004

*EPA Region 5*
Compliance Tracker
Air Enforcement and Compliance Assurance Branch
U.S. Environmental Protection Agency - Region 5
77 West Jackson Blvd. ECA-18J
Chicago, Illinois 60604-3590

AND by email: r5ardreporting@epa.gov

52

**As to the Sierra Club:**

Shannon Fisk
Earthjustice
1617 John F. Kennedy Blvd. Suite 1130
Philadelphia, PA 19103
sfisk@earthjustice.org

**As to DTE:**

DTE Energy Company
Office of the General Counsel
One Energy Plaza
Detroit, MI  48226

Attn: DTE Electric General Counsel

With copy to:

DTE Energy Company
Environmental Management & Resources
One Energy Plaza 2455 WCB
Detroit, MI  48226

Attn: Vice President

100.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above, including requiring notices be submitted electronically in lieu of by mail or commercial delivery service.

101.    All paper notifications, communications, or submissions made pursuant to this Section shall be sent either by: (a) overnight mail or overnight delivery service with signature required for delivery or (b) certified or registered mail, return receipt requested.  All notifications, communications, and transmissions (a) sent by overnight, certified, or registered mail shall be deemed submitted on the date they are postmarked, or (b) sent by overnight delivery service shall be deemed submitted on the date they are delivered to the delivery service.

## XVII.  SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS

102.     At least 60 Days prior to any transfer of ownership or operation of any System Unit, Defendants shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer to the United States and Sierra Club.  No transfer of ownership or operation of a System Unit, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendants of their obligation to ensure that the terms of the Consent Decree are implemented, unless and until:

        a.     the transferee agrees, in writing, to undertake the obligations required by this Consent Decree with respect to that System Unit(s);

        b.     the United States and Sierra Club consent, in writing, to relieve Defendants of their Consent Decree obligations applicable to such System Unit(s); and

        c.     the transferee becomes a party to this Consent Decree with respect to the System Unit(s), pursuant to Section XX (Modification).

103.     Any attempt to transfer ownership or operation of any of the System Units or any portion thereof, without complying with Paragraph 102 above constitutes a violation of this Consent Decree.

## XVIII.  EFFECTIVE DATE

104.     The effective date of this Consent Decree shall be the Date of Entry.

## XIX.  RETENTION OF JURISDICTION

105.    The Court shall retain jurisdiction of this case after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for the interpretation, construction, execution, or modification of the Consent Decree, or for adjudication of disputes.  During the term of this Consent Decree, any Party to this Consent Decree may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

## XX.  MODIFICATION

106.    The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

## XXI.  GENERAL PROVISIONS

107.    When this Consent Decree specifies that Defendants shall achieve and maintain a 30-Day Rolling Average Emission Rate, the Parties expressly recognize that compliance with such 30-Day Rolling Average Emission Rate shall commence immediately upon the date specified and that compliance as of such specified date (e.g., December 30) shall be determined based on data from that date and the 29 prior Unit Operating Days (e.g., December 1-30).

108.    This Consent Decree is not a permit.  Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or regulations.  The emission rates set forth herein do not relieve Defendants from any obligation to

comply with other state and federal requirements under the CAA, including Defendants' obligation to satisfy any State modeling requirements set forth in the Michigan SIP.

109.     This Consent Decree does not apply to any claim(s) of alleged criminal liability.

110.     In any subsequent administrative or judicial action initiated by the United States or Sierra Club for injunctive relief or civil penalties relating to a System Unit, as covered by this Consent Decree, Defendants shall not assert any defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, or claim splitting, or any other defense based upon the contention that the claims raised by the United States or Sierra Club in the subsequent proceeding were brought, or should have been brought, in the instant case; provided, however, that nothing in this Paragraph is intended to affect the validity of Section VIII (Resolution of Claims).

111.     Nothing in this Consent Decree shall relieve Defendants of their obligation to comply with all applicable federal, state, and local laws and regulations, including, but not limited to, the Clean Water Act and the National Pollutant Discharge Elimination System (NPDES) implementing regulations, National Ambient Air Quality Standards, the National Emission Standards for Hazardous Air Pollutants From Coal and Oil-Fired Electric Utility Steam Generating Units (Utility MACT or MATS), Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial Commercial-Institutional Steam Generating Units (Utility NSPS).  Nothing in this Consent Decree should be construed to provide any relief from the emission limits or deadlines specified in such regulations, including, but not limited to, deadlines for the installation of pollution controls required by any such regulations.

112.     Subject to the provisions in Section VIII (Resolution of Claims), Section XIII (Dispute Resolution), and Section XI (Stipulated Penalties) nothing contained in this Consent Decree shall be construed to prevent or limit the rights of Plaintiffs to obtain penalties or injunctive relief under the Act or other federal, state, or local statutes, regulations, or permits.

113.     Each limit and/or other requirement established by or under this Consent Decree is a separate, independent requirement.

114.     Performance standards, emissions limits, and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed.  For example, an Emission Rate of 0.100 is not met if the actual Emission Rate is 0.101.  Defendants shall round the fourth significant digit to the nearest third significant digit, or the third significant digit to the nearest second significant digit, depending upon whether the limit is expressed to three or two significant digits.  For example, if an actual Emission Rate is 0.1004, that shall be reported as 0.100, and shall be in compliance with an Emission Rate of 0.100, and if an actual Emission Rate is 0.1005 that shall be reported as 0.101, and shall not be in compliance with an Emission Rate of 0.100.  Defendants shall report data to the number of significant digits in which the standard or limit is expressed.

115.     This Consent Decree does not limit, enlarge, or affect the rights of any Party to this Consent Decree as against any third parties.

116.     The Parties shall bear their own costs of this action, including attorneys' fees.

## XXII.  **SIGNATORIES AND SERVICE**

117.    Each undersigned representative of Defendants and Sierra Club certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.  The Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, identified on the United States' signature page below, is fully authorized to enter into the terms and conditions of this Consent Decree and to legally bind the United States to this document.

118.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

119.    Unless otherwise ordered by the Court, Plaintiffs agree that Defendants are not required to file any answer or other pleading responsive to the amended complaints in this matter until and unless the Court expressly declines to enter this Consent Decree, in which case Defendants shall have no less than 30 Days after receiving notice of such express declination to file an answer or other pleading in response to the Complaints.

## XXIII.  **PUBLIC COMMENT/AGENCY REVIEW**

120.    The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to the procedures of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations which indicate that this Consent Decree is inappropriate, improper, or inadequate.  Defendants and Sierra Club shall not oppose entry of this Consent

Decree by this Court or challenge any provision of this Consent Decree unless the United States has notified Defendants and Sierra Club, in writing, that the United States no longer supports entry of this Consent Decree.

121.    In addition to this agreement, DTE and Intervenor-Plaintiff the Sierra Club intend to submit a separate proposed agreement between DTE and Sierra Club. This proposed agreement, if entered, would resolve all of Sierra Club's claims (potential and actual) and would provide relief to Sierra Club and its members beyond what the United States was is willing to agree to. The United States therefore reserves the right to object to any the motion for entry of this separate agreement and notes that it believes the separate agreement requires entry by the Court. If the Court does not enter rejects the separate agreement, all parties to this Consent Decree—including the United States—agree to join a stipulation to dismiss with prejudice Sierra Club's Amended Complaint.  If the Court approves the separate agreement or finds it does not have to enter and approve the separate agreement for the separate agreement to take effect, the United States reserves its rights to object and/or appeal.

## XXIV.  <u>TERMINATION</u>

122.    Once Defendants have:

a.    completed the requirements of Sections IV (Compliance Requirements) and VI (Environmental Mitigation Projects);

b.    maintained continuous compliance with this Consent Decree, including continuous operation of all pollution controls required by this Consent Decree, for a period of 24 months, and have successfully completed all actions necessary to Refuel, Repower, or Retrofit

any Unit required or elected to be Refueled, Repower, or Retrofit, as required by this Consent Decree;

        c.    paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree;

        d.    either included the requirements and limitations enumerated in this Consent Decree into a federally enforceable permit or obtained a site-specific amendment to the Michigan SIP for each plant in the System, as required by Section XIV (Permits) of this Consent Decree such that the requirements and limitations enumerated in this Consent Decree, including all Unit-specific, plant-specific, and System-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree become and remain "applicable requirements" as that term is defined in 40 C.F.R. Part 70.2; and

        e.    certified that the date of Defendants' Request for Termination is later than December 31, 2030, Defendants may serve upon Plaintiffs a Request for Termination of this Consent Decree as a whole, stating that Defendants have satisfied all the requirements of this Paragraph, together with all necessary supporting documentation.

123. Following receipt by Plaintiffs of Defendants' Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendants have satisfactorily complied with the requirements for termination of this Consent Decree. If the United States, after consultation with Sierra Club, agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

124.     If the United States, after consultation with Sierra Club, does not agree that the Decree may be terminated, Defendants may invoke Dispute Resolution under Section XIII of this Decree.  However, Defendants shall not seek Dispute Resolution of any dispute regarding termination until 60 days after service of their Request for Termination or receipt of an adverse decision from Plaintiffs, whichever is earlier.

## XXV.  26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

125.     For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of:

- Section II (Applicability), Paragraph 3;

- Section IV (Compliance Requirements), Paragraphs 7-26;

- Section VI (Environmental Mitigation Project), Paragraphs 30-38 and related Appendix A;

- Section IX (Periodic Reporting), Paragraphs 48, 50, and 51;

- Section X (Review and Approval of Submittals), 52 (except with respect to dispute resolution) and 53;

- Section XIV (Permits), Paragraphs 87-89 and 91-94; and

- Section XV (Information Collection and Retention), Paragraphs 95 and 96,

is restitution or required to come into compliance with law.

## XXVI.  <u>FINAL JUDGMENT</u>

126.    Upon approval and entry of this Consent Decree by the Court, this Consent

Decree shall constitute a final judgment between the Parties.


<u>s/Bernard A. Friedman</u>

Dated:  July 22, 2020                 Bernard A. Friedman
        Detroit, Michigan            Senior United States District Judge

*United States, et al. v. DTE Energy Co., et al.,* Consent Decree Signature Page

**FOR THE UNITED STATES**

July 8, 2020

_____

Date

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources
 Division
United States Department of Justice

*s/Thomas A. Benson*

_____

THOMAS A. BENSON
KRISTIN M. FURRIE
Environmental Enforcement Section
Environment and Natural Resources
 Division
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-5261

MATTHEW J. SCHNEIDER
United States Attorney
Eastern District of Michigan

PETER CAPLAN
Civil Division Chief
United States Attorney's Office
Eastern District of Michigan
211 W. Fort Street, Suite 2001
Detroit, MI 48226

*United States, et al. v. DTE Energy Co., et al.,* Consent Decree Signature Page

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

SUSAN BODINE  Digitally signed by SUSAN BODINE
Date: 2020.05.13 11:59:01 -04'00'

_____          _____
Date                             SUSAN PARKER BODINE
                                 Assistant Administrator
                                 Office of Enforcement and
                                   Compliance Assurance
                                 U.S. Environmental Protection Agency

_____
SABRINA ARGENTIERI
Attorney-Advisor
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W. (2242A)
Washington, DC 20460

64

*United States, et al. v. DTE Energy Co., et al.,* Consent Decree Signature Page

## FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

_____
Date

T. Leverett Nelson    Digitally signed by T. Leverett Nelson
                      Date: 2020.05.07 14:10:38 -05'00'

T. LEVERETT NELSON
Regional Counsel
U.S. Environmental Protection Agency
Region V


SUSAN PROUT
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region V

65

*United States, et al. v. DTE Energy Co., et al.,* Consent Decree Signature Page

**FOR SIERRA CLUB**

By its Counsel:

\_\_5/11/20_____
Date

SHANNON FISK
Managing Attorney
Earthjustice
1617 John F. Kennedy Blvd. Suite 1130
Philadelphia, PA 19103

66

*United States, et al. v. DTE Energy Co., et al.,* Consent Decree Signature Page

## FOR DTE ENERGY CO. AND DETROIT EDISON CO.

May 5, 2020
_____
Date

*Anne L. Arabofske*
_____
Randall L. Rutkofske
Vice President & Deputy General Counsel DTE Energy
General Counsel DTE Electric Company
One Energy Plaza, 2335 WCB, Detroit MI 48226

_____
Michael Solo
Office of the General Counsel
DTE Energy
313-235-9512

67

# APPENDIX A

## ENVIRONMENTAL MITIGATION PROJECT

1.      Defendants shall comply with the requirements of this Appendix and Section VI (Environmental Mitigation Project) of the Consent Decree to implement and secure the benefits of each project described in this Appendix.

2.      Defendants shall propose and implement a plan to replace school buses and/or municipal transit buses, as described below.  The project shall facilitate the replacement of existing public buses with new, more energy-efficient buses.  Defendants shall maximize the environmental benefits of the project and shall seek and prioritize bus replacements with the greatest potential emissions reductions and those located in non-attainment and/or environmental justice areas, consistent with the applicable requirements of the Consent Decree and this Appendix.  Defendants shall spend no less than $5.5 million in Project Dollars on the Bus Replacement Project.

3.      Within 180 days of the Effective Date, Defendants shall submit a plan to EPA for review and approval, in consultation with Sierra Club, for the implementation of the Bus Replacement Project.  Upon approval of the plan by EPA, Defendants shall implement the plan. The plan shall include:

        a.      A plan for implementing the project;

        b.      A summary-level budget for the project;

        c.      A timeline for the project, with project spending to be completed within six years of the Effective Date;

      d.     A description of the anticipated environmental benefits of the project, including an estimate of the emission reductions expected to be realized, and the methodology and any calculations used in the derivation of such expected benefits; and

      e.     The anticipated Project Dollars associated with each bus replacement.

4.    <u>Reporting</u>.  As part of the periodic reports required by Section IX (Periodic Reporting) of the Consent Decree, Defendants shall provide an update on the Bus Replacement Project.  These reports shall continue until the conclusion of the Bus Replacement Project.  The update shall address the steps taken by Defendants during the reporting period related to the Bus Replacement Project, including the vehicles replaced, the fueling infrastructure installed, the Project Dollars proposed to be credited for and actual cost of each vehicle and/or fueling infrastructure, and an updated schedule for integration of vehicles and related infrastructure into the fleets addressed by the Bus Replacement Project.

**A.**    **School Bus Replacements**

5.    To the extent Defendants' Bus Replacement Project addresses school buses, Defendants shall follow the requirements of this Subsection A.

6.    Defendants shall facilitate the replacement of public school buses (Eligible School Buses) with new buses (New School Buses), including any necessary fueling infrastructure, thereby reducing emissions of $NO_x$ and particulate matter.  Defendants shall ensure that the replaced Eligible School Buses are fully scrapped and permanently removed from service.

7.    To be eligible to participate in the Bus Replacement Project, the public school district must be located in the service area of Defendants' System and own the Eligible School Bus(es) that will be replaced as part of this Project with the following exceptions:

      a.      Public school districts may apply with state-owned buses as long as they receive an authorized letter from the state agency that owns the buses allowing the school district to acquire New School Bus(es) and scrap the Eligible School Bus(es);

      b.      Third-party school bus contractors who own Eligible School Bus(es) serving public school districts are eligible to participate in the program, however third-party school bus contractors who lease the proposed bus(es) to be replaced are only eligible if the remaining lease on the vehicle equals or exceeds three years; and

      c.      Buses owned by Federal agencies are not eligible.

8.      An Eligible School Bus is a bus that meets all of the following criteria:

      a.      Is primarily used for the purpose of transporting 10 or more pre-primary, primary, or secondary school students to schools or homes;

      b.      Is rated Class 3-8, as defined by the Department of Transportation's vehicle service classifications;

      c.      Has a Gross Vehicle Weight Rating (GVWR) of at least 10,001 pounds;

      d.      Has accumulated at least 10,000 miles transporting students over the most recent 12 months, or has been in use for at least three days per week transporting students during the current school year;

      e.      Is operated within Wayne County;

      f.      Has a diesel-powered engine with a model year of 1996-2009; and

      g.      Is able to start, move in all directions, and have all operational parts.

9.      For a replacement to be considered eligible, the New School Bus must

      a.      Be model year 2019 or later;

b.　　Operate in the same manner and over similar routes as the original school bus;

c.　　Meet all applicable engine standards, certifications, and/or verifications and shall be retained and operated for its useful life; and

d.　　Meet Federal safety standards and required warranties.

10.　　For the school bus replacement to be considered eligible, the school district must provide to Defendants, and Defendants must retain and provide to the Plaintiffs in Defendants' periodic report, documentation that each diesel bus that is being replaced is scrapped or rendered permanently disabled within 90 days of being replaced.  More specifically:

a.　　The preferred scrapping method is cutting a three-inch by three-inch hole in the engine block (the part of the engine containing the cylinders).

c.　　A signed certificate of destruction and digital photos of the engine tag (showing serial number, engine family number, and engine model year), the destroyed engine block, and cut frame rails or other cut structural components, or other evidence of destruction, as applicable, shall be provided.

d.　　Equipment and vehicle components that are not part of the engine or chassis may be salvaged from the unit being replaced (e.g. plow blades, shovels, seats, tires, etc.).

**B.　　Transit Bus Replacements**

11.　　To the extent Defendants' Bus Replacement Project addresses transit buses, Defendants shall follow the requirements of this Subsection B.

12.　　Defendants shall replace transit buses (Eligible Transit Buses) with new buses (New Transit Buses), including any necessary fueling infrastructure, thereby reducing emissions

of NOx and particulate matter.  Defendants shall ensure that the replaced Eligible Transit Buses are fully scrapped and permanently removed from service.

13. To be eligible to participate in the Transit Bus Replacement Project, the participant must own the Eligible Transit Bus(es) that will be replaced as part of this Project.

14. An Eligible Transit Bus is a bus that meets all of the following criteria:

a. Is primarily used for public transportation for people in the transit bus district;

b. Is rated Class 3-8, as defined by the Department of Transportation's vehicle service classifications;

c. Has a Gross Vehicle Weight Rating (GVWR) of at least 10,001 pounds;

d. Has accumulated at least 10,000 miles transporting people over the most recent 12 months;

e. Is operated within Wayne County;

f. Has a diesel-powered engine with a model year of 1996-2009 or older; and

g. Is able to start, move in all directions, and have all operational parts.

15. For a replacement to be considered eligible, the New Transit Bus must:

a. Be model year 2019 or later;

b. Operate in the same manner and over similar routes as the original bus; and

c. Meet all applicable engine standards, certifications, and/or verifications and shall be retained and operated for its useful life; and

d. Meet Federal safety standards and required warranties.

A-5

16.     For the transit bus replacement to be considered eligible, the transit district must provide to Defendants, and Defendants must retain and provide to the Plaintiffs in Defendants' annual report, documentation that each diesel bus that is being replaced is scrapped or rendered permanently disabled within 90 days of being replaced, as described further in Paragraph 10 of this Appendix.